IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LENIL COLBERT, CONSTANCE GRAY, ERNEST REEVES, KENYA LYLES, and DWIGHT SCOTT, for themselves and all others similarly situated,

Plaintiffs,

v.

ROD R. BLAGOJEVICH, in his official capacity as Governor of the State of Illinois; CAROL L. ADAMS, in her official capacity as Secretary of the Illinois Department of Human Services; BARRY S. MARAM, in his official capacity as Director of the Illinois Department of Healthcare and Family Services; and ERIC E. WHITAKER, M.D., in his official capacity as Director of the Illinois Department of Public Health,

Defendants.

CLASS ACTION

07CV4737
JUDGE LEFKOW
MAG. JUDGE VALDEZ

FILED
AUG 22 2007
8-22-07
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**COMPLAINT**

## I. INTRODUCTION

1. This is an action for declaratory and injunctive relief under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), the Social Security Act, 42 U.S.C. §§ 1396-1396v, and the Nursing Home Reform Act, 42 U.S.C. § 1396a(a)(28)(A).

2. Plaintiffs are Medicaid-eligible individuals with disabilities who want to live in their own homes or apartments in the community and could reside in them with appropriate services, but have been unnecessarily and inappropriately institutionalized in skilled nursing facilities (hereafter "nursing facilities") in Cook County, Illinois. Plaintiffs are eligible for,

could be appropriately served by, and desire to obtain appropriate long-term care services provided by Defendants in the community rather than in institutions segregated from their family and friends, and from community life.

3. Defendants operate a system of long-term care for eligible individuals with disabilities. Under Defendants' system of care, as a condition of Plaintiffs' receiving long-term services, Plaintiffs are effectively compelled to accept and receive these services in segregated institutional settings.

4. Plaintiffs' plight is shared by many others. According to data maintained by the state and federal governments, over 30% of elderly Cook County nursing facility residents and between 50-60% of non-elderly residents would prefer to receive long-term care services in their own homes, apartments, and community instead of a nursing facility.

5. Plaintiffs' and others' choices and preferences for integrated, community care have been, and are being, systematically denied or ignored in favor of more expensive institutional nursing facility care to which Defendants dedicate nearly 80% of Illinois' long-term care budget for adults with disabilities.

6. As a result of Defendants' conditions for receipt of services, people with disabilities must enter nursing facilities in order to receive needed long-term care and assistance, forcing them to forego liberty, privacy, independence, the opportunity to attend churches of their choice, and their housing.

7. Under the "integration mandates" of the ADA, 42 U.S.C. § 12132, its implementing regulations, 28 C.F.R. § 35.130(d), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and its implementing regulations, 28 C.F.R. § 41.51(d), Defendants must administer their long-term care program for people with disabilities in a manner that provides services to individuals with disabilities in the most integrated setting appropriate to their

individual needs. The unnecessary and unwanted segregation and isolation of people with disabilities in institutions constitutes discrimination on the basis of disability. *Olmstead v. L.C.*, 527 U.S. 581, 587 (1999).

8. Defendants have violated Plaintiffs' and others' rights under federal law by: (a) conditioning receipt of long-term care services on people with disabilities entering and remaining in unnecessarily segregated and institutionalized settings; (b) failing to ensure that nursing facility residents are assessed for community long-term care services, both at admission and regularly thereafter; (c) failing to inform nursing facility residents of home- and community-based long-term care options and alternatives; and (d) failing to provide nursing facility residents with sufficient, meaningful community-based long-term care, services and supports to reasonably accommodate those residents who can benefit from community life.

9. As a result of these violations, Plaintiffs and others have needlessly languished in institutions and have been denied long-term care in the community.

10. On behalf of themselves and a class of similarly situated persons, Plaintiffs seek declaratory and injunctive relief to remedy these civil rights violations.

## II. JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1342. Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201-02 and 42 U.S.C. § 1983. At all times relevant to this action, Defendants have acted under color of state law.

12. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose there.

## III. PARTIES

13. Plaintiff LENIL COLBERT is a thirty-five-year-old man who currently resides at Oak Park Healthcare Center, a nursing facility located in Oak Park, Illinois.

14. Mr. Colbert has seizures, is partially paralyzed, and uses a wheelchair. He is eligible for and receives Medicaid.

15. Despite his disabilities, Mr. Colbert does not require extensive nursing care or oversight. The healthcare and personal assistance services he receives in the nursing facility could be provided in the community. Defendants provide funding for disability services in the community for a limited number of people situated similarly to Mr. Colbert without conditioning receipt of such services on placement in a nursing facility.

16. Before moving to the nursing facility, Mr. Colbert worked in a variety of jobs, including drill press operator, factory worker and delivery company driver.

17. In February 2005, Mr. Colbert had a stroke resulting from surgery to remove a blood clot. The stroke paralyzed him on the left side of his body and prevented him from working.

18. In mid-January 2006, Mr. Colbert was living in Chicago with his mother. During that time, Mr. Colbert had several seizures. Mr. Colbert went to the hospital for evaluation of his seizures, where he was referred to a nursing facility. He was subsequently admitted to Oak Park Healthcare Center in February 2006, where he has resided ever since.

19. At the nursing facility, Mr. Colbert must share a room with three other adults and accordingly has little personal privacy or any space to call his own.

20. Like other residents of the nursing facility, Mr. Colbert is subject to a 10:00 p.m. curfew, after which the nursing facility's doors are locked. Residents who arrive later risk being locked out of the facility.

21. Furthermore, Mr. Colbert and other residents are confined to their rooms after 10:00 p.m. Watching television in common areas and walking in the halls after that time are forbidden. Mr. Colbert has been reprimanded for walking in the hallway of Oak Park Healthcare Center after 10:00 p.m. while exercising his disabled leg.

22. Mr. Colbert and all residents of Oak Park Healthcare Center are relegated to the use of a single pay phone in the nursing facility, making outside communication difficult and dependent upon the nursing facility staff.

23. Although Mr. Colbert has requested community-based services, to his knowledge no one at Oak Park Healthcare Center has followed up on his requests.

24. Mr. Colbert wishes to live independently in the community with periodic nursing services and other appropriate supports. His family supports his desire to live in the community.

25. Mr. Colbert is capable of living in the community, which is, for him, the most integrated setting appropriate to his needs. However, under Defendants' system of care, Mr. Colbert has only been offered long-term care in an institutional, nursing facility setting.

26. Plaintiff CONSTANCE GRAY is forty-nine-year old woman who currently resides at California Gardens Nursing and Rehabilitation Center ("California Gardens"), a nursing facility located in Chicago, Illinois.

27. Ms. Gray has asthma and chronic obstructive pulmonary disease ("COPD"). She also sometimes uses a wheelchair for mobility. She is eligible for and receives Medicaid.

28. Despite her disabilities, Ms. Gray does not require extensive nursing care or oversight. The healthcare and personal assistance services she receives in the nursing facility could be provided in the community. Defendants provide funding for disability services in the community for a limited number of people situated similarly to Ms. Gray without conditioning receipt of such services on placement in a nursing facility.

29. Ms. Gray graduated from Kennedy-King College with an associate's degree. Prior to becoming disabled, Ms. Gray worked as a caregiver and personal assistant.

30. In early 2003, Ms. Gray had three brain aneurysms for which she was treated at University of Chicago Hospital. She was later transferred to Mount Sinai Hospital for rehabilitative treatment of her aneurysms. In February 2003, Ms. Gray was transferred to California Gardens, her current nursing facility. Defendants did not offer, inform or provide to Ms. Gray any other options such as home- or community-based healthcare.

31. Residents of California Gardens are typically required to obtain passes from the nurses, sign in and out upon departure and return, and notify the nursing home of their intended destinations and estimated times of return. Residents may not stay overnight elsewhere.

32. Ms. Gray has encountered abuse at the hands of other residents at California Gardens. Another resident, without cause or provocation, physically attacked and punched Ms. Gray. She was hospitalized for one week to recover from her injuries.

33. Ms. Gray seeks to live in the community, preferably with a friend and caretaker, or with periodic nursing services. She is capable of living in the community with appropriate supports and services. However, under Defendants' system of care, Ms. Gray has only been offered long-term care in an institutional, nursing facility setting.

34. Plaintiff ERNEST REEVES is a fifty-six-year-old man who currently resides at Renaissance at Midway, a nursing facility located in Chicago, Illinois.

35. Mr. Reeves is paralyzed due to a spinal cord injury and uses a wheelchair for mobility. He is eligible for and receives Medicaid.

36. Despite his disabilities, Mr. Reeves does not require extensive nursing care or oversight. The healthcare and personal assistance services he receives in the nursing facility could be provided in the community. Defendants provide funding for disability services in the

community for a limited number of people situated similarly to Mr. Reeves without conditioning receipt of such services on placement in a nursing facility.

37. Before moving to the nursing facility, Mr. Reeves worked as a window cleaner on high-rise office buildings in downtown Chicago, and eventually owned and operated a window cleaning business. More recently, Mr. Reeves worked on renovating residential properties. In the course of that work, Mr. Reeves fell through the roof of a two-story property and broke his spinal cord, resulting in paralysis.

38. Mr. Reeves received treatment at several hospitals and rehabilitation facilities. Eventually, he moved to International Village, located in Chicago, where he resided for approximately six months. Mr. Reeves developed bed sores and other ailments at International Village due to lack of proper health care.

39. Approximately four years ago, Mr. Reeves transferred from International Village to Renaissance at Midway, his current nursing facility.

40. Although Mr. Reeves is allowed to leave the nursing facility, he is required to receive permission beforehand and generally must return by 9:00 p.m.

41. Mr. Reeves has had numerous personal items stolen from him at the nursing facility, including cash from his wallet, clothing, and electronics. The nursing facility compensated Mr. Reeves $200 for stolen clothing, but did not compensate him for any other stolen items.

42. At no time did the Defendants offer, inform, or provide to Mr. Reeves his options for community-based services upon his admission to the nursing facilities. Beginning roughly one year ago, Mr. Reeves began asking the staff at Renaissance at Midway to inquire about the possibility of moving to the community. Although staff promised to do so, they never followed up with Mr. Reeves.

43. Mr. Reeves believes his life would improve if he were able to live in the community again. Mr. Reeves would like to work, live on his own and become economically self-sufficient.

44. Mr. Reeves is capable of living in the community, which is, for him, the most integrated setting appropriate to his needs. However, under Defendants' system of care, Mr. Reeves has only been offered long-term care in an institutional, nursing facility setting.

45. Plaintiff KENYA LYLES is a thirty-two-year-old woman who is a resident of the California Gardens Nursing and Rehabilitation Center in Chicago, Illinois.

46. Ms. Lyles has seizures, high blood pressure, kidney failure for which she receives dialysis. She is eligible for and receives Medicaid.

47. Despite her disabilities, Ms. Lyles does not require extensive nursing care or oversight. The healthcare and personal assistance services she receives in the nursing facility could be provided in the community. Defendants provide funding for disability services in the community for a limited number of people situated similarly to Ms. Lyles without conditioning receipt of such services on placement in a nursing facility.

48. Ms. Lyles is from Chicago. She graduated from Philips High School and attended Southern Illinois University.

49. Ms. Lyles was admitted at California Gardens following a stay at South Shore Hospital, where she had been treated for a kidney-related condition. Upon admission, Ms. Lyles was told she would be in the nursing facility for only one or two weeks.

50. After one or two weeks, Ms. Lyles was ready to leave California Gardens, and her sister had come to the premises to pick her up and take her home. However, the on-site nursing home social worker told Ms. Lyles that if she left, she would no longer receive necessary medications. Against her personal desires, Ms. Lyles remained in the facility.

51. Ms. Lyles finds living at California Gardens to be "hectic," and is uncomfortable with the number of people. She has found random persons going through her room and looking through her personal items and has also had personal items stolen.

52. Ms. Lyles must share a room and bathroom with three roommates. There is a communal shower down the hall which Ms. Lyles does not use because other residents sometimes urinate and defecate in the shower. Instead, she washes herself in her bathroom and showers only when she visits her family.

53. During the day at California Gardens, Ms. Lyles sits in her room and watches television. She does little else there.

54. No one at California Gardens has ever discussed community living options with Ms. Lyles, either upon admission or afterwards.

55. Ms. Lyles is capable of living in the community, which is, for her, the most integrated setting appropriate to her needs. However, under Defendants' system of care, Ms. Lyles has only been offered long-term care in an institutional, nursing facility setting.

56. Plaintiff DWIGHT SCOTT is a fifty-four-year-old man who currently resides in Glenshire Nursing and Rehabilitation Center, a nursing facility located in Richton Park, Illinois.

57. Mr. Scott has paralysis on his left side of his body as a result of a stroke and uses a wheelchair. He is eligible for and receives Medicaid.

58. Despite his disabilities, Mr. Scott does not require extensive nursing care or oversight. The healthcare and personal assistance services he receives in the nursing facility could be provided in the community. Defendants provide funding for disability services in the community for a limited number of people situated similarly to Mr. Scott without conditioning receipt of such services on placement in a nursing facility.

59. Before entering the nursing facility, Mr. Scott worked as a regional supervisor at a medical supply company. Mr. Scott managed delivery operations for the region and was based in Hammond, Indiana. He attended high school in Chicago and graduated from Washburn Trade School.

60. On or about February 15, 2006, Mr. Scott had a stroke while driving on the highway. Mr. Scott was treated at various hospitals and ultimately referred to Schwab Rehabilitation Hospital in Chicago. At Schwab, Mr. Scott began to undergo physical therapy treatment for paralysis that resulted from his stroke.

61. Following rehabilitation, Mr. Scott was admitted to Glenshire Nursing and Rehabilitation Center, where he has lived ever since.

62. Defendants did not offer, inform, or provide to Mr. Scott his options for community-based services upon admission to the nursing facility.

63. When Mr. Scott arrived at Glenshire, he was assigned a room on the second floor in a unit for residents recovering from strokes. When the unit began undergoing renovations, Mr. Scott was moved to the fourth floor of the facility, which houses residents with psychiatric disabilities and Alzheimer's, even though Mr. Scott has no such disabilities.

64. While at Schwab Rehabilitation Hospital, Mr. Scott was progressing well under an aggressive regimen of physical therapy. He has since languished at the nursing facility and his joints are becoming stiff, making mobility increasingly difficult.

65. Mr. Scott seeks to live in a community setting in his own apartment, preferably in a community for senior citizens, with periodic nursing services, so he could maintain his independence.

66. Mr. Scott is capable of living in the community, which is, for him, the most integrated setting appropriate to his needs. However, under Defendants' system of care, Mr. Scott has only been offered long-term care in an institutional, nursing facility setting.

67. Defendant ROD R. BLAGOJEVICH is the Governor and chief executive officer of the State of Illinois. He is responsible for directing, supervising and controlling the executive departments of state government. Governor Blagojevich is ultimately responsible for ensuring that Illinois operates its long-term care system for people with disabilities in conformance with federal law. He is sued in his official capacity and only for prospective injunctive relief.

68. Defendant CAROL L. ADAMS is the Secretary of the Illinois Department of Human Services ("DHS"), the state agency responsible for administering Illinois' long-term care system for people with disabilities. Secretary Adams is responsible for the oversight, supervision and control of DHS and its divisions and is ultimately responsible for ensuring that DHS' services for people with disabilities are provided in conformance with federal law. She is sued in her official capacity and only for prospective injunctive relief.

69. Defendant BARRY S. MARAM is the Director of the Illinois Department of Healthcare and Family Services, the "single state agency" that operates Illinois' Medicaid program. *See* 42 U.S.C. § 1396a(a)(5). Defendant Maram is responsible for oversight, supervision, control and implementation of Illinois' Medicaid program and assuring its compliance with federal law. He is sued in his official capacity and only for prospective injunctive relief.

70. Defendant ERIC E. WHITAKER, M.D., is the Director of the Illinois Department of Public Health, the state agency responsible for licensing, regulating, and inspecting all nursing facilities in Illinois to determine compliance of Illinois' long-term care

program with federal law, including Medicaid. *See* 42 U.S.C. § 1396a(a)(9). He is sued in his official capacity and only for prospective injunctive relief.

## IV. CLASS ACTION ALLEGATIONS

71. Pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action as a class action on behalf of all Medicaid-eligible adults with disabilities in Cook County, Illinois, who are being, or may in the future be, unnecessarily confined to nursing facilities and with appropriate supports and services may be able to live in a community setting.

72. The size of the class is so numerous that joinder is impracticable. Over 20,000 Medicaid-eligible nursing facility residents live in Cook County. According to the Centers for Medicare and Medicaid Services, over 7,000 Cook County nursing facility residents have said they would rather live in the community, and Plaintiffs believe the actual number may be higher. Joinder is also impracticable because the class is not static and because class members lack the knowledge and financial means to maintain individual actions.

73. There are questions of law and fact common to the class, and the claims of the named Plaintiffs are typical of those of the class. These claims include:

a. whether Defendants violate the integration mandates of the ADA and Section 504 by requiring Plaintiffs and class members to be segregated and confined to nursing facilities in order to receive long-term care services, rather than providing those services in appropriate, integrated settings in their homes and communities;

b. whether Defendants fail to ensure that comprehensive, appropriate assessments – including those required under the Nursing Home Reform Act and Medicaid – are conducted to determine the need for institutionalization for class members at risk of institutionalization or class members' discharge potential;

c. whether Defendants fail effectively to inform Plaintiffs and class members of community-based long-term care alternatives to nursing facilities; and

d. whether Defendants fail to provide nursing facility residents with community long-term care services with reasonable promptness, as required under federal Medicaid law.

74. The representative parties will fairly and adequately protect the interests of the class. The named Plaintiffs will vigorously represent the interests of unnamed class members, and all members of the proposed class will benefit from the efforts of the named Plaintiffs. The interests of the proposed class and the named Plaintiffs are identical.

75. Defendants, their agents, employees, and predecessors and successors in office have acted or will act on grounds generally applicable to the class, thereby making injunctive or declaratory relief appropriate to the class as a whole.

## V. STATEMENT OF FACTS

### A. History of the "Integration Mandates" of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act

76. On July 26, 1990, President George H.W. Bush signed the ADA, 42 U.S.C. §§ 12101-12181, establishing the most important civil rights laws for persons with disabilities in our nation's history.

77. In enacting the ADA, Congress was particularly concerned about the unnecessary segregation and institutionalization of people with disabilities and the resulting lack of full participation in and access to community services and activities. It found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

78. Congress further found that "discrimination against individuals with disabilities persists in … institutionalization … and access to public services." 42 U.S.C. § 12101(a)(3).

79. Title II of the ADA prohibits public entities, including Defendants, from discriminating against persons with disabilities whom they serve. 42 U.S.C. §§ 12131-32.

80. Regulations implementing the ADA require that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of" people with disabilities. 28 C.F.R. § 35.130(d). Section 504, on which the ADA is modeled, contains an identical requirement. 28 C.F.R. § 41.51(d).

81. Segregation of persons with disabilities from society as a result of unnecessary institutionalization constitutes discrimination under Title II. *Olmstead*, 527 U.S. at 587. Unnecessary institutionalization is discriminatory because, the Supreme Court noted, "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable and unworthy of participating in community life" and "confinement in an institution severely diminishes the everyday life activities of individuals, including family options, social contacts, economic independence, educational advancement, and cultural enrichment." *Id.* at 600.

**B. <u>The State-Federal Medicaid Program</u>**

82. Medicaid is a joint federal and state program that provides medical services to low-income persons pursuant to Title XIX of the Social Security Act. 42 U.S.C. §§ 1396-1396v.

83. States are not required to participate in Medicaid, but if they do, they must comply with the requirements of Title XIX and its implementing regulations promulgated by the U.S. Department of Health & Human Services ("HHS"). States who participate must further

submit to HHS a state Medicaid plan that fulfills the requirements of Title XIX. 42 U.S.C. § 1396a(a).

84. One of the primary purposes of Medicaid is "to furnish … rehabilitation and other services to help families and individuals attain or retain capability for independence and self care …." 42 U.S.C. § 1396. Each participating State's Medicaid plan must contain reasonable standards to determine the extent of services needed to obtain these objectives. 42 U.S.C. § 1396a(a)(17).

85. Individuals are eligible for Medicaid if they are either "categorically needy" or "medically needy." Individuals who, for example, receive Supplemental Security Income ("SSI") benefits are deemed "categorically needy."

86. Certain services are mandatory under Title XIX and must be provided to all persons considered "categorically needy." 42 U.S.C. § 1396a(a)(10)(A)(i) (incorporating 42 U.S.C. § 1396d(a)(1)-(5), (17), (21)). "Mandatory" services include services in a skilled nursing facility. *Id.*

87. Medicaid also allows states to provide, at their option, in-home and community services, including home healthcare services, private-duty nursing, home and community care for functionally disabled elderly individuals, personal care services, and any other medical and remedial care recognized under state law. 42 U.S.C. § 1396d(a). Once a state elects to provide an optional service, it becomes part of the state's Medicaid plan and is subject to the requirements of Title XIX. 42 U.S.C. § 1396a(a)(1). Title XIX also requires that states ensure "the inclusion of home health services for any individual who, under the state plan, is entitled to nursing facility services." 42 U.S.C. § 1396a(a)(10)(D).

88. Additionally, Medicaid allows states to waive certain requirements in order to enable people with disabilities to avoid institutionalization and receive long-term care services in

the community. 42 U.S.C. § 1396n(c). These programs are known as Home and Community Based Services "waivers."

C. **The Nursing Home Reform Act**

89. The Nursing Home Reform Act ("NHRA"), which is part of Title XIX, was enacted in 1987 to address the widespread problem of warehousing people with disabilities in nursing facilities. As part of their Medicaid plans, States must ensure that the care and services provided by nursing facilities to Medicaid-eligible individuals are consistent with the NHRA's requirements. 42 U.S.C. § 1396a(a)(28)(A).

90. Under the NHRA, each nursing facility resident, upon admission and periodically thereafter, must be provided with a comprehensive assessment of his or her functional capacity, including the resident's potential for discharge to the community. The resident must be involved in the assessment process, and the assessment must be updated quarterly. 42 U.S.C. § 1396r; 42 C.F.R. § 483.20. Residents must also, when appropriate, receive "sufficient preparation" to ensure their "safe and orderly transfer or discharge" from the nursing facility. 42 C.F.R. § 483.12(a)(7).

91. The NHRA further addresses the problem of unnecessary institutionalization or warehousing of people with psychiatric or developmental disabilities in nursing homes. To this end, special pre-admission screening and resident reviews are required for all individuals believed to have a psychiatric or developmental disability to determine whether a nursing facility level of care is needed, and whether these same services could be provided in the community. 42 U.S.C. §§ 1396r(b)(3)(F)(i), 1396r(e)(7)(A) & (B); 42 C.F.R. §§ 483.112, 483.128, 483.132, 483.134, 483.136.

**D. Illinois' Long-Term Care System for People with Disabilities**

92. Illinois participates in Medicaid and, as such, offers and provides nursing facility services to Medicaid-eligible people with disabilities who qualify for long-term care. Defendants provide these services through privately owned and operated nursing facilities, many of which are for-profit businesses.

93. Defendants also provide in-home and community services to persons who would otherwise qualify for nursing facility services. These programs are also funded under Medicaid, either under the Home Health option or through a Home and Community Based Services waiver. Under these programs, people with disabilities live independently with community-based supports and services, including healthcare, personal attendant care, and other long-term care services otherwise found in nursing facilities.

94. For some people with disabilities served in the community, Defendants contract with private home health agencies to provide in-home community long-term care. Other people with disabilities served in the community hire their own caregivers and attendants, whose wages are paid by Defendants. DHS has recognized that the cost of these community programs is "far below the average annual nursing home cost."

95. Despite the fact that many, perhaps most, seniors and people with disabilities prefer to live in the community, Defendants have dedicated the vast majority of Illinois' long-term care funding – nearly 80% – to nursing facility and other institutional services – one of the highest rates in the nation. For people with physical disabilities, Illinois' per capita spending on nursing facilities is nearly four times that for home and community care. As a result, community services are chronically unavailable to many who need and want them, effectively compelling institutionalization of people with disabilities.

## E. Nursing Facilities in Cook County

96. According to the Illinois Department of Public Health, 241 nursing facilities operate in Cook County, of which 190 are certified to serve Medicaid long-term care recipients. Four of these facilities have between 300-400 residents, another 38 have between 200-300 residents, and 112 have between 100-200 residents.

97. Over 31,000 people in Cook County live in nursing facilities. Over 20,000 have Medicaid as their primary payment source and over 7,400 – nearly 24% – are under age 65. In six of the ten largest facilities, the majority of residents are not elderly.

98. Most nursing facility residents are admitted from acute care hospitals or from their own homes because they lack access to in-home healthcare. Most individuals are not assessed upon admission to determine whether services could be provided in their existing homes or in the community.

99. Once Medicaid-eligible individuals are admitted to nursing facilities, they must turn over most of their assets and income, including Supplemental Security Income from Social Security, to the state and nursing facility. Residents receive an allowance of $30.00 per month. As a result, residents are often unable to continue paying rent or mortgages and accordingly lose the home they had before entering the nursing facility. Residents also lack resources to obtain community services and housing on their own. They often cannot afford even basic transportation costs to leave the facility, whether to pursue community services or for any other purpose.

100. Nursing facilities are not real homes or even home-like, but rather are segregated institutions housing large numbers of unrelated persons, both elderly and non-elderly, in congregate settings, where residents must share bedrooms, bathrooms and living spaces with strangers. A June 12, 2000 DHS memorandum reported that former nursing facility residents

"almost universally describe[d] their transition from these institutions back into the community as 'being freed from jail.'"

101. Although the majority of nursing facility residents have primarily physical disabilities, many residents have mental illness as their primary diagnosis, and some are primarily developmentally disabled. Nursing facilities neither provide, nor are designed to provide, significant treatment, rehabilitation and therapy for these individuals. Their care is primarily custodial, despite the residents' need for treatment or rehabilitation.

102. Many nursing facility residents are, for the most part, neither integrated into nor part of the communities in which they live. Residents have limited access to the community and it is difficult, if not impossible, for them to participate in community activities such as government, churches or clubs.

103. Nursing facility residents are often denied meaningful access to educational and employment opportunities by virtue of the congregate environments in which they live and the limited supports that are provided to them.

104. Many nursing facilities resemble hospitals. They have nurses' stations and often have locked doors, curfews and, at times, guards posted to monitor persons entering and leaving the facility.

105. There is little, if any, privacy for nursing facility residents who share rooms and bathrooms with up to five residents whom they did not know previously and with whom they did not choose to live. In some facilities, entire wards share bathrooms and shower facilities. Medications are often dispensed publicly, with residents waiting in line.

106. Nursing facility residents often lack their own telephones, and are often restricted in the use of the nursing facility telephones.

107. Nursing facilities offer few places for residents to gather or safeguard their personal belongings. Many residents report that their personal property has been stolen or damaged.

108. Nursing facility residents have little, if any, choice on what to eat, when to eat, or with whom to eat.

109. Nursing facilities often employ restrictive practices such as limiting telephone use by residents, limiting residents' ability to come and go from the facility, confining residents to locked floors or wards, and utilizing medically-inappropriate referrals for short-term inpatient psychiatric admission.

**F. <u>Residents' Desire and Ability to Live in the Community</u>**

110. The Centers for Medicare and Medicaid Services of the U.S. Department of Health and Human Services ("CMS") publishes quarterly data on nursing facility residents. This data, called the "Minimum Data Set" ("MDS"), is collected by nursing facilities and sent to each state's Medicaid single state agency, which then sends it to CMS. *See* 42 C.F.R. § 483.20(c).

111. The MDS reports that in Cook County, 60.9% of residents under age 65, and whose care is not paid for by Medicare, have expressed or indicated to their nursing facility that they want to live in the community instead of a nursing facility. For such residents over age 65, 31.4% have told their nursing facility they desire to live in the community. There is reason to believe the actual number may be far higher. The majority of these residents are Medicaid-eligible.

112. Many nursing facility residents could be served safely and appropriately in the community if long-term care and services were available there. When appropriate supports and services have been provided, persons with disabilities, of all ages and multiple levels of

disability, have successfully moved into or remained in the community in order to live more independently.

**G. Defendants' Failure to Serve Class Members in the Community**

113. Defendants have not ensured that nursing facility residents are properly evaluated, whether prior to admission or thereafter, to determine whether they could be served adequately and safely in the community. The nursing facilities with which Defendants contract to provide long-term care services routinely fail to conduct any meaningful evaluation of residents' ability to live in the community or any meaningful discharge planning.

114. Defendants, and the nursing facilities with whom they contract, routinely fail to provide residents with information and choices on integrated, home- and community-based long-term care alternatives.

115. Defendants have failed to provide Plaintiffs and class members with integrated long-term care services in the community. Instead, Defendants administer Illinois' long-term care system in a manner that requires Plaintiffs and class members to submit to unnecessary, segregated nursing facility placement as a condition of receiving long-term care services.

## VI. CAUSES OF ACTION

**Count I: Violations of the Americans with Disabilities Act**

116. Plaintiffs re-allege and incorporate Paragraphs 1-115 as if fully set forth herein.

117. Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

118. Each Plaintiff and class member is a "qualified individual with a disability" within the meaning of the ADA in that he or she has a physical and/or mental impairment that

substantially limits one or more major life activities. Plaintiffs and class members meet the essential eligibility requirements for long-term care under Illinois' Medicaid program and are thus "qualified."

119. Defendants are public agency directors responsible for operation of a public entity, pursuant to 42 U.S.C. §§ 12131(1)(A) & (B).

120. Regulations implementing Title II of the ADA require that a public entity administer its services, programs and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d).

121. The ADA's implementing regulations further provide that "a public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration: (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities ...." 28 C.F.R. § 35.130(b)(3).

122. Defendants have required that Plaintiffs and class members be confined unnecessarily in institutions, *i.e.*, nursing facilities, rather than permit them to reside in the community in order to obtain long-term care services in violation of the ADA's integration mandate.

123. Further, Defendants have utilized criteria and methods of administration that subject Plaintiffs and class members to discrimination on the basis of disability, including unnecessary institutionalization, by (1) failing to assess properly the services and supports that would enable Plaintiffs and class members to live in the community, (2) failing to inform Plaintiffs and class members, upon admission and thereafter, of community long-term care

options, and (3) allocating resources for institutional long-term care contrary to the desires and needs of people with disabilities.

124. Defendants' actions are in violation of Title II of the ADA.

**Count II: Violations of Section 504 of the Rehabilitation Act**

125. Plaintiffs re-allege and incorporate Paragraphs 1-124 as if fully set forth herein.

126. Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified person with disabilities shall, solely by reason of his or her disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

127. Defendants direct state agencies that receive federal financial assistance.

128. Each Plaintiff and class member is a "qualified person with disabilities" within the meaning of Section 504, because they have physical and/or mental impairments that substantially limit one or more major life activities. Plaintiffs and class members meet the essential eligibility requirements for long term care under Illinois' Medicaid program and are thus "qualified."

129. Regulations implementing Section 504 require that a public entity administer its services, programs and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 C.F.R. § 41.51(d).

130. Section 504's regulations prohibit recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration ... (i) [t]hat have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons." 45 C.F.R. § 84.4(b)(4); 28 C.F.R. § 41.51(b)(3)(I).

131. Defendants have required that Plaintiffs and class members be confined unnecessarily in institutions, *i.e.*, nursing facilities, rather than the community in order to obtain long-term care services, in violation of Section 504's integration mandate.

132. Further, Defendants have utilized criteria and methods of administration that subject Plaintiffs and class members to discrimination on the basis of disability, including unnecessary institutionalization, by (1) failing to assess properly the services and supports that would enable Plaintiffs and class members to live in the community, (2) failing to inform Plaintiffs and class members, upon admission and thereafter, of community long-term care options, and (3) allocating resources for institutional long-term care contrary to the desires and needs of people with disabilities.

133. Defendants' actions are in violation of Section 504 of the Rehabilitation Act.

**Count III: Violations of Title XIX of the Social Security Act**

134. Plaintiffs re-allege and incorporate Paragraphs 1-133 as if fully set forth herein.

135. Plaintiffs and class members are eligible for Medicaid.

136. As participants in the federal-state Medicaid program, Defendants must comply with all applicable provisions of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, in their administration of Illinois' Medicaid program.

**A. Violations of the Nursing Home Reform Act**

137. Title XIX of the Social Security Act requires that each state's Medicaid plan "provide … that any nursing facility receiving payments under such plan must satisfy all the requirements of [the Nursing Home Reform Act]." 42 U.S.C. § 1396a(a)(28)(A).

138. The Act requires nursing facilities to conduct and implement comprehensive assessments and "sufficient preparation" for residents' discharge from the facility if professionally appropriate. 42 U.S.C. § 1396r(b)(3)(A); 42 C.F.R. §§ 483.12, 483.20.

139. The Act further mandates special pre-admission screening and resident reviews for residents with mental illness or developmental disabilities. These evaluations, which must be conducted at admission and annually thereafter, must determine whether nursing facility level of care is required and whether such services could be provided in the community. 42 U.S.C. §§ 1396r(b)(3)(F), 1396r(e)(7)(A)&(B); 42 C.F.R. §§ 483.128, 483.132, 438.134 & 483.136.

140. Defendants have violated the rights of Plaintiffs and class members under the Act by failing to provide or ensure provision of timely and comprehensive assessments and quarterly reviews to determine discharge potential and the appropriateness of community-based long-term care options.

**B. Failure to Provide Services with Reasonable Promptness**

141. Title XIX of the Social Security Act requires that Medicaid services be furnished to eligible individuals, and without delay caused by the state agency's administrative procedures. 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.930(a).

142. Defendants' policies, practices, acts and omissions concerning administration of Illinois' long-term care program have denied or extensively delayed provision of medically-necessary long-term care services in the community that are otherwise available under the state Medicaid plan. As a result, Defendants have denied Plaintiffs and class members the reasonably prompt provision of community long-term care services, in violation of the Social Security Act.

**C. Failure to Provide Timely and Adequate Notice and Choice of Community Care**

143. Title XIX of the Social Security Act requires that any individual determined to need the level of care provided by a nursing facility must be informed of feasible alternatives under the state's Home and Community Based Services ("HOBS") waiver and be given a choice between nursing facility or waiver services. 42 U.S.C. § 1396n(c)(2)(C).

144. Illinois has HCBS waivers that provide a variety of feasible alternatives to nursing facility care, including home-based and community long-term care.

145. Defendants have failed to inform nursing facility residents, or ensure that residents are informed, of feasible, integrated, community-based alternative services under the HCBS waivers, and have failed to provide residents a choice between such services, in violation of Title XIX.

## VII. REQUESTED RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the class, respectfully request that the Court:

A. Enter an order certifying the Plaintiff class;

B. Declare that Defendants' failure to provide Plaintiffs with services in the most integrated setting appropriate to their needs violates Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Title XIX of the Social Security Act, and the federal Nursing Home Care Act;

C. Enjoin Defendants to:

(1) inform Plaintiffs and class members that they may be eligible for community services and that they have the choice of such services;

(2) provide comprehensive assessments, evaluations and screenings to determine Plaintiffs' and class members' eligibility for community services, both prior to and after admission to nursing facilities;

(3) provide, as appropriate, Plaintiffs and class members with long-term care services and supports in the community and refrain from providing long-term care only in institutional settings.

D. Award Plaintiffs their reasonable attorneys' fees, litigation expenses and costs; and

E. Grant such other relief as the Court deems just and proper.

Dated: August 22, 2007.

Respectfully submitted,

[signature]

Daniel J. Zollner
David Curkovic
Regina A. Ripley
ROSS, DIXON & BELL, LLP
55 West Monroe St, Suite 3000
Chicago, Illinois 60603
Tel: (312) 759-1920
Fax: (312) 759-1939

Max Lapertosa
Kenneth M. Walden
ACCESS LIVING OF METROPOLITAN CHICAGO
115 West Chicago Avenue
Chicago, Illinois 60610
Tel: (312) 640-2100
Fax: (312) 640-2131

Edward B. Mullen III
3501 N. Southport Ave, Suite 206
Chicago, Illinois 60657-1435
Tel: (773) 322-8055
Fax: (312) 759-1939

Stephen F. Gold
125 S. Ninth Street, Suite 700
Philadelphia, Pennsylvania 19107
Tel: (215) 627-7100
Fax: (215) 627-3183

Laura A. Miller
Karen I. Ward
EQUIP FOR EQUALITY
20 North Michigan Avenue, Suite 300
Chicago, IL 60602
Tel: (312) 341-0022
Fax: (312) 341-0295

Benjamin S. Wolf
Gail Waller
THE ROGER BALDWIN FOUNDATION OF
THE AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS
180 North Michigan Avenue, Suite 2300
Chicago, Illinois 60601
Tel: (312) 201-9740
Fax: (312) 201-9760