# EXHIBIT 1

*April 10, 2017*

# COLBERT CONSENT DECREE

# Report to the Court Monitor: Recommendations for System and Process Improvements

**AUTHORS**

*Gail P. Hutchings, MPA*

*Jake Bowling, MSW*

*Heather Cobb*

*Carlyle Hooff, MEd*

*Kevin A. Huckshorn, PhD, MSN, RN, ICRC*

*Cynthia Zubritsky, PhD*

*Behavioral Health Policy Collaborative, LLC*

*Suggested Citation:*

*Hutchings, G., Bowling, J., Cobb, H., Hooff, C., Hucskhorn, K., and Zubritsky, C. (April, 10, 2017). Colbert Consent Decree Report to the Court Monitor: Recommendations for System and Process Improvements. Behavioral Health Policy Collaborative, LLC: Alexandria, VA.*



**Behavioral Health Policy Collaborative, LLC**

# Table of Contents

Executive Summary ..................................................................................................................... 1
    Synopsis of Goals and Recommendations for System and Process Improvements ........................ 2
Background and Introduction ...................................................................................................... 7
    Statement of Work .......................................................................................................... 11
    BHPC Project Team ......................................................................................................... 11
    Project Approach ............................................................................................................. 12
**Goal 1: Effective Governance Structures Guide Colbert Program Implementation** ........................... 14
    Recommendations .......................................................................................................... 16
**Goal 2: Clear Colbert Vision Statement and Communications Plan Educates and Engages**
**Stakeholders** ............................................................................................................................ 19
    Recommendations .......................................................................................................... 19
**Goal 3: Comprehensive Data Enterprise Program Drives Colbert-wide Performance Assessment and**
**Decision-making** ...................................................................................................................... 20
    Recommendations .......................................................................................................... 21
**Goal 4: System-wide Investments Achieve Colbert Mandates and Avoid Inappropriate Nursing Home**
**Placements** ............................................................................................................................. 26
    Recommendations .......................................................................................................... 27
**Goal 5: Colbert Uses Efficient and Reliable Outreach, Screening, and Evaluation/Assessment**
**Processes and Protocols** ........................................................................................................... 30
    Recommendations .......................................................................................................... 31
**Goal 6: Provider Capacity Exists to Successfully Serve Transitioned Class Members** ......................... 34
    Recommendations .......................................................................................................... 34
**Goal 7: Appropriate and Affordable Independent Housing Is Available for Class Members** .............. 41
    Recommendations .......................................................................................................... 46
**Goal 8: Knowledgeable and Skilled Staff Are Prepared to Address Class Members' Complex Needs** 49
    Recommendations .......................................................................................................... 49
**Goal 9: Independent Quality Assurance Mechanisms Ensure Colbert Program and Service Integrity** 51
    Recommendations .......................................................................................................... 51
**Goal 10: Diversion Strategies Prevent Inappropriate Nursing Home Placements for People with**
**Disabilities and Redress System "Front Door" Issues** ..................................................................... 54
    Recommendations .......................................................................................................... 54
**Conclusion** .............................................................................................................................. 57

*Behavioral Health Policy Collaborative, LLC*

# Executive Summary

The Summer of 2017 marks a decade since the *Colbert v. Quinn* lawsuit was filed in Chicago, Illinois on behalf of people with disabilities residing in Cook Country nursing homes. Now, as it enters its second decade, an opportunity exists to create and deliver on a second generation of Colbert — one in which individuals' civil liberties are fully respected and Federal laws strictly adhered to.

With concerted effort, Illinois can achieve a unified, seamless system in Cook County and elsewhere that universally expects most people with psychiatric and physical disabilities to thrive and live independently in the community. This can be accomplished when the right mix of services and housing exist; when savings earned by transitioning and diverting people away from nursing homes into the community are reinvested to build and strengthen adequate, functional, and efficient community-based mental health, healthcare, and housing systems; and, ultimately, where the community at-large embraces individuals with disabilities not as "them" but as "us."

By many accounts, several processes to identify and serve Colbert Class Members (Class Members) and the resulting outcomes have improved overall since the U.S. District Court approved the original Consent Decree in December 2011. Yet, while the lawsuit's parties and the Judge agreed to year-to-year increases in the expectations for evaluation and transition of a finite number of Class Members out of nursing homes, the actual number of those transitioned has begun to lag significantly, with no realistic change trend in sight without a new course map.

Successfully complying with the Colbert Consent Decree is systemically arduous. Most Class Members present complex histories of some combination of poverty, mental illness, substance abuse, physical disability, co-morbid chronic medical diseases, housing instability, trauma, and/or criminal justice involvement. The barriers to transition readiness are formidable. The State has progressed, but a course redirect can guide the parties to address the gaps and continued needs of current and future Class Members to eventually absolve the decree.

The State needs to provide substantial investments, resources, workforce, and extensive partnerships for utmost success. Involved systems must improve governing structures and oversight; enhance engagement and communication with stakeholders, partners and prospective partners, and current and potential Class Members; enhance data tracking and outcome measurement to maximize quality improvement; assure service quality; redistribute savings and expenditures to community-based services; restructure care delivery including embracing integration of medical and behavioral health care; maintain sufficient housing options with proximity to behavioral health and medical services in the immediate community; provide an adequate and trained workforce; implement quality monitoring; and create diversion pathways to prevent inappropriate institutionalization.

The Colbert Court Monitor retained the Behavioral Health Policy Collaborative (BHPC) to undertake this independent review of Colbert-related systems and processes. A team comprised of behavioral health and housing services policy, system, data, and clinical experts completed the work. The findings, observations, and goals and recommendations aim to significantly contribute to the vision inherent in the Colbert Consent Decree and its success.

Toward that end, BHPC offers these 10 goals and associated recommendations to realize Colbert's second generation to improve systems and processes and expand capacity to serve the most Class Members possible.



*Behavioral Health Policy Collaborative, LLC*

1

# Colbert Consent Decree
# Synopsis of Goals and Recommendations for System and Process Improvements

| GOAL 1 | **Effective Governance Structures Guide Colbert Program Implementation** |
|---|---|
| | Illinois significantly outpaces all other states in housing residents with certain psychiatric disabilities in nursing homes, and Cook County outpaces the rest of Illinois by 9.4 percent. That said, successful compliance with the Colbert Consent Decree is difficult, challenging work. It requires vision, leadership, policy and financing context, cross-agency and cross-discipline coordination, and a focus on process and outcome measures. |
| | *Recommendations:* |
| | 1.1  Appoint a Colbert Task Force |
| | 1.2  Institute a Workgroup Structure and Charge Workgroups with Key Goals and Objectives |
| | 1.3  Revise Contracting Content, Processes, and Monitor with New Data Dashboard |
| | 1.4  Develop Staffing and Infrastructure Plan |
| | 1.5  Provide Additional Staffing to IDoA Colbert Implementation Office |
| GOAL 2 | **A Clear Colbert Vision Statement and Communications Plan Educates and Engages Stakeholders** |
| | An accessible Colbert vision statement can inform the Decree's vast audiences about its mission and goals, galvanize allies, and guide success and positive outcomes. In step with such a statement, a communications and marketing plan detailing how to inform and engage said stakeholders would facilitate long-term success. |
| | *Recommendations:* |
| | 2.1  Create a Clear Vision and Mission Statement |
| | 2.2  Develop and Implement a Communications and Marketing Plan |
| GOAL 3 | **A Comprehensive Data Enterprise Program Drives Colbert-wide Performance Assessment and Decision-making** |
| | A centralized system that systematically collects, houses, and accesses real-time data is essential to Colbert program planning and management. It provides empirical understanding of all program aspects — from population information and workforce efficiency to performance and outcome. This will advise stakeholders of course-correction needs, necessary resource re-allocations, information sharing opportunities, performance and quality issues, compliance, and more. |
| | *Recommendations:* |
| | 3.1  Convene a Data Enterprise Workgroup and Create a Data Enterprise Program |
| | 3.2  Implement Data Review Processes |
| | 3.3  Use Technology for Data Collection |
| | 3.4  Increase IDoA Staff Support in Data Collection and Analysis |
| | 3.5  Devise and Use Data Methodology to Predict Class Members Size and Project Rates for Transition Stages |
| | 3.6  Increase Already-Mandated Data Reporting Compliance |



*Behavioral Health Policy Collaborative, LLC*

| GOAL 4 | **System-wide Investments Achieve Colbert Mandates and Avoid Inappropriate Nursing Home Placements** |
|---|---|
| | Systems serving Class Members need adequate resources. Accurately capturing and understanding the total cost of transitioning people, identifying and securing strategic investments and reinvestments, and using financial levers will help meet Colbert goals and outcomes. |
| | *Recommendations:* |
| | 4.1  Garner a Formal Savings Reinvestment Commitment |
| | 4.2  Expand Comprehensive Cost Study and Use Results to Target Services Delivery |
| | 4.3  Identify and Act Upon Inappropriate System Incentives and Disincentives |
| | 4.4  Assess Medicaid Reimbursement Rates and Incentives |
| | 4.5  Explore Risk Bearing Requirements in Medicaid Managed Care Contracts |
| GOAL 5 | **Colbert Uses Efficient and Reliable Outreach, Screening, and Evaluation/Assessment Processes and Protocols** |
| | Pre-transition processes are paramount. Colbert success is impossible without identifying, engaging, and evaluating potential Class Members, as well as timely referrals and service plans. Streamlining procedures, creating efficiencies, reducing duplication, establishing performance standards, expediting processes, and enhancing workforce capacity and skill levels are the goals. |
| | *Recommendations:* |
| | 5.1  Create and Use a Short Screening Tool and Simplify Current Evaluation/Assessment Tool |
| | 5.2  Institute Catchment Area Nursing Home Assignment System |
| | 5.3  Establish Outreach and Evaluation Targets |
| | 5.4  Formally Engage Nursing Home Administrators and Staff in Outreach and Evaluation/ Assessment Processes |
| | 5.5  Ensure Appropriate Match Between Class Member Needs and Referred Service Provider Agency |
| GOAL 6 | **Provider Capacity Exists to Successfully Serve Transitioned Class Members** |
| | The linchpin of success for Colbert implementation is a robust community-based service and housing system that aligns with Class Members' needs, enshrines evidence-based practices, offers integrated primary and behavioral healthcare and innovative person-centered models, provides safe and affordable independent housing, and builds a workforce skilled in meeting the needs of vulnerable populations. Addressing provider capacity is supreme, and adopting a standard framework to guide referrals, determine capacity needs, and promote adoption of evidence-based practices is necessary to build and maintain an adequate capacity among Colbert service providers. |
| | *Recommendations:* |
| | 6.1. Stratify Class Member Populations Using the Four Quadrant Clinical Integration Model |
| | 6.2. Use the Four Quadrant Clinical Integration Model to Guide Resource Mapping and Systems Planning |
| | 6.3. Augment System Capacity by Quantifying Need and Increasing Funding for Evidence-based Services, Promising Practices, and Supports |



*Behavioral Health Policy Collaborative, LLC*

|  | 6.4. Expand Pool of Colbert Service Providers to Increase Capacity and Integrated Care |
|---|---|
|  | 6.5. Streamline Approvals for Durable Medical Equipment |
|  | 6.6. Examine and Use SSI/SSDI Presumptive Eligibility and Enrollment Expediting Programs |
| GOAL 7 | **Appropriate and Affordable Independent Housing Is Available for Class Members** |
|  | The full participation of people with disabilities in community life is only possible with access to safe, appropriate, and affordable independent housing. Increasing housing units for transitioning Class Members points to refining housing search processes, testing new models of integrated care coordination and housing location, maximizing capacity of housing service providers, engaging significantly more landlords, expanding housing models to address the needs of people with physical disabilities and complex medical comorbidities, increasing proven strategies used to overcome common housing barriers, and streamlining other housing-related processes. |
|  | *Recommendations:* |
|  | 7.1 Convene Colbert Housing Workgroup |
|  | 7.2 Increase IDoA Colbert Housing Staff |
|  | 7.3 Re-engineer Housing Search Process |
|  | 7.4 Pilot Integrated Colbert MCO and Housing Locator Teams |
|  | 7.5 Develop Housing-Specific Key Performance Indicators and Realign Contractor Targets with Capacity |
|  | 7.6 Implement a Landlord Engagement Initiative |
|  | 7.7 Increase Special Housing and Accessible Housing Inventory |
|  | 7.8 Address Common Rental Barriers |
|  | 7.9 Expedite Transition Funds and HQS Inspections |
| GOAL 8 | **Knowledgeable and Skilled Staff Are Prepared to Address Class Members' Complex Needs** |
|  | Next to a Class Member's role, the staff roll is one of the most important determinants of transition success. A staff that supports the entire transition process must also commit to providing high-quality care. This empowered workforce fundamentally influences and contributes to transition. Training is of the utmost importance to achieve this. |
|  | *Recommendations:* |
|  | 8.1 Expand Training Offered Under Existing Training Institute |
|  | 8.2 Launch Colbert Learning Collaboratives |
| GOAL 9 | **Independent Quality Assurance Mechanisms Ensure Colbert Program and Service Integrity** |
|  | Much of a person's success in the community is contingent on the integrity and conduct of staff. Attention and mechanisms to promote professional and lawful conduct and guard against negative conduct and illegal acts are crucial safeguards. Improving safeguards at the State-level vis-à-vis conducting monitoring and quality assurance assessments is prime. Colbert process and workflow must incorporate strong, independent, and data-informed quality assurance mechanisms and staff. |

*Behavioral Health Policy Collaborative, LLC*

| | |
|---|---|
| | **Recommendations:** |
| | 9.1 Ensure Adequate Access to and Authority of State Long-term Care Ombudsman or Appoint Colbert Ombudsman |
| | 9.2 Hire Independent Staff or Contractors to Conduct Contractor/Provider Monitoring and Quality Reviews |
| | 9.3 Increase Oversight for "Unable to Serve" Designations |
| **Goal 10** | **Diversion Strategies Prevent Inappropriate Nursing Home Placements for People with Disabilities and Redress System "Front Door" Issues** |
| | While not specifically in the Colbert Consent Decree requirements, considering and addressing upstream, front-door issues that permit and even incentivize placing people with disabilities who belong in the community into nursing homes will help expedite exit from the Decree. |
| | **Recommendations:** |
| | 10.1 Educate and Engage Nursing Home Referral Sources |
| | 10.2 Conduct Retrospective Examination of PASRR Screens |

There is an understandable and difficult tension present among Colbert stakeholders. Many have observed, correctly, that while exact numbers remain unknown, at the current pace of transitions, it could take almost 10 years to move individuals in the current Colbert Class into communities. They see this as an unacceptably long period. In addition, that estimate does not account for any new nursing home residents who will increase the Class size. Other views signal capacity shortages, funding and reimbursement limitations, and overall concern for Class Member safety and well-being — without adequate community-based services and appropriate and affordable housing — as hindrances to achieving current transition targets and addressing factors that stymie future significant transition expansion efforts. Those views are also valid.

It remains difficult to quantify, assess, and predict the system's capacity for the type and degree of expansion that would be required to transition significantly more Class Members. Under current resources and progress, there are serious concerns as to if the 2017 transition targets will be met, even more so 2018's increased targets. We believe that implementing at least some of the recommendations offered herein will alleviate several bottlenecks in current transition processes.

For example, devising and utilizing a much shorter, yet reliable screening tool, for initial Class Member transition readiness assessment should free-up considerable time and resources, allowing for more Class Members to be evaluated and recommended for transition. Similarly, increasing referrals to housing locators to get them up to current capacity; employing more master leases; establishing relationships with significantly more landlords, especially to bring more accessible rental units online; and using currently budgeted expansion funds to add more essential services (e.g., ACT teams, CST, integrated care, nursing support) to existing providers and to new providers from county government and FQHCs. This should result in transitioning more Class Members into the community within shorter timeframes. Similarly, attending to the significant issues we expect exist with PASRR compliance, educating referral sources about diversion pathways to community versus nursing home care, and actively using managed care tools and techniques (e.g., pre-authorization, risk bearing) should help stem the flow of people away from inappropriate, costly nursing home placements and to community services and housing, thereby relieving some of the pressures that the continuing addition of new Class Members continue to create.



***Behavioral Health Policy Collaborative, LLC***

However, in our opinion, the State will not see a successful resolution to the Colbert Consent Decree without significant increases to the upfront investments necessary to build and sustain the range of community-based medical, behavioral health, housing, and other services needed to serve vulnerable Class Members with complex needs and simultaneous interventions to change the inappropriate customs and practices that contribute to inappropriate nursing home and other institutional placements. While financially difficult given the State's budget circumstances, we contend that transitioning significantly more Class Members will require implementation of several of our recommendations in addition to those mentioned above, including examining and considering increasing Medicaid reimbursement rates, exploring rate exceptions and incentives, and investing more in affordable and accessible housing.

While considering and devising solutions to these complex issues, it is imperative that the State and others pay careful attention to maintaining a system-wide view. Without such, corrections or fixes to one area or process can result in perverse consequences in other areas. For example, simply forbidding future nursing home referrals/placements without investment and assurance of appropriate diversion alternatives could easily lead to increased institutionalizations in other settings or homelessness for Class Members.

Finally, we acknowledge that the 45 recommendations that BHPC developed and offers herein can seem daunting to those charged with implementing and overseeing the Consent Decree. While we stand behind the importance of each one, we respectfully offer the following "top 10" list of the recommendations we see as requiring priority action. These recommendations are in the order in which they appear and are discussed in the body of the report.

- Appoint a Colbert Task Force (Recommendation 1.1)
- Convene a Data Enterprise Workgroup and Create a Data Enterprise Program (Recommendation 3.1)
- Garner a Formal Savings Reinvestment Commitment (Recommendation 4.1)
- Identify and Act Upon Inappropriate System Incentives and Disincentives (Recommendation 4.3)
- Assess Medicaid Reimbursement Rates and Incentives (Recommendation 4.4) and Augment System Capacity by Quantifying Need and Increasing Funding for Evidence-based Services, Promising Practices, and Supports (Recommendation 6.3)
- Create and Use a Short Screening Tool and Simplify Current Evaluation/Assessment Tool (Recommendation 5.1)
- Establish Outreach and Evaluation Targets (Recommendation 5.3)
- Expand Pool of Colbert Service Providers to Increase Capacity and Integrated Care (Recommendation 6.4)
- Develop Housing-specific Key Performance Indicators and Realign Contractor Targets with Capacity (Recommendation 7.5)
- Increase Special Housing and Accessible Housing Inventory (Recommendation 7.7)



*Behavioral Health Policy Collaborative, LLC*

# Background and Introduction

**Brief Background: Colbert Lawsuit and Consent Decree.** In 2007, a lawsuit known as *Colbert v. Quinn*[1] was filed in the United States District Court for the Northern District of Illinois on behalf of individuals with disabilities residing in nursing facilities in Cook County, Illinois. The lawsuit claimed violations of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Social Security Act by segregating and institutionalizing people with disabilities and failing to provide opportunities for those individuals to live in integrated community settings. The lawsuit was filed against the Governor and four Illinois state agencies: Department of Human Services (DHS), Department of Public Health (DPH), Department of Aging (IDoA), and Department of Healthcare and Family Services (HFS).

In December, 2011, the Federal District Court Judge approved a Colbert Consent Decree that was agreed to by the parties.[2] The Consent Decree obligates the State to support the transition of eligible and appropriate Class Members from Cook County[3] nursing facilities to community-based housing with services and supports. It enumerates annual Class Member transition targets and addresses outreach and education of potential Class Members, evaluation/assessment of eligible Class Members, service planning and housing location assistance, and transition and placement services. It also requires submission of annual implementation plans and appointment of an independent monitor to evaluate and at least annually report to the Court on Consent Decree compliance.

The Consent Decree defines Class Members as "…[A]ll Medicaid-eligible adults with disabilities who are being, or may in the future be, unnecessarily confined to Nursing Facilities in Cook County, Illinois, and who with appropriate supports and services may be able to live in a Community-Based Setting."[4]

State agency-level responsibility and leadership for implementation of the Consent Decree's agreed-upon terms was assigned originally to HFS. After two years, in January, 2014, it transferred to IDoA, where is remains today.

**Progress to date toward Class Members transitions.** It is difficult to determine the true size of the Member Class because it is not static; no time or size parameters have been established for determination of its size. IDoA states that approximately 18,500 individuals comprise the Colbert Class[5] but agrees to needing a verifiable methodology to more accurately determine this number. As indicated in Table 1, the transition target for 2013 was 300 transitions; when the IDoA assumed responsibility for Class Member transitioning in 2014, there was a target of 500 transitions. The State met its obligation to transition a cumulative total of 1,100 Class Members in 2015, exceeding the target by 12 individuals. The current pace of transitions has slowed significantly, despite the Court's requirement for an increase. In 2016, the target transition number was 504 individuals; yet, only 384 transitions

---

[1] *Colbert v. Quinn. No. 07 C 4737, United States District Court for the Northern District of Illinois, Eastern Division. Filed August 22, 2007.*
[2] *Colbert v. Quinn. No. 07 C 4737, United States District Court for the Northern District of Illinois, Eastern Division. Order. Filed December, 31, 2011.*
[3] *References made to Cook County throughout this report also includes the City of Chicago, IL.*
[4] *Colbert v. Quinn. No. 07 C 4737, United States District Court for the Northern District of Illinois, Eastern Division. Order. Filed December, 31, 2011. Pg. 2.*
[5] *Illinois Department on Aging. (undated). Colbert Consent Decree. Approximation from HFS data on number of individuals in Cook County Nursing Homes as of September 30, 2016.*


*Behavioral Health Policy Collaborative, LLC*

were completed.[6] The target is increased again for 2017 to 550 transitions; however, there are serious concerns about the system's ability to meet the current targets.

| Table 1.  Colbert Transition Targets and Completions: 2013-2017[7] | | | | | |
|---|---|---|---|---|---|
| Year[8] | | | | | |
| Transition #'s | 2013 | 2014 | 2015 | 2016 | 2017 |
| Transition Target | 300 | 500 | 300 | 504 | 550 |
| Transitions Completed | 111 | 464 | 537 | 384 | - |
| Cumulative Transitions Completed | 111 | 575 | 1,112 | 1,496 | - |

**Brief Overview of Major Colbert Systems and Processes.** The Colbert Project Director — whose position is Division Manager, Illinois Department on Aging Office of Transitions and Community Relations — manages the Colbert implementation process. This position oversees major Colbert contracts with organizations that provide various services to Class Members, including: two programs that provide outreach and education to Colbert Nursing Home residents; two managed care companies responsible for the evaluations/assessments of individuals to determine Class Member eligibility, their appropriateness for referral and transition to community housing, and to determine the services necessary to support and maintain the individual in the community; three Care Coordination Units (CCUs) that serve  Class Members who are age 60 and over with intensive long-term care needs by developing service plans for individuals with functional impairment(s) who need housekeeping assistance, home-delivered meals, personal care, or other services; four housing locator contracts; nine Community Mental Health Center (CMHCs) of which some provide outreach, evaluation, housing, and transition services and all providing, transition services, post-transition mental health and other services and supports.

The flowchart below (Figure 1) depicts the core elements of the Colbert Transition Process.[9] While progress has been made in coordinating some of the major process elements, an integrated approach to managing these functions is necessary to develop a more cohesive method to serving Class Members and to make the process run more smoothly overall. Regular data sharing and analyses, recurrent forums to discuss barriers and strategies to overcome them, and additional shared incentives could achieve cross function communication and efficiencies.

---

[6] Personal communication with the Colbert Transition Team, March 15, 2017.
[7] Colbert Court Monitor. (January 18, 2016). Colbert v. Rauner, Case No. 07-C4737 (N.D. Ill.). Annual Report to the Court.
[8] As mentioned elsewhere, reporting and analysis of these and other data are compromised given the variability in how years are determined, ranging from fiscal, calendar, and other court-established timeframes.
[9] Illinois Department on Aging. (December 19, 2016). Colbert Consent Decree Implementation Plan Phase 3. Pg. 62. Graphic used with permission.



*Behavioral Health Policy Collaborative, LLC*

*Figure 1. Colbert Consent Decree Transition Process*



*Behavioral Health Policy Collaborative, LLC*

**Recent key developments.** In the past year alone, several developments emerged that either directly or indirectly impact Colbert implementation. These factors have or are expected to influence Colbert policies and operations. These include:

- **Cost Neutral Plan**. As briefly discussed above, the finalization of the Cost Neutral Plan, approved by the Court on November 1, 2016, is a recent and important development. It contains various provisions, including required outreach activities, targets for the number of individuals evaluated and transitioned, and a call for an updated implementation plan. The order approving the Cost Neutral Plan includes a community capacity-building section, empowering the Court Monitor to retain an appropriate independent consultant to determine the current barriers and offer recommendations on how the Defendant can achieve Consent Decree compliance and transition greater numbers of Class Members into community-based housing and services.

- **Implementation Plan**. Filed with the Court on March 22, the Phase III implementation plan outlined strategies to meet the requirements of the Cost Neutral Plan amendment and respond to Class Members' needs, including those which were unforeseen when the Phase II Implementation Plan was written. The document includes operational plans for the outreach, evaluation, referral, transition, housing, and other activities that facilitate transitioning Colbert-eligible Cook County nursing home residents into the community.

- **Illinois Behavioral Health Transformation**. In recognition that Illinois has: Medicaid recipients with behavioral health needs comprising 25 percent of the Medicaid recipient pool but use 56 percent of all Illinois Medicaid spending; a system that overuses institutional care; inadequate capacity in the community-based behavioral health system to meet service demand; and far too few offerings of integrated primary care and behavioral health services, the State submitted an 1115 Waiver application to the federal Centers for Medicare and Medicaid Services (CMS) in 2016. The waiver, if approved, projects drawing down $2.7 billion in Federal match dollars for Medicaid services and envisions generating an Illinois Behavioral Health Transformation by authorizing Medicaid reimbursement for supportive housing and employment services, transition services for justice-involved individuals, substance use disorder case management, and other critical services designed to reduce over-reliance on institutional care and provide more robust community-based supportive services.[10]

- **Uniform Evaluation/Assessment Tool.** The University of Illinois at Chicago College of Nursing (UIC-CON) developed a consolidated, uniform evaluation tool to assess the readiness and support needs for individuals in Cook County nursing homes to transition into the community. The tool is now uniformly used by Colbert contractors that conduct evaluation services and allows for data comparisons across providers, including determinations of transition readiness. (See Recommendation 5.1 for discussion and a recommendation for this instrument's administration.)

- **Training Institute for Colbert Providers.** Designed and facilitated by UIC-CON, the Training Institute provides education and training to Colbert and Williams Consent Decrees' providers to develop their knowledge and skills to effectively conduct assessments and engage in service planning and delivery to facilitate Class Members' transition to community-based settings.

---

[10] *Illinois Department of Healthcare and Family Services. Illinois' Behavioral Health Transformation — 1115 Overview. 2016.*

 *Behavioral Health Policy Collaborative, LLC*

# Statement of Work and Project Approach

## Statement of Work

In December, 2016, the Colbert Court Monitor, Dennis Jones, MSW, MBA, engaged the Behavioral Health Policy Collaborative, LLC (BHPC) to conduct an independent review and assessment of major Colbert-related systems and processes to:

1. Devise recommendations designed to improve quality and outcomes; identify factors for increasing capacity to serve Class Members; and contribute to the development of a quantitative methodology that can predict the future Class size. The specific scope of work called for BHPC to: participate in a "kickoff" session with providers, State officials, and the Court Monitor that clearly lays out the scope of the task ahead, the consultant's role, and the needed participation of each provider.
2. Participate in site visits and meetings with nursing home administrators, Colbert outreach and evaluation staff, CMHCs, and Class Members.
3. Evaluate the overall system and outreach, evaluation, and transition processes and procedures currently used for Class Members. Identify problems and impediments to increasing the number of transitions.
4. Work with State officials to develop a methodology that reasonably predicts the number and percentage of Class Members who will ultimately transition.
5. Meet with individual providers — both leadership and key staff — to review Colbert progress-to-date, performance barriers, and key requirements for planned growth. Develop a multiyear growth plan that articulates provider commitments, including Board approval, and required State supports.
6. Evaluate the current State-level supports (i.e., money, personnel, quality systems, ability to grow) for Colbert. Recommend any enhancements necessary to ensure substantial growth.
7. Recommend any needed systemic changes, or enhancements, in key areas (e.g., provider capacity, housing availability, payment system, State oversight, training, data enhancements, and interagency and provider collaboration).
8. Based on specific agency analysis and overall systemic findings, recommend whatever changes necessary for overall growth in future years. In like kind, recommend the growth potential and the specific actions needed to achieve this level of growth.
9. Meet again with providers, State officials, plaintiffs, and the Court Monitor to share findings and recommendations.

## BHPC Project Team

BHPC identified and proposed a consulting team of consultants to the Court Monitor who in turn discussed it with the Colbert parties. In December 2016, the BHPC consulting team was approved and consisted of: Gail P. Hutchings, MPA, BHPC President and CEO and Project Director; Carlyle Hooff, MEd, Housing Lead; Kevin A. Huckshorn, PhD, MSN, RN, ICRC, Systems and Clinical Lead; and Cynthia Zubritsky, PhD, Data Lead. Jake Bowling, MSW, Writer, and Heather Cobb, Editor, were later added to the team.



*Behavioral Health Policy Collaborative, LLC*

## *Project Approach*

The Colbert Project was assigned to begin in January 2017 and conclude the following February with report writing and submission due in March 2017. BHPC's approach to the project took the form of four primary methods: (1) key documents, materials, and data reviews; (2) key informant interviews; (3) site visits; and (4) outside research.

**Project Orientation and Planning Meeting with Court Monitor.** On December 14, 2016, BHPC project leads met with the Colbert Court Monitor in Chicago to refine project expectations and to finalize the scope of work and work plan.

**Key Documents, Data, and Other Materials Reviews.** BHPC team members reviewed a wide range of data, published and unpublished documents, and other materials in preparation for and during the project. These materials included, but were not limited to; Colbert Order/Consent Decree and subsequent pertinent Court Orders, Colbert Court Monitor Reports, Colbert Implementation Plans, Cost Neutral Report, Illinois Behavioral Health Transformation 1115 Waiver documents, assessment tools, data reports, annual reports, and myriad other relevant materials.

**Questions and Data Needs Submissions.** Team members devised a list of questions before each key informant meeting to structure and focus the discussions. In some cases, the questions were provided in advance of the meetings to help informants prepare for the discussions and to identify and provide the team with key documents. Similarly, the team made data requests to IDoA Colbert staff and others, including staff from other State agencies, service and housing providers, Colbert-contracted managed care companies, and others.

**Stakeholder Meetings/Interviews.** BHPC convened and led more than two dozen in-person meetings and one dozen phone interviews to learn about Colbert system processes, strengths, barriers, and other relevant factors. Key informants who participated in these meetings included Colbert parties (i.e., plaintiffs and defendants); State agency staff from IDoA (Department on Aging), Department of Human Services (including its Division of Mental Health and Division of Rehabilitation Services) Department of Healthcare and Family Services (HFS), Housing Development Authority, Long-Term Care Ombudsman, and others; Colbert-funded contractors providing outreach, evaluation/assessment, care coordination, healthcare and behavioral healthcare, and housing coordination and location services; and prospective Colbert partners/service providers. In many instances, additional follow-up was made to clarify information and to obtain data and/or documents.

**Site Visits.** Part of the BHPC team's three trips to Cook County were to conduct various site visits. During these, we visited two nursing homes to interview nursing home administrators, relevant staff, and Class Members, including those interested in community transition, those already approved and in the transition process, and those not interested in moving. We also interviewed staff from the two Colbert managed care companies responsible for Colbert outreach, assessment, and care coordination. Other site visits allowed us to meet with leadership and staff from three CMHCs and more Class Members who had already transitioned and live in the community. Finally, we visited three housing sites with specialized housing programs created for Class Members, including: an accessible housing project funded partially by the Low-Income Housing Tax Credits; an apartment unit in a building funded partially by Low Income Housing Tax Credits where an additional rental subsidy is used to make the unit affordable; and a building using a Cluster Housing Model.

**Final Project Report.** All BHPC team members contributed to the development of this report. A draft report was submitted to the Colbert Court Monitor on March 29, 2017, with a request that he review it for factual errors or



*Behavioral Health Policy Collaborative, LLC*

omissions only. The final report was submitted to the Court Monitor on April 10, 2017, with plans for the BHPC team to present an overview of the report, its key findings, and recommendations to the Court Monitor and a range of Colbert stakeholders, including State officials, plaintiffs, and service, housing, and other providers, on April 13, 2017 in Chicago.

**Project and Report Limitations.** The boundaries of BHPC's consultation and our ensuing a report were limited along several parameters:

- The work entailed a time- and scope-limited, systems-level review; thus, it was not intended to touch every or even a representative sample of Class Members, nursing homes, providers, and/or housing settings.

- Given that the primary audience of BHPC's project report is the Colbert Court Monitor, BHPC assumes that other readers have at least some familiarity with the Colbert Consent Decree and efforts underway to comply with the ruling. This approach enabled BHPC report authors to avoid lengthy repetition of information and data already presented elsewhere and to more immediately and directly focus on identifying the key observations and findings that justify our goals and recommendations.

- The work was intended to reflect a point in time, taking into consideration system- and process-level mechanisms in place and used during the consultation project and focusing, for the most part, on identifying and serving prospective and identified Class Members from nursing home point-of-entry to 12-months post-community transition. Pre-nursing home entry and post 12-month transition were not the intended focus of the effort, although sections of the report do address both as relevant to the conduct of the work overall.

- Data reporting is limited due to the lack of a centralized Colbert data function that collects, and analyzes data on a regular basis. Some of the difficulties in determining data targets and reports include: multiple data reports from differing stakeholders for a single report; continued use of and reference to three differing time periods (i.e., calendar years, fiscal years, and "Colbert/Court years"); changes in data collection and reporting responsibilities over time; and changes in providers over time.

- The project was not designed to conduct client-level clinical assessments or case reviews.

- The consulting team was not expected to conduct fiscal or quality audits at the service delivery-, expenditure-, or billing-levels.

The remainder of the report offers 10 goals and associated recommendations intended to guide Colbert implementation and management as well as systems capacity expansion.

*Behavioral Health Policy Collaborative, LLC*

# GOAL 1
# Effective Governance Structures Guide Colbert Program Implementation

By any account, leading, managing, and implementing the effort needed to successfully comply with, and ultimately exit, the Colbert Consent Decree is difficult and challenging work. Many of the Class Members have complex histories with some combination of poverty, mental illness, substance abuse, physical disability, co-morbid chronic medical diseases, housing instability, trauma, and/or criminal justice involvement. Their readiness for transition is often compromised by stigma, lost daily living skills from years of institutionalization, feelings of fear and hopelessness, strained or lost family connections, and lack of alternatives to institutional placement that provide affordable housing in the community with accessible services and supports.

To successfully transition people with disabilities from nursing homes into communities under Colbert requires significant commitments, investments, resources, and workforce. Decades of a State admittedly over-reliant on institutional care and with insufficient community-based behavioral health, healthcare, and affordable housing systems resulted in thousands of people with disabilities residing inappropriately in nursing homes located throughout Cook County and other Illinois communities.

To clearly illustrate the magnitude of these circumstances it is helpful to understand where Illinois as a State places vis-à-vis other states in the U.S. for nursing facility placements, including those for individuals with serious mental illness. The same applies to the need to understand where Cook County places versus other Counties in Illinois. According to 2015 data from the Kaiser Family Foundation, Illinois is ranked 7th state in the country for number of residents in certified nursing facilities with 68,840 individuals in these facilities. While Illinois has four percent of the U.S. population, it has five percent of all certified nursing facility placements.[11]

More than 500,000 individuals with mental illness live in U.S. nursing homes, significantly exceeding the number living in all other health care institutions combined.[12] Adults with serious mental illness who live in nursing homes experience disproportionate levels of mental health problems compared with their peers living in the community[13] and 54.8 percent become long-stay patients.[14]

---

[11] *Retrieved on March 31, 2017 from:* http://kff.org/other/state-indicator/number-of-nursing-facility-residents/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.
[12] *Fullerton, C. A., McGuire, T. G., Feng, Z., Mor, V., & Grabowski, D. C. (2009). Trends in mental health admissions to nursing homes, 1999–2005. Psychiatric Services.*
[13] *Kane, R. L., Ouslander, J. G., & Abrass, I. B. (2004). Essentials of clinical geriatrics (5th ed.). New York: McGraw-Hill.*
[14] *Grabowski, D. C., Aschbrenner, K. A., Feng, Z., & Mor, V. (2009). Mental illness in nursing homes: Variations across states. Health Affairs, 28(3), 689-700.*

 ***Behavioral Health Policy Collaborative, LLC***

14

*Figure 2. Prevalence of Schizophrenia or Bipolar Disorder Diagnoses Among Nursing Home Residents by State*



In Illinois, 21 percent of individuals placed in nursing homes have schizophrenia or bipolar disorder (See Figure 2). Not only does this rate place Illinois in the highest quartile, but it has the highest rate in the U.S. and by a significant percentage.[15] The next two highest state rates are Missouri at 15.7 percent and Ohio at 15 percent.

Furthermore, Figure 3 indicates that the rate for Cook County exceeds even the overall State rate by 9.4 percent (30.4 percent versus 21 percent).[16]

*Figure 3. Prevalence of Schizophrenia or Bipolar Disorder Among Nursing Home Residents in Cook County*



Given this data is limited to counts of persons in nursing homes with schizophrenia and bipolar disorder, but not other serious mental illnesses, it is fair to predict that the rates in Illinois overall, Cook County specifically, and elsewhere throughout the U.S. are even higher. Consideration of data such as this reinforces the need for system rebalancing in Illinois, including Cook County, and the imperative for Colbert implementation.

Colbert success demands realistic resource investments and effective collaboration and cooperation among multiple State and county government agencies, service and housing providers, advocates, and others — each with varying missions, constituencies, governing laws, regulations, and policies, funding streams, and ways of doing business. The challenges of garnering and coordinating disparate resources along with creating and improving collaborations to build and sustain a reformed, seamless, functional system can be daunting, though possible.

---

[15]"Shaping Long Term Care in America Project at Brown University funded in part by the National Institute on Aging (1P01AG027296).Retrieved March 20, 2017 from: http://ltcfocus.org/map/57/percent-medicaid-ltc-spending-on-nh-care#2009/US/col=0&dir=asc&pg=&lat=38.95940879245423&lng=-99.4921875&zoom=4
[16] "Shaping Long Term Care in America Project at Brown University funded in part by the National Institute on Aging (1P01AG027296).Retrieved March 20, 2017  from: http://ltcfocus.org/map/50/percent-schizophrenic-or-bi-polar-prevalence#2015/IL/col=0&dir=asc&pg=1&lat=40.86077156828314&lng=-88.3740234375&zoom=8


*Behavioral Health Policy Collaborative, LLC*

A clear vision, formidable leadership skills, a keen understanding of policy and financing context, adequate resource investments, and a focus on both process and outcome measures are needed to transform current long-term care structures into a sustainable, person-centered, recovery-oriented, and coordinated system of care.

Many of the key informants interviewed said there has been notable progress in the past several years on a host of administrative areas and other processes that underpin the Colbert implementation work. We agree with this assessment. As examples, a Colbert Tracking Database was developed and is in use; a uniform assessment tool now exists; a training institute contract is in place and operational; home modification processes have been developed; and, as an overall indicator, the 2015 target number for transitioning 500 Class Members was reached. However, the 2016 transition target was not met by 24% and significant gaps in needed governance structures and processes remain; their addition could help foster and buttress successful Colbert implementation, including expanding current capacity to significantly reach and transition more Class Members.

The Colbert Consent Decree is an enormous undertaking that requires staffing comprised of a diverse team of individuals who are both skilled in systems change initiatives and available to commit to this high-stakes initiative. The IDoA's Office of Transitions and Community Relations, the entity that oversees and manages Colbert implementation, has a minimal staffing mix. In FY17, six staff positions were funded in the Office, including the Colbert Project Director, two quality and compliance liaisons, a housing and transition liaison, and two project assistants. An additional two positions, a housing liaison and a data analyst coordinator have been vacant for 15 and 12 months, respectively, as of the date of this writing.

Important opportunities for systems collaboration and coordination improvements are missed because there are no formal bodies of cross-State agency representatives or Colbert cross-discipline/area stakeholders who regularly meet to review and assess progress to date, discuss barriers and potential solutions, share lessons learned and recommendations, and offer suggestions for course corrections. While some meetings do occur regularly (i.e., lawsuit parties with the Court Monitor and Colbert Project Director; separate Colbert IDoA staff meetings with care coordinators, housing locators, and CMHCs), the needed regularly held meetings of high-level State- and county-government agency representatives of multiple systems and the cross-stakeholder are missing.

## Recommendations

### 1.1  Appoint a Colbert Task Force.

Effective governance structures can help fill essential oversight needs, define project mission, develop an action-driven charter, promote operational productivity, and collaborate/communicate with project or operational teams that conduct the initiative's day-to-day work. We recommend that the Governor's Office appoint and charge a Colbert Task Force comprised of representatives from State and County government agencies who will identify and share responsibility with IDoA for the investment made and outcomes realized under Colbert implementation. While outside of the scope of BHPC's consultation, we suggest the State and others consider whether to combine the Williams Consent Decree[17] into the Task Force given the clear overlaps of systems issues leading to that Class,

---

[17] Fullerton, McGuire, Feng, Mor & Grabowski, 2009.  (Fullerton, CA, et al., 2008).



**Behavioral Health Policy Collaborative, LLC**

commonality of circumstances and services needed by both sets of Class Members transitioning to the community, and the needed resources to resolve both consent decrees.

BHPC specifies inclusion of Cook County-level government membership on the Task Force in addition to the Cook County Housing Authority because our review found little evidence of involvement of key county-level officials and agencies (i.e., departments of health, behavioral health, transportation, human services, aging services, community development) in Colbert implementation. Including the County represents important opportunities to garner additional resources that can be applied toward service capacity expansion, including integrated care, crisis and respite services, more Assertive Community Treatment (ACT) teams and Community Support Teams, and housing models and units.

The Task Force should meet regularly to identify needed process improvements and propose solutions; identify, share, and review data, mainly to identify gaps and trends and their anticipated implications; and notify one another of important policy and regulatory developments with potential impact on serving Class Members. Through regular meetings, we recommend that the Task Force maintain focus on current barriers and needs to increase system efficiencies and examine and respond to recommendations from all Colbert system stakeholders.

To further the effort to clearly depict and align the many agencies and entities that are needed currently and in the future for Colbert implementation effectiveness, the Task Force should consider developing a clear Colbert Systems and Process Map that depicts domains of agency responsibility; how the multiple entities engaged in the Colbert implementation coordinate and/or overlap; their mutual links; and the resources and information flows through the system. In multiagency, multistakeholder efforts such as this, it is imperative that each entity have clear lines of responsibility and accountability and strong methods for communication and collaboration.

The Task Force's initial charge should focus on these matters, including identifying opportunities for operational efficiencies. Its focus should later evolve to developing a sustainable Exit Plan to gain the Court's permission to release the State from the Colbert Consent Decree, including the strategic positioning and specific outcomes necessary for success. The Plan should identify specific exit standards and strategies, with benchmarks and performance measures.

**1.2  Institute a Workgroup Structure and Charge Workgroups with Key Goals and Objectives**.

Task Forces and other steering bodies often develop a workgroup structure to invite experts and other stakeholders to help address challenges or issues that require expanded or deeper input than global governance efforts. We recommend that four workgroups be established quickly to address high-priority areas of need related to Colbert Consent Decree compliance and systems transformation efforts. These include workgroups for: data enterprise, evaluation/assessment, housing, and workforce development. Depending on the nature of the need, some workgroups will be ongoing (e.g., data workgroup needing ongoing effort to review key performance indicators and identify trends) whereas others will be time-limited (e.g., evaluation/assessment workgroup to create a short screening tool and revise existing evaluation tool).



*Behavioral Health Policy Collaborative, LLC*

**1.3 Revise Contracting Content, Processes, and Monitor with a New Data Dashboard.**

Contracting processes establish clear vendor responsibilities, deliverables, measurable goals, expected outcomes, and quality standards. Most contracts issued for Colbert-related services, except for those with housing locators, do contain either activity targets or "best effort language." However, many of the front-line and other Colbert-funded contractor staff providing outreach, evaluation, and/or service and housing activities who we interviewed were unaware how many Class Members they or their organizations were expected to contact, evaluate, transition, house, and/or serve. Several stated that their targets were sometimes issued verbally and subject to change. We suggest re-examining and where needed retooling vendor contracts to address this. Furthermore, there is no regularly used mechanism for Colbert staff to share with all contractors/vendors with data-driven assessments of contract performance. We recommend Colbert staff devise and use a Data Dashboard as part of the Colbert Data Enterprise Program (See Recommendation 3.1) to assist with transparent contractor performance assessment and to signal course corrections.

**1.4 Develop Staffing and Infrastructure Plan.**

To ensure a sufficient number of staff, both within and outside of governmental agencies, to plan, execute, and monitor Colbert activities, we recommend that IDoA and the Task Force conduct or commission a staffing analysis, consulting industry benchmarks, to understand staffing stress points and bottlenecks, identify gaps and needed staff by roles/responsibilities, and prioritize funding decisions within budget parameters. The effort should focus on system-wide staffing needed not only within State agencies to effectuate Colbert transitions but also across the array of community-based settings among service and housing providers, training entities, and others.

Our brief effort to identify and collect Colbert workforce-related data across providers and others was stymied by the lack of existing data and the short project timeframe that did not allow for new data collection that could then be verified. Once a comprehensive effort to collect, verify, and use such workforce data is achieved, it can be used to target transition efforts and plan service delivery. For example, these data, once verified, could be mapped against other program data to determine contractor/provider productivity goals and outcomes, as well as to project need for additional staff as a ratio to the number of additional Class Members to be served.

**1.5 Provide Additional Staffing to IDoA Colbert Implementation Office.**

Our preliminary assessment found IDoA' s current cadre of staff overseeing Colbert implementation insufficient to meet this complex program's demands with it involving myriad agencies, funding sources, and the Federal Court and Court Monitor. We recommend adding full-time positions in IDoA' s Colbert implementation office to staff at least one communications/marketing position, one transition manager, one fiscal position, two data analysts, one senior clinical staff or consultant who can provide clinical consultations to providers to avoid inappropriate "unable to serve" status of Class Members specifically and assist service planning designed to overcome barriers to community transition overall, two additional housing development positions, and two quality assurance/monitoring staff with at least one being a nurse.

*Behavioral Health Policy Collaborative, LLC*

18

## GOAL 2
## A Clear Colbert Vision Statement and Communications Plan Educates and Engages Stakeholders

While several materials such as program descriptions, public reports, and others were issued to explain Colbert, we found no evidence of a clear and visible mission or vision statement specific to Colbert. Such a statement could help inform Class Members, stakeholders, and the public about its mission and goals. It could galvanize allies and guide and assess the program's overall success and outcomes.

Similarly, we were not made aware of any communications or marketing plan designed to inform and engage the wide range of organizations and individuals needed for Colbert's long-term success. These organizations and individuals range from nursing home administrators and owners; potential and actual Class Members; family members; current and prospective providers of medical, behavioral health, housing, and transportation services; and advocates serving people with physical, intellectual, and/or psychiatric disabilities, as well as substance use disorders; County health department and other local government officials; and others.

In addition, the communications and marketing plan should aim to capture and, with permission, relay Class Members' stories and experiences of successfully transitioned from nursing homes to independently living. This is crucial to showcase that people with disabilities can successfully live and thrive in the community.

### Recommendations

**2.1 Create a Clear Vision and Mission Statement**.

We recommend the Task Force (See Recommendation 1.1) and IDoA Colbert staff lead an effort to develop a clear vision and mission statement, with stakeholder participation. The Governor can issue the final leadership statement and succinctly convey the Colbert implementation effort's vision and mission. The statement should be clear, concise, memorable, and useful in galvanizing stakeholders around Colbert's important mission.

**2.2 Develop and Implement a Communications and Marketing Plan.**

We suggest creating and using a communications and marketing plan that outlines key messages, communication methods, target audiences, and communication frequency. Customize materials to identified target audiences (e.g., Class Members, family members, media, nursing home administrators, advocates). The plan should entail ways to gather and disseminate Class Members' success stories, media engagement strategies, and approaches to collaboration with system allies willing to help garner program support.



*Behavioral Health Policy Collaborative, LLC*

19

# GOAL 3
# A Comprehensive Data Enterprise Program Drives Colbert-wide Performance Assessment and Decision-making

A centralized system used to collect, house, and access real-time data and analytics is essential Colbert program planning and management. It can provide an empirical understanding of the number of potential and actual Class Members such as their demographics, service needs and utilization patterns; display provider workload and efficiency metrics, track status and timespan between key outreach steps, evaluation, and transition processes; and monitor and report on performance indicators and quality outcome measures. Such a system can also help identify outliers and trends and suggest uses for this information to adjust resource allocations.

Several data sources and systems housed in the existing Colbert Tracking System help track Colbert implementation. This database was designed to identify individuals eligible for transition out of the Cook County nursing home system into community housing and services. The system provides data on potential and actual Class Members and tracks them through the Colbert outreach, evaluation, and transition processes, providing ongoing reporting of individuals' movements through the system. As we recommend below, monthly data should be collected and reported to all transition team providers and annual data should be reported to support monitoring and measurement of the initiative's progress.

Our review revealed a lack of consistent collection, reporting, and use of other important datasets that provide fundamentally important information impacting Colbert implementation. For example, Colbert staff recently began receiving HFS monthly Medicaid data reports on the number and names of individuals in Cook County nursing facilities and use this to identify potential Class Members for outreach. However, according to program staff, out of concern for confidentiality and other related issues, HFS will not supply residents' clinical diagnoses, which could be used to provide at least preliminary indication of their eligibility for Colbert services and, thus, impact time spent on outreach and assessment. As detailed below, we found little evidence of use or consideration of other important data sets existing within the nursing home system. Data sets that provide critical information and can inform Colbert planning and implementation, as well as clinical decision-making, include the Minimum Data Set (MDS),[18] the MDS Section Q,[19] Medicaid claims data, and the Pre-Admission Screening and Resident Review

---

[18] *The Minimum Data Set (MDS) is a federally mandated resident assessment instrument administered to all residents in Medicare or Medicaid-certified nursing facilities within 14 days of admission and at prescribed intervals thereafter. The MDS provides a comprehensive assessment of the medical, functional, and psychosocial status of each resident, enables detailed measures of behavioral characteristics, and perhaps most relevant to Colbert implementation, includes questions on preference and support to return to the community. The MDS is to be administered to all residents upon admission, quarterly, yearly, and whenever there is a significant change in an individual's condition. MDS data are to be used by the nursing home staff to identify needs, develop care plans, and monitor progress.*


*Behavioral Health Policy Collaborative, LLC*

(PASSR);[20] (See Goal 10 for a detailed description of PASSR). We acknowledge that Colbert program managers state that the MDS Section Q data has been in use for the past year.

Additionally, there are other hindrances to effectuating a robust data-informed system, including no integrated plan for reporting and disseminating data to stakeholders across Colbert systems; insufficient staffing in IDoA's Colbert implementation office for data analyses and reporting; and no comprehensive mechanism for planners and managers to identify and acquire more needed data, review this, and use it to manage the program.

To support Colbert governance and oversight, development of a Data Enterprise Program should be considered. The Program can offer real time information to enable IDoA Colbert leadership and Task Force and Workgroup members to assess system performance, address quality issues as they arise, ensure regulatory compliance, avoid duplication of effort for both staff and individuals, and reduce costs with a streamlined process, duplication reduction, and economies of scale.

## Recommendations

### 3.1  Convene a Data Enterprise Workgroup and Create Data Enterprise Program.

Effective implementation of data-informed decision-making requires project leadership to identify the key information it needs to interpret program performance, assess quality, and identify trends. While IDoA Colbert program managers and other agency staff already engage in some data collection and reporting, a more thorough and robust data initiative is needed, along with the resources to ensure it can effectively collect data, report, conduct analyses, and disseminate information. We recommend that IDoA convene a Colbert Data Enterprise Workgroup comprised of government agencies, providers, and consumer representatives to collaborate with IDoA data analysis staff to develop a strong data use, monitoring, and evaluation plan and includes the development and regular use of a Colbert Data Dashboard addressing key program goals' progress via specific measures. This plan should also include training for individuals required to collect and report data.

The Data Workgroup should assess the adequacy of the current Colbert Tracking System and take steps to enhance it. We observed that the system involves numerous entities that often share responsibilities and functions, too often without clear parameters or catchment areas. For example, we interviewed several Colbert contractors responsible for outreach to and evaluation of potential Class Members. Several admitted to lack of clarity about which nursing homes were assigned to their agencies. Moreover, they discussed many instances in which multiple

---

[19] MDS Section Q is the part of the MDS designed to explore meaningful opportunities for nursing facility residents to return to community settings. The MDS 3.0 Section Q allows individuals to express interest in learning more about possibilities for living outside of the nursing facility. All Medicare and Medicaid certified nursing facilities are required to use the MDS 3.0.

[20] The Pre-Admission Screening and Annual Resident Review (PASRR) – authorized by the Omnibus Budget Reconciliation Act (OBRA) of 1987 - is designed to identify nursing home applicants and residents with mental illness and determine whether nursing home application and placement is appropriate or not. Under the PASRR program, nursing facilities are prohibited from admitting any individual with a serious mental illness unless the State Mental Health Authority determines that nursing home level care is required for that individual (Linkins et al., 2001). PASRR is used to determine whether specialized mental health services are needed for nursing home residents. However, fewer than half of nursing home residents with a major mental illness receive appropriate preadmission screening.


**Behavioral Health Policy Collaborative, LLC**

Colbert contractors subject the same nursing home residents to the same lengthy evaluation process. This evidences duplication of effort, wasted resources, and confused and frustrated nursing home residents/Class Members and staff. To reduce duplication of effort, enable efficiency, and facilitate transparency, our recommendation includes adding specific nursing home assignment data and individual resident-level outreach assignments and status under the Colbert Data Enterprise Program in the Colbert Tracking System. This will permit the system to provide and track accurately and timely individual and aggregate data on outreach, evaluation, and transition activities by initial contact, unique provider, and unique client levels.

### 3.2  Implement Data Review Processes.

Systems transformation efforts should measure and report performance to drive actionable quality improvements. We recommend Colbert managers and staff, Task Force and Data Enterprise Workgroup members, and the Court Monitor determine how to define success for Colbert's mission and scope; then select associated quantitative and qualitative Key Performance Indicators (KPIs). Data review processes are needed to confirm Colbert implementation is working effectively and/or identify the need for process improvements. The data reviews can help identify program successes, barriers, bottlenecks, and training needs. We also suggest developing a data analytic partnership to benchmark Colbert data against national and other long-term care data to plan and implement strategies to manage both the existing Class, as well as new entries into nursing homes.

### 3.3  Use Technology for Data Collection.

Tablets, smartphones, and other electronic devices can support real-time data collection efforts such as client/patient assessments, streamlined authorization for services and supports, and ongoing monitoring of individual needs and care. We recommend the Data Enterprise Workgroup explore options for technology-enabled data collection and reporting to increase compliance, uniform data collection, and timeliness.

### 3.4  Increase IDoA Staff Support in Data Collection and Analysis.

Colbert funders and administrators must have access to and use key data reports to manage the effort, especially if a significant increase in the numbers of Class Members evaluated and transitioned is to occur. Likewise, busy provider teams and agency officials need access to real-time data to inform decision-making and adjust staffing patters, among other things; yet, they do not have time to clean, calculate, and analyze these data. Currently, only one part-time Colbert staff conducts data analysis; this professional is also assigned to other projects and, thus, Colbert work often does not take precedence and few analyses are completed. Informed by Data Enterprise Workgroup recommendations, to better meet these important needs, IDoA should consider increasing their data team's size by adding two full-time staff members dedicated exclusively to Colbert data work (See Recommendation 3.4).

### 3.5 Devise and Use Data Methodology to Predict Class Member Size and Project Rates for Transition Stages.

It is clear that not being able to predict how many Class Members are likely to transition to the community compromises efforts to plan and manage Colbert implementation. The significant data-related limitations discussed above compromised our efforts to devise and apply a methodology to answer these basic programmatic questions. For example, since this answer determines the baseline to make projections under the program, and difficulties with obtaining other reliable data needed to make valid program estimations, we could not proceed



*Behavioral Health Policy Collaborative, LLC*

with actual calculations. However, we did endeavor to identify these and other parameters for the data needed and offer a simple step-by-step methodology to do so.

Table 2 presents data categories that we suggest as examples of the types, reporting format, and potential analyses that could be used for reporting, projections, and planning on several key measures for Colbert contacts, evaluations, and transitions. This data needs to be complete so that it reports activities for the two Colbert-MCOs (Illinicare and Aetna) and includes similar services provided by CMHCs, care coordinators, and housing locators and coordinators, among others. Specific components needed before analyses can be properly conducted and the results used include agreed upon target numbers within a single measurement timeline, and baseline and regular time interval activity data from all providers. Data analysts can use the completed data to calculate average numbers of Class Members who were originally identified, indicated interest in transitioning, were assessed, and recommended and not recommended for transition and why. All of these represent critical knowledge points for Colbert program management — both today and in the future.

| Table 2.  Potential Colbert Data Collection on Monthly Contacts, Evaluations and Transitions for Use in Program Projections and Planning | | | | | | |
|---|---|---|---|---|---|---|
| Colbert Activity/ (#) | Month 1 N (%) | Month 2 N (%) | Month 3 N (%) | Month 4… N (% | Total | Average/ Month |
| **Attempted Contacts** | | | | | | |
| | | | | | | |
| **Completed Contacts** | | | | | | |
| | | | | | | |
| **Completed Evaluations** | | | | | | |
| | | | | | | |
| **Recommended for Transition** | | | | | | |
| | | | | | | |
| **Not Recommended for Transition/Unable to Complete Evaluation and Reasons** | | | | | | |
| Evaluator Agency 1 | | | | | | |
| Medical | | | | | | |
| Mental Health | | | | | | |
| Dementia | | | | | | |
| Evaluator Agency 2… | | | | | | |
| Medical | | | | | | |
| Mental Health | | | | | | |
| Dementia | | | | | | |

We offer several basic steps that create a methodology to determine key Colbert factors, including Class size and numbers of Class Members expected to progress through several program stages, from outreach to community transition. The Data Workgroup should review and refine this methodology before applying it to address the limitations noted above; then implement the final methodology that Colbert implementation managers should regularly update and use.

*Behavioral Health Policy Collaborative, LLC*

***Step 1: Determine total County nursing home population***. Identify the total number of individuals residing in Cook County nursing homes on a given date using HFS data including Medicaid claims data (currently estimated by the State to be approximately 18,500 individuals).

***Step 2: Estimate the number of current Class Members.*** Use the MDS to identify the number of current and continuing county nursing home residents who meet the Colbert eligibility requirements for inclusion in the Member Class. The MDS has the advantage of having all clients (e.g., private pay, Medicare, and/or Medicaid covered) in the database, which makes it the most inclusive of all residents and, therefore, should capture all potential Class Members. Alternatively, or in addition to using the MDS, Medicaid claims data can be used to identify all Medicaid billing for residents in the service type, "long-term care," diagnosed with a mental illness since 2013, as well as those with other chronic physical disorders or with co-occurring physical health issues and serious mental illness. Data from Colbert program implementation experience to date can also be used to project estimates for percentages of nursing home residents who will not meet Colbert eligibility criteria. Estimate the current total Colbert Class size by taking the total number of Cook County nursing home residents (Step 1) and subtracting the number of residents projected to be ineligible for Colbert status due to a dementia diagnosis, or other exclusion criteria. Using the remaining number of all individuals who do meet criteria, consider applying (if validated) secondary criteria using PASSR data (i.e., all persons who apply for admission to a nursing facility are screened using PASRR-Level II) and cross these data with the MDS and/or Medicaid/Medicare dataset to identify individuals with a mental illness who meet Colbert Class criteria. The number calculated under this step can help forecast the capacity needed for outreach services to potential Class Members and for nursing home staff engagement.

***Step 3: Project the number of Class Members who will likely be interested in transitioning to community housing.*** Subtract from the number derived under Step 2 (i.e., number of nursing home residents who comprise the Colbert Class) the projected number of residents who will likely decline consideration, be discharged before transition or otherwise not complete transition, based on the percentages that have done so under the Colbert program to date. (These data can also be compared to MDS Section Q data.) The number derived under Step 3 can help Colbert program managers identify the number of contractors and staff needed to conduct the projected number of pre-screens and full evaluations/assessments of Class Members.

***Step 4: Estimate the number of Class Members, after the pre-screening (See Recommendation 5.1) and evaluation/assessment process, will be recommended for transition.*** Analyze existing transition experience data to determine transition predictors; subtract from the subtotal derived in Step 3 the number of Class Members projected to experience active psychosis, self-harm, medical issues requiring nursing home levels of care, or other significant factors that will likely result in a not ready to transition determination. **The number remaining is the number of *current* Class Members projected to be recommended for community transition.**

The results of the calculations made in Step 4 should be used to project community housing and service capacity needs, including number and types of housing units, types and extent of housing accommodation/modifications that will be needed, type and intensity levels of expected needed medical, behavioral health, social welfare, and other services and supports by location (as expressed by Class Member preference).

*Behavioral Health Policy Collaborative, LLC*

**3.6 Increase Already-Mandated Data Reporting Compliance.**

There are several critical datasets that the Colbert program has not considered or used, or have recently begun to use but need to be utilized further; yet these datasets have immediate relevance to Colbert implementation. For example, the Minimum Data Set (MDS) is a federally mandated resident assessment instrument administered to all residents in Medicare or Medicaid-certified nursing facilities within 14 days of admission and at prescribed intervals thereafter. The MDS provides a comprehensive assessment of the medical, functional, and psychosocial status of each resident, enables detailed measures of behavioral characteristics, and — perhaps most relevant to Colbert implementation — includes questions on preference and support to return to the community. The MDS is to be administered to all residents upon admission, quarterly, yearly, and whenever there is a significant change in an individual's condition. Nursing home staff must use MDS data to identify needs, develop care plans, and monitor progress.

The MDS Section Q is the section designed to explore meaningful opportunities for nursing facility residents to return to community settings. The MDS 3.0 Section Q allows individuals to express interest in learning more about possibilities for living outside of the nursing facility. All Medicare and Medicaid certified nursing facilities are required to use the MDS 3.0. Colbert program managers say that within the past year they have begun examining Section Q data and attempting to find ways to expand its use.

Another dataset exists under the Pre-Admission Screening and Annual Resident Review (PASRR) — authorized by the Omnibus Budget Reconciliation Act (OBRA) of 1987. As Federal law, PASRR is designed to identify nursing home applicants and residents with mental illness and determine whether nursing home application and placement is appropriate or not. (Detailed discussion of PASRR compliance and it relevance to appropriate nursing home diversion appears under Recommendation 10.2)

Given the relevance of these and other datasets to Colbert Consent Decree goals, compliance for MDS and PASSR data collection and reporting should be reviewed and likely increased. Colbert program managers and the Data Workgroup should ensure regular review and consideration of this data to inform and drive Colbert outreach, evaluation, and other key transition services, as well as to inform investments in and development of viable diversion pathways.



*Behavioral Health Policy Collaborative, LLC*

# GOAL 4
# System-wide Investments Achieve Colbert Mandates and Avoid Inappropriate Nursing Home Placements

To achieve full compliance with the Colbert Consent Decree, the systems that serve Class Members must be adequately resourced, which includes making upfront investments to build and expand systems capacity, reinvesting cost savings and aligning financial incentives and disincentives with project goals. Currently, the lion's share of State resources targeted for Class Members is most readily identified in the budgets of IDoA (administrative and other costs) and HFS (Medicaid costs). Together, these funds support the costs of IDoA staff assigned to the Colbert project; contracts with outreach, assessment, medical, behavioral health, and housing service providers; Medicaid services including medical equipment, contracts for training and case determination reviews with the University of Illinois Chicago; and other project-related expenses.

State budgets are a critical revenue stream for healthcare, behavioral health, housing, and other vital community-based services. From Federal block grant allocations to Medicaid spending, state match dollars and general fund dollars are vital resources for keeping the doors open for safety-net services. Illinois' state budget crisis — now with more than two years without an approved budget — resulted in cuts to community-based services, which has compromised and undermined Colbert implementation specifically and the spirit of Olmstead compliance overall.

Because of the budget impasse in Illinois dating back to FY15, the Colbert budget since that time has remained unchanged at $32.5 million. The Federal Court Judge overseeing Colbert implementation has twice ordered that payments to providers be continued under Colbert, albeit maintained at the FY15 levels. According to stakeholders we interviewed, the inability to pass a state budget impacted the program in several negative ways, including: provider drop-out due to too-low reimbursement rates; long delays in payments for non-Colbert services that make up the majority of their budgets; uncertainty and reluctance of some providers to increase or join the Colbert provider/contractor pool; and budget cuts to related/ancillary programs and services needed by Class Members. These factors have serious implications for the State's ability and system capacity to maintain current levels, much less significantly increase the number of evaluations and transitions of Class Members.

We offer the following recommendations designed to help accurately capture and understand the total costs of transitioning clients under the Colbert Consent Decree, identify and secure strategic investments and reinvestments, and use financial levers to buttress Colbert's goals and outcomes.

*Behavioral Health Policy Collaborative, LLC*

## ▌*Recommendations*

**4.1 Garner a Formal Savings Reinvestment Commitment.**

The Cost Neutral Plan recently agreed to by the parties and approved by the Court in November 2016 accepts the findings of a cost study conducted by the Berkeley Research Group (BRG), which concluded that, on average, it is 38 percent less expensive to serve Class Members in the community than it is in Cook County nursing homes.[21] However, we could find no written or other evidence of an affirmative State commitment to reinvest any of the actual or anticipated savings into any aspect of building or expanding the community-based infrastructure capacity determined necessary to adequately serve Class members, including any specific behavioral health, healthcare, housing, employment, transportation, or other program or service.

In an era of scarce resources, public mental health systems struggle to develop comprehensive community-based treatment and rehabilitation systems for persons with mental illnesses and other disabilities. Many states have used an innovative budgeting and contractual process to incentivize providers by supporting reinvestment strategies for services. Reinvestment strategies can be contract-, policy-, or legislatively-based.

Pennsylvania, New York, and North Carolina have reinvestment strategies in place for behavioral health services. The Pennsylvania Department of Health and Human Services, Office of Mental Health and Substance Abuse Services allows providers to keep and spend dollars saved through innovative services funding. The Governor's Annual Budget features the reinvestment process and individual departments monitor reinvestments. The opportunity to use reinvestment funds are written into individual providers' annual budgets. At the end of the fiscal year, Counties receive a per-person ("capitation") payment from the State under Medicaid or behavioral health services. If the County and its behavioral health MCO spend less than the State payment, they must reinvest that "profit" in services.

In New York State, the Community Mental Health Reinvestment Act, signed into law in December 1993, established the State's commitment to provide substantial new resources to fund the development of community services. The basic principle behind the legislation is that funds saved from downsizing the State hospital system through closures and census reductions must be "reinvested" to create more community-based services.

North Carolina made the decision to implement managed care for Medicaid-funded behavioral health and intellectual and other developmental disability services to achieve the goals of Medicaid reform efforts: improve the quality of care and consumer satisfaction through more efficient use of resources; provide budget predictability; and create a sustainable system by implementing the 1915 (b)/(c) Medicaid Waiver. The State also mandated that any savings realized through more efficient use of resources be available to reinvest in the system. Since the public Local Management Entities/Managed Care Organizations (LME/MCOs) are governmental entities that cannot, by definition, earn a profit and do not have stockholders expecting a return on investment, any savings that the LME/MCOs earn are available to reinvest as one-time dollars in additional services and initiatives.

Similar to these States' reinvestment programs, we recommend that at least a portion of the cost savings realized under Colbert implementation go to rebalance Cook County's systems serving Class Members (e.g., behavioral health, healthcare, housing) to focus on community-based services. Legislation, budget authority, or other

---

[21] *Berkeley Research Group. (Filed with the Court November 16, 2016). Expert Report of James Heenan, Stuart McCrary, and Michael Neupert. Appendix A.*

 **Behavioral Health Policy Collaborative, LLC**

mechanism should formerly codify this multiyear commitment. We recognize that the State's budget crisis may likely lend formidable opposition to this recommendation as pressures exist and will remain to apply savings realized under Colbert implementation to other budget priorities.

**4.2 Expand Comprehensive Cost Study and Use Results to Target Services Delivery.** The recent BRG Cost Study mentioned above calculated, "The average cost of care for transitioned Class Members prior to transitioning was $28,611 versus $17,883 after transitioning, a decline of $10,728 or 37.5%."[22] We recommend that IDoA build upon the work of the BRG Cost Neutral Study to continue and expand upon efforts to determine Colbert costs that span all systems, including housing, healthcare, and social services. The results can continue to help determine true costs of nursing home care compared to community-based services and supports and, particularly, inform and support an active commitment to reinvest savings into the community. It will also prove instrumental in projecting resources needed to expand specific community services (e.g., ACT, CST teams, cluster housing with 24/7 medical support), as no reliable mechanism exists currently for doing so.

**4.3. Identify and Act Upon Inappropriate System Incentives and Disincentives.**

Colbert implementation efforts entail a complicated set of interagency and inter-organizational relationships, each associated with distinct incentives and disincentives. It is critical to address incentives and disincentives related to the Consent Decree forthrightly. We suggest the Task Force (See Recommendation 1.1), in collaboration with IDoA, identify nursing homes, MCOs, CMHCs, housing locators, and pre-transition service provider organizations' individual and collective incentives and disincentives. Several existing incentives implemented under Colbert are worthwhile, but do not adequately work and need revision (i.e., shared bonus payments between MCOs and housing coordinators based upon Class Members' successful community tenure at the six- and 12-month marks.)

During our project's short duration, we identified several system incentives and disincentives that must be quickly examined and either adjusted or removed altogether. For example, while we were told that the contracts with managed care organizations that serve Medicaid beneficiaries in the County require risk bearing for members entering nursing home care, a function used by many states to disincentive entry into institutional care, we did not see evidence of active use of this contracting tool. (See Recommendation 4.5). Similarly, we received varying responses regarding whether MCOs required pre-authorization for covered members before nursing home placement. Several key informants offered that their MCOs were actually paid or reimbursed at a higher rate for a Class Member's care in a nursing facility than in community-based care. If this is the actual case, it clearly bears examination as it offers a system-wide financial incentive to continue nursing home placement even when community alternatives are more appropriate and less expensive. However, it does not appear that these incentives have been identified and considered for their role in impeding Colbert implementation. We recommend that Colbert program managers identify these and other system incentives and disincentives, review them, and, where needed, work with relevant parties (e.g., other state agencies, funders) to systematically enforce, change, or remove them.

---

[22] *Based on adjusted sample of 291 transitioned Class Members for 12 months prior to and after transition.*


*Behavioral Health Policy Collaborative, LLC*

**4.4   Assess Medicaid Reimbursement Rates and Incentives.**

Several interviewed providers and IDoA Colbert staff told us of provider contentions that they lose significant dollars while serving Class Members; their costs routinely exceed payment and reimbursement rates. We were told of instances in which inadequate payments spurred providers to drop out of the Colbert program's contracted services delivery organization pool or decline to enter it altogether.

Provider-level costing of services allows organizations to understand their real costs for service provision versus the reimbursement or other revenue obtained to support a service. We recommend that providers partner with IDoA and other relevant state agencies (i.e., HFS, DHS, DMH, Division of Rehabilitation Services *to* design and then engage in service costing exercises. IDoA and these sister agencies should verify and use the costing examination's results to assess the adequacy of reimbursement rates for common services and how to infuse innovation for capacity expansion. If indicated, the State should consider offering rate reforms/adjustments. Together, the parties should also investigate barriers under current reimbursement structures (i.e. Rule 132) and whether any setting- and provider-based provisions or restrictions in the Medicaid State Plan could alleviate provider shortages or reimbursement challenges (e.g., telemedicine, telepsychiatry).

IDoA, HFS, DMH, and other State agencies should also examine the link between and appropriateness of PASRR determinations and referral source and nursing home use of medical override status, which disincentives community transition efforts, in part by securing and continuing Medicaid reimbursement for nursing homes that may not follow IMD (Institutions for Mental Disease) rules by having more than 50 percent of residents with primary diagnoses of serious mental illness.

**4.5   Explore Risk Bearing Requirements in Medicaid Managed Care Contracts.**

Many healthcare systems are moving away from fee-for-service payment approaches that reinforce volume toward value-based purchasing arrangements that drive outcome improvement. As mentioned above, we were assured that State and local Medicaid managed care contracts require the MCOs to bear financial risk for institutional versus community placement of members, however we remain unconvinced this is in active use. We recommend the State investigate this and if absent or not being fully used, consider revising its current expectations and, if necessary, contracts with MCOs to address financial risk-bearing parameters to incentivize MCOs to address Class Members' health issues by providing community-based care and services as early as possible to avoid inappropriate and costly hospital, nursing home, or other institutional care.

# GOAL 5
# Colbert Uses Efficient and Reliable Outreach, Screening, and Evaluation/Assessment Processes and Protocols

The Colbert Consent Decree mandates the identification of Class Members defined as "Medicaid eligible adults with disabilities who are being or may in the future be, unnecessarily confined to Nursing Facilities in Cook County, Illinois…"[23] and, when appropriate, transitioning those recommended to community-based housing with services and supports. Achieving these goals is contingent upon the successful identification, outreach, engagement, and evaluation/assessment of potential Class Members. Once identified and recommended for transition, Class Members need timely development of service plans with referrals to community-based services, as well as services and supports that prepare them and support them in successful community tenure, including safe, appropriate, accessible, and affordable housing. The following offers a brief synopsis of the current three major pre-transition Colbert activities.

- **Outreach** is the process of engaging Class Members and, sometimes, their families and/or loved ones to explain their rights and opportunities in transitioning and moving into the community from their nursing home placement, supported by the provision of robust wraparound services. This process is primarily educational in nature and should have a clear goal of full engagement of Class Members and their families, necessitating that outreach staff be well skilled in customer service, therapeutic communication, and effective approaches used to address/allay the fears and anxieties that both Class Members and their families may experience. Recently expanded to allow five CMHCs to conduct direct outreach, this activity is primarily performed by staff from seven other outreach entities, including the two Colbert-contracted MCOs.

- **Evaluation and Assessment** are terms often used interchangeably under Colbert. Each refers to the step that occurs after outreach efforts and indicates that a nursing home resident desires and consents to consideration for a transition recommendation. Contract staff (including the two Colbert MCOs, CMHCs, and other agencies) now use a recently implemented standardized 47-page assessment protocol that entails an in-person interview of the nursing home resident identified for participation after outreach, documentation gathering, and review of medical and behavioral health diagnoses, housing and employment histories, income status and sources, and many other aspects.

- **Referrals** must be made to providers with the resources and services that can meet those needs for individuals with significant medical, physical, and/or serious mental health diagnoses. Referrals for Class Members interested in or recommended for evaluation are typically made through the MFP (Money Follows

---

[23] Colbert v. Quinn. No. 07 C 4737, United States District Court for the Northern District of Illinois, Eastern Division. Order. Filed December, 31, 2011. Pg. 2.

*Behavioral Health Policy Collaborative, LLC*

the Person) website. Post evaluation/assessment referrals for transitioning Class Members to community-based providers (e.g., CMHCs, housing locators) are made by the Colbert MCOs or CMHCs who conduct assessments; with CMHCs often self-referring. Generally, the referral process entails an outreach staff drawing upon resources that appear to vary greatly by geographic location and from provider to provider. In addition, there did not appear to be a known referral process target goal for average time allowed from point of referral to completed transition.

Based upon our review of these pre-transition processes, including examination of tools, forms, reports, and other materials, together stakeholder interviews with Class Members, nursing home administrators, outreach and evaluation staff from the Colbert-funded MCOs and CMHCs, Colbert IDoA staff, the Colbert Court Monitor, and others, we offer several recommendations designed to streamline procedures, create efficiencies, reduce duplication, establish performance standards, expedite processes, and enhance workforce capacity and skill levels.

## Recommendations

**5.1  Create and Use a Short Screening Tool and Simplify Current Evaluation/Assessment Tool.**

The evaluation/assessment tool used to identify Class Members appropriate for community transition should be clear, concise, and targeted to obtain information that can be used to assess transition readiness. While overall a positive development, the new screening tool used uniformly by Colbert contract staff charged with conducting this step is too long at 47 pages. It takes between two to three hours to administer to the nursing home resident and approximately six to eight additional hours to collect all required documents, write the assessment finding, and conduct other steps. However, despite common knowledge that several key factors that can — once known — indicate that the Class Member may not be immediately appropriate for transition, completion of the entire lengthy, burdensome tool is required. This is a significant and unnecessary use of staff and resources, placing undue burden on potential Class Members, nursing home staff who are asked to supply numerous documents, and Colbert-funded staff who conduct full evaluations — even when the results are clearly very early in the process.

We recommend the convening of a short-term Evaluation/Assessment Workgroup to develop, pilot test, and validate a Colbert brief screening tool. The tool should take no longer than 30-minutes to implement and be comprised of no more than 10 questions that, if positive for a certain number of the factors, reliably indicate that the nursing home resident is not yet ready for transition due to disqualifying Colbert eligibility standards (i.e., diagnoses of severe dementia or severe cognitive disorders) or other current conditions such as acute suicidality or self-injurious behaviors that compromise safety, unstable psychiatric conditions, serious medical issues requiring nursing home level of care (e.g., open wounds or infections), or inability to manage basic activities of daily living. Basic identifying and diagnostic data could be pre-filled with existing data from the nursing home MDS or other databases. Existing tools, for example the Camberwell Assessment of Need (CAN)[24] should be considered by the Workgroup as using validated tools will increase efficacy.

---

[24] *The Camberwell Assessment of Need (CAN) Instrument is designed to help providers understand the health and social needs of adults who have severe mental health problems. It covers 22 domains of an individual's life, including accommodation, food, self-care, daytime activities, psychotic symptoms, childcare, money, psychological distress, physical health, and relationships. For more information see: www.researchintorecovery.com/adultcan*



**Behavioral Health Policy Collaborative, LLC**

Nursing home residents for whom the new screening tool indicates that current transition is inappropriate should be reassessed within at least six months, or sooner if recommended by the Workgroup, to determine if circumstances changed and they are now ready to move forward in the process. Independent quality monitors, either State staff or contractors not otherwise contracted to conduct outreach or evaluations of Class Members, should routinely review a representative sample of screening tool determinations and follow an established and monitored process to identify and rectify unacceptable levels of inappropriate determinations.

We recommend that the same Workgroup re-examine the current Colbert evaluation/assessment tool and make concrete recommendations about if and where it can be significantly shortened. Workgroup members should include clinical experts knowledgeable about empirically-supported evidence on the factors that have demonstrated accurate predictions regarding community tenure for people with psychiatric and/or physical disabilities, as well as MCO and CMHC staff experienced and skilled in using the current tool who can offer practical advice on revising it. Program administrators and Workgroup members should keep in mind that several CMHC key informants serving Class Members told us of their processes to conduct yet another evaluation/assessment of Class Members once they become their agency's new clients as they use their own evaluation/assessment process to enter required data into their respective electronic health records and revise or develop treatment and service plans, among other things. Addressing these duplications by revising, shortening, and streamlining steps in the pre-transition process depicts yet another opportunity to save resources, speed up steps, and evaluate more potential Class Members.

## 5.2 Institute Catchment Area Nursing Home Assignment System.

During our work, it became evident that Cook County's 186 nursing homes are not clearly divided and assigned among the Colbert-funded MCOs and CMHCs responsible for conducting Colbert outreach and evaluation activities in the nursing homes. While we acknowledge that this task is complicated by differing types of populations across nursing facilities and lack of access to Class Members' diagnostic information that is used to assign an outreach entity, the current circumstance has created instances of confusion, uncertainty, and redundant work, with little accountability in terms of productivity and effectiveness. We were informed of recurring instances where several of these agencies conducted both outreach and the lengthy assessment with the same nursing home resident. This subjects nursing home residents to repetitious, long interviews with no clear indication of who their main point of contact is. It also frustrates nursing home administrators and staff because they are not informed of what agencies are entering their nursing homes to conduct Colbert work; this hinders opportunities to develop more effective working relationships between the nursing homes and Colbert providers. We are told that IDoA Colbert project staff are aware of this and are working to identify and implement solutions; we encourage this effort. We recommend developing and implementing a system to clearly designate by catchment area each contracted agency's nursing home assignments and support the system with a database that contracted Colbert outreach and evaluation staff can readily access data and information on which nursing home residents have been contacted and/or evaluated and the results from these contacts.

## 5.3 Establish Outreach and Evaluation Targets.

Key Performance Indicators (KPIs) use quantifiable measures to evaluate success for individual staff and entire systems. While some outreach and evaluation staff indicated that they were aware of their targets for the number of per-month outreach contacts and evaluations, several were not clear or did not know altogether their or their agency's targets.; Consistent with our Recommendation 1.3, we suggest that IDoA ensure that outreach-related



*Behavioral Health Policy Collaborative, LLC*

KPIs are specified in contracts and transparently monitor and assess performance with accountability for the attainment of KPIs on individual or agency levels.

**5.4  Formally Engage Nursing Home Administrators and Staff in Outreach and Evaluation/Assessment Processes**.

Some interviewees contended that nursing homes will be uncooperative in the Colbert endeavors because Colbert success means they lose residents and, thus, revenue. However, most said, for the most part, nursing home staff cooperate by providing access to residents, making space available for Colbert contracted staff to conduct outreach and assessment work, supplying requested documents, and participating in discharge planning meetings. They noted this level of cooperation and access was not always the case, but has improved over the years.

However, our interviews with two nursing home administrators and several of their staff revealed frustrations that they are not informed and provided with the opportunity to participate more deeply in a range of Colbert activities. They said that they would like more information on the Colbert project overall, to be informed of what agencies have been assigned to work with their facilities and how determinations to transition residents are made, and the opportunity to offer insights into why a resident may or may not be ready to transition.

While IDoA outlined expectations for facility administrators in past and recent letters to Cook County nursing facility administrators, we nevertheless see the need for more direct and frequent interactions with nursing home principals. We recommend that part of the communications and engagement plan that we suggest under Recommendation 2.2 address messaging and engagement strategies customized to nursing home administrators and staff to more fully engage their participation and cooperation with Colbert activities. Increasing engagement will foster critical activities, including supporting outreach, evaluation/assessment, and referral processes to transition nursing home residents into the community.

**5.5  Ensure Appropriate Match Between Class Member Needs and Referred Service Provider Agency.**

Appropriate referrals to service providers should ensure that Class Members receive services that best respond to their unique clinical and medical needs. Currently, the Colbert referral process appears to sometimes match persons with primary medical conditions and without diagnoses of serious mental illness to CMHCs. While data could not be provided on frequency, it may indicate a barrier as these agencies are intended to serve people with serious mental illness and do not have capacity or resources to meet other's needs. Such misalignments may result in underserving the Class Members or even putting them at risk of being placed on the "unable to serve" list.

Furthermore, some of the contracted outreach staff are not trained to work with or identify persons with serious mental illness. To a degree, this may contribute to the inaccuracy of some referrals. Colbert MCO staff currently tasked in part with identifying Colbert members with serious mental illnesses seem to have significant experience with working with individuals with physical disabilities, but not always with those diagnosed with serious mental illness. Conversely, most CMHC staff are not trained to work with individuals with physical disabilities and serious mental illness, but they receive referrals to do so under Colbert. We recommend better aligning referral staff expertise, Class Member clinical profile and needs, referral agencies/services offered; and, adding or increasing cross-disability training. (Recommendation 6.1 proposes a framework intended to improve appropriate referrals.)



*Behavioral Health Policy Collaborative, LLC*

# GOAL 6
# Provider Capacity Exists to Successfully Serve Transitioned Class Members

The linchpin of success for implementing the Colbert Consent Decree is a robust community-based service and housing system that aligns with Class Members' needs, enshrines evidence-based practices, offers integrated primary and behavioral healthcare and other innovative person-centered models, provides safe and affordable independent housing that includes accessible units for individuals with physical disabilities, and develops a knowledgeable workforce skilled in meeting the needs of vulnerable populations.

Focusing on these system needs and attributes is now especially important as the Colbert Consent Decree moves into a revised implementation plan with the Court's mandate to increase community placements, which places great demands on the system. Under the Cost Neutral Plan, which is now part of the Consent Decree, another 550 Class Members are required to be transitioned from nursing homes into the community during 2017, a 43 percent increase from 2016.

We offer several recommendations in support of Goal 6's aim to build and maintain adequate capacity among Colbert service providers (with Goal 7 solely focused on housing). These suggest adopting a standard framework that uses population health approaches and can be employed in Colbert implementation to guide Class Member referrals to appropriate provider agencies, use Class Member service needs to determine specific areas requiring enhanced capacity building, and promote adoption of evidence-based practices.

## *Recommendations*

### 6.1  Stratify Class Member Populations Using the Four Quadrant Clinical Integration Model.

To drive appropriate service delivery and systems planning, it is important to both understand differences within and among client populations and then allot and manage resources effectively to meet their healthcare and social service needs. We recommend using a standard approach to determine and stratify Class Members into clinical profile categories; then, use those determinations to best match Class Members to appropriate service providers.

This approach can not only help optimize care, but can also apply to predictive modeling to project future service needs and the community's capacity to meet them. The Four Quadrant Clinical Integration Model[25] provides an easy-to-understand and useable framework to organize Class Members into clinical profile categories and further understanding of the mix of provider capacity required to address demand and service needs (See Figure 4).

---

[25]*Mauer, Barbara J. Behavioral Health/Primary Care Integration — The Four Quadrant Model and Evidence Based Practices (Revised February 2006).*

 **Behavioral Health Policy Collaborative, LLC**

34

*Figure 4. Four Quadrant Clinical Integration Model*



We suggest this specific model not only for its utility in identifying and stratifying Colbert service populations, but also, principally, because it addresses Class Members' medical/primary care and behavioral healthcare (i.e., mental health and substance abuse services) with integrated approaches, a key and relatively recent advance of the field to understand that this is a best practice designed to turnaround the early mortality and morbidity of people with behavioral health disorders such as is the case with the majority of Class Members (See Recommendation 6.4).

Briefly, the Four Quadrant Model is framed along two continuums: one for physical health ranging from low- to high-risk and complexity as indicators of acuity and service needs and the other for behavioral health also ranging from low- to high-risk/complexity. Thus, if a Class Member has both a serious mental illness with a high level of acuity together with a co-morbid medical condition(s) and high service needs, then the person would be assigned to Quadrant IV. Assignment to each Quadrant is associated with a list of key services that should be considered when devising the Class Member's service plan and then used to identify and select appropriate service providers that can deliver those services.

We recommend that IDoA Colbert program managers work with service providers and other key stakeholders to consider, assess, and determine if our recommendation to implement the Four Quadrant Model. The model should be customized with more specificity to suit Class Members service needs. By way of examples, in Quadrant IV,

*Behavioral Health Policy Collaborative, LLC*

"specialty BH" should be expanded to specify that this includes such essential Colbert services as ACT teams and CST; services regularly needed by people with physical disabilities such as home modification and medical transportation should be added to each Quadrant. Use of the model should occur at the stages in the Colbert process that involve Class Member evaluation of transition readiness, service plan development for post-discharge, and other service planning and delivery post-transition to the community.

**6.2  Use the Four Quadrant Clinical Integration Model to Guide Resource Mapping and Systems Planning.**

Even in resource-rich areas, it can be difficult to understand what systems-level service mix is necessary to address the needs of individuals served in the community. Without investigation and outcomes monitoring, investments can be made in services that may not be the most effective, strategic, or responsive. Furthermore, if a full system is not clearly mapped to display both need and response resources, critical partners that might help address service capacity needs may be missed or ignored.

For instance, it appears that either Cook County does not maintain or Colbert providers are not aware of a list of medical providers or services that are available county-wide to the CMHCs that serve transitioned Class Members and that do not themselves offer integrated primary and behavioral healthcare (the majority do not). Many Class Members have co-occurring acute and chronic medical issues that require a health care provider's routine oversight. Without strong contractual agreements, it may prove extremely difficult for a free-standing CMHC to care for a person with high medical service needs by itself. As such, our interviews revealed that several CMHCs needed to identify medical resources and develop those relationships, often without incentive dollars or other funds to cover this effort — and with mixed results.

We suggest that, at least in part, this lack of available, coordinated, and ideally integrated physical health service provision exacerbates the numbers of Class Members deemed as "unable to serve" post-transition. We recommend that Colbert IDoA program managers work with the Colbert Task Force (See Recommendation 1.1), other relevant State-, County-, and city-agencies, as well as other stakeholders, to devise a Colbert service needs and systems map. The maps' development should rely in part on the Colbert-customized Four Quadrant Clinical Integration Model to identify Class Member service needs within each Quadrant and system-wide; specify service capacity by type or number currently contracted to accept and serve Class Members; identify gaps in service provider types and capacity; and use predictive modeling to project if, where, and how much service capacity is needed to address the needs of a growing Class Member population and/or increased transition targets. Using predictive modeling, we expect that service gaps will manifest and can elucidate areas of strategic investments in an environment of limited financial resources.

**6.3  Augment System Capacity by Quantifying Need and Increasing Funding for Evidence-based Services, Promising Practices, and Supports.**

Given Class Members' clinical and social vulnerability, the service system should deploy evidence-based and promising practices; we noted that many are currently use. These include ACT teams, CST, medication management, cognitive behavioral therapy (CBT), dialectical behavioral therapy (DBT), chronic disease management approaches, motivational interviewing, Wellness Recovery Action Planning (WRAP), and Screening, Brief Intervention, and Referral to Treatment (SBIRT). However, existing evidence-based practices are inadequate in array and capacity to meet current service needs, much less the increase in demand anticipated under the Court's requirement to transition significantly more Class Members in 2017 and beyond.



*Behavioral Health Policy Collaborative, LLC*

We recommend targeting several specific evidence-based practices and promising practices for significant capacity expansion or as new additions to the array of services available to Class Members. Priorities for these expanded or new services include ACT and CST, integrated primary and behavioral healthcare (See Recommendations 6.1 and 6.2), peer support, embedded advanced practice nurse, crisis beds, medication assisted treatment for people with substance use disorders, integrated cluster medical housing, daily living skills training, home modifications/fall prevention. Others to be considered are therapeutic exercise, functional restoration, and occupation and activity-based interventions. Implementation of each of these practices requires attention to fidelity adherence and must be buttressed by a strong workforce training and skills development resources and quality and outcome monitoring as part of a quality assurance/quality improvement plan.

Given the data available for our review and consideration, a thorough projection of service capacity expansion was not possible. For example, our preliminary examination of Colbert systems and processes indicate that additional ACT teams and CST services are needed to meet Consent Decree transition targets both now and in the future. However, estimating the number of new ACT and CST needed and their associated costs is complicated because current CMHC ACT teams and CST are comprised of a mix of Colbert and non-Colbert clients without clear data delineating separate cohorts among these; there does not appear to be uniformity in the number of clients on any given ACT team within and among CMHC providers despite fidelity standards for this; when asked for cost data by type of service provided, several CMHCs and other Colbert service provider agencies do not have such data and cannot produce it; changing estimations and projections of current and future Class Member size and the numbers of those anticipated for transition changes hinder prediction and planning and efforts.

Because of the important role that ACT and CST services play in helping Class Members with serious mental illness succeed in community living, we recommend that IDoA Colbert staff work with DMH, CMHCs, and other relevant stakeholders to retain a consultant with real-world clinical, program, and financing expertise implementing the ACT team model. The consultant should help develop uniform ACT standards and expectations across Colbert-funded providers, help project the number of ACT teams needed now and in the future to serve Class members, and support work to identify and plan for other, lower level care management services needed by Class Members. Furthermore, a developing practice known as "ACT Plus" that includes additional nursing staff and peer support specialists should be explored and considered for funding given the complex medical needs of many Class Members and the intention to avoid designations of "unable to serve."

Similar to ACT and CST services, there do not appear to be sufficient intensive community services in the current Cook County mental health system to support the transition of Colbert members who have complex psychiatric, medical, physical, and other (e.g., substance abuse) needs. We recommend that, IDoA Colbert program managers follow national best practices and fidelity standards and identify evidence-based or promising readiness to transition services, including those mentioned above, for funding and implementation. Through Medicaid waivers, state funding, reinvestment of system savings from rebalancing the system away from more costly nursing home/institutional care to community-based care, and other sources, IDoA should explore these and other financing and policy levers that can expand capacity of the community provider system — and specifically outpatient/community services that promote Class Members' full participation in community life.

### 6.4   Expand Pool of Colbert Service Providers to Increase Capacity and Integrated Care.

Those invested in achieving the Colbert Consent Decree goals must actively look for and engage as potential partners of new organizations to expand the pool of service providers and the system's overall capacity to meet



*Behavioral Health Policy Collaborative, LLC*

transitioning Class Members' current and future needs. During our work, we identified two important groups of potential new partners that should be immediately engaged in discussions and considered for service contracts.

One of these is the Cook County Health and Hospitals System (CCHHS), which performs dual roles as the county health authority and county safety-net hospital and clinical services provider. A CCHHS executive we interviewed conveyed a keen interest in effectively serving Class Members, but indicated no current partnership exists. The agency operates two acute care hospitals, a Medicaid managed care plan with 150,000 members, 16 clinics, crisis beds, and a behavioral health consortium. It partners with housing developers and is now examining opportunities to offer cluster medical housing (See Recommendation 7.7). CCHHS can offer Class Members an array of needed services, including care coordination, medical health homes and behavioral health clinical and support services that include ACT teams and integrated care.

Using the Four Quadrant Clinical Integration Model (See Recommendation 6.1), this organization should be engaged, at a minimum, in discussions on how it might serve Class Members stratified into Quadrants I ("low behavioral health and low physical health") and III ("low behavioral health and high physical health").

We are intrigued by CCHHS's relatively new Behavioral Health Consortium comprised of six provider organizations that are paid at rates higher than Medicaid and that together offer a single phone number for use by individuals in the County who seek behavioral health services who then cannot turn away. Under this rubric, CCHHS already funds ACT teams and indicated they are willing to fund more; recently opened the first community triage center and 24/7 drop-in center; and are about to open a psychiatric emergency department with access to crisis beds. Given these resources and their degree of interest, we recommend immediate consideration of CCHHS as a provider to serve Class Members in the other two Quadrants as well.

Furthermore, we anticipate that given its large role in the Cook County health system, CCHHS carries influence over the County's acute care hospitals, including the one it owns, that discharge patients into nursing homes, some of who are eligible Class Members. We suggest that Colbert program managers explore other aspects of a new partnership with CCHHS to determine how hospital discharge and referral sources might be engaged and led to avoid inappropriate nursing home referrals by diverting appropriate Class Members to community-based services.

The other potential service vendor and partner seemingly not currently involved with the Colbert program are Federally Qualified Health Centers (FQHCs) located within Cook County. FQHCs serve a critical role in providing high-quality, affordable health care services to nearly 22 million people in the U.S. who are either enrolled in Medicaid or are uninsured. Typical FQHC services include geriatrics, internal medicine, obstetrics, gynecology, pediatrics, medical and surgical sub-specialties, laboratory services, pharmacy, podiatry, x-ray, dental, and more recently specialty mental health and substance use disorder services.

In the past decade, FQHCs have increasingly adopted integrated primary and behavioral healthcare models. This trend is accelerated by two grant programs through the U.S. Health Resources and Services Administration (HRSA): The Behavioral Health Integration (BHI) Grant Program and the Substance Abuse Services Expansion Grant Program. These competitive grants provide funding for health centers to build their capacity to address their clients' behavioral health needs, thus providing a crucial opportunity for resource-strapped behavioral health systems because it builds primary care settings' capacity to address the comprehensive health needs of medically vulnerable individuals with behavioral health conditions.



**Behavioral Health Policy Collaborative, LLC**

In Illinois, there are currently 10 BHI grantees and 16 SASE grantees, representing a significant proportion of area health centers that are enhancing their capabilities to address behavioral health. Cook County alone has five of these BHI grantees and 10 of the SASE grantees. We recommend IDoA Colbert program leadership immediately meet with Cook County FQHCs to formally explore their partnership potential as service providers to Class Members. Informally and in the interim, these FQHCs should be added to the referral networks of the Colbert-MCOs involved in service plan design for Class Members approved for transition and of existing community providers serving Class Members with behavioral health conditions and medical comorbidities.

Adding service capacity with CCHHS and local FQHCs is a critical step, but only represents two spokes in the wheel of integrated care approaches that communities across America are implemented; they are now viewed as imperative to addressing the complex clinical needs of people with behavioral health and medical conditions. However, to implement and sustain integrated care models, Illinois and local systems must adopt new clinical, financial, operational, and workforce models for integrated care, which requires provider, state and local agency, and payer alignment. We recommend that IDoA Colbert leadership, the Colbert Task Force, and others expand the State's exploration and pursuit of appropriate State and local financial and policy levers (e.g., Medicaid Waivers, Health Homes, HRSA Mental Health Expansion Grants, SAMHSA Primary Behavioral Health Care Integration [PBHCI] Grants, reinvestment provisions) to finance and implement sustainable integrated care models for Class Members. Doing so will help realize the promise of becoming a fully-integrated system of care and reduce strain on both the behavioral health and public health systems by taking advantage of new policy and financing levers.

**6.5.    Streamline Approvals for Durable Medical Equipment.**

Durable Medical Equipment (DME) is a critical necessity and facilitator for individuals with physical health conditions and disabilities for them to successfully transition and thrive in the community. Several Key Informants from Colbert-funded CMHCs and other housing locator agencies stated that a barrier to timely transitioning Class Members to community-based housing is obtaining prompt agency approvals for DME. However, while the CMHCs and others have experienced this process as often difficult and slow, it appears that that the two MCOs that provide Colbert outreach and evaluation services are expert in obtaining timely approval for DME equipment. As such, we recommend that the Colbert MCOs partner with CMHCs and other agencies serving Class Members who need DME to train and actively support the acquisition of approvals for DME. Further, the process should be reviewed with the involvement of HFS and IDoA to determine if processes can be streamlined.

**6.6.    Examine and Use SSI/SSDI Presumptive Eligibility and Enrollment Expediting Programs.**

Social welfare and health benefits acquisition is a critical component to successful community tenure for low-income, vulnerable individuals, including Class Members. Applying, qualifying, and obtaining needed financial benefits — such as Supplemental Security Income (SSI) and Social Security Disability Insurance (SSDI) — is needed to support critical rental/housing costs, food, transportation, clothing, medical copayments, and other necessities for successful community life. While some parts of the system may use this process, Key Informants from multiple State agencies and provider organizations could neither find anyone familiar with presumptive eligibility (explained below) and similar benefits determination processes nor whether they are used with Class Members. As such, we recommend that IDoA ensure benefits enrollment protocols for Class Members include screening for presumptive eligibility and expedited access to benefits through SSI/SSDI Outreach, Access, and Recovery (SOAR) programs.

*Behavioral Health Policy Collaborative, LLC*

The Social Security Administration has authority to approve immediate SSI payments for up to six months for people who meet presumptive eligibility criteria. For these individuals, their conditions are so serious that they are "presumed" as SSI eligible. Class Members may have qualifying conditions — including blindness, amputation, stroke, confinement to wheelchair due to chronic condition, and several other conditions — that give them presumptive eligibility and, thus, immediate access to cash benefits. We recommend that all Class Member case managers and discharge planners be made aware of and trained on presumptive eligibility and then screen Class Members to determine if they meet the criteria to gain prompt access to financial resources that can bolster their ability to successfully transition into the community.

Furthermore, the SOAR program facilitates prompt access to disability income for individuals who are at risk of homelessness and have a mental illness, medical impairment, and/or a co-occurring substance use disorder. Experienced SOAR case managers use a State or local SOAR process to expedite SSI and SSDI applications, which has proven to increase approvals from 26 percent to 65 percent and reduce wait times from one year to two to three months. We recommend that Colbert program managers collaborate with other relevant State and County agencies to implement or partner with an existing SOAR program and target Class Members who qualify for SOAR because of potential risk for homelessness either pre- or post-nursing home placement.

*Behavioral Health Policy Collaborative, LLC*

# GOAL 7
# Appropriate and Affordable Independent Housing Is Available for Class Members

The full participation of people with disabilities in community life — the aspiration of the Supreme Court's Olmstead decision and the Colbert Consent Decree — is only possible with access to safe, appropriate, and affordable independent housing. Housing is a critical component to recovery and completely necessary for successful deinstitutionalization. Each Class Member transitioned into the community must have a place to live, appropriate to his/her disability and needs, with accessibility to community-based services.

There are multiple challenges to locating and securing housing for individuals living in an institutional setting such as Class Members residing in Cook County nursing homes. Individual-level barriers can include complications arising from the nature of a person's disability and the stigma attached to people with disabilities; lack of independent living skills; past involvement in the criminal justice system; current or past substance abuse; poor or nonexistent credit; and landlord-tenant issues.

In addition to individual-level barriers, individuals also face myriad systems-level obstacles. They face a dearth of accessible housing; limited stock of rental subsidies and landlords willing to accept subsidies; landlords' preconceived notions about particular disabilities; insufficient or nonexistent services and other supports that contribute to successful community tenure; and a lack of coordination among housing and service providers.

**Core Elements of an Effective Housing System for People with Disabilities.** A high-functioning housing system — aligned with the Colbert Decree's goals — is essential for Class Members to surmount these barriers. The tenets of a high-functioning housing system that must exist in Cook County include:

- **System Capacity**
  - Adequate and affordable housing stock for all income ranges
  - Housing close to community-based services and other services and necessities such as a grocery store, doctors, transportation, and recreation
  - Continuum of housing options with enough available stock to house and rehouse Class Members, including cluster housing, master lease housing, independent housing, physically-accessible housing, permanent supportive housing, and supportive living facilities
  - Data collection and reporting to monitor activity and outcomes
  - Centralized database of available units with quick turnaround time for both landlord and tenant referrals
  - Prioritization process for the limited specialty housing units
  - Fair housing/anti-discrimination enforcement

- **Financing and Affordability**
  - Affordable housing in safe communities
  - Affordable housing financing models with or without rental assistance
  - Rental assistance separate from the housing financing models



*Behavioral Health Policy Collaborative, LLC*

- **Pre- and Post-tenancy Housing Services**
  - Pre-tenancy supports, including credit checks, criminal background check, and acquisition of furnishing and other household items
  - Quick response time for pre-occupancy requests, including unit modifications to make it physically accessible, unit inspections, and transition funds
  - Post-tenancy care to ensure the Class Member is supported while living in the unit

- **Relationships with Landlords and Other Important Housing Parties**
  - Cooperative landlords willing to accept rental subsidies, lease to Class Members, and/or modify units for accessibility
  - Cooperative landlords willing to work with Class Members throughout their tenancies
  - Long-term working relationships between the landlord community, community service providers, and State agencies involved in Class Members' long-term success
  - Ongoing outreach and engagement processes with individual landlords, apartment association(s), realtor association(s), and others that lease housing units

**Housing Strategies Deployed Under Colbert.** The effort to ensure continued successful community tenure of already-transitioned Class Members and to locate and secure permanent independent housing for future transitioning Class Members requires enhancing the aforementioned elements to meet the Court's expanded transition expectations for 2017 and beyond. To its credit, the current Cook County housing system available to Class Members does have some of each of the above elements. To date, the State through the Illinois Housing Development Authority (IDHA) has implemented several strategies to increase housing capacity for Class Members, including:

- IDHA-facilitated housing development through the Low-Income Housing Tax Credit (LIHTC) Program for accessible units;
- IDHA-secured Section 811 subsidies coupled with LIHTC properties Round One Funding in 2012, and Round 2 funding in 2015, which produced hundreds of units; and
- IDHS-created Statewide Referral Network online database and referral system for Section 811 and permanent supportive housing units.

**Housing Models Available to Class Members**. Housing for Class Members is available in a variety of ways: by a specific housing model[26] designed for the Colbert Consent Decree (cluster model, master lease model, Accessible Housing Initiative through Home First, Section 811 units in newly developed low-income housing tax credit properties); set-asides for housing vouchers through the Chicago Housing Authority and the Housing Authority of Cook County and Bridge Funding Housing Rental Subsidies; general apartment/housing units offered on the open market that meet the Fair Market Rents (FMR) and Housing Quality Standards (HQS) requirements of either the Housing Choice Voucher or the Bridge Funding programs; or a supported living facility for clients with physical disabilities whose housing needs can only be addressed in this setting. All housing options are designed using the scattered site concept, except for the supported living facilities because of their specific service delivery model.

---

[26] *Colbert v. Rauner Case No. 07-C4737, (N.D.Ill.) Annual Report to the Court Dennis R. Jones, MSW, MBA Colbert Court Monitor January 29, 2016. Pages 9-11.*



***Behavioral Health Policy Collaborative, LLC***

Units are funded by state and/or federal dollars, including the LIHTC program, a program facilitated by states to encourage housing investors to invest in developing affordable housing units, combined with Section 811 funding for Class Members, Housing Choice Vouchers from the Chicago Housing Authority, or the Housing Authority of Cook County, and State Bridge Funding program for Class Members. Table 3 outlines Colbert housing units available and filled by type, number, and funding source as of January 2017.

| Table 3. Types of Colbert Housing and Funding Source Available and Filled as of January 2017[27] | | | | | | |
|---|---|---|---|---|---|---|
| Type of Housing | # Units/ Vouchers | # Units/ Vouchers Filled | Funding Source | | | |
| | | | HCV | 811 | Bridge | Other |
| Cluster Model | 16 | 10 (+3 pending) | | | x | |
| Master Lease | 53 | 49 (+1 pending) | | | x | |
| Home First Illinois | 57 | 47 | x | x | | |
| Housing Authority of Cook County | 120 | 30 | x | | x | |
| Chicago Housing Authority | 600* | 38 | x | | | |
| Scattered Sites[28] | NA | 1,173 | | | x | |
| Supported Living Facilities | NA | 150 | | | | x |
| TOTAL | | 1,497 | | | | |

*Number of vouchers allotted for both Colbert and Williams Consent Decrees.*

**Colbert Housing Location and Placement Providers and Process.** There are two types of organizations tasked with identifying housing options for Class Members: housing locator agencies and CMHCs. IDoA currently funds four housing locator agencies focused on serving people with physical disabilities who may have a secondary diagnosis of mental illness but are not in need of high-intensity mental health services (i.e., ACT or CST). Nine CMHCs are contracted to focus on serving Class Members who have a primary diagnosis of serious mental illness and may or may not also have a physical disability. The CMHCs perform both service- and housing-related transition services.

IDoA contracts housing locator organizations to perform a variety housing-related transition services for Class Members (See Table 4). Referrals made to a housing locator come from those agencies that conduct Colbert evaluations/assessments (e.g., Aetna, Illinicare) for Class Members recommended for transition. Receiving referral agencies are determined based upon the Class Members' geographic living preference and, if unavailable, where housing units are available.

In general, both organizations types follow the same procedures when transitioning Class Members. This entails housing location, coordination, and placement. Table 4 identifies the Colbert housing transition process general activities and shows the procedural similarities and differences between housing locator agencies and CMHCs.[29]

---

[27] Data provided by IDoA on March 9, 2017.
[28] Scattered sites are housing units owned and managed by private landlords and secured on the open housing market; they are different from the cluster model, master lease program or Home First Illinois, which are also scattered sites.
[29] The activities in the table were extracted from the housing locator contracts' scope of work between the housing locator agency and IDoA and are referenced in the CMHC contract.



*Behavioral Health Policy Collaborative, LLC*

| Table 4. Housing Activities for Colbert Transitions: Housing Locator Agencies versus Community Mental Health Centers | | |
|---|:---:|:---:|
| **Activity** | **CMHC** | **Housing Locator Agency** |
| In-reach into nursing homes to evaluate and identify Class Members for transition | ✓ | |
| Referrals by the Colbert-MCO to housing agency | ✓ | ✓ |
| Serves Class Members with primary diagnosis of serious mental illness | ✓ | |
| Serves Class Members with primary diagnosis of physical disability | | ✓ |
| Obtains clinical and other documents for transition | ✓ | |
| Conducts housing search | ✓ | ✓ |
| Requests transition funds from HACC through debit cards | ✓ | ✓ |
| Requests to HACC for HQS Inspections by HACC vendors | ✓ | ✓ |
| Provides mental health services during transition to the community | ✓ | |
| Requests UIC-ATU to make accessibility alterations, if needed | ✓ | ✓ |
| Moves Class Member into housing unit | ✓ | ✓ |

Table 3 shows that between the start of Colbert transitions/housing placements in 2013 and January 2017, 1,497 Class Members transitioned into community housing units. (During calendar year 2016, 384 Class Members transitioned into the community.) The Colbert transition goal for calendar year 2017 is 550 Class Members (250 by June 30 and another 300 by December 31).[30] The one-year transition goal change represents a 9 percent increase from the target goal of 504 transitions in 2016 to 550 in 2017. Perhaps more important, achieving the 2017 transition target would mean 166 more transitions over the number achieved during 2016, a 43 percent increase. This increase represents a formidable challenge to the Colbert program.

Achieving significant increases to Colbert's transition goals for 2017 and beyond requires an understanding of barriers to housing placements, devising strategies to mitigate or overcome them, and an effective implementation plan. During our review of Colbert housing stages and process, we identified several stages where delays and bottlenecks appear to occur and slow down the housing transition process. Each of these areas requires closer investigation and mitigation, including:

- Insufficient number of housing options/units in the form of cluster housing or master lease units, which are often viable options for Class Members with compromised credit histories and criminal justice involvement;
- Lack of affordable housing units on the open market;
- Delays due to a complex and lengthy process to obtain approvals for Class Members' debit cards with transition funds; and
- The number of organizations, steps, and scheduling delays associated with conducting required HQS Inspections.

Further, to illustrate examining data to begin the process of program performance and identify areas for potential quality improvement, we collected and analyzed several key data points. We then calculated the average time it took for Class Member transition from point of referral to move-in in 2016 (See Table 5).

---

[30] *Colbert Consent Decree — Power Point Illinois Department of Aging, January 9, 2017.*

*Behavioral Health Policy Collaborative, LLC*

| Table 5. Colbert Housing Locator Agencies and CMHCs: Average Transition Times by Stage in 2016 [31, 32] | | | | |
|---|---|---|---|---|
| | **Housing Locator Agencies** | | **CMHCs** | |
| **Housing Stage** | **Number of Class Members** | **Cumulative Average Length of Time** | **Number of Class Members** | **Cumulative Average Length of Time** |
| Referral to Intake | 192 | 15 days | 459 | 11 days |
| Intake to Housing Search | 149 | 52 days (1.73 months) | 180 | 117 days (3.86 months) |
| Total Referral to Community Housing Move-In | 175 | 134 days (4.46 months) | 170 | 178 days (5.93 months) |
| ***Total Average Time*** | **516** | ***4.46 months*** | **809** | ***5.93 months*** |

In examining this data, a wealth of information emerges that would need more thorough examination and discussion regarding potential areas to improve the Colbert housing search process and to address the challenges associated with placing Class Members with problematic backgrounds that prevent their leasing units on the open housing market.

- **Housing locator agencies**
  - Received 29 percent of Colbert transition referrals for housing in 2016.
  - Took an average of 67 days (or 2.23 months) from the time of housing unit identification to the time the Class Member moved into the unit.[33]
  - Found and placed 90 percent of Class Members referred to them for community housing in 2016.
  - Completed the overall housing process in approximately 4.5 months, with almost half of that time spent on housing search and the other half on required pre-transition housing applications, credit checks, inspections, modifications, and other activities.

- **CMHCs conducting housing services:**
  - Received 71 percent of Colbert referrals for housing transition in 2016.
  - Took about one-third longer (nearly 1. 5 months more) than housing locator agencies to find and place Class Members in community housing.
  - Succeeded in housing location and placement 36 percent of the time in 2016, compared to 90 percent for housing locator agencies.

This brief analysis reveals several important questions to pursue such as, "Why do such significant process time differences between types of housing providers exist"? Of note, these differences could be valid due to complexity of the Class Members' housing, services, and support needs and other factors such as differing rates of criminal justice involvement and other issues that delay or jeopardize housing placement. Nevertheless, it merits inquiry.

---

[31] *Illinois Department of Aging. Colbert Housing Locator Agencies Average Transition Timeline Report: CY16.*

[32] *Illinois Department of Aging. Colbert CMHC Agencies Average Transition Timeline Report: CY16.*

[33] *Housing activities conducted during this stage can entail HQS inspection, modifications to the unit, requests for transition funds/debit cards, lease signing, and securing medical equipment.*


*Behavioral Health Policy Collaborative, LLC*

We propose several recommendations designed to increase capacity, oversight, and leadership of housing-related Colbert Consent Decree processes and goals, invest in landlord engagement, address common rental barriers, and realign staffing resources to optimize outreach and placement processes.

## Recommendations

### 7.1 Convene Colbert Housing Workgroup.

Given the complexity of finding and transitioning Class Members into appropriate housing with the right types and levels of services and supports, we recommend IDoA appoint and lead a Colbert Housing Workgroup to map out and examine the entire housing process designed for Class Members and determine where to modify and streamline. The Workgroup can serve as a catalyst in identifying and analyzing important housing related data, idea exchange, and strategy development to solve systems bottlenecks such as the process between where a housing unit is found, but not yet occupied, where significant delays occur. Without a concerted and focused effort led by IDoA Colbert staff, the contracted agencies responsible for housing transition and significantly increasing their transition outcomes in 2017 will lack sufficient information, resources, or support to achieve these goals.

Along with IDoA Colbert housing and leadership staff, other Workgroup members should include representatives from State (i.e., IHDA) and local (i.e., County) housing authorities, other State and local agencies (e.g., DMH, HACC, DRS) together with the active involvement of the Colbert housing-related contractors, including housing locator agencies, CMHCs, and others key to the coordination of housing with services and supports (e.g., Colbert MCOs, Featherfist, Access Living) given their deep understanding and experience with the complexities of successfully navigating the housing process. Others to consider include representatives from landlord associations, real estate developers, and advocates.

### 7.2 Increase IDoA Colbert Housing Staff.

Managing and overseeing every part of transforming Cook County's housing systems to successfully support Colbert Consent Decree goals necessitates involvement of many stakeholders and activities to identify available housing resources, engage with landlords, and conceptualize process improvements and other proactive solutions that reduce barriers to housing for Class Members. As such, we recommend IDoA immediately fill its housing-related positions, with at least two more temporary housing staff members to implement the landlord outreach plan (See Recommendation 7.6) and to support other Goal 7 recommendations.

### 7.3 Re-engineer Housing Search Process.

We recommend the Colbert Housing Workgroup conduct a housing resource mapping and workflow analysis to assess and ensure that the most efficient communications, administration, and quality oversight processes are used to perform and expedite housing access. We anticipate that this and other Workgroup efforts will result in, at a minimum, the need to reengineer the housing search process. Our Key Informants revealed problems with navigating the Statewide Referral Network (SRN) website, an important resource in identifying available units for Class Members. They reported that the SRN is cumbersome and time-consuming for not only Colbert-contracted



*Behavioral Health Policy Collaborative, LLC*

housing services providers but for private landlords, as well. A SRN Workgroup should meet to determine the most efficient method to link the landlord to the tenant without having to rely on the cumbersome database process.

**7.4  Pilot Integrated Colbert MCO and Housing Locator Teams.**

Our stakeholder interviews revealed a lack of coordination between the two Colbert-funded MCOs and the housing locators as it pertains to the assessment process for Class Members with physical disabilities. Stakeholders worry that the MCO evaluators do not have a thorough understanding of how often individuals with the most challenging physical disabilities can live independently with the right mix of services and supports. We recommend a pilot test to determine if integrated teams comprised of staff from the Colbert MCOs and housing locator agencies can effectively work together to conduct in-reach and comprehensive evaluation of housing and service needs of Class Members with primary diagnoses of physical disability. Outcomes of the pilot should determine if it results in increased rates of appropriate recommendations for transition among these Class Member, followed by actual transition, and then successful community tenure for at least one year, which is the designated period in which Class Members are followed after community placement. If successful, the pilot should transform into institution, with implementation of integrated teams across the program.

**7.5  Develop Housing-Specific Key Performance Indicators and Realign Contractor Targets with Capacity.**

IDoA Colbert housing staff and members of our recommended Data Enterprise Workgroup and Housing Workgroup (See Recommendations 3.1 and 7.1) should define KPIs and include them in contracts with Colbert housing service providers. These will assess key process and outcome measures in the housing process and hold contractors accountable. They should include timeframe benchmarks for key steps in the housing location and transition process; rates of Class Members referred compared to those transitioned into community housing; number of new landlord relationships developed and number of housing units that result from those new relationships; percentage of time that the Class Members' geographic and other housing preferences are met; and rates of housing stability versus instability of Class Members post-transition. The Colbert Data Dashboard should include this regular KPI reporting and monitoring (See Recommendation 3.2) and transparently shared that with housing contractors.

Relatedly, IDoA and the Housing Workgroup should conduct a capacity and productivity assessment of current Colbert housing service contractors to determine if programs work at full capacity, assignments leverage each agency's strengths, and the parameters and costs needed to properly increase Colbert Class transitions are met. The housing locator agency staff we interviewed indicated that they are prepared and willing to accept more referrals of Class Members needing community housing; after assurance that capacity exits to do this, quality should be acted upon immediately.

**7.6  Implement a Landlord Engagement Initiative.**

Chicago and Cook County lack affordable housing units. Although Colbert-funded housing locators are required to maintain a current list of housing options for Class Members, they often lack adequate capacity or resources to network on a regular basis with potentially large landlord groups that could offer housing units and/or resources to Class Members. We recommend IDoA Colbert housing staff and the Housing Workgroup (See Recommendation 7.1) explore successful landlord engagement models (e.g., Pathways to Housing) and use them to create and implement a robust landlord engagement and communications plan that describes the Colbert program and emphasizes incentives and benefits for landlord participation. This plan will engage leasing agents, apartment

*Behavioral Health Policy Collaborative, LLC*

associations, local board of realtors, and other organizations that provide professional services to landlords, leasing agents, and property management companies. The plan should delineate regular outreach activities, identify key housing events that IDoA housing staff and contractors should attend to increase engagement, marketing outreach, and relationship development opportunities with leasing agents and landlords.

**7.7  Increase Special Housing and Accessible Housing Inventory.**

As mentioned, a dearth of fully accessible units exists in both Chicago and Cook County, limiting options for Class Members overall and, particularly, for those with physical disabilities. We recommend that the Housing Workgroup explore and identify strategies to increase accessible housing for this Class Member cohort by using LIHTC, garnering commitment from current landlords to modify units to meet accessibility standards, and identifying interest from high-rise building management to modify a percentage of their existing inventory. Once units are approved for modifications, IDoA should ensure performance process and prompt modifications so a Class Member does not lose a unit, frustrating and losing cooperative landlords and incurring unnecessary delays to Class Member move-in. The current timeline runs up to 90 days.

In addition to accessible units, to meet the needs of Class Members with complex medical needs who require access to reliable medical care, albeit not 24-hour medical services such as those provided in nursing homes, we recommend the State add units under cluster housing models for people with medical comorbidities and master lease housing for people with negative credit or criminal justice histories to the Colbert Special Housing Inventory.

**7.8  Address Common Rental Barriers.**

Key Informants from both housing locator agencies and CMHCs spoke of barriers to Class Members' housing, poor credit backgrounds, and criminal justice histories. We concur with their recommendation that, instead of waiting for a landlord to conduct background checks and risk losing the unit if negative, a more efficient and effective system be implemented. Their agencies conduct these checks before beginning the housing search process to employ strategies to best address these barriers and, then, target more lenient landlords. Another solution is for the State to invest in more master lease housing in which landlords are traditionally more lenient with background issues because of their relationship with State agencies. In addition, IDoA Colbert staff and relevant housing stakeholders should identify and use existing resources to address Class Members' housing barriers such as landlord education, legal clinics, and Federal, State, and local legislation addressing housing discrimination.

**7.9  Expedite Transition Funds and HQS Inspections.**

Each Class Member is eligible for up to $4,000 in transition funds to cover the costs of approved housing- and transition-related expenses such as unit security deposits, utility deposits, purchase of furniture and household items, and other costs directly related to the move. This is a unique and important aspect of the Colbert program and its existence plays a crucial role in enabling the transition process.

Both housing locator organizations and CMHCs depend on HACC to issue transition funds through debit cards and conduct HQS inspections on units prior to Class Member move-in. We contend that the current approval process for physical access to these debit cards — now taking up to 30 days — is too long and Colbert housing service providers are frequently required to front the transition fund monies to avoid losing the unit; then, they seek reimbursed later. We recommend examining the process for accessing transition funds for ways to expedite it.


*Behavioral Health Policy Collaborative, LLC*

# GOAL 8
# Knowledgeable and Skilled Staff Are Prepared to Address Class Members' Complex Needs

In addition to Class Members' own roles in achieving successful community tenures, it is the caliber of staff that will be one of the most important determinants of whether Class Members successfully transition and remain in the community. Systems transformation often requires significant shifts in the workforce, which includes addressing staff attitudinal barriers and biases, engaging staff in training and skills enhancement, introducing evidence-based practices and fidelity standards, encouraging the adoption of new philosophical frameworks (i.e., recovery orientation), and building knowledge and competencies needed to succeed in interlinking systems and cross-systems collaboration and coordination.

This is especially true for successfully implementing the Colbert Consent Decree, as staff who support the various activities, from outreach, evaluation, pre- and post-transition skills development to health, behavioral health, and housing services, must — while representing different agencies and functions — commit to learning and deploying the skills needed to provide high-quality care. Such a workforce fundamentally influences and contributes to achieving the goal of transitioning individuals into the community.

The path to building and maintaining a strong and knowledgeable workforce includes ongoing workforce training that focuses on providing appropriate training to new staff entering various arenas within the system. It also requires continually enhancing staff skills. A Colbert-funded Training Institute recently began and serves this important function. However, important opportunities remain to expand the Colbert workforce (See Recommendations 1.4, 1.5, 3.4, 4.4, 6.3, 6.4, 7.2, and 9.2) and ensure that new providers, including peers and others, receive appropriate and adequate training through a variety of new and existing mechanisms, including those addressed in previous recommendations.

## Recommendations

### 8.1  Expand Training Offered Under Existing Training Institute.

We recommend that IDoA Colbert staff engage all stakeholders in the Colbert implementation process to devise and prioritize additional training topics that the Colbert Training Institute should offer. These could include: educational offerings designed to raise awareness and reduce stigma toward individuals with disabilities — including serious mental illness and physical disabilities — as well as research that quells misconceptions about the capabilities of individuals with disabilities to live successfully in the community. Other training topics could include disability awareness, peer services' role in community transition and retention, compliance issues with Federal and State laws designed to protect individuals with disabilities (i.e., PASSR, ADA, Fair Housing), adjusting business models under systems rebalancing, bi-directional primary and behavioral healthcare integration, and specific


*Behavioral Health Policy Collaborative, LLC*

evidence-based practices, among others. To minimize costs, training providers should explore technical assistance and training available to States, providers, and other from the many existing Federal- and other-funded resources (i.e. SAMHSA-HRSA Center for Integrated Health Solutions[34], Bringing Recovery Supports to Scale Technical Assistance Center (BRSS-TACS)[35], BHbusiness[36]).

Further, the audience of prospective training recipients should be broadened from the current limited cadre of outreach, evaluation, and Colbert service and housing providers to include nursing home administrators and staff, advocates, family members, and other key allies. A range of training mechanism should be used such as webinars, online courses, conferences and workshops, and one-on-one or group coaching. Whenever possible, trainings should offer Continuing Education Credits to incentive participation among disciplines required to acquire them.

**8.2  Launch Colbert Learning Collaboratives**.

The Institute for Healthcare Improvement (IHI) conceptualized the "collaborative" model to facilitate structured and shared learning, convening organizations to work with each other and expert faculty to rapidly test and implement changes that drive them toward improvement and sustainable change within a specific topic area.[37] IDoA Colbert staff, with input from the new Task Force (See Recommendation 1.1) and other key parties, should use project data to identify particular "pain points" that jeopardize achievement of Colbert goals and launch a series of Colbert Learning Collaboratives for Colbert-funded providers and others to address these obstacles by sharing strategies to overcome barriers, technical assistance or other helpful resources, and establishing a culture that promotes shared learning and adaptation. Potential topics include integrating primary care services into CMHCs for medically vulnerable clients, innovative financing models and approaches, understanding and collaborating with housing systems and providers, using population health and treat-to-target strategies, emerging research on best practices in maintaining successful community tenure, and data-driven clinical decision-making.

---

[34] See: /www.integration.samhsa.gov
[35] See: www.samhsa.gov/brss-tacs
[36] See: https://bhbusiness.org/home


*Behavioral Health Policy Collaborative, LLC*

# GOAL 9
# Independent Quality Assurance Mechanisms Ensure Colbert Program and Service Integrity

Under the Colbert Consent Decree, it is critical that every touchpoint with staff — whether outreach staff, assessors/evaluators, referral specialists, housing locators, or community-based social service and healthcare providers — Class Members receive high-quality services from staff who value and offer customer service, reliability, integrity, and respect. So much of a person's entrance into the community and success living there is contingent on the integrity and appropriate conduct of staff because interactions and determinations can drastically impact a Class Member's trajectory into successful community living or return to institutional living.

Careful attention must be paid, and mechanisms put in place, to promote professional and lawful conduct and to guard against negative conduct (e.g., intimidation, negative persuasion) and illegal acts (e.g., bribery, extortion, theft). Some mechanisms exist for implementing safeguards at the State-level (e.g., long-term care ombudsman, independent reviews of adverse events, and "unable to serve" determinations) but we are unaware of Colbert State-level (i.e., IDoA) staff or independent contractors who are responsible for conducting regular and thorough program monitoring and quality assurance assessments.

As such, we recommend that every appropriate Colbert process and workflow incorporate strong, independent, and data-informed quality assurance mechanisms and staff. We offer specific recommendations below, including ensuring proper venues for reporting abuse allegations, neglect, and improper conduct, among others; defining and strengthening appeals and complaints processes; using project data to identify program and service integrity red flags; and monitoring "unable to serve" designations.

## Recommendations

**9.1 Ensure Adequate Access to and Authority of State Long-term Care Ombudsman or Appoint Colbert Ombudsman**.

Among such clinically and socially marginalized and disenfranchised populations as those represented by Class Members, it is critical that an independent individual remain accessible to Class Members who may be vulnerable to, fear, or experience retribution and intimidation by lodging complaints against agencies that control their livelihoods (e.g., access to food, shelter, and social connection). This process must be in place and effective not only for Class Members but also for family members, providers, advocates, and others.

Through our review of Colbert processes, we assumed nursing home residents are apprised of their rights upon entry into the facility. However, during Key Informant interviews across multiple stakeholders they were not

51


*Behavioral Health Policy Collaborative, LLC*

certain if Class Members were covered by the Illinois Long-Term Care Ombudsman and could they identify any meetings, communications, linkages, or data sharing with that Office.

Authorized and funded through the Older American Act of 1965, states are mandated to institute Long-Term Care Ombudsman Programs to visit long-term care facilities, monitor conditions of care, and provide direct advocacy services to nursing home residents. Illinois also provides a Home Care Ombudsman Program. In developing our report, we contacted the Illinois Long-Term Care Ombudsman's office to inquire about whether Class Members who are discharged from nursing homes are covered by the Office's authority. We were informed that once they are discharged from nursing homes Class Members are not eligible. This contradicts information posted on the Illinois Department of Aging website.[38] We asked the Ombudsman's Office representative if they knew about and understood the Colbert Consent Decree and found that the official had limited information. We also placed calls to the three Regional Long-Term Care Ombudsman Offices in Cook County and left messages requesting return calls, receiving only one call back to date.

Our inquiries revealed that there does not appear to be a link between Class Members once they are transitioned and existing ombudsman services; ombudsman staff do not understand Colbert's intricacies or definitively whether Class Members are eligible, and they may not have capacity to address the needs of hundreds of additional individuals such as Class Members who have complex histories and health statuses.

We recommend that the Colbert Court Monitor, IDoA, and the Task Force either expand the scope and resources of the Long-term Care Ombudsman Program for Class Members, or designate a dedicated Colbert Consent Decree Ombudsman. If they elect to collaborate with the State-level Long-term Care Ombudsman, they should ensure that this office's scope extends beyond nursing home walls since rights violations can occur in services and housing-related processes outside of the facility (e.g., in-unit audits to verify that funds from Class Members' housing transition debit cards were expended for security deposit, furniture, household and other approved items).

We recommend that IDoA, the new Colbert Task Force, and the Colbert Court Monitor establish a strong collaborative relationship with the Long-term Care Ombudsman to ensure enforcement of Class Members' rights and protections, even if their access to this Ombudsman is only while they reside in the nursing facility. If this Ombudsman does not have jurisdiction over Class Members once they transition to community housing, then other existing Ombudsman-type relationships should be identified, established, and coordinated. If these do not exist or are deemed inappropriate or insufficient for Colbert purposes, the State should consider appointing a dedicated Colbert Ombudsman.

Once an Ombudsman(s) is clarified or newly identified, we recommend that the Ombudsman and IDoA together establish clear mechanisms and processes for reporting concerns regarding quality of care and intimidation or abuse of Class Members. The Ombudsman and Colbert program administrators should meet regularly to review complaint data and dispositions and determine if corrective actions or program adjustments to increase Class Members' protections are needed and devise action plans to accomplish this. This data should become part of the Colbert Data Dashboard (See Recommendation 3.2) and regularly reported to the Colbert Court Monitor and other stakeholders. Once the Ombudsman role is designated and clarified, IDoA and the Task Force should develop and

---

[38] *Long-Term Care Ombudsman Program. "Long Term Care Ombudsman: Long-Term Care Ombudsman Program." n.d. Web. Retrieved March 23, 2017 from: www.illinois.gov/aging/ProtectionAdvocacy/LTCombudsman/Pages/default.aspx. "The Ombudsman program services are available free of charge to: …Person(s) 18 or older who is either a current resident, a prospective resident, or a former resident of a long-term care facility…"*



**Behavioral Health Policy Collaborative, LLC**

implement a communications plan to notify all Class Members and their families, agency and nursing home staff, and other stakeholders about how to navigate the complaints process.

## 9.2  Hire Independent Staff or Contractors to Conduct Contractor/Provider Monitoring and Quality Reviews.

In our view, the Colbert program should consider adding staff or independent contractors to conduct service and expenditure audits to authenticate appropriate use of Colbert resources. For example, random, unannounced site visits should be made to where the Class Members' reside before they transition and move-in to community housing. This will ensure verification that funds used from Class Members' debit cards for security deposits, furnishings, household goods, other allowable purchases (e.g., first month of food) are paid and items are in the housing unit. Similarly, a random sample of clinical record reviews and site visits should be conducted to ensure that Colbert-funded ACT teams and CST services make the required number and type of Class Member contacts and that these match billing records. Processes and procedures used to conduct quality assurance must be transparent to the monitored individuals and agencies.

Colbert's quality assurance program and its staff that perform quality assurance functions should use the Colbert Data Enterprise Program (See Goal 3) to inform this work. By regularly reviewing and analyzing Colbert data, program managers and quality assurance staff can identify bottlenecks, agency and individual staff attainment of KPIs, timelines between different stages of pre- and post-transition, rates and trends with Class Members placed on "unable to serve" lists, and overturn rates of ready to transition and not ready to transition rates, among others. After reviewing this data, the Task Force should recommend further investigation or appropriate course corrections or actions designed to address identified barriers.

## 9.3  Increase Oversight for "Unable to Serve" Designations.

When an individual is rejected for transition services, Colbert-funded CMHCs use the "unable to serve" designation.   Without strong oversight, this label is at-risk for inappropriate assignment; agencies can approve Class Members for transition who are perceived as easier to manage, meanwhile negatively labelling those with complex challenges; and transition decisions are contingent upon whether the CMHCs believe that challenges can be managed in the community and whether resources are available there to support the Class Member.

This is contrary to best practice, which expects all CMHCs to be able to admit and serve most people with serious mental illness with support and funding, by the State, as necessary. A robust community mental health service system requires the ability to wrap needed services around all potential clients. To do that, the provider agency requires additional, special funding to do this work well. There does not appear to be any formal data used or plans to identify the ideal number of ACT teams for Cook County; it appears the current number is not based on data-based projections and, at this time, lack sufficient numbers.

Beyond adding oversight, analysis, and review to this process, we recommend changing the label "unable to serve" to "complex transition needs," which is accompanied by a list of specific challenges, potential solutions, and funding required to serve the person. The new senior-level clinical expert (See Recommendation 1.5) —  whether IDoA staff or contractor — should work with community providers to offer clinical case consultations to determine if and how the Class Member can maintain community placement. It is imperative that the clinical staff/consultant assigned this role is an expert and experienced in factors, methods, and services fundamentals to successfully transitioning people with disabilities from institutions to community settings, including deep familiarization with community-based healthcare and behavioral health systems.



**Behavioral Health Policy Collaborative, LLC**

# Goal 10
# Diversion Strategies Prevent Inappropriate Nursing Home Placements for People with Disabilities and Redress System "Front Door" Issues

The recommendations offered under Goals 1-9 are designed to improve appropriateness, capacity, quality, and outcomes for current Class Members residing in Cook County nursing homes. They should result in more individuals successfully transitioning into the community. However, while not included among the Colbert Consent Decree requirements, it will be essential to consider and address the upstream, front-door issues that currently permit and even incentivize the flow of individuals with disabilities into nursing homes and other institutions when many can and should flow into community-based housing and supports.

Further delays in actively addressing front-door issues and replacing them with appropriate diversion pathways and resources will continually result in resources going to inappropriate nursing home care (and other institutional care) for Class Members, already established as costlier than community-based services. Similarly, neither compliance with the Supreme Court's Olmstead decision, the ADA, and other Federal laws can be achieved or exit from the Colbert Consent Decree be likely, as it is difficult to envision a system that perpetually and successfully identifies and transitions Class Members without a specific plan for diverting them from the system's current front-doors.

Our recommended strategies for diversion include educating nursing home referral sources about existing viable community-based options, investigating the reliability and administration of PASRR screens designed to divert individuals with serious mental illness from nursing homes and increasing oversight for nursing home admissions through more rigorous utilization review and preauthorization processes.

## Recommendations

**10.1 Educate and Engage Nursing Home Referral Sources.**

Referral sources in hospitals and other settings are critical allies in nursing home diversion — they determine whether an individual is appropriate for discharge to a nursing home or to a community agency. While our Key Informants indicated that nursing home administrators seem to have robust relationships with referral sources often responding to their request to come to the hospital to interview prospective residents that same day, the same breadth and depth of these relationships did not appear to be the case for Colbert-funded outreach,



*Behavioral Health Policy Collaborative, LLC*

54

evaluation, and other community-based agency staff. Changing the referral practices of local hospitals and other nursing home referral agencies can occur only when the alternative works as seamlessly as the original process.

We recommend that an active engagement and education process be established and implemented on an ongoing basis so that: (1) referral sources are educated on existing community-based services and the areas in the County served by each of them and (2) discharge to community-based housing and agencies is the more appropriate — and Olmstead compliant — treatment and discharge decision, unless an individual specifically requires nursing home level of care. The training provided under this recommendation should be both in-person and supplemented by brief, written material that clarify criteria for community versus nursing home referrals.

Because referral source may be unaware of community treatment and support options, as part of the above, we recommend IDoA identify the most common Cook County nursing home referral sources (e.g., hospital systems) and examine their knowledge of community resources and beliefs about whether community-based services can address the complex needs of individuals they discharge. Using this data, we recommend that IDoA design the education initiative so referral staff and administrators strengthen their knowledge about availability of diversionary resources and operational strategies (e.g., referral workflows, memoranda of understanding, coordinated care models) that can facilitate strong connections between referral sources and the community-based system.

**10.2 Conduct Retrospective Examination of PASRR Screens.**

Pre-admission Screening and Annual Resident Review (PASRR) is a Federal screening requirement designed to prevent individuals with serious mental illness from being inappropriately assigned to nursing home care. The PASRR program prohibits nursing facilities from admitting any individual with a serious mental illness unless the State Mental Health Authority determines that the individual requires nursing home-level care.[39] PASRR helps determine whether specialized mental health services are needed for nursing home residents. However, fewer than half of nursing home residents with a serious mental illness receives appropriate preadmission screening. In national, state-by-state PASSR ratings, Illinois' use is in the third quartile, with only 26 to 50 percent of Illinois nursing homes implementing and reporting PASSR screening.[40]

While PASSR is designed to ensure that individuals with mental health needs are identified prior to nursing home entry to safeguard them from inappropriate placement, this safeguard is only effective if the screening is accurate and completely objective, as mistakes in administration or interpretation of results can drastically change a person's treatment options and pathways. CMHCs, under contract with DMH, conduct PASRR screens impacting Class Members, as may other organizations funded by other agencies. Yet, these CMHCs are among the same agencies that may become the service provider that determines a Class Member's appropriateness for transition and provides a host of post-transition services. We are concerned this may present actual or perceived conflict of interest and suggest it be reconsidered from that perspective.

During our work, we noted questions and concerns about the accuracy and appropriateness of PASRR implementation. As such, we recommend that IDoA and DMH collaborate to design and conduct a one-year retrospective administrative review of PASRR determinations of individuals in Cook County. We also recommend

---

[39] Linkins et al., (2001).
[40] *PASRR Technical Assistance Center. (December, 2015). 2015 PASRR National Report: A Review of Preadmission Screening and Resident Review (PASRR) Programs.*

*Behavioral Health Policy Collaborative, LLC*

that the State request technical assistance from the Federal PASSR Technical Assistance Center,[41] which provides training and technical assistance to states to improve the PASSR implementation and more closely mirror its Federal intent.

The review should include clinical assessment of the accuracy of PASRR determinations at its Level 1 and Level 2 stages; appropriateness of PASRR findings for nursing home placement, other institution, or the community (e.g., self-care, family, agency); determination and the rates and proportions for each; comparison of these PASRR administration rates and proportions benchmarked against other Illinois counties, U.S. counties of like size, and national standards; demographic and clinical characteristics associated with Level 1 and Level 2 determinations. This examination's findings should elucidate key themes such as setting-specific trends, provider bias, if any, demographic trends in cohorts, PASRR implementation rates, and other issues that may necessitate prompt correction. The review's results should be considered to form an assessment of the current PASRR administration's overall appropriateness and effectiveness and whether it can be better used to stem the flow of inappropriate nursing home placements as part of its impact on Class Members and the larger population of people with serious mental illness.

Depending upon the review's results, it may be appropriate for the State to consider shifting contracts for PASRR work to independent agencies or organizations that do not have actual or perceived stake in the outcome of each PASRR determination and that can ensure uniform and reliable administration. A strong training protocol should be used for PASRR administrators to ensure reliability, along with a rigorous and regular review and monitoring process in which PASRR data is routinely examined for efficacy and used to identify potential trends of concern.

---

[41] *See* www.pasrrassist.org



**Behavioral Health Policy Collaborative, LLC**

# CONCLUSION

As we approach a decade since the filing of *Colbert v. Williams* and six years since the Consent Decree, the State of Illinois and the many other Colbert stakeholders, including Class Members themselves, have successfully accomplished transitions for more than 1,500 individuals with disabilities from nursing homes to communities.

Colbert stakeholders are facing an acute dichotomy. Many are frustrated by the current pace of transitions. They estimate that it could take almost 10 years for individuals in the current Colbert Class to be moved into communities; not accounting for any new nursing home residents who will grow the Class size. They want the number and pace of transitions to significantly increase. Others see capacity shortages, funding and reimbursement limitations, and overall concern for Class Member safety and well-being -- without adequate community-based services and appropriate and affordable housing -- as hindrances to achieving current transition targets and factors that stymie future significant transition expansion efforts. Both views are valid.

It remains difficult to quantify, assess, and predict the system's capacity for the type and degree of expansion that would be required to transition significantly more Class Members. Under current resources and progress, there are serious concerns as to if the 2017 transition targets will be met, even more so 2018's increased targets. We believe that implementing at least some of the recommendations offered herein will alleviate several bottlenecks in current transition processes.

For example, devising and utilizing a much shorter, yet reliable screening tool, for initial Class Member transition readiness assessment should free-up considerable time and resources, allowing for more Class Members to be evaluated and recommended for transition. Similarly, increasing referrals to housing locators to get them up to current capacity; employing more master leases; establishing relationships with significantly more landlords, especially to bring more accessible rental units online; and using currently budgeted expansion funds to add more essential services (e.g., ACT teams, CST, integrated care, nursing support) to existing providers and to new providers from county government and FQHCs. This should result in transitioning more Class Members into the community within shorter timeframes. Similarly, attending to the significant issues we expect exist with PASSR compliance, educating referral sources about diversion pathways to community versus nursing home care, and actively using managed care tools and techniques (e.g., pre-authorization, risk bearing) should help stem the flow of people away from inappropriate, costly nursing home placements and to community services and housing, thereby relieving some of the pressures that the continuing addition of new Class Members continue to create.

However, in our opinion, the State will not see a successful resolution to the Colbert Consent Decree without significant increases to the upfront investments necessary to build and sustain the range of community-based medical, behavioral health, housing, and other services needed to serve vulnerable Class Members with complex needs and simultaneous interventions to change the inappropriate customs and practices that contribute to inappropriate nursing home and other institutional placements. While financially difficult given the State's budget circumstances, we contend that transitioning significantly more Class Members will require implementation of several of BHPC's recommendations in addition to those mentioned above, including examining and considering increasing Medicaid reimbursement rates, exploring rate exceptions and incentives, and investing more in affordable and accessible housing.

*Behavioral Health Policy Collaborative, LLC*

While considering and devising solutions to these complex issues, it is imperative that the State and others pay careful attention to maintaining a system-wide view. Without such, corrections or fixes to one area or process can result in perverse consequences in other areas. For example, simply forbidding future nursing home referrals/placements without investment and assurance of appropriate diversion alternatives could easily lead to increased institutionalizations in other settings or homelessness for Class Members.

Finally, we acknowledge that the 45 recommendations that BHPC developed and offers herein can seem daunting to those charged with implementing and overseeing the Consent Decree. While we stand behind the importance of each one, we respectfully offer the following "top 10" list of the recommendations we see as requiring priority action. These recommendations are in the order in which they appear and are discussed in the body of the report.

- Appoint a Colbert Task Force (Recommendation 1.1)
- Convene a Data Enterprise Workgroup and Create a Data Enterprise Program (Recommendation 3.1)
- Garner a Formal Savings Reinvestment Commitment (Recommendation 4.1)
- Identify and Act Upon Inappropriate System Incentives and Disincentives (Recommendation 4.3)
- Assess Medicaid Reimbursement Rates and Incentives (Recommendation 4.4) and Augment System Capacity by Quantifying Need and Increasing Funding for Evidence-based Services, Promising Practices, and Supports (Recommendation 6.3)
- Create and Use a Short Screening Tool and Simplify Current Evaluation/Assessment Tool (Recommendation 5.1)
- Establish Outreach and Evaluation Targets (Recommendation 5.3)
- Expand Pool of Colbert Service Providers to Increase Capacity and Integrated Care (Recommendation 6.4)
- Develop Housing-specific Key Performance Indicators and Realign Contractor Targets with Capacity (Recommendation 7.5)
- Increase Special Housing and Accessible Housing Inventory (Recommendation 7.7)

The forthcoming second generation of Colbert will be judged by the successes or failures that result from the commitments, investments, implementation, and outcomes realized under Colbert. As such, the Colbert Court Monitor engaged the Behavioral Health Policy Collaborative to review accessible areas of the system using mutli-pronged approaches. BHPC's findings, observations, and goals and recommendations aim to significantly and meaningfully contribute to the vision inherent in the Colbert Decree and to its success.

Illinois has much work to do, as does the nation, but the commitment to this end is the motivator that will influence both compliance and success; thus, improving the lives of thousands.

*Behavioral Health Policy Collaborative, LLC*

*April 10, 2017*

# COLBERT CONSENT DECREE

# Report to the Court Monitor: Recommendations for System and Process Improvements

*AUTHORS*

*Gail P. Hutchings, MPA*

*Jake Bowling, MSW*

*Heather Cobb*

*Carlyle Hooff, MEd*

*Kevin A. Huckshorn, PhD, MSN, RN, ICRC*

*Cynthia Zubritsky, PhD*

*Behavioral Health Policy Collaborative, LLC*

*Suggested Citation:*

*Hutchings, G., Bowling, J., Cobb, H., Hooff, C., Hucskhorn, K., and Zubritsky, C. (April, 10, 2017). Colbert Consent Decree Report to the Court Monitor: Recommendations for System and Process Improvements. Behavioral Health Policy Collaborative, LLC: Alexandria, VA.*

**Behavioral Health Policy Collaborative, LLC**

# Table of Contents

Executive Summary ....................................................................................................... 1
Synopsis of Goals and Recommendations for System and Process Improvements ........................... 2
Background and Introduction ........................................................................................ 7
Statement of Work .................................................................................................... 11
BHPC Project Team .................................................................................................... 11
Project Approach ....................................................................................................... 12
**Goal 1: Effective Governance Structures Guide Colbert Program Implementation** ........................... **14**
Recommendations ..................................................................................................... 16
**Goal 2: Clear Colbert Vision Statement and Communications Plan Educates and Engages Stakeholders** .................................................................................................................. **19**
Recommendations ..................................................................................................... 19
**Goal 3: Comprehensive Data Enterprise Program Drives Colbert-wide Performance Assessment and Decision-making** ............................................................................................... **20**
Recommendations ..................................................................................................... 21
**Goal 4: System-wide Investments Achieve Colbert Mandates and Avoid Inappropriate Nursing Home Placements** ............................................................................................................ **26**
Recommendations ..................................................................................................... 27
**Goal 5: Colbert Uses Efficient and Reliable Outreach, Screening, and Evaluation/Assessment Processes and Protocols** ........................................................................................ **30**
Recommendations ..................................................................................................... 31
**Goal 6: Provider Capacity Exists to Successfully Serve Transitioned Class Members** ......................... **34**
Recommendations ..................................................................................................... 34
**Goal 7: Appropriate and Affordable Independent Housing Is Available for Class Members** ............. **41**
Recommendations ..................................................................................................... 46
**Goal 8: Knowledgeable and Skilled Staff Are Prepared to Address Class Members' Complex Needs** **49**
Recommendations ..................................................................................................... 49
**Goal 9: Independent Quality Assurance Mechanisms Ensure Colbert Program and Service Integrity** **51**
Recommendations ..................................................................................................... 51
**Goal 10: Diversion Strategies Prevent Inappropriate Nursing Home Placements for People with Disabilities and Redress System "Front Door" Issues** ............................................... **54**
Recommendations ..................................................................................................... 54
**Conclusion** .................................................................................................................. **57**

*Behavioral Health Policy Collaborative, LLC*

# Executive Summary

The Summer of 2017 marks a decade since the *Colbert v. Quinn* lawsuit was filed in Chicago, Illinois on behalf of people with disabilities residing in Cook Country nursing homes. Now, as it enters its second decade, an opportunity exists to create and deliver on a second generation of Colbert — one in which individuals' civil liberties are fully respected and Federal laws strictly adhered to.

With concerted effort, Illinois can achieve a unified, seamless system in Cook County and elsewhere that universally expects most people with psychiatric and physical disabilities to thrive and live independently in the community. This can be accomplished when the right mix of services and housing exist; when savings earned by transitioning and diverting people away from nursing homes into the community are reinvested to build and strengthen adequate, functional, and efficient community-based mental health, healthcare, and housing systems; and, ultimately, where the community at-large embraces individuals with disabilities not as "them" but as "us."

By many accounts, several processes to identify and serve Colbert Class Members (Class Members) and the resulting outcomes have improved overall since the U.S. District Court approved the original Consent Decree in December 2011. Yet, while the lawsuit's parties and the Judge agreed to year-to-year increases in the expectations for evaluation and transition of a finite number of Class Members out of nursing homes, the actual number of those transitioned has begun to lag significantly, with no realistic change trend in sight without a new course map.

Successfully complying with the Colbert Consent Decree is systemically arduous. Most Class Members present complex histories of some combination of poverty, mental illness, substance abuse, physical disability, co-morbid chronic medical diseases, housing instability, trauma, and/or criminal justice involvement. The barriers to transition readiness are formidable. The State has progressed, but a course redirect can guide the parties to address the gaps and continued needs of current and future Class Members to eventually absolve the decree.

The State needs to provide substantial investments, resources, workforce, and extensive partnerships for utmost success. Involved systems must improve governing structures and oversight; enhance engagement and communication with stakeholders, partners and prospective partners, and current and potential Class Members; enhance data tracking and outcome measurement to maximize quality improvement; assure service quality; redistribute savings and expenditures to community-based services; restructure care delivery including embracing integration of medical and behavioral health care; maintain sufficient housing options with proximity to behavioral health and medical services in the immediate community; provide an adequate and trained workforce; implement quality monitoring; and create diversion pathways to prevent inappropriate institutionalization.

The Colbert Court Monitor retained the Behavioral Health Policy Collaborative (BHPC) to undertake this independent review of Colbert-related systems and processes. A team comprised of behavioral health and housing services policy, system, data, and clinical experts completed the work. The findings, observations, and goals and recommendations aim to significantly contribute to the vision inherent in the Colbert Consent Decree and its success.

Toward that end, BHPC offers these 10 goals and associated recommendations to realize Colbert's second generation to improve systems and processes and expand capacity to serve the most Class Members possible.



*Behavioral Health Policy Collaborative, LLC*

1

# Colbert Consent Decree
# Synopsis of Goals and Recommendations for System and Process Improvements

| | |
|---|---|
| **GOAL 1** | **Effective Governance Structures Guide Colbert Program Implementation**<br><br>Illinois significantly outpaces all other states in housing residents with certain psychiatric disabilities in nursing homes, and Cook County outpaces the rest of Illinois by 9.4 percent. That said, successful compliance with the Colbert Consent Decree is difficult, challenging work. It requires vision, leadership, policy and financing context, cross-agency and cross-discipline coordination, and a focus on process and outcome measures.<br><br>*Recommendations:*<br>1.1  Appoint a Colbert Task Force<br>1.2  Institute a Workgroup Structure and Charge Workgroups with Key Goals and Objectives<br>1.3  Revise Contracting Content, Processes, and Monitor with New Data Dashboard<br>1.4  Develop Staffing and Infrastructure Plan<br>1.5  Provide Additional Staffing to IDoA Colbert Implementation Office |
| **GOAL 2** | **A Clear Colbert Vision Statement and Communications Plan Educates and Engages Stakeholders**<br><br>An accessible Colbert vision statement can inform the Decree's vast audiences about its mission and goals, galvanize allies, and guide success and positive outcomes. In step with such a statement, a communications and marketing plan detailing how to inform and engage said stakeholders would facilitate long-term success.<br><br>*Recommendations:*<br>2.1  Create a Clear Vision and Mission Statement<br>2.2  Develop and Implement a Communications and Marketing Plan |
| **GOAL 3** | **A Comprehensive Data Enterprise Program Drives Colbert-wide Performance Assessment and Decision-making**<br><br>A centralized system that systematically collects, houses, and accesses real-time data is essential to Colbert program planning and management. It provides empirical understanding of all program aspects — from population information and workforce efficiency to performance and outcome. This will advise stakeholders of course-correction needs, necessary resource re-allocations, information sharing opportunities, performance and quality issues, compliance, and more.<br><br>*Recommendations:*<br>3.1  Convene a Data Enterprise Workgroup and Create a Data Enterprise Program<br>3.2  Implement Data Review Processes<br>3.3  Use Technology for Data Collection<br>3.4  Increase IDoA Staff Support in Data Collection and Analysis<br>3.5  Devise and Use Data Methodology to Predict Class Members Size and Project Rates for Transition Stages<br>3.6  Increase Already-Mandated Data Reporting Compliance |



***Behavioral Health Policy Collaborative, LLC***

| GOAL 4 | **System-wide Investments Achieve Colbert Mandates and Avoid Inappropriate Nursing Home Placements** |
|---|---|
| | Systems serving Class Members need adequate resources. Accurately capturing and understanding the total cost of transitioning people, identifying and securing strategic investments and reinvestments, and using financial levers will help meet Colbert goals and outcomes. |
| | *Recommendations:* |
| | 4.1  Garner a Formal Savings Reinvestment Commitment |
| | 4.2  Expand Comprehensive Cost Study and Use Results to Target Services Delivery |
| | 4.3  Identify and Act Upon Inappropriate System Incentives and Disincentives |
| | 4.4  Assess Medicaid Reimbursement Rates and Incentives |
| | 4.5  Explore Risk Bearing Requirements in Medicaid Managed Care Contracts |
| GOAL 5 | **Colbert Uses Efficient and Reliable Outreach, Screening, and Evaluation/Assessment Processes and Protocols** |
| | Pre-transition processes are paramount. Colbert success is impossible without identifying, engaging, and evaluating potential Class Members, as well as timely referrals and service plans. Streamlining procedures, creating efficiencies, reducing duplication, establishing performance standards, expediting processes, and enhancing workforce capacity and skill levels are the goals. |
| | *Recommendations:* |
| | 5.1  Create and Use a Short Screening Tool and Simplify Current Evaluation/Assessment Tool |
| | 5.2  Institute Catchment Area Nursing Home Assignment System |
| | 5.3  Establish Outreach and Evaluation Targets |
| | 5.4  Formally Engage Nursing Home Administrators and Staff in Outreach and Evaluation/ Assessment Processes |
| | 5.5  Ensure Appropriate Match Between Class Member Needs and Referred Service Provider Agency |
| GOAL 6 | **Provider Capacity Exists to Successfully Serve Transitioned Class Members** |
| | The linchpin of success for Colbert implementation is a robust community-based service and housing system that aligns with Class Members' needs, enshrines evidence-based practices, offers integrated primary and behavioral healthcare and innovative person-centered models, provides safe and affordable independent housing, and builds a workforce skilled in meeting the needs of vulnerable populations. Addressing provider capacity is supreme, and adopting a standard framework to guide referrals, determine capacity needs, and promote adoption of evidence-based practices is necessary to build and maintain an adequate capacity among Colbert service providers. |
| | *Recommendations:* |
| | 6.1. Stratify Class Member Populations Using the Four Quadrant Clinical Integration Model |
| | 6.2. Use the Four Quadrant Clinical Integration Model to Guide Resource Mapping and Systems Planning |
| | 6.3. Augment System Capacity by Quantifying Need and Increasing Funding for Evidence-based Services, Promising Practices, and Supports |



***Behavioral Health Policy Collaborative, LLC***

|  | 6.4. Expand Pool of Colbert Service Providers to Increase Capacity and Integrated Care |
|---|---|
|  | 6.5. Streamline Approvals for Durable Medical Equipment |
|  | 6.6. Examine and Use SSI/SSDI Presumptive Eligibility and Enrollment Expediting Programs |
| GOAL 7 | **Appropriate and Affordable Independent Housing Is Available for Class Members** |
|  | The full participation of people with disabilities in community life is only possible with access to safe, appropriate, and affordable independent housing. Increasing housing units for transitioning Class Members points to refining housing search processes, testing new models of integrated care coordination and housing location, maximizing capacity of housing service providers, engaging significantly more landlords, expanding housing models to address the needs of people with physical disabilities and complex medical comorbidities, increasing proven strategies used to overcome common housing barriers, and streamlining other housing-related processes. |
|  | *Recommendations:* |
|  | 7.1 Convene Colbert Housing Workgroup |
|  | 7.2 Increase IDoA Colbert Housing Staff |
|  | 7.3 Re-engineer Housing Search Process |
|  | 7.4 Pilot Integrated Colbert MCO and Housing Locator Teams |
|  | 7.5 Develop Housing-Specific Key Performance Indicators and Realign Contractor Targets with Capacity |
|  | 7.6 Implement a Landlord Engagement Initiative |
|  | 7.7 Increase Special Housing and Accessible Housing Inventory |
|  | 7.8 Address Common Rental Barriers |
|  | 7.9 Expedite Transition Funds and HQS Inspections |
| GOAL 8 | **Knowledgeable and Skilled Staff Are Prepared to Address Class Members' Complex Needs** |
|  | Next to a Class Member's role, the staff roll is one of the most important determinants of transition success. A staff that supports the entire transition process must also commit to providing high-quality care. This empowered workforce fundamentally influences and contributes to transition. Training is of the utmost importance to achieve this. |
|  | *Recommendations:* |
|  | 8.1 Expand Training Offered Under Existing Training Institute |
|  | 8.2 Launch Colbert Learning Collaboratives |
| GOAL 9 | **Independent Quality Assurance Mechanisms Ensure Colbert Program and Service Integrity** |
|  | Much of a person's success in the community is contingent on the integrity and conduct of staff. Attention and mechanisms to promote professional and lawful conduct and guard against negative conduct and illegal acts are crucial safeguards. Improving safeguards at the State-level vis-à-vis conducting monitoring and quality assurance assessments is prime. Colbert process and workflow must incorporate strong, independent, and data-informed quality assurance mechanisms and staff. |

*Behavioral Health Policy Collaborative, LLC*

|  | **Recommendations:**<br>9.1 Ensure Adequate Access to and Authority of State Long-term Care Ombudsman or Appoint Colbert Ombudsman<br>9.2 Hire Independent Staff or Contractors to Conduct Contractor/Provider Monitoring and Quality Reviews<br>9.3 Increase Oversight for "Unable to Serve" Designations |
|---|---|
| **Goal 10** | **Diversion Strategies Prevent Inappropriate Nursing Home Placements for People with Disabilities and Redress System "Front Door" Issues**<br>While not specifically in the Colbert Consent Decree requirements, considering and addressing upstream, front-door issues that permit and even incentivize placing people with disabilities who belong in the community into nursing homes will help expedite exit from the Decree.<br><br>**Recommendations:**<br>10.1 Educate and Engage Nursing Home Referral Sources<br>10.2 Conduct Retrospective Examination of PASRR Screens |

There is an understandable and difficult tension present among Colbert stakeholders. Many have observed, correctly, that while exact numbers remain unknown, at the current pace of transitions, it could take almost 10 years to move individuals in the current Colbert Class into communities. They see this as an unacceptably long period. In addition, that estimate does not account for any new nursing home residents who will increase the Class size. Other views signal capacity shortages, funding and reimbursement limitations, and overall concern for Class Member safety and well-being — without adequate community-based services and appropriate and affordable housing — as hindrances to achieving current transition targets and addressing factors that stymie future significant transition expansion efforts. Those views are also valid.

It remains difficult to quantify, assess, and predict the system's capacity for the type and degree of expansion that would be required to transition significantly more Class Members. Under current resources and progress, there are serious concerns as to if the 2017 transition targets will be met, even more so 2018's increased targets. We believe that implementing at least some of the recommendations offered herein will alleviate several bottlenecks in current transition processes.

For example, devising and utilizing a much shorter, yet reliable screening tool, for initial Class Member transition readiness assessment should free-up considerable time and resources, allowing for more Class Members to be evaluated and recommended for transition. Similarly, increasing referrals to housing locators to get them up to current capacity; employing more master leases; establishing relationships with significantly more landlords, especially to bring more accessible rental units online; and using currently budgeted expansion funds to add more essential services (e.g., ACT teams, CST, integrated care, nursing support) to existing providers and to new providers from county government and FQHCs. This should result in transitioning more Class Members into the community within shorter timeframes. Similarly, attending to the significant issues we expect exist with PASRR compliance, educating referral sources about diversion pathways to community versus nursing home care, and actively using managed care tools and techniques (e.g., pre-authorization, risk bearing) should help stem the flow of people away from inappropriate, costly nursing home placements and to community services and housing, thereby relieving some of the pressures that the continuing addition of new Class Members continue to create.



**Behavioral Health Policy Collaborative, LLC**

However, in our opinion, the State will not see a successful resolution to the Colbert Consent Decree without significant increases to the upfront investments necessary to build and sustain the range of community-based medical, behavioral health, housing, and other services needed to serve vulnerable Class Members with complex needs and simultaneous interventions to change the inappropriate customs and practices that contribute to inappropriate nursing home and other institutional placements. While financially difficult given the State's budget circumstances, we contend that transitioning significantly more Class Members will require implementation of several of our recommendations in addition to those mentioned above, including examining and considering increasing Medicaid reimbursement rates, exploring rate exceptions and incentives, and investing more in affordable and accessible housing.

While considering and devising solutions to these complex issues, it is imperative that the State and others pay careful attention to maintaining a system-wide view. Without such, corrections or fixes to one area or process can result in perverse consequences in other areas. For example, simply forbidding future nursing home referrals/placements without investment and assurance of appropriate diversion alternatives could easily lead to increased institutionalizations in other settings or homelessness for Class Members.

Finally, we acknowledge that the 45 recommendations that BHPC developed and offers herein can seem daunting to those charged with implementing and overseeing the Consent Decree. While we stand behind the importance of each one, we respectfully offer the following "top 10" list of the recommendations we see as requiring priority action. These recommendations are in the order in which they appear and are discussed in the body of the report.

- Appoint a Colbert Task Force (Recommendation 1.1)
- Convene a Data Enterprise Workgroup and Create a Data Enterprise Program (Recommendation 3.1)
- Garner a Formal Savings Reinvestment Commitment (Recommendation 4.1)
- Identify and Act Upon Inappropriate System Incentives and Disincentives (Recommendation 4.3)
- Assess Medicaid Reimbursement Rates and Incentives (Recommendation 4.4) and Augment System Capacity by Quantifying Need and Increasing Funding for Evidence-based Services, Promising Practices, and Supports (Recommendation 6.3)
- Create and Use a Short Screening Tool and Simplify Current Evaluation/Assessment Tool (Recommendation 5.1)
- Establish Outreach and Evaluation Targets (Recommendation 5.3)
- Expand Pool of Colbert Service Providers to Increase Capacity and Integrated Care (Recommendation 6.4)
- Develop Housing-specific Key Performance Indicators and Realign Contractor Targets with Capacity (Recommendation 7.5)
- Increase Special Housing and Accessible Housing Inventory (Recommendation 7.7)


*Behavioral Health Policy Collaborative, LLC*

# Background and Introduction

**Brief Background: Colbert Lawsuit and Consent Decree.** In 2007, a lawsuit known as *Colbert v. Quinn*[1] was filed in the United States District Court for the Northern District of Illinois on behalf of individuals with disabilities residing in nursing facilities in Cook County, Illinois. The lawsuit claimed violations of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Social Security Act by segregating and institutionalizing people with disabilities and failing to provide opportunities for those individuals to live in integrated community settings. The lawsuit was filed against the Governor and four Illinois state agencies: Department of Human Services (DHS), Department of Public Health (DPH), Department of Aging (IDoA), and Department of Healthcare and Family Services (HFS).

In December, 2011, the Federal District Court Judge approved a Colbert Consent Decree that was agreed to by the parties.[2] The Consent Decree obligates the State to support the transition of eligible and appropriate Class Members from Cook County[3] nursing facilities to community-based housing with services and supports. It enumerates annual Class Member transition targets and addresses outreach and education of potential Class Members, evaluation/assessment of eligible Class Members, service planning and housing location assistance, and transition and placement services. It also requires submission of annual implementation plans and appointment of an independent monitor to evaluate and at least annually report to the Court on Consent Decree compliance.

The Consent Decree defines Class Members as "…[A]ll Medicaid-eligible adults with disabilities who are being, or may in the future be, unnecessarily confined to Nursing Facilities in Cook County, Illinois, and who with appropriate supports and services may be able to live in a Community-Based Setting."[4]

State agency-level responsibility and leadership for implementation of the Consent Decree's agreed-upon terms was assigned originally to HFS. After two years, in January, 2014, it transferred to IDoA, where is remains today.

**Progress to date toward Class Members transitions.** It is difficult to determine the true size of the Member Class because it is not static; no time or size parameters have been established for determination of its size. IDoA states that approximately 18,500 individuals comprise the Colbert Class[5] but agrees to needing a verifiable methodology to more accurately determine this number. As indicated in Table 1, the transition target for 2013 was 300 transitions; when the IDoA assumed responsibility for Class Member transitioning in 2014, there was a target of 500 transitions. The State met its obligation to transition a cumulative total of 1,100 Class Members in 2015, exceeding the target by 12 individuals. The current pace of transitions has slowed significantly, despite the Court's requirement for an increase. In 2016, the target transition number was 504 individuals; yet, only 384 transitions

---

[1] *Colbert v. Quinn. No. 07 C 4737, United States District Court for the Northern District of Illinois, Eastern Division. Filed August 22, 2007.*
[2] *Colbert v. Quinn. No. 07 C 4737, United States District Court for the Northern District of Illinois, Eastern Division. Order. Filed December, 31, 2011.*
[3] *References made to Cook County throughout this report also includes the City of Chicago, IL.*
[4] *Colbert v. Quinn. No. 07 C 4737, United States District Court for the Northern District of Illinois, Eastern Division. Order. Filed December, 31, 2011. Pg. 2.*
[5] *Illinois Department on Aging. (undated). Colbert Consent Decree. Approximation from HFS data on number of individuals in Cook County Nursing Homes as of September 30, 2016.*



*Behavioral Health Policy Collaborative, LLC*

were completed.[6] The target is increased again for 2017 to 550 transitions; however, there are serious concerns about the system's ability to meet the current targets.

| Table 1. Colbert Transition Targets and Completions: 2013-2017[7] | | | | | |
|---|---|---|---|---|---|
| Year[8] | | | | | |
| Transition #'s | 2013 | 2014 | 2015 | 2016 | 2017 |
| Transition Target | 300 | 500 | 300 | 504 | 550 |
| Transitions Completed | 111 | 464 | 537 | 384 | - |
| Cumulative Transitions Completed | 111 | 575 | 1,112 | 1,496 | - |

**Brief Overview of Major Colbert Systems and Processes.** The Colbert Project Director — whose position is Division Manager, Illinois Department on Aging Office of Transitions and Community Relations — manages the Colbert implementation process. This position oversees major Colbert contracts with organizations that provide various services to Class Members, including: two programs that provide outreach and education to Colbert Nursing Home residents; two managed care companies responsible for the evaluations/assessments of individuals to determine Class Member eligibility, their appropriateness for referral and transition to community housing, and to determine the services necessary to support and maintain the individual in the community; three Care Coordination Units (CCUs) that serve Class Members who are age 60 and over with intensive long-term care needs by developing service plans for individuals with functional impairment(s) who need housekeeping assistance, home-delivered meals, personal care, or other services; four housing locator contracts; nine Community Mental Health Center (CMHCs) of which some provide outreach, evaluation, housing, and transition services and all providing, transition services, post-transition mental health and other services and supports.

The flowchart below (Figure 1) depicts the core elements of the Colbert Transition Process.[9] While progress has been made in coordinating some of the major process elements, an integrated approach to managing these functions is necessary to develop a more cohesive method to serving Class Members and to make the process run more smoothly overall. Regular data sharing and analyses, recurrent forums to discuss barriers and strategies to overcome them, and additional shared incentives could achieve cross function communication and efficiencies.

---

[6] Personal communication with the Colbert Transition Team, March 15, 2017.
[7] Colbert Court Monitor. (January 18, 2016). Colbert v. Rauner, Case No. 07-C4737 (N.D. Ill.). Annual Report to the Court.
[8] As mentioned elsewhere, reporting and analysis of these and other data are compromised given the variability in how years are determined, ranging from fiscal, calendar, and other court-established timeframes.
[9] Illinois Department on Aging. (December 19, 2016). Colbert Consent Decree Implementation Plan Phase 3. Pg. 62. Graphic used with permission.



*Behavioral Health Policy Collaborative, LLC*

*Figure 1. Colbert Consent Decree Transition Process*



*Behavioral Health Policy Collaborative, LLC*

**Recent key developments.** In the past year alone, several developments emerged that either directly or indirectly impact Colbert implementation. These factors have or are expected to influence Colbert policies and operations. These include:

- **Cost Neutral Plan**. As briefly discussed above, the finalization of the Cost Neutral Plan, approved by the Court on November 1, 2016, is a recent and important development. It contains various provisions, including required outreach activities, targets for the number of individuals evaluated and transitioned, and a call for an updated implementation plan. The order approving the Cost Neutral Plan includes a community capacity-building section, empowering the Court Monitor to retain an appropriate independent consultant to determine the current barriers and offer recommendations on how the Defendant can achieve Consent Decree compliance and transition greater numbers of Class Members into community-based housing and services.

- **Implementation Plan**. Filed with the Court on March 22, the Phase III implementation plan outlined strategies to meet the requirements of the Cost Neutral Plan amendment and respond to Class Members' needs, including those which were unforeseen when the Phase II Implementation Plan was written. The document includes operational plans for the outreach, evaluation, referral, transition, housing, and other activities that facilitate transitioning Colbert-eligible Cook County nursing home residents into the community.

- **Illinois Behavioral Health Transformation**. In recognition that Illinois has: Medicaid recipients with behavioral health needs comprising 25 percent of the Medicaid recipient pool but use 56 percent of all Illinois Medicaid spending; a system that overuses institutional care; inadequate capacity in the community-based behavioral health system to meet service demand; and far too few offerings of integrated primary care and behavioral health services, the State submitted an 1115 Waiver application to the federal Centers for Medicare and Medicaid Services (CMS) in 2016. The waiver, if approved, projects drawing down $2.7 billion in Federal match dollars for Medicaid services and envisions generating an Illinois Behavioral Health Transformation by authorizing Medicaid reimbursement for supportive housing and employment services, transition services for justice-involved individuals, substance use disorder case management, and other critical services designed to reduce over-reliance on institutional care and provide more robust community-based supportive services.[10]

- **Uniform Evaluation/Assessment Tool.** The University of Illinois at Chicago College of Nursing (UIC-CON) developed a consolidated, uniform evaluation tool to assess the readiness and support needs for individuals in Cook County nursing homes to transition into the community. The tool is now uniformly used by Colbert contractors that conduct evaluation services and allows for data comparisons across providers, including determinations of transition readiness. (See Recommendation 5.1 for discussion and a recommendation for this instrument's administration.)

- **Training Institute for Colbert Providers.** Designed and facilitated by UIC-CON, the Training Institute provides education and training to Colbert and Williams Consent Decrees' providers to develop their knowledge and skills to effectively conduct assessments and engage in service planning and delivery to facilitate Class Members' transition to community-based settings.

---

[10] *Illinois Department of Healthcare and Family Services. Illinois' Behavioral Health Transformation — 1115 Overview. 2016.*



*Behavioral Health Policy Collaborative, LLC*

10

# Statement of Work and Project Approach

## Statement of Work

In December, 2016, the Colbert Court Monitor, Dennis Jones, MSW, MBA, engaged the Behavioral Health Policy Collaborative, LLC (BHPC) to conduct an independent review and assessment of major Colbert-related systems and processes to:

1. Devise recommendations designed to improve quality and outcomes; identify factors for increasing capacity to serve Class Members; and contribute to the development of a quantitative methodology that can predict the future Class size. The specific scope of work called for BHPC to: participate in a "kickoff" session with providers, State officials, and the Court Monitor that clearly lays out the scope of the task ahead, the consultant's role, and the needed participation of each provider.
2. Participate in site visits and meetings with nursing home administrators, Colbert outreach and evaluation staff, CMHCs, and Class Members.
3. Evaluate the overall system and outreach, evaluation, and transition processes and procedures currently used for Class Members. Identify problems and impediments to increasing the number of transitions.
4. Work with State officials to develop a methodology that reasonably predicts the number and percentage of Class Members who will ultimately transition.
5. Meet with individual providers — both leadership and key staff — to review Colbert progress-to-date, performance barriers, and key requirements for planned growth. Develop a multiyear growth plan that articulates provider commitments, including Board approval, and required State supports.
6. Evaluate the current State-level supports (i.e., money, personnel, quality systems, ability to grow) for Colbert. Recommend any enhancements necessary to ensure substantial growth.
7. Recommend any needed systemic changes, or enhancements, in key areas (e.g., provider capacity, housing availability, payment system, State oversight, training, data enhancements, and interagency and provider collaboration).
8. Based on specific agency analysis and overall systemic findings, recommend whatever changes necessary for overall growth in future years. In like kind, recommend the growth potential and the specific actions needed to achieve this level of growth.
9. Meet again with providers, State officials, plaintiffs, and the Court Monitor to share findings and recommendations.

## BHPC Project Team

BHPC identified and proposed a consulting team of consultants to the Court Monitor who in turn discussed it with the Colbert parties. In December 2016, the BHPC consulting team was approved and consisted of: Gail P. Hutchings, MPA, BHPC President and CEO and Project Director; Carlyle Hooff, MEd, Housing Lead; Kevin A. Huckshorn, PhD, MSN, RN, ICRC, Systems and Clinical Lead; and Cynthia Zubritsky, PhD, Data Lead. Jake Bowling, MSW, Writer, and Heather Cobb, Editor, were later added to the team.

 *Behavioral Health Policy Collaborative, LLC*

11

## Project Approach

The Colbert Project was assigned to begin in January 2017 and conclude the following February with report writing and submission due in March 2017. BHPC's approach to the project took the form of four primary methods: (1) key documents, materials, and data reviews; (2) key informant interviews; (3) site visits; and (4) outside research.

**Project Orientation and Planning Meeting with Court Monitor.** On December 14, 2016, BHPC project leads met with the Colbert Court Monitor in Chicago to refine project expectations and to finalize the scope of work and work plan.

**Key Documents, Data, and Other Materials Reviews.** BHPC team members reviewed a wide range of data, published and unpublished documents, and other materials in preparation for and during the project. These materials included, but were not limited to; Colbert Order/Consent Decree and subsequent pertinent Court Orders, Colbert Court Monitor Reports, Colbert Implementation Plans, Cost Neutral Report, Illinois Behavioral Health Transformation 1115 Waiver documents, assessment tools, data reports, annual reports, and myriad other relevant materials.

**Questions and Data Needs Submissions.** Team members devised a list of questions before each key informant meeting to structure and focus the discussions. In some cases, the questions were provided in advance of the meetings to help informants prepare for the discussions and to identify and provide the team with key documents. Similarly, the team made data requests to IDoA Colbert staff and others, including staff from other State agencies, service and housing providers, Colbert-contracted managed care companies, and others.

**Stakeholder Meetings/Interviews.** BHPC convened and led more than two dozen in-person meetings and one dozen phone interviews to learn about Colbert system processes, strengths, barriers, and other relevant factors. Key informants who participated in these meetings included Colbert parties (i.e., plaintiffs and defendants); State agency staff from IDoA (Department on Aging), Department of Human Services (including its Division of Mental Health and Division of Rehabilitation Services) Department of Healthcare and Family Services (HFS), Housing Development Authority, Long-Term Care Ombudsman, and others; Colbert-funded contractors providing outreach, evaluation/assessment, care coordination, healthcare and behavioral healthcare, and housing coordination and location services; and prospective Colbert partners/service providers. In many instances, additional follow-up was made to clarify information and to obtain data and/or documents.

**Site Visits.** Part of the BHPC team's three trips to Cook County were to conduct various site visits. During these, we visited two nursing homes to interview nursing home administrators, relevant staff, and Class Members, including those interested in community transition, those already approved and in the transition process, and those not interested in moving. We also interviewed staff from the two Colbert managed care companies responsible for Colbert outreach, assessment, and care coordination. Other site visits allowed us to meet with leadership and staff from three CMHCs and more Class Members who had already transitioned and live in the community. Finally, we visited three housing sites with specialized housing programs created for Class Members, including: an accessible housing project funded partially by the Low-Income Housing Tax Credits; an apartment unit in a building funded partially by Low Income Housing Tax Credits where an additional rental subsidy is used to make the unit affordable; and a building using a Cluster Housing Model.

**Final Project Report.** All BHPC team members contributed to the development of this report. A draft report was submitted to the Colbert Court Monitor on March 29, 2017, with a request that he review it for factual errors or



*Behavioral Health Policy Collaborative, LLC*

omissions only. The final report was submitted to the Court Monitor on April 10, 2017, with plans for the BHPC team to present an overview of the report, its key findings, and recommendations to the Court Monitor and a range of Colbert stakeholders, including State officials, plaintiffs, and service, housing, and other providers, on April 13, 2017 in Chicago.

**Project and Report Limitations.** The boundaries of BHPC's consultation and our ensuing a report were limited along several parameters:

- The work entailed a time- and scope-limited, systems-level review; thus, it was not intended to touch every or even a representative sample of Class Members, nursing homes, providers, and/or housing settings.

- Given that the primary audience of BHPC's project report is the Colbert Court Monitor, BHPC assumes that other readers have at least some familiarity with the Colbert Consent Decree and efforts underway to comply with the ruling. This approach enabled BHPC report authors to avoid lengthy repetition of information and data already presented elsewhere and to more immediately and directly focus on identifying the key observations and findings that justify our goals and recommendations.

- The work was intended to reflect a point in time, taking into consideration system- and process-level mechanisms in place and used during the consultation project and focusing, for the most part, on identifying and serving prospective and identified Class Members from nursing home point-of-entry to 12-months post-community transition. Pre-nursing home entry and post 12-month transition were not the intended focus of the effort, although sections of the report do address both as relevant to the conduct of the work overall.

- Data reporting is limited due to the lack of a centralized Colbert data function that collects, and analyzes data on a regular basis. Some of the difficulties in determining data targets and reports include: multiple data reports from differing stakeholders for a single report; continued use of and reference to three differing time periods (i.e., calendar years, fiscal years, and "Colbert/Court years"); changes in data collection and reporting responsibilities over time; and changes in providers over time.

- The project was not designed to conduct client-level clinical assessments or case reviews.

- The consulting team was not expected to conduct fiscal or quality audits at the service delivery-, expenditure-, or billing-levels.

The remainder of the report offers 10 goals and associated recommendations intended to guide Colbert implementation and management as well as systems capacity expansion.

*Behavioral Health Policy Collaborative, LLC*

# GOAL 1
# Effective Governance Structures Guide Colbert Program Implementation

By any account, leading, managing, and implementing the effort needed to successfully comply with, and ultimately exit, the Colbert Consent Decree is difficult and challenging work. Many of the Class Members have complex histories with some combination of poverty, mental illness, substance abuse, physical disability, co-morbid chronic medical diseases, housing instability, trauma, and/or criminal justice involvement. Their readiness for transition is often compromised by stigma, lost daily living skills from years of institutionalization, feelings of fear and hopelessness, strained or lost family connections, and lack of alternatives to institutional placement that provide affordable housing in the community with accessible services and supports.

To successfully transition people with disabilities from nursing homes into communities under Colbert requires significant commitments, investments, resources, and workforce. Decades of a State admittedly over-reliant on institutional care and with insufficient community-based behavioral health, healthcare, and affordable housing systems resulted in thousands of people with disabilities residing inappropriately in nursing homes located throughout Cook County and other Illinois communities.

To clearly illustrate the magnitude of these circumstances it is helpful to understand where Illinois as a State places vis-à-vis other states in the U.S. for nursing facility placements, including those for individuals with serious mental illness. The same applies to the need to understand where Cook County places versus other Counties in Illinois. According to 2015 data from the Kaiser Family Foundation, Illinois is ranked 7th state in the country for number of residents in certified nursing facilities with 68,840 individuals in these facilities. While Illinois has four percent of the U.S. population, it has five percent of all certified nursing facility placements.[11]

More than 500,000 individuals with mental illness live in U.S. nursing homes, significantly exceeding the number living in all other health care institutions combined.[12] Adults with serious mental illness who live in nursing homes experience disproportionate levels of mental health problems compared with their peers living in the community[13] and 54.8 percent become long-stay patients.[14]

---

[11] *Retrieved on March 31, 2017 from:* http://kff.org/other/state-indicator/number-of-nursing-facility-residents/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[12] *Fullerton, C. A., McGuire, T. G., Feng, Z., Mor, V., & Grabowski, D. C. (2009). Trends in mental health admissions to nursing homes, 1999–2005. Psychiatric Services.*

[13] *Kane, R. L., Ouslander, J. G., & Abrass, I. B. (2004). Essentials of clinical geriatrics (5th ed.). New York: McGraw-Hill.*

[14] *Grabowski, D. C., Aschbrenner, K. A., Feng, Z., & Mor, V. (2009). Mental illness in nursing homes: Variations across states. Health Affairs, 28(3), 689-700.*


**Behavioral Health Policy Collaborative, LLC**

*Figure 2. Prevalence of Schizophrenia or Bipolar Disorder Diagnoses Among Nursing Home Residents by State*



In Illinois, 21 percent of individuals placed in nursing homes have schizophrenia or bipolar disorder (See Figure 2). Not only does this rate place Illinois in the highest quartile, but it has the highest rate in the U.S. and by a significant percentage.[15] The next two highest state rates are Missouri at 15.7 percent and Ohio at 15 percent.

Furthermore, Figure 3 indicates that the rate for Cook County exceeds even the overall State rate by 9.4 percent (30.4 percent versus 21 percent).[16]

*Figure 3. Prevalence of Schizophrenia or Bipolar Disorder Among Nursing Home Residents in Cook County*



Given this data is limited to counts of persons in nursing homes with schizophrenia and bipolar disorder, but not other serious mental illnesses, it is fair to predict that the rates in Illinois overall, Cook County specifically, and elsewhere throughout the U.S. are even higher. Consideration of data such as this reinforces the need for system rebalancing in Illinois, including Cook County, and the imperative for Colbert implementation.

Colbert success demands realistic resource investments and effective collaboration and cooperation among multiple State and county government agencies, service and housing providers, advocates, and others — each with varying missions, constituencies, governing laws, regulations, and policies, funding streams, and ways of doing business. The challenges of garnering and coordinating disparate resources along with creating and improving collaborations to build and sustain a reformed, seamless, functional system can be daunting, though possible.

---

[15]"Shaping Long Term Care in America Project at Brown University funded in part by the National Institute on Aging (1P01AG027296).Retrieved March 20, 2017 from: http://ltcfocus.org/map/57/percent-medicaid-ltc-spending-on-nh-care#2009/US/col=0&dir=asc&pg=&lat=38.95940879245423&lng=-99.4921875&zoom=4

[16] "Shaping Long Term Care in America Project at Brown University funded in part by the National Institute on Aging (1P01AG027296).Retrieved March 20, 2017  from: http://ltcfocus.org/map/50/percent-schizophrenic-or-bi-polar-prevalence#2015/IL/col=0&dir=asc&pg=1&lat=40.86077156828314&lng=-88.3740234375&zoom=8



**Behavioral Health Policy Collaborative, LLC**

15

A clear vision, formidable leadership skills, a keen understanding of policy and financing context, adequate resource investments, and a focus on both process and outcome measures are needed to transform current long-term care structures into a sustainable, person-centered, recovery-oriented, and coordinated system of care.

Many of the key informants interviewed said there has been notable progress in the past several years on a host of administrative areas and other processes that underpin the Colbert implementation work. We agree with this assessment. As examples, a Colbert Tracking Database was developed and is in use; a uniform assessment tool now exists; a training institute contract is in place and operational; home modification processes have been developed; and, as an overall indicator, the 2015 target number for transitioning 500 Class Members was reached. However, the 2016 transition target was not met by 24% and significant gaps in needed governance structures and processes remain; their addition could help foster and buttress successful Colbert implementation, including expanding current capacity to significantly reach and transition more Class Members.

The Colbert Consent Decree is an enormous undertaking that requires staffing comprised of a diverse team of individuals who are both skilled in systems change initiatives and available to commit to this high-stakes initiative. The IDoA's Office of Transitions and Community Relations, the entity that oversees and manages Colbert implementation, has a minimal staffing mix. In FY17, six staff positions were funded in the Office, including the Colbert Project Director, two quality and compliance liaisons, a housing and transition liaison, and two project assistants. An additional two positions, a housing liaison and a data analyst coordinator have been vacant for 15 and 12 months, respectively, as of the date of this writing.

Important opportunities for systems collaboration and coordination improvements are missed because there are no formal bodies of cross-State agency representatives or Colbert cross-discipline/area stakeholders who regularly meet to review and assess progress to date, discuss barriers and potential solutions, share lessons learned and recommendations, and offer suggestions for course corrections. While some meetings do occur regularly (i.e., lawsuit parties with the Court Monitor and Colbert Project Director; separate Colbert IDoA staff meetings with care coordinators, housing locators, and CMHCs), the needed regularly held meetings of high-level State- and county-government agency representatives of multiple systems and the cross-stakeholder are missing.

## Recommendations

### 1.1 Appoint a Colbert Task Force.

Effective governance structures can help fill essential oversight needs, define project mission, develop an action-driven charter, promote operational productivity, and collaborate/communicate with project or operational teams that conduct the initiative's day-to-day work. We recommend that the Governor's Office appoint and charge a Colbert Task Force comprised of representatives from State and County government agencies who will identify and share responsibility with IDoA for the investment made and outcomes realized under Colbert implementation. While outside of the scope of BHPC's consultation, we suggest the State and others consider whether to combine the Williams Consent Decree[17] into the Task Force given the clear overlaps of systems issues leading to that Class,

---

[17] *Fullerton, McGuire, Feng, Mor & Grabowski, 2009.  (Fullerton, CA, et al., 2008).*


***Behavioral Health Policy Collaborative, LLC***

commonality of circumstances and services needed by both sets of Class Members transitioning to the community, and the needed resources to resolve both consent decrees.

BHPC specifies inclusion of Cook County-level government membership on the Task Force in addition to the Cook County Housing Authority because our review found little evidence of involvement of key county-level officials and agencies (i.e., departments of health, behavioral health, transportation, human services, aging services, community development) in Colbert implementation. Including the County represents important opportunities to garner additional resources that can be applied toward service capacity expansion, including integrated care, crisis and respite services, more Assertive Community Treatment (ACT) teams and Community Support Teams, and housing models and units.

The Task Force should meet regularly to identify needed process improvements and propose solutions; identify, share, and review data, mainly to identify gaps and trends and their anticipated implications; and notify one another of important policy and regulatory developments with potential impact on serving Class Members. Through regular meetings, we recommend that the Task Force maintain focus on current barriers and needs to increase system efficiencies and examine and respond to recommendations from all Colbert system stakeholders.

To further the effort to clearly depict and align the many agencies and entities that are needed currently and in the future for Colbert implementation effectiveness, the Task Force should consider developing a clear Colbert Systems and Process Map that depicts domains of agency responsibility; how the multiple entities engaged in the Colbert implementation coordinate and/or overlap; their mutual links; and the resources and information flows through the system. In multiagency, multistakeholder efforts such as this, it is imperative that each entity have clear lines of responsibility and accountability and strong methods for communication and collaboration.

The Task Force's initial charge should focus on these matters, including identifying opportunities for operational efficiencies. Its focus should later evolve to developing a sustainable Exit Plan to gain the Court's permission to release the State from the Colbert Consent Decree, including the strategic positioning and specific outcomes necessary for success. The Plan should identify specific exit standards and strategies, with benchmarks and performance measures.

**1.2  Institute a Workgroup Structure and Charge Workgroups with Key Goals and Objectives**.

Task Forces and other steering bodies often develop a workgroup structure to invite experts and other stakeholders to help address challenges or issues that require expanded or deeper input than global governance efforts. We recommend that four workgroups be established quickly to address high-priority areas of need related to Colbert Consent Decree compliance and systems transformation efforts. These include workgroups for: data enterprise, evaluation/assessment, housing, and workforce development. Depending on the nature of the need, some workgroups will be ongoing (e.g., data workgroup needing ongoing effort to review key performance indicators and identify trends) whereas others will be time-limited (e.g., evaluation/assessment workgroup to create a short screening tool and revise existing evaluation tool).

*Behavioral Health Policy Collaborative, LLC*

**1.3  Revise Contracting Content, Processes, and Monitor with a New Data Dashboard.**

Contracting processes establish clear vendor responsibilities, deliverables, measurable goals, expected outcomes, and quality standards. Most contracts issued for Colbert-related services, except for those with housing locators, do contain either activity targets or "best effort language." However, many of the front-line and other Colbert-funded contractor staff providing outreach, evaluation, and/or service and housing activities who we interviewed were unaware how many Class Members they or their organizations were expected to contact, evaluate, transition, house, and/or serve. Several stated that their targets were sometimes issued verbally and subject to change. We suggest re-examining and where needed retooling vendor contracts to address this. Furthermore, there is no regularly used mechanism for Colbert staff to share with all contractors/vendors with data-driven assessments of contract performance. We recommend Colbert staff devise and use a Data Dashboard as part of the Colbert Data Enterprise Program (See Recommendation 3.1) to assist with transparent contractor performance assessment and to signal course corrections.

**1.4  Develop Staffing and Infrastructure Plan.**

To ensure a sufficient number of staff, both within and outside of governmental agencies, to plan, execute, and monitor Colbert activities, we recommend that IDoA and the Task Force conduct or commission a staffing analysis, consulting industry benchmarks, to understand staffing stress points and bottlenecks, identify gaps and needed staff by roles/responsibilities, and prioritize funding decisions within budget parameters. The effort should focus on system-wide staffing needed not only within State agencies to effectuate Colbert transitions but also across the array of community-based settings among service and housing providers, training entities, and others.

Our brief effort to identify and collect Colbert workforce-related data across providers and others was stymied by the lack of existing data and the short project timeframe that did not allow for new data collection that could then be verified. Once a comprehensive effort to collect, verify, and use such workforce data is achieved, it can be used to target transition efforts and plan service delivery. For example, these data, once verified, could be mapped against other program data to determine contractor/provider productivity goals and outcomes, as well as to project need for additional staff as a ratio to the number of additional Class Members to be served.

**1.5  Provide Additional Staffing to IDoA Colbert Implementation Office.**

Our preliminary assessment found IDoA' s current cadre of staff overseeing Colbert implementation insufficient to meet this complex program's demands with it involving myriad agencies, funding sources, and the Federal Court and Court Monitor. We recommend adding full-time positions in IDoA' s Colbert implementation office to staff at least one communications/marketing position, one transition manager, one fiscal position, two data analysts, one senior clinical staff or consultant who can provide clinical consultations to providers to avoid inappropriate "unable to serve" status of Class Members specifically and assist service planning designed to overcome barriers to community transition overall, two additional housing development positions, and two quality assurance/monitoring staff with at least one being a nurse.

*Behavioral Health Policy Collaborative, LLC*

# GOAL 2
# A Clear Colbert Vision Statement and Communications Plan Educates and Engages Stakeholders

While several materials such as program descriptions, public reports, and others were issued to explain Colbert, we found no evidence of a clear and visible mission or vision statement specific to Colbert. Such a statement could help inform Class Members, stakeholders, and the public about its mission and goals. It could galvanize allies and guide and assess the program's overall success and outcomes.

Similarly, we were not made aware of any communications or marketing plan designed to inform and engage the wide range of organizations and individuals needed for Colbert's long-term success. These organizations and individuals range from nursing home administrators and owners; potential and actual Class Members; family members; current and prospective providers of medical, behavioral health, housing, and transportation services; and advocates serving people with physical, intellectual, and/or psychiatric disabilities, as well as substance use disorders; County health department and other local government officials; and others.

In addition, the communications and marketing plan should aim to capture and, with permission, relay Class Members' stories and experiences of successfully transitioned from nursing homes to independently living. This is crucial to showcase that people with disabilities can successfully live and thrive in the community.

## Recommendations

**2.1  Create a Clear Vision and Mission Statement**.

We recommend the Task Force (See Recommendation 1.1) and IDoA Colbert staff lead an effort to develop a clear vision and mission statement, with stakeholder participation. The Governor can issue the final leadership statement and succinctly convey the Colbert implementation effort's vision and mission. The statement should be clear, concise, memorable, and useful in galvanizing stakeholders around Colbert's important mission.

**2.2  Develop and Implement a Communications and Marketing Plan.**

We suggest creating and using a communications and marketing plan that outlines key messages, communication methods, target audiences, and communication frequency. Customize materials to identified target audiences (e.g., Class Members, family members, media, nursing home administrators, advocates). The plan should entail ways to gather and disseminate Class Members' success stories, media engagement strategies, and approaches to collaboration with system allies willing to help garner program support.


*Behavioral Health Policy Collaborative, LLC*

19

# GOAL 3
# A Comprehensive Data Enterprise Program Drives Colbert-wide Performance Assessment and Decision-making

A centralized system used to collect, house, and access real-time data and analytics is essential Colbert program planning and management. It can provide an empirical understanding of the number of potential and actual Class Members such as their demographics, service needs and utilization patterns; display provider workload and efficiency metrics, track status and timespan between key outreach steps, evaluation, and transition processes; and monitor and report on performance indicators and quality outcome measures. Such a system can also help identify outliers and trends and suggest uses for this information to adjust resource allocations.

Several data sources and systems housed in the existing Colbert Tracking System help track Colbert implementation. This database was designed to identify individuals eligible for transition out of the Cook County nursing home system into community housing and services. The system provides data on potential and actual Class Members and tracks them through the Colbert outreach, evaluation, and transition processes, providing ongoing reporting of individuals' movements through the system. As we recommend below, monthly data should be collected and reported to all transition team providers and annual data should be reported to support monitoring and measurement of the initiative's progress.

Our review revealed a lack of consistent collection, reporting, and use of other important datasets that provide fundamentally important information impacting Colbert implementation. For example, Colbert staff recently began receiving HFS monthly Medicaid data reports on the number and names of individuals in Cook County nursing facilities and use this to identify potential Class Members for outreach. However, according to program staff, out of concern for confidentiality and other related issues, HFS will not supply residents' clinical diagnoses, which could be used to provide at least preliminary indication of their eligibility for Colbert services and, thus, impact time spent on outreach and assessment. As detailed below, we found little evidence of use or consideration of other important data sets existing within the nursing home system. Data sets that provide critical information and can inform Colbert planning and implementation, as well as clinical decision-making, include the Minimum Data Set (MDS),[18] the MDS Section Q,[19] Medicaid claims data, and the Pre-Admission Screening and Resident Review

---

[18] *The Minimum Data Set (MDS) is a federally mandated resident assessment instrument administered to all residents in Medicare or Medicaid-certified nursing facilities within 14 days of admission and at prescribed intervals thereafter. The MDS provides a comprehensive assessment of the medical, functional, and psychosocial status of each resident, enables detailed measures of behavioral characteristics, and perhaps most relevant to Colbert implementation, includes questions on preference and support to return to the community. The MDS is to be administered to all residents upon admission, quarterly, yearly, and whenever there is a significant change in an individual's condition. MDS data are to be used by the nursing home staff to identify needs, develop care plans, and monitor progress.*



*Behavioral Health Policy Collaborative, LLC*

(PASSR);[20] (See Goal 10 for a detailed description of PASSR). We acknowledge that Colbert program managers state that the MDS Section Q data has been in use for the past year.

Additionally, there are other hindrances to effectuating a robust data-informed system, including no integrated plan for reporting and disseminating data to stakeholders across Colbert systems; insufficient staffing in IDoA's Colbert implementation office for data analyses and reporting; and no comprehensive mechanism for planners and managers to identify and acquire more needed data, review this, and use it to manage the program.

To support Colbert governance and oversight, development of a Data Enterprise Program should be considered. The Program can offer real time information to enable IDoA Colbert leadership and Task Force and Workgroup members to assess system performance, address quality issues as they arise, ensure regulatory compliance, avoid duplication of effort for both staff and individuals, and reduce costs with a streamlined process, duplication reduction, and economies of scale.

## Recommendations

### 3.1 Convene a Data Enterprise Workgroup and Create Data Enterprise Program.

Effective implementation of data-informed decision-making requires project leadership to identify the key information it needs to interpret program performance, assess quality, and identify trends. While IDoA Colbert program managers and other agency staff already engage in some data collection and reporting, a more thorough and robust data initiative is needed, along with the resources to ensure it can effectively collect data, report, conduct analyses, and disseminate information. We recommend that IDoA convene a Colbert Data Enterprise Workgroup comprised of government agencies, providers, and consumer representatives to collaborate with IDoA data analysis staff to develop a strong data use, monitoring, and evaluation plan and includes the development and regular use of a Colbert Data Dashboard addressing key program goals' progress via specific measures. This plan should also include training for individuals required to collect and report data.

The Data Workgroup should assess the adequacy of the current Colbert Tracking System and take steps to enhance it. We observed that the system involves numerous entities that often share responsibilities and functions, too often without clear parameters or catchment areas. For example, we interviewed several Colbert contractors responsible for outreach to and evaluation of potential Class Members. Several admitted to lack of clarity about which nursing homes were assigned to their agencies. Moreover, they discussed many instances in which multiple

---

[19] MDS Section Q is the part of the MDS designed to explore meaningful opportunities for nursing facility residents to return to community settings. The MDS 3.0 Section Q allows individuals to express interest in learning more about possibilities for living outside of the nursing facility. All Medicare and Medicaid certified nursing facilities are required to use the MDS 3.0.

[20] The Pre-Admission Screening and Annual Resident Review (PASRR) – authorized by the Omnibus Budget Reconciliation Act (OBRA) of 1987 - is designed to identify nursing home applicants and residents with mental illness and determine whether nursing home application and placement is appropriate or not. Under the PASRR program, nursing facilities are prohibited from admitting any individual with a serious mental illness unless the State Mental Health Authority determines that nursing home level care is required for that individual (Linkins et al., 2001). PASRR is used to determine whether specialized mental health services are needed for nursing home residents. However, fewer than half of nursing home residents with a major mental illness receive appropriate preadmission screening.



*Behavioral Health Policy Collaborative, LLC*

21

Colbert contractors subject the same nursing home residents to the same lengthy evaluation process. This evidences duplication of effort, wasted resources, and confused and frustrated nursing home residents/Class Members and staff. To reduce duplication of effort, enable efficiency, and facilitate transparency, our recommendation includes adding specific nursing home assignment data and individual resident-level outreach assignments and status under the Colbert Data Enterprise Program in the Colbert Tracking System. This will permit the system to provide and track accurately and timely individual and aggregate data on outreach, evaluation, and transition activities by initial contact, unique provider, and unique client levels.

### 3.2  Implement Data Review Processes.

Systems transformation efforts should measure and report performance to drive actionable quality improvements. We recommend Colbert managers and staff, Task Force and Data Enterprise Workgroup members, and the Court Monitor determine how to define success for Colbert's mission and scope; then select associated quantitative and qualitative Key Performance Indicators (KPIs). Data review processes are needed to confirm Colbert implementation is working effectively and/or identify the need for process improvements. The data reviews can help identify program successes, barriers, bottlenecks, and training needs. We also suggest developing a data analytic partnership to benchmark Colbert data against national and other long-term care data to plan and implement strategies to manage both the existing Class, as well as new entries into nursing homes.

### 3.3  Use Technology for Data Collection.

Tablets, smartphones, and other electronic devices can support real-time data collection efforts such as client/patient assessments, streamlined authorization for services and supports, and ongoing monitoring of individual needs and care. We recommend the Data Enterprise Workgroup explore options for technology-enabled data collection and reporting to increase compliance, uniform data collection, and timeliness.

### 3.4  Increase IDoA Staff Support in Data Collection and Analysis.

Colbert funders and administrators must have access to and use key data reports to manage the effort, especially if a significant increase in the numbers of Class Members evaluated and transitioned is to occur. Likewise, busy provider teams and agency officials need access to real-time data to inform decision-making and adjust staffing patters, among other things; yet, they do not have time to clean, calculate, and analyze these data. Currently, only one part-time Colbert staff conducts data analysis; this professional is also assigned to other projects and, thus, Colbert work often does not take precedence and few analyses are completed. Informed by Data Enterprise Workgroup recommendations, to better meet these important needs, IDoA should consider increasing their data team's size by adding two full-time staff members dedicated exclusively to Colbert data work (See Recommendation 3.4).

### 3.5 Devise and Use Data Methodology to Predict Class Member Size and Project Rates for Transition Stages.

It is clear that not being able to predict how many Class Members are likely to transition to the community compromises efforts to plan and manage Colbert implementation. The significant data-related limitations discussed above compromised our efforts to devise and apply a methodology to answer these basic programmatic questions. For example, since this answer determines the baseline to make projections under the program, and difficulties with obtaining other reliable data needed to make valid program estimations, we could not proceed



*Behavioral Health Policy Collaborative, LLC*

with actual calculations. However, we did endeavor to identify these and other parameters for the data needed and offer a simple step-by-step methodology to do so.

Table 2 presents data categories that we suggest as examples of the types, reporting format, and potential analyses that could be used for reporting, projections, and planning on several key measures for Colbert contacts, evaluations, and transitions. This data needs to be complete so that it reports activities for the two Colbert-MCOs (Illinicare and Aetna) and includes similar services provided by CMHCs, care coordinators, and housing locators and coordinators, among others. Specific components needed before analyses can be properly conducted and the results used include agreed upon target numbers within a single measurement timeline, and baseline and regular time interval activity data from all providers. Data analysts can use the completed data to calculate average numbers of Class Members who were originally identified, indicated interest in transitioning, were assessed, and recommended and not recommended for transition and why. All of these represent critical knowledge points for Colbert program management — both today and in the future.

| Table 2.  Potential Colbert Data Collection on Monthly Contacts, Evaluations and Transitions for Use in Program Projections and Planning | | | | | | |
|---|---|---|---|---|---|---|
| Colbert Activity/ (#) | Month 1 N (%) | Month 2 N (%) | Month 3 N (%) | Month 4... N (% | Total | Average/ Month |
| **Attempted Contacts** | | | | | | |
| | | | | | | |
| **Completed Contacts** | | | | | | |
| | | | | | | |
| **Completed Evaluations** | | | | | | |
| | | | | | | |
| **Recommended for Transition** | | | | | | |
| | | | | | | |
| **Not Recommended for Transition/Unable to Complete Evaluation and Reasons** | | | | | | |
| Evaluator Agency 1 | | | | | | |
| Medical | | | | | | |
| Mental Health | | | | | | |
| Dementia | | | | | | |
| Evaluator Agency 2... | | | | | | |
| Medical | | | | | | |
| Mental Health | | | | | | |
| Dementia | | | | | | |

We offer several basic steps that create a methodology to determine key Colbert factors, including Class size and numbers of Class Members expected to progress through several program stages, from outreach to community transition. The Data Workgroup should review and refine this methodology before applying it to address the limitations noted above; then implement the final methodology that Colbert implementation managers should regularly update and use.

*Behavioral Health Policy Collaborative, LLC*

***Step 1: Determine total County nursing home population****. Identify the total number of individuals residing in Cook County nursing homes on a given date using HFS data including Medicaid claims data (currently estimated by the State to be approximately 18,500 individuals).*

***Step 2: Estimate the number of current Class Members.*** Use the MDS to identify the number of current and continuing county nursing home residents who meet the Colbert eligibility requirements for inclusion in the Member Class. The MDS has the advantage of having all clients (e.g., private pay, Medicare, and/or Medicaid covered) in the database, which makes it the most inclusive of all residents and, therefore, should capture all potential Class Members. Alternatively, or in addition to using the MDS, Medicaid claims data can be used to identify all Medicaid billing for residents in the service type, "long-term care," diagnosed with a mental illness since 2013, as well as those with other chronic physical disorders or with co-occurring physical health issues and serious mental illness. Data from Colbert program implementation experience to date can also be used to project estimates for percentages of nursing home residents who will not meet Colbert eligibility criteria. Estimate the current total Colbert Class size by taking the total number of Cook County nursing home residents (Step 1) and subtracting the number of residents projected to be ineligible for Colbert status due to a dementia diagnosis, or other exclusion criteria. Using the remaining number of all individuals who do meet criteria, consider applying (if validated) secondary criteria using PASSR data (i.e., all persons who apply for admission to a nursing facility are screened using PASRR-Level II) and cross these data with the MDS and/or Medicaid/Medicare dataset to identify individuals with a mental illness who meet Colbert Class criteria. The number calculated under this step can help forecast the capacity needed for outreach services to potential Class Members and for nursing home staff engagement.

***Step 3: Project the number of Class Members who will likely be interested in transitioning to community housing.*** Subtract from the number derived under Step 2 (i.e., number of nursing home residents who comprise the Colbert Class) the projected number of residents who will likely decline consideration, be discharged before transition or otherwise not complete transition, based on the percentages that have done so under the Colbert program to date. (These data can also be compared to MDS Section Q data.) The number derived under Step 3 can help Colbert program managers identify the number of contractors and staff needed to conduct the projected number of pre-screens and full evaluations/assessments of Class Members.

***Step 4: Estimate the number of Class Members, after the pre-screening (See Recommendation 5.1) and evaluation/assessment process, will be recommended for transition.*** Analyze existing transition experience data to determine transition predictors; subtract from the subtotal derived in Step 3 the number of Class Members projected to experience active psychosis, self-harm, medical issues requiring nursing home levels of care, or other significant factors that will likely result in a not ready to transition determination. **The number remaining is the number of *current* Class Members projected to be recommended for community transition.**

The results of the calculations made in Step 4 should be used to project community housing and service capacity needs, including number and types of housing units, types and extent of housing accommodation/modifications that will be needed, type and intensity levels of expected needed medical, behavioral health, social welfare, and other services and supports by location (as expressed by Class Member preference).

*Behavioral Health Policy Collaborative, LLC*

**3.6 Increase Already-Mandated Data Reporting Compliance.**

There are several critical datasets that the Colbert program has not considered or used, or have recently begun to use but need to be utilized further; yet these datasets have immediate relevance to Colbert implementation. For example, the Minimum Data Set (MDS) is a federally mandated resident assessment instrument administered to all residents in Medicare or Medicaid-certified nursing facilities within 14 days of admission and at prescribed intervals thereafter. The MDS provides a comprehensive assessment of the medical, functional, and psychosocial status of each resident, enables detailed measures of behavioral characteristics, and — perhaps most relevant to Colbert implementation — includes questions on preference and support to return to the community. The MDS is to be administered to all residents upon admission, quarterly, yearly, and whenever there is a significant change in an individual's condition. Nursing home staff must use MDS data to identify needs, develop care plans, and monitor progress.

The MDS Section Q is the section designed to explore meaningful opportunities for nursing facility residents to return to community settings. The MDS 3.0 Section Q allows individuals to express interest in learning more about possibilities for living outside of the nursing facility. All Medicare and Medicaid certified nursing facilities are required to use the MDS 3.0. Colbert program managers say that within the past year they have begun examining Section Q data and attempting to find ways to expand its use.

Another dataset exists under the Pre-Admission Screening and Annual Resident Review (PASRR) — authorized by the Omnibus Budget Reconciliation Act (OBRA) of 1987. As Federal law, PASRR is designed to identify nursing home applicants and residents with mental illness and determine whether nursing home application and placement is appropriate or not. (Detailed discussion of PASRR compliance and it relevance to appropriate nursing home diversion appears under Recommendation 10.2)

Given the relevance of these and other datasets to Colbert Consent Decree goals, compliance for MDS and PASSR data collection and reporting should be reviewed and likely increased. Colbert program managers and the Data Workgroup should ensure regular review and consideration of this data to inform and drive Colbert outreach, evaluation, and other key transition services, as well as to inform investments in and development of viable diversion pathways.

*Behavioral Health Policy Collaborative, LLC*

# GOAL 4
# System-wide Investments Achieve Colbert Mandates and Avoid Inappropriate Nursing Home Placements

To achieve full compliance with the Colbert Consent Decree, the systems that serve Class Members must be adequately resourced, which includes making upfront investments to build and expand systems capacity, reinvesting cost savings and aligning financial incentives and disincentives with project goals. Currently, the lion's share of State resources targeted for Class Members is most readily identified in the budgets of IDoA (administrative and other costs) and HFS (Medicaid costs). Together, these funds support the costs of IDoA staff assigned to the Colbert project; contracts with outreach, assessment, medical, behavioral health, and housing service providers; Medicaid services including medical equipment, contracts for training and case determination reviews with the University of Illinois Chicago; and other project-related expenses.

State budgets are a critical revenue stream for healthcare, behavioral health, housing, and other vital community-based services. From Federal block grant allocations to Medicaid spending, state match dollars and general fund dollars are vital resources for keeping the doors open for safety-net services. Illinois' state budget crisis — now with more than two years without an approved budget — resulted in cuts to community-based services, which has compromised and undermined Colbert implementation specifically and the spirit of Olmstead compliance overall.

Because of the budget impasse in Illinois dating back to FY15, the Colbert budget since that time has remained unchanged at $32.5 million. The Federal Court Judge overseeing Colbert implementation has twice ordered that payments to providers be continued under Colbert, albeit maintained at the FY15 levels. According to stakeholders we interviewed, the inability to pass a state budget impacted the program in several negative ways, including: provider drop-out due to too-low reimbursement rates; long delays in payments for non-Colbert services that make up the majority of their budgets; uncertainty and reluctance of some providers to increase or join the Colbert provider/contractor pool; and budget cuts to related/ancillary programs and services needed by Class Members. These factors have serious implications for the State's ability and system capacity to maintain current levels, much less significantly increase the number of evaluations and transitions of Class Members.

We offer the following recommendations designed to help accurately capture and understand the total costs of transitioning clients under the Colbert Consent Decree, identify and secure strategic investments and reinvestments, and use financial levers to buttress Colbert's goals and outcomes.

*Behavioral Health Policy Collaborative, LLC*

## Recommendations

**4.1 Garner a Formal Savings Reinvestment Commitment.**

The Cost Neutral Plan recently agreed to by the parties and approved by the Court in November 2016 accepts the findings of a cost study conducted by the Berkeley Research Group (BRG), which concluded that, on average, it is 38 percent less expensive to serve Class Members in the community than it is in Cook County nursing homes.[21] However, we could find no written or other evidence of an affirmative State commitment to reinvest any of the actual or anticipated savings into any aspect of building or expanding the community-based infrastructure capacity determined necessary to adequately serve Class members, including any specific behavioral health, healthcare, housing, employment, transportation, or other program or service.

In an era of scarce resources, public mental health systems struggle to develop comprehensive community-based treatment and rehabilitation systems for persons with mental illnesses and other disabilities. Many states have used an innovative budgeting and contractual process to incentivize providers by supporting reinvestment strategies for services. Reinvestment strategies can be contract-, policy-, or legislatively-based.

Pennsylvania, New York, and North Carolina have reinvestment strategies in place for behavioral health services. The Pennsylvania Department of Health and Human Services, Office of Mental Health and Substance Abuse Services allows providers to keep and spend dollars saved through innovative services funding. The Governor's Annual Budget features the reinvestment process and individual departments monitor reinvestments. The opportunity to use reinvestment funds are written into individual providers' annual budgets. At the end of the fiscal year, Counties receive a per-person ("capitation") payment from the State under Medicaid or behavioral health services. If the County and its behavioral health MCO spend less than the State payment, they must reinvest that "profit" in services.

In New York State, the Community Mental Health Reinvestment Act, signed into law in December 1993, established the State's commitment to provide substantial new resources to fund the development of community services. The basic principle behind the legislation is that funds saved from downsizing the State hospital system through closures and census reductions must be "reinvested" to create more community-based services.

North Carolina made the decision to implement managed care for Medicaid-funded behavioral health and intellectual and other developmental disability services to achieve the goals of Medicaid reform efforts: improve the quality of care and consumer satisfaction through more efficient use of resources; provide budget predictability; and create a sustainable system by implementing the 1915 (b)/(c) Medicaid Waiver. The State also mandated that any savings realized through more efficient use of resources be available to reinvest in the system. Since the public Local Management Entities/Managed Care Organizations (LME/MCOs) are governmental entities that cannot, by definition, earn a profit and do not have stockholders expecting a return on investment, any savings that the LME/MCOs earn are available to reinvest as one-time dollars in additional services and initiatives.

Similar to these States' reinvestment programs, we recommend that at least a portion of the cost savings realized under Colbert implementation go to rebalance Cook County's systems serving Class Members (e.g., behavioral health, healthcare, housing) to focus on community-based services. Legislation, budget authority, or other

---

[21] *Berkeley Research Group. (Filed with the Court November 16, 2016). Expert Report of James Heenan, Stuart McCrary, and Michael Neupert. Appendix A.*



**Behavioral Health Policy Collaborative, LLC**

27

mechanism should formerly codify this multiyear commitment. We recognize that the State's budget crisis may likely lend formidable opposition to this recommendation as pressures exist and will remain to apply savings realized under Colbert implementation to other budget priorities.

**4.2 Expand Comprehensive Cost Study and Use Results to Target Services Delivery.** The recent BRG Cost Study mentioned above calculated, "The average cost of care for transitioned Class Members prior to transitioning was $28,611 versus $17,883 after transitioning, a decline of $10,728 or 37.5%."[22] We recommend that IDoA build upon the work of the BRG Cost Neutral Study to continue and expand upon efforts to determine Colbert costs that span all systems, including housing, healthcare, and social services. The results can continue to help determine true costs of nursing home care compared to community-based services and supports and, particularly, inform and support an active commitment to reinvest savings into the community. It will also prove instrumental in projecting resources needed to expand specific community services (e.g., ACT, CST teams, cluster housing with 24/7 medical support), as no reliable mechanism exists currently for doing so.

**4.3. Identify and Act Upon Inappropriate System Incentives and Disincentives.**

Colbert implementation efforts entail a complicated set of interagency and inter-organizational relationships, each associated with distinct incentives and disincentives. It is critical to address incentives and disincentives related to the Consent Decree forthrightly. We suggest the Task Force (See Recommendation 1.1), in collaboration with IDoA, identify nursing homes, MCOs, CMHCs, housing locators, and pre-transition service provider organizations' individual and collective incentives and disincentives. Several existing incentives implemented under Colbert are worthwhile, but do not adequately work and need revision (i.e., shared bonus payments between MCOs and housing coordinators based upon Class Members' successful community tenure at the six- and 12-month marks.)

During our project's short duration, we identified several system incentives and disincentives that must be quickly examined and either adjusted or removed altogether. For example, while we were told that the contracts with managed care organizations that serve Medicaid beneficiaries in the County require risk bearing for members entering nursing home care, a function used by many states to disincentive entry into institutional care, we did not see evidence of active use of this contracting tool. (See Recommendation 4.5). Similarly, we received varying responses regarding whether MCOs required pre-authorization for covered members before nursing home placement. Several key informants offered that their MCOs were actually paid or reimbursed at a higher rate for a Class Member's care in a nursing facility than in community-based care. If this is the actual case, it clearly bears examination as it offers a system-wide financial incentive to continue nursing home placement even when community alternatives are more appropriate and less expensive. However, it does not appear that these incentives have been identified and considered for their role in impeding Colbert implementation. We recommend that Colbert program managers identify these and other system incentives and disincentives, review them, and, where needed, work with relevant parties (e.g., other state agencies, funders) to systematically enforce, change, or remove them.

---

[22] *Based on adjusted sample of 291 transitioned Class Members for 12 months prior to and after transition.*



*Behavioral Health Policy Collaborative, LLC*

**4.4  Assess Medicaid Reimbursement Rates and Incentives.**

Several interviewed providers and IDoA Colbert staff told us of provider contentions that they lose significant dollars while serving Class Members; their costs routinely exceed payment and reimbursement rates. We were told of instances in which inadequate payments spurred providers to drop out of the Colbert program's contracted services delivery organization pool or decline to enter it altogether.

Provider-level costing of services allows organizations to understand their real costs for service provision versus the reimbursement or other revenue obtained to support a service. We recommend that providers partner with IDoA and other relevant state agencies (i.e., HFS, DHS, DMH, Division of Rehabilitation Services *to* design and then engage in service costing exercises. IDoA and these sister agencies should verify and use the costing examination's results to assess the adequacy of reimbursement rates for common services and how to infuse innovation for capacity expansion. If indicated, the State should consider offering rate reforms/adjustments. Together, the parties should also investigate barriers under current reimbursement structures (i.e. Rule 132) and whether any setting- and provider-based provisions or restrictions in the Medicaid State Plan could alleviate provider shortages or reimbursement challenges (e.g., telemedicine, telepsychiatry).

IDoA, HFS, DMH, and other State agencies should also examine the link between and appropriateness of PASRR determinations and referral source and nursing home use of medical override status, which disincentives community transition efforts, in part by securing and continuing Medicaid reimbursement for nursing homes that may not follow IMD (Institutions for Mental Disease) rules by having more than 50 percent of residents with primary diagnoses of serious mental illness.

**4.5  Explore Risk Bearing Requirements in Medicaid Managed Care Contracts.**

Many healthcare systems are moving away from fee-for-service payment approaches that reinforce volume toward value-based purchasing arrangements that drive outcome improvement. As mentioned above, we were assured that State and local Medicaid managed care contracts require the MCOs to bear financial risk for institutional versus community placement of members, however we remain unconvinced this is in active use. We recommend the State investigate this and if absent or not being fully used, consider revising its current expectations and, if necessary, contracts with MCOs to address financial risk-bearing parameters to incentivize MCOs to address Class Members' health issues by providing community-based care and services as early as possible to avoid inappropriate and costly hospital, nursing home, or other institutional care.

*Behavioral Health Policy Collaborative, LLC*

# GOAL 5
# Colbert Uses Efficient and Reliable Outreach, Screening, and Evaluation/Assessment Processes and Protocols

The Colbert Consent Decree mandates the identification of Class Members defined as "Medicaid eligible adults with disabilities who are being or may in the future be, unnecessarily confined to Nursing Facilities in Cook County, Illinois…"[23] and, when appropriate, transitioning those recommended to community-based housing with services and supports. Achieving these goals is contingent upon the successful identification, outreach, engagement, and evaluation/assessment of potential Class Members. Once identified and recommended for transition, Class Members need timely development of service plans with referrals to community-based services, as well as services and supports that prepare them and support them in successful community tenure, including safe, appropriate, accessible, and affordable housing. The following offers a brief synopsis of the current three major pre-transition Colbert activities.

- **Outreach** is the process of engaging Class Members and, sometimes, their families and/or loved ones to explain their rights and opportunities in transitioning and moving into the community from their nursing home placement, supported by the provision of robust wraparound services. This process is primarily educational in nature and should have a clear goal of full engagement of Class Members and their families, necessitating that outreach staff be well skilled in customer service, therapeutic communication, and effective approaches used to address/allay the fears and anxieties that both Class Members and their families may experience. Recently expanded to allow five CMHCs to conduct direct outreach, this activity is primarily performed by staff from seven other outreach entities, including the two Colbert-contracted MCOs.

- **Evaluation and Assessment** are terms often used interchangeably under Colbert. Each refers to the step that occurs after outreach efforts and indicates that a nursing home resident desires and consents to consideration for a transition recommendation. Contract staff (including the two Colbert MCOs, CMHCs, and other agencies) now use a recently implemented standardized 47-page assessment protocol that entails an in-person interview of the nursing home resident identified for participation after outreach, documentation gathering, and review of medical and behavioral health diagnoses, housing and employment histories, income status and sources, and many other aspects.

- **Referrals** must be made to providers with the resources and services that can meet those needs for individuals with significant medical, physical, and/or serious mental health diagnoses. Referrals for Class Members interested in or recommended for evaluation are typically made through the MFP (Money Follows

---

[23] *Colbert v. Quinn. No. 07 C 4737, United States District Court for the Northern District of Illinois, Eastern Division. Order. Filed December, 31, 2011. Pg. 2.*

*Behavioral Health Policy Collaborative, LLC*

the Person) website. Post evaluation/assessment referrals for transitioning Class Members to community-based providers (e.g., CMHCs, housing locators) are made by the Colbert MCOs or CMHCs who conduct assessments; with CMHCs often self-referring. Generally, the referral process entails an outreach staff drawing upon resources that appear to vary greatly by geographic location and from provider to provider. In addition, there did not appear to be a known referral process target goal for average time allowed from point of referral to completed transition.

Based upon our review of these pre-transition processes, including examination of tools, forms, reports, and other materials, together stakeholder interviews with Class Members, nursing home administrators, outreach and evaluation staff from the Colbert-funded MCOs and CMHCs, Colbert IDoA staff, the Colbert Court Monitor, and others, we offer several recommendations designed to streamline procedures, create efficiencies, reduce duplication, establish performance standards, expedite processes, and enhance workforce capacity and skill levels.

## Recommendations

**5.1  Create and Use a Short Screening Tool and Simplify Current Evaluation/Assessment Tool.**

The evaluation/assessment tool used to identify Class Members appropriate for community transition should be clear, concise, and targeted to obtain information that can be used to assess transition readiness. While overall a positive development, the new screening tool used uniformly by Colbert contract staff charged with conducting this step is too long at 47 pages. It takes between two to three hours to administer to the nursing home resident and approximately six to eight additional hours to collect all required documents, write the assessment finding, and conduct other steps. However, despite common knowledge that several key factors that can — once known — indicate that the Class Member may not be immediately appropriate for transition, completion of the entire lengthy, burdensome tool is required. This is a significant and unnecessary use of staff and resources, placing undue burden on potential Class Members, nursing home staff who are asked to supply numerous documents, and Colbert-funded staff who conduct full evaluations — even when the results are clearly very early in the process.

We recommend the convening of a short-term Evaluation/Assessment Workgroup to develop, pilot test, and validate a Colbert brief screening tool. The tool should take no longer than 30-minutes to implement and be comprised of no more than 10 questions that, if positive for a certain number of the factors, reliably indicate that the nursing home resident is not yet ready for transition due to disqualifying Colbert eligibility standards (i.e., diagnoses of severe dementia or severe cognitive disorders) or other current conditions such as acute suicidality or self-injurious behaviors that compromise safety, unstable psychiatric conditions, serious medical issues requiring nursing home level of care (e.g., open wounds or infections), or inability to manage basic activities of daily living. Basic identifying and diagnostic data could be pre-filled with existing data from the nursing home MDS or other databases. Existing tools, for example the Camberwell Assessment of Need (CAN)[24] should be considered by the Workgroup as using validated tools will increase efficacy.

---

[24] *The Camberwell Assessment of Need (CAN) Instrument is designed to help providers understand the health and social needs of adults who have severe mental health problems. It covers 22 domains of an individual's life, including accommodation, food, self-care, daytime activities, psychotic symptoms, childcare, money, psychological distress, physical health, and relationships. For more information see: www.researchintorecovery.com/adultcan*



*Behavioral Health Policy Collaborative, LLC*

Nursing home residents for whom the new screening tool indicates that current transition is inappropriate should be reassessed within at least six months, or sooner if recommended by the Workgroup, to determine if circumstances changed and they are now ready to move forward in the process. Independent quality monitors, either State staff or contractors not otherwise contracted to conduct outreach or evaluations of Class Members, should routinely review a representative sample of screening tool determinations and follow an established and monitored process to identify and rectify unacceptable levels of inappropriate determinations.

We recommend that the same Workgroup re-examine the current Colbert evaluation/assessment tool and make concrete recommendations about if and where it can be significantly shortened. Workgroup members should include clinical experts knowledgeable about empirically-supported evidence on the factors that have demonstrated accurate predictions regarding community tenure for people with psychiatric and/or physical disabilities, as well as MCO and CMHC staff experienced and skilled in using the current tool who can offer practical advice on revising it. Program administrators and Workgroup members should keep in mind that several CMHC key informants serving Class Members told us of their processes to conduct yet another evaluation/assessment of Class Members once they become their agency's new clients as they use their own evaluation/assessment process to enter required data into their respective electronic health records and revise or develop treatment and service plans, among other things. Addressing these duplications by revising, shortening, and streamlining steps in the pre-transition process depicts yet another opportunity to save resources, speed up steps, and evaluate more potential Class Members.

## 5.2 Institute Catchment Area Nursing Home Assignment System.

During our work, it became evident that Cook County's 186 nursing homes are not clearly divided and assigned among the Colbert-funded MCOs and CMHCs responsible for conducting Colbert outreach and evaluation activities in the nursing homes. While we acknowledge that this task is complicated by differing types of populations across nursing facilities and lack of access to Class Members' diagnostic information that is used to assign an outreach entity, the current circumstance has created instances of confusion, uncertainty, and redundant work, with little accountability in terms of productivity and effectiveness. We were informed of recurring instances where several of these agencies conducted both outreach and the lengthy assessment with the same nursing home resident. This subjects nursing home residents to repetitious, long interviews with no clear indication of who their main point of contact is. It also frustrates nursing home administrators and staff because they are not informed of what agencies are entering their nursing homes to conduct Colbert work; this hinders opportunities to develop more effective working relationships between the nursing homes and Colbert providers. We are told that IDoA Colbert project staff are aware of this and are working to identify and implement solutions; we encourage this effort. We recommend developing and implementing a system to clearly designate by catchment area each contracted agency's nursing home assignments and support the system with a database that contracted Colbert outreach and evaluation staff can readily access data and information on which nursing home residents have been contacted and/or evaluated and the results from these contacts.

## 5.3 Establish Outreach and Evaluation Targets.

Key Performance Indicators (KPIs) use quantifiable measures to evaluate success for individual staff and entire systems. While some outreach and evaluation staff indicated that they were aware of their targets for the number of per-month outreach contacts and evaluations, several were not clear or did not know altogether their or their agency's targets.; Consistent with our Recommendation 1.3, we suggest that IDoA ensure that outreach-related



*Behavioral Health Policy Collaborative, LLC*

KPIs are specified in contracts and transparently monitor and assess performance with accountability for the attainment of KPIs on individual or agency levels.

**5.4 Formally Engage Nursing Home Administrators and Staff in Outreach and Evaluation/Assessment Processes**.

Some interviewees contended that nursing homes will be uncooperative in the Colbert endeavors because Colbert success means they lose residents and, thus, revenue. However, most said, for the most part, nursing home staff cooperate by providing access to residents, making space available for Colbert contracted staff to conduct outreach and assessment work, supplying requested documents, and participating in discharge planning meetings. They noted this level of cooperation and access was not always the case, but has improved over the years.

However, our interviews with two nursing home administrators and several of their staff revealed frustrations that they are not informed and provided with the opportunity to participate more deeply in a range of Colbert activities. They said that they would like more information on the Colbert project overall, to be informed of what agencies have been assigned to work with their facilities and how determinations to transition residents are made, and the opportunity to offer insights into why a resident may or may not be ready to transition.

While IDoA outlined expectations for facility administrators in past and recent letters to Cook County nursing facility administrators, we nevertheless see the need for more direct and frequent interactions with nursing home principals. We recommend that part of the communications and engagement plan that we suggest under Recommendation 2.2 address messaging and engagement strategies customized to nursing home administrators and staff to more fully engage their participation and cooperation with Colbert activities. Increasing engagement will foster critical activities, including supporting outreach, evaluation/assessment, and referral processes to transition nursing home residents into the community.

**5.5 Ensure Appropriate Match Between Class Member Needs and Referred Service Provider Agency.**

Appropriate referrals to service providers should ensure that Class Members receive services that best respond to their unique clinical and medical needs. Currently, the Colbert referral process appears to sometimes match persons with primary medical conditions and without diagnoses of serious mental illness to CMHCs. While data could not be provided on frequency, it may indicate a barrier as these agencies are intended to serve people with serious mental illness and do not have capacity or resources to meet other's needs. Such misalignments may result in underserving the Class Members or even putting them at risk of being placed on the "unable to serve" list.

Furthermore, some of the contracted outreach staff are not trained to work with or identify persons with serious mental illness. To a degree, this may contribute to the inaccuracy of some referrals. Colbert MCO staff currently tasked in part with identifying Colbert members with serious mental illnesses seem to have significant experience with working with individuals with physical disabilities, but not always with those diagnosed with serious mental illness. Conversely, most CMHC staff are not trained to work with individuals with physical disabilities and serious mental illness, but they receive referrals to do so under Colbert. We recommend better aligning referral staff expertise, Class Member clinical profile and needs, referral agencies/services offered; and, adding or increasing cross-disability training. (Recommendation 6.1 proposes a framework intended to improve appropriate referrals.)



*Behavioral Health Policy Collaborative, LLC*

# GOAL 6
# Provider Capacity Exists to Successfully Serve Transitioned Class Members

The linchpin of success for implementing the Colbert Consent Decree is a robust community-based service and housing system that aligns with Class Members' needs, enshrines evidence-based practices, offers integrated primary and behavioral healthcare and other innovative person-centered models, provides safe and affordable independent housing that includes accessible units for individuals with physical disabilities, and develops a knowledgeable workforce skilled in meeting the needs of vulnerable populations.

Focusing on these system needs and attributes is now especially important as the Colbert Consent Decree moves into a revised implementation plan with the Court's mandate to increase community placements, which places great demands on the system. Under the Cost Neutral Plan, which is now part of the Consent Decree, another 550 Class Members are required to be transitioned from nursing homes into the community during 2017, a 43 percent increase from 2016.

We offer several recommendations in support of Goal 6's aim to build and maintain adequate capacity among Colbert service providers (with Goal 7 solely focused on housing). These suggest adopting a standard framework that uses population health approaches and can be employed in Colbert implementation to guide Class Member referrals to appropriate provider agencies, use Class Member service needs to determine specific areas requiring enhanced capacity building, and promote adoption of evidence-based practices.

## *Recommendations*

### 6.1  Stratify Class Member Populations Using the Four Quadrant Clinical Integration Model.

To drive appropriate service delivery and systems planning, it is important to both understand differences within and among client populations and then allot and manage resources effectively to meet their healthcare and social service needs. We recommend using a standard approach to determine and stratify Class Members into clinical profile categories; then, use those determinations to best match Class Members to appropriate service providers.

This approach can not only help optimize care, but can also apply to predictive modeling to project future service needs and the community's capacity to meet them. The Four Quadrant Clinical Integration Model[25] provides an easy-to-understand and useable framework to organize Class Members into clinical profile categories and further understanding of the mix of provider capacity required to address demand and service needs (See Figure 4).

---

[25]Mauer, Barbara J. *Behavioral Health/Primary Care Integration — The Four Quadrant Model and Evidence Based Practices (Revised February 2006).*

  **Behavioral Health Policy Collaborative, LLC**

34

*Figure 4. Four Quadrant Clinical Integration Model*



We suggest this specific model not only for its utility in identifying and stratifying Colbert service populations, but also, principally, because it addresses Class Members' medical/primary care and behavioral healthcare (i.e., mental health and substance abuse services) with integrated approaches, a key and relatively recent advance of the field to understand that this is a best practice designed to turnaround the early mortality and morbidity of people with behavioral health disorders such as is the case with the majority of Class Members (See Recommendation 6.4).

Briefly, the Four Quadrant Model is framed along two continuums: one for physical health ranging from low- to high-risk and complexity as indicators of acuity and service needs and the other for behavioral health also ranging from low- to high-risk/complexity. Thus, if a Class Member has both a serious mental illness with a high level of acuity together with a co-morbid medical condition(s) and high service needs, then the person would be assigned to Quadrant IV. Assignment to each Quadrant is associated with a list of key services that should be considered when devising the Class Member's service plan and then used to identify and select appropriate service providers that can deliver those services.

We recommend that IDoA Colbert program managers work with service providers and other key stakeholders to consider, assess, and determine if our recommendation to implement the Four Quadrant Model. The model should be customized with more specificity to suit Class Members service needs. By way of examples, in Quadrant IV,

*Behavioral Health Policy Collaborative, LLC*

"specialty BH" should be expanded to specify that this includes such essential Colbert services as ACT teams and CST; services regularly needed by people with physical disabilities such as home modification and medical transportation should be added to each Quadrant. Use of the model should occur at the stages in the Colbert process that involve Class Member evaluation of transition readiness, service plan development for post-discharge, and other service planning and delivery post-transition to the community.

**6.2  Use the Four Quadrant Clinical Integration Model to Guide Resource Mapping and Systems Planning.**

Even in resource-rich areas, it can be difficult to understand what systems-level service mix is necessary to address the needs of individuals served in the community. Without investigation and outcomes monitoring, investments can be made in services that may not be the most effective, strategic, or responsive. Furthermore, if a full system is not clearly mapped to display both need and response resources, critical partners that might help address service capacity needs may be missed or ignored.

For instance, it appears that either Cook County does not maintain or Colbert providers are not aware of a list of medical providers or services that are available county-wide to the CMHCs that serve transitioned Class Members and that do not themselves offer integrated primary and behavioral healthcare (the majority do not). Many Class Members have co-occurring acute and chronic medical issues that require a health care provider's routine oversight. Without strong contractual agreements, it may prove extremely difficult for a free-standing CMHC to care for a person with high medical service needs by itself. As such, our interviews revealed that several CMHCs needed to identify medical resources and develop those relationships, often without incentive dollars or other funds to cover this effort — and with mixed results.

We suggest that, at least in part, this lack of available, coordinated, and ideally integrated physical health service provision exacerbates the numbers of Class Members deemed as "unable to serve" post-transition. We recommend that Colbert IDoA program managers work with the Colbert Task Force (See Recommendation 1.1), other relevant State-, County-, and city-agencies, as well as other stakeholders, to devise a Colbert service needs and systems map. The maps' development should rely in part on the Colbert-customized Four Quadrant Clinical Integration Model to identify Class Member service needs within each Quadrant and system-wide; specify service capacity by type or number currently contracted to accept and serve Class Members; identify gaps in service provider types and capacity; and use predictive modeling to project if, where, and how much service capacity is needed to address the needs of a growing Class Member population and/or increased transition targets. Using predictive modeling, we expect that service gaps will manifest and can elucidate areas of strategic investments in an environment of limited financial resources.

**6.3  Augment System Capacity by Quantifying Need and Increasing Funding for Evidence-based Services, Promising Practices, and Supports.**

Given Class Members' clinical and social vulnerability, the service system should deploy evidence-based and promising practices; we noted that many are currently use. These include ACT teams, CST, medication management, cognitive behavioral therapy (CBT), dialectical behavioral therapy (DBT), chronic disease management approaches, motivational interviewing, Wellness Recovery Action Planning (WRAP), and Screening, Brief Intervention, and Referral to Treatment (SBIRT). However, existing evidence-based practices are inadequate in array and capacity to meet current service needs, much less the increase in demand anticipated under the Court's requirement to transition significantly more Class Members in 2017 and beyond.


*Behavioral Health Policy Collaborative, LLC*

We recommend targeting several specific evidence-based practices and promising practices for significant capacity expansion or as new additions to the array of services available to Class Members. Priorities for these expanded or new services include ACT and CST, integrated primary and behavioral healthcare (See Recommendations 6.1 and 6.2), peer support, embedded advanced practice nurse, crisis beds, medication assisted treatment for people with substance use disorders, integrated cluster medical housing, daily living skills training, home modifications/fall prevention. Others to be considered are therapeutic exercise, functional restoration, and occupation and activity-based interventions. Implementation of each of these practices requires attention to fidelity adherence and must be buttressed by a strong workforce training and skills development resources and quality and outcome monitoring as part of a quality assurance/quality improvement plan.

Given the data available for our review and consideration, a thorough projection of service capacity expansion was not possible. For example, our preliminary examination of Colbert systems and processes indicate that additional ACT teams and CST services are needed to meet Consent Decree transition targets both now and in the future. However, estimating the number of new ACT and CST needed and their associated costs is complicated because current CMHC ACT teams and CST are comprised of a mix of Colbert and non-Colbert clients without clear data delineating separate cohorts among these; there does not appear to be uniformity in the number of clients on any given ACT team within and among CMHC providers despite fidelity standards for this; when asked for cost data by type of service provided, several CMHCs and other Colbert service provider agencies do not have such data and cannot produce it; changing estimations and projections of current and future Class Member size and the numbers of those anticipated for transition changes hinder prediction and planning and efforts.

Because of the important role that ACT and CST services play in helping Class Members with serious mental illness succeed in community living, we recommend that IDoA Colbert staff work with DMH, CMHCs, and other relevant stakeholders to retain a consultant with real-world clinical, program, and financing expertise implementing the ACT team model. The consultant should help develop uniform ACT standards and expectations across Colbert-funded providers, help project the number of ACT teams needed now and in the future to serve Class members, and support work to identify and plan for other, lower level care management services needed by Class Members. Furthermore, a developing practice known as "ACT Plus" that includes additional nursing staff and peer support specialists should be explored and considered for funding given the complex medical needs of many Class Members and the intention to avoid designations of "unable to serve."

Similar to ACT and CST services, there do not appear to be sufficient intensive community services in the current Cook County mental health system to support the transition of Colbert members who have complex psychiatric, medical, physical, and other (e.g., substance abuse) needs. We recommend that, IDoA Colbert program managers follow national best practices and fidelity standards and identify evidence-based or promising readiness to transition services, including those mentioned above, for funding and implementation. Through Medicaid waivers, state funding, reinvestment of system savings from rebalancing the system away from more costly nursing home/institutional care to community-based care, and other sources, IDoA should explore these and other financing and policy levers that can expand capacity of the community provider system — and specifically outpatient/community services that promote Class Members' full participation in community life.

**6.4   Expand Pool of Colbert Service Providers to Increase Capacity and Integrated Care.**

Those invested in achieving the Colbert Consent Decree goals must actively look for and engage as potential partners of new organizations to expand the pool of service providers and the system's overall capacity to meet



*Behavioral Health Policy Collaborative, LLC*

transitioning Class Members' current and future needs. During our work, we identified two important groups of potential new partners that should be immediately engaged in discussions and considered for service contracts.

One of these is the Cook County Health and Hospitals System (CCHHS), which performs dual roles as the county health authority and county safety-net hospital and clinical services provider. A CCHHS executive we interviewed conveyed a keen interest in effectively serving Class Members, but indicated no current partnership exists. The agency operates two acute care hospitals, a Medicaid managed care plan with 150,000 members, 16 clinics, crisis beds, and a behavioral health consortium. It partners with housing developers and is now examining opportunities to offer cluster medical housing (See Recommendation 7.7). CCHHS can offer Class Members an array of needed services, including care coordination, medical health homes and behavioral health clinical and support services that include ACT teams and integrated care.

Using the Four Quadrant Clinical Integration Model (See Recommendation 6.1), this organization should be engaged, at a minimum, in discussions on how it might serve Class Members stratified into Quadrants I ("low behavioral health and low physical health") and III ("low behavioral health and high physical health").

We are intrigued by CCHHS's relatively new Behavioral Health Consortium comprised of six provider organizations that are paid at rates higher than Medicaid and that together offer a single phone number for use by individuals in the County who seek behavioral health services who then cannot turn away. Under this rubric, CCHHS already funds ACT teams and indicated they are willing to fund more; recently opened the first community triage center and 24/7 drop-in center; and are about to open a psychiatric emergency department with access to crisis beds. Given these resources and their degree of interest, we recommend immediate consideration of CCHHS as a provider to serve Class Members in the other two Quadrants as well.

Furthermore, we anticipate that given its large role in the Cook County health system, CCHHS carries influence over the County's acute care hospitals, including the one it owns, that discharge patients into nursing homes, some of who are eligible Class Members. We suggest that Colbert program managers explore other aspects of a new partnership with CCHHS to determine how hospital discharge and referral sources might be engaged and led to avoid inappropriate nursing home referrals by diverting appropriate Class Members to community-based services.

The other potential service vendor and partner seemingly not currently involved with the Colbert program are Federally Qualified Health Centers (FQHCs) located within Cook County. FQHCs serve a critical role in providing high-quality, affordable health care services to nearly 22 million people in the U.S. who are either enrolled in Medicaid or are uninsured. Typical FQHC services include geriatrics, internal medicine, obstetrics, gynecology, pediatrics, medical and surgical sub-specialties, laboratory services, pharmacy, podiatry, x-ray, dental, and more recently specialty mental health and substance use disorder services.

In the past decade, FQHCs have increasingly adopted integrated primary and behavioral healthcare models. This trend is accelerated by two grant programs through the U.S. Health Resources and Services Administration (HRSA): The Behavioral Health Integration (BHI) Grant Program and the Substance Abuse Services Expansion Grant Program. These competitive grants provide funding for health centers to build their capacity to address their clients' behavioral health needs, thus providing a crucial opportunity for resource-strapped behavioral health systems because it builds primary care settings' capacity to address the comprehensive health needs of medically vulnerable individuals with behavioral health conditions.

*Behavioral Health Policy Collaborative, LLC*

In Illinois, there are currently 10 BHI grantees and 16 SASE grantees, representing a significant proportion of area health centers that are enhancing their capabilities to address behavioral health. Cook County alone has five of these BHI grantees and 10 of the SASE grantees. We recommend IDoA Colbert program leadership immediately meet with Cook County FQHCs to formally explore their partnership potential as service providers to Class Members. Informally and in the interim, these FQHCs should be added to the referral networks of the Colbert-MCOs involved in service plan design for Class Members approved for transition and of existing community providers serving Class Members with behavioral health conditions and medical comorbidities.

Adding service capacity with CCHHS and local FQHCs is a critical step, but only represents two spokes in the wheel of integrated care approaches that communities across America are implemented; they are now viewed as imperative to addressing the complex clinical needs of people with behavioral health and medical conditions. However, to implement and sustain integrated care models, Illinois and local systems must adopt new clinical, financial, operational, and workforce models for integrated care, which requires provider, state and local agency, and payer alignment. We recommend that IDoA Colbert leadership, the Colbert Task Force, and others expand the State's exploration and pursuit of appropriate State and local financial and policy levers (e.g., Medicaid Waivers, Health Homes, HRSA Mental Health Expansion Grants, SAMHSA Primary Behavioral Health Care Integration [PBHCI] Grants, reinvestment provisions) to finance and implement sustainable integrated care models for Class Members. Doing so will help realize the promise of becoming a fully-integrated system of care and reduce strain on both the behavioral health and public health systems by taking advantage of new policy and financing levers.

**6.5.    Streamline Approvals for Durable Medical Equipment.**

Durable Medical Equipment (DME) is a critical necessity and facilitator for individuals with physical health conditions and disabilities for them to successfully transition and thrive in the community. Several Key Informants from Colbert-funded CMHCs and other housing locator agencies stated that a barrier to timely transitioning Class Members to community-based housing is obtaining prompt agency approvals for DME. However, while the CMHCs and others have experienced this process as often difficult and slow, it appears that that the two MCOs that provide Colbert outreach and evaluation services are expert in obtaining timely approval for DME equipment. As such, we recommend that the Colbert MCOs partner with CMHCs and other agencies serving Class Members who need DME to train and actively support the acquisition of approvals for DME. Further, the process should be reviewed with the involvement of HFS and IDoA to determine if processes can be streamlined.

**6.6.    Examine and Use SSI/SSDI Presumptive Eligibility and Enrollment Expediting Programs.**

Social welfare and health benefits acquisition is a critical component to successful community tenure for low-income, vulnerable individuals, including Class Members. Applying, qualifying, and obtaining needed financial benefits — such as Supplemental Security Income (SSI) and Social Security Disability Insurance (SSDI) — is needed to support critical rental/housing costs, food, transportation, clothing, medical copayments, and other necessities for successful community life. While some parts of the system may use this process, Key Informants from multiple State agencies and provider organizations could neither find anyone familiar with presumptive eligibility (explained below) and similar benefits determination processes nor whether they are used with Class Members. As such, we recommend that IDoA ensure benefits enrollment protocols for Class Members include screening for presumptive eligibility and expedited access to benefits through SSI/SSDI Outreach, Access, and Recovery (SOAR) programs.

*Behavioral Health Policy Collaborative, LLC*

The Social Security Administration has authority to approve immediate SSI payments for up to six months for people who meet presumptive eligibility criteria. For these individuals, their conditions are so serious that they are "presumed" as SSI eligible. Class Members may have qualifying conditions — including blindness, amputation, stroke, confinement to wheelchair due to chronic condition, and several other conditions — that give them presumptive eligibility and, thus, immediate access to cash benefits. We recommend that all Class Member case managers and discharge planners be made aware of and trained on presumptive eligibility and then screen Class Members to determine if they meet the criteria to gain prompt access to financial resources that can bolster their ability to successfully transition into the community.

Furthermore, the SOAR program facilitates prompt access to disability income for individuals who are at risk of homelessness and have a mental illness, medical impairment, and/or a co-occurring substance use disorder. Experienced SOAR case managers use a State or local SOAR process to expedite SSI and SSDI applications, which has proven to increase approvals from 26 percent to 65 percent and reduce wait times from one year to two to three months. We recommend that Colbert program managers collaborate with other relevant State and County agencies to implement or partner with an existing SOAR program and target Class Members who qualify for SOAR because of potential risk for homelessness either pre- or post-nursing home placement.

*Behavioral Health Policy Collaborative, LLC*

# GOAL 7
# Appropriate and Affordable Independent Housing Is Available for Class Members

The full participation of people with disabilities in community life — the aspiration of the Supreme Court's Olmstead decision and the Colbert Consent Decree — is only possible with access to safe, appropriate, and affordable independent housing. Housing is a critical component to recovery and completely necessary for successful deinstitutionalization. Each Class Member transitioned into the community must have a place to live, appropriate to his/her disability and needs, with accessibility to community-based services.

There are multiple challenges to locating and securing housing for individuals living in an institutional setting such as Class Members residing in Cook County nursing homes. Individual-level barriers can include complications arising from the nature of a person's disability and the stigma attached to people with disabilities; lack of independent living skills; past involvement in the criminal justice system; current or past substance abuse; poor or nonexistent credit; and landlord-tenant issues.

In addition to individual-level barriers, individuals also face myriad systems-level obstacles. They face a dearth of accessible housing; limited stock of rental subsidies and landlords willing to accept subsidies; landlords' preconceived notions about particular disabilities; insufficient or nonexistent services and other supports that contribute to successful community tenure; and a lack of coordination among housing and service providers.

**Core Elements of an Effective Housing System for People with Disabilities.** A high-functioning housing system — aligned with the Colbert Decree's goals — is essential for Class Members to surmount these barriers. The tenets of a high-functioning housing system that must exist in Cook County include:

- **System Capacity**
  - Adequate and affordable housing stock for all income ranges
  - Housing close to community-based services and other services and necessities such as a grocery store, doctors, transportation, and recreation
  - Continuum of housing options with enough available stock to house and rehouse Class Members, including cluster housing, master lease housing, independent housing, physically-accessible housing, permanent supportive housing, and supportive living facilities
  - Data collection and reporting to monitor activity and outcomes
  - Centralized database of available units with quick turnaround time for both landlord and tenant referrals
  - Prioritization process for the limited specialty housing units
  - Fair housing/anti-discrimination enforcement

- **Financing and Affordability**
  - Affordable housing in safe communities
  - Affordable housing financing models with or without rental assistance
  - Rental assistance separate from the housing financing models



*Behavioral Health Policy Collaborative, LLC*

- **Pre- and Post-tenancy Housing Services**
  - Pre-tenancy supports, including credit checks, criminal background check, and acquisition of furnishing and other household items
  - Quick response time for pre-occupancy requests, including unit modifications to make it physically accessible, unit inspections, and transition funds
  - Post-tenancy care to ensure the Class Member is supported while living in the unit

- **Relationships with Landlords and Other Important Housing Parties**
  - Cooperative landlords willing to accept rental subsidies, lease to Class Members, and/or modify units for accessibility
  - Cooperative landlords willing to work with Class Members throughout their tenancies
  - Long-term working relationships between the landlord community, community service providers, and State agencies involved in Class Members' long-term success
  - Ongoing outreach and engagement processes with individual landlords, apartment association(s), realtor association(s), and others that lease housing units

**Housing Strategies Deployed Under Colbert.** The effort to ensure continued successful community tenure of already-transitioned Class Members and to locate and secure permanent independent housing for future transitioning Class Members requires enhancing the aforementioned elements to meet the Court's expanded transition expectations for 2017 and beyond. To its credit, the current Cook County housing system available to Class Members does have some of each of the above elements. To date, the State through the Illinois Housing Development Authority (IDHA) has implemented several strategies to increase housing capacity for Class Members, including:

- IDHA-facilitated housing development through the Low-Income Housing Tax Credit (LIHTC) Program for accessible units;
- IDHA-secured Section 811 subsidies coupled with LIHTC properties Round One Funding in 2012, and Round 2 funding in 2015, which produced hundreds of units; and
- IDHS-created Statewide Referral Network online database and referral system for Section 811 and permanent supportive housing units.

**Housing Models Available to Class Members**. Housing for Class Members is available in a variety of ways: by a specific housing model[26] designed for the Colbert Consent Decree (cluster model, master lease model, Accessible Housing Initiative through Home First, Section 811 units in newly developed low-income housing tax credit properties); set-asides for housing vouchers through the Chicago Housing Authority and the Housing Authority of Cook County and Bridge Funding Housing Rental Subsidies; general apartment/housing units offered on the open market that meet the Fair Market Rents (FMR) and Housing Quality Standards (HQS) requirements of either the Housing Choice Voucher or the Bridge Funding programs; or a supported living facility   for clients with physical disabilities whose housing needs can only be addressed in this setting. All housing options are designed using the scattered site concept, except for the supported living facilities because of their specific service delivery model.

---

[26] *Colbert v. Rauner Case No. 07-C4737, (N.D.Ill.) Annual Report to the Court Dennis R. Jones, MSW, MBA Colbert Court Monitor January 29, 2016. Pages 9-11.*



***Behavioral Health Policy Collaborative, LLC***

Units are funded by state and/or federal dollars, including the LIHTC program, a program facilitated by states to encourage housing investors to invest in developing affordable housing units, combined with Section 811 funding for Class Members, Housing Choice Vouchers from the Chicago Housing Authority, or the Housing Authority of Cook County, and State Bridge Funding program for Class Members. Table 3 outlines Colbert housing units available and filled by type, number, and funding source as of January 2017.

| Table 3. Types of Colbert Housing and Funding Source Available and Filled as of January 2017[27] | | | | | | |
|---|---|---|---|---|---|---|
| Type of Housing | # Units/ Vouchers | # Units/ Vouchers Filled | Funding Source | | | |
| | | | HCV | 811 | Bridge | Other |
| Cluster Model | 16 | 10 (+3 pending) | | | x | |
| Master Lease | 53 | 49 (+1 pending) | | | x | |
| Home First Illinois | 57 | 47 | x | x | | |
| Housing Authority of Cook County | 120 | 30 | x | | x | |
| Chicago Housing Authority | 600* | 38 | x | | | |
| Scattered Sites[28] | NA | 1,173 | | | x | |
| Supported Living Facilities | NA | 150 | | | | x |
| TOTAL | | 1,497 | | | | |

*Number of vouchers allotted for both Colbert and Williams Consent Decrees.*

**Colbert Housing Location and Placement Providers and Process.** There are two types of organizations tasked with identifying housing options for Class Members: housing locator agencies and CMHCs. IDoA currently funds four housing locator agencies focused on serving people with physical disabilities who may have a secondary diagnosis of mental illness but are not in need of high-intensity mental health services (i.e., ACT or CST). Nine CMHCs are contracted to focus on serving Class Members who have a primary diagnosis of serious mental illness and may or may not also have a physical disability. The CMHCs perform both service- and housing-related transition services.

IDoA contracts housing locator organizations to perform a variety housing-related transition services for Class Members (See Table 4). Referrals made to a housing locator come from those agencies that conduct Colbert evaluations/assessments (e.g., Aetna, Illinicare) for Class Members recommended for transition. Receiving referral agencies are determined based upon the Class Members' geographic living preference and, if unavailable, where housing units are available.

In general, both organizations types follow the same procedures when transitioning Class Members. This entails housing location, coordination, and placement. Table 4 identifies the Colbert housing transition process general activities and shows the procedural similarities and differences between housing locator agencies and CMHCs.[29]

---

[27] Data provided by IDoA on March 9, 2017.
[28] Scattered sites are housing units owned and managed by private landlords and secured on the open housing market; they are different from the cluster model, master lease program or Home First Illinois, which are also scattered sites.
[29] The activities in the table were extracted from the housing locator contracts' scope of work between the housing locator agency and IDoA and are referenced in the CMHC contract.



*Behavioral Health Policy Collaborative, LLC*

| Table 4. Housing Activities for Colbert Transitions: Housing Locator Agencies versus Community Mental Health Centers | | |
|---|---|---|
| Activity | CMHC | Housing Locator Agency |
| In-reach into nursing homes to evaluate and identify Class Members for transition | ✓ | |
| Referrals by the Colbert-MCO to housing agency | ✓ | ✓ |
| Serves Class Members with primary diagnosis of serious mental illness | ✓ | |
| Serves Class Members with primary diagnosis of physical disability | | ✓ |
| Obtains clinical and other documents for transition | ✓ | |
| Conducts housing search | ✓ | ✓ |
| Requests transition funds from HACC through debit cards | ✓ | ✓ |
| Requests to HACC for HQS Inspections by HACC vendors | ✓ | ✓ |
| Provides mental health services during transition to the community | ✓ | |
| Requests UIC-ATU to make accessibility alterations, if needed | ✓ | ✓ |
| Moves Class Member into housing unit | ✓ | ✓ |

Table 3 shows that between the start of Colbert transitions/housing placements in 2013 and January 2017, 1,497 Class Members transitioned into community housing units. (During calendar year 2016, 384 Class Members transitioned into the community.) The Colbert transition goal for calendar year 2017 is 550 Class Members (250 by June 30 and another 300 by December 31).[30] The one-year transition goal change represents a 9 percent increase from the target goal of 504 transitions in 2016 to 550 in 2017. Perhaps more important, achieving the 2017 transition target would mean 166 more transitions over the number achieved during 2016, a 43 percent increase. This increase represents a formidable challenge to the Colbert program.

Achieving significant increases to Colbert's transition goals for 2017 and beyond requires an understanding of barriers to housing placements, devising strategies to mitigate or overcome them, and an effective implementation plan. During our review of Colbert housing stages and process, we identified several stages where delays and bottlenecks appear to occur and slow down the housing transition process. Each of these areas requires closer investigation and mitigation, including:

- Insufficient number of housing options/units in the form of cluster housing or master lease units, which are often viable options for Class Members with compromised credit histories and criminal justice involvement;
- Lack of affordable housing units on the open market;
- Delays due to a complex and lengthy process to obtain approvals for Class Members' debit cards with transition funds; and
- The number of organizations, steps, and scheduling delays associated with conducting required HQS Inspections.

Further, to illustrate examining data to begin the process of program performance and identify areas for potential quality improvement, we collected and analyzed several key data points. We then calculated the average time it took for Class Member transition from point of referral to move-in in 2016 (See Table 5).

---

[30] Colbert Consent Decree — Power Point Illinois Department of Aging, January 9, 2017.

*Behavioral Health Policy Collaborative, LLC*

| Table 5. Colbert Housing Locator Agencies and CMHCs: Average Transition Times by Stage in 2016 [31, 32] | | | | |
|---|---|---|---|---|
| | **Housing Locator Agencies** | | **CMHCs** | |
| **Housing Stage** | **Number of Class Members** | **Cumulative Average Length of Time** | **Number of Class Members** | **Cumulative Average Length of Time** |
| Referral to Intake | 192 | 15 days | 459 | 11 days |
| Intake to Housing Search | 149 | 52 days (1.73 months) | 180 | 117 days (3.86 months) |
| Total Referral to Community Housing Move-In | 175 | 134 days (4.46 months) | 170 | 178 days (5.93 months) |
| ***Total Average Time*** | **516** | ***4.46 months*** | **809** | ***5.93 months*** |

In examining this data, a wealth of information emerges that would need more thorough examination and discussion regarding potential areas to improve the Colbert housing search process and to address the challenges associated with placing Class Members with problematic backgrounds that prevent their leasing units on the open housing market.

- **Housing locator agencies**
  - Received 29 percent of Colbert transition referrals for housing in 2016.
  - Took an average of 67 days (or 2.23 months) from the time of housing unit identification to the time the Class Member moved into the unit.[33]
  - Found and placed 90 percent of Class Members referred to them for community housing in 2016.
  - Completed the overall housing process in approximately 4.5 months, with almost half of that time spent on housing search and the other half on required pre-transition housing applications, credit checks, inspections, modifications, and other activities.

- **CMHCs conducting housing services:**
  - Received 71 percent of Colbert referrals for housing transition in 2016.
  - Took about one-third longer (nearly 1. 5 months more) than housing locator agencies to find and place Class Members in community housing.
  - Succeeded in housing location and placement 36 percent of the time in 2016, compared to 90 percent for housing locator agencies.

This brief analysis reveals several important questions to pursue such as, "Why do such significant process time differences between types of housing providers exist"? Of note, these differences could be valid due to complexity of the Class Members' housing, services, and support needs and other factors such as differing rates of criminal justice involvement and other issues that delay or jeopardize housing placement. Nevertheless, it merits inquiry.

---

[31] *Illinois Department of Aging. Colbert Housing Locator Agencies Average Transition Timeline Report: CY16.*

[32] *Illinois Department of Aging. Colbert CMHC Agencies Average Transition Timeline Report: CY16.*

[33] *Housing activities conducted during this stage can entail HQS inspection, modifications to the unit, requests for transition funds/debit cards, lease signing, and securing medical equipment.*



*Behavioral Health Policy Collaborative, LLC*

We propose several recommendations designed to increase capacity, oversight, and leadership of housing-related Colbert Consent Decree processes and goals, invest in landlord engagement, address common rental barriers, and realign staffing resources to optimize outreach and placement processes.

## Recommendations

**7.1  Convene Colbert Housing Workgroup.**

Given the complexity of finding and transitioning Class Members into appropriate housing with the right types and levels of services and supports, we recommend IDoA appoint and lead a Colbert Housing Workgroup to map out and examine the entire housing process designed for Class Members and determine where to modify and streamline. The Workgroup can serve as a catalyst in identifying and analyzing important housing related data, idea exchange, and strategy development to solve systems bottlenecks such as the process between where a housing unit is found, but not yet occupied, where significant delays occur. Without a concerted and focused effort led by IDoA Colbert staff, the contracted agencies responsible for housing transition and significantly increasing their transition outcomes in 2017 will lack sufficient information, resources, or support to achieve these goals.

Along with IDoA Colbert housing and leadership staff, other Workgroup members should include representatives from State (i.e., IHDA) and local (i.e., County) housing authorities, other State and local agencies (e.g., DMH, HACC, DRS) together with the active involvement of the Colbert housing-related contractors, including housing locator agencies, CMHCs, and others key to the coordination of housing with services and supports (e.g., Colbert MCOs, Featherfist, Access Living) given their deep understanding and experience with the complexities of successfully navigating the housing process. Others to consider include representatives from landlord associations, real estate developers, and advocates.

### 7.2  Increase IDoA Colbert Housing Staff.

Managing and overseeing every part of transforming Cook County's housing systems to successfully support Colbert Consent Decree goals necessitates involvement of many stakeholders and activities to identify available housing resources, engage with landlords, and conceptualize process improvements and other proactive solutions that reduce barriers to housing for Class Members. As such, we recommend IDoA immediately fill its housing-related positions, with at least two more temporary housing staff members to implement the landlord outreach plan (See Recommendation 7.6) and to support other Goal 7 recommendations.

**7.3  Re-engineer Housing Search Process.**

We recommend the Colbert Housing Workgroup conduct a housing resource mapping and workflow analysis to assess and ensure that the most efficient communications, administration, and quality oversight processes are used to perform and expedite housing access. We anticipate that this and other Workgroup efforts will result in, at a minimum, the need to reengineer the housing search process. Our Key Informants revealed problems with navigating the Statewide Referral Network (SRN) website, an important resource in identifying available units for Class Members. They reported that the SRN is cumbersome and time-consuming for not only Colbert-contracted


*Behavioral Health Policy Collaborative, LLC*

housing services providers but for private landlords, as well. A SRN Workgroup should meet to determine the most efficient method to link the landlord to the tenant without having to rely on the cumbersome database process.

### 7.4 Pilot Integrated Colbert MCO and Housing Locator Teams.

Our stakeholder interviews revealed a lack of coordination between the two Colbert-funded MCOs and the housing locators as it pertains to the assessment process for Class Members with physical disabilities. Stakeholders worry that the MCO evaluators do not have a thorough understanding of how often individuals with the most challenging physical disabilities can live independently with the right mix of services and supports. We recommend a pilot test to determine if integrated teams comprised of staff from the Colbert MCOs and housing locator agencies can effectively work together to conduct in-reach and comprehensive evaluation of housing and service needs of Class Members with primary diagnoses of physical disability. Outcomes of the pilot should determine if it results in increased rates of appropriate recommendations for transition among these Class Member, followed by actual transition, and then successful community tenure for at least one year, which is the designated period in which Class Members are followed after community placement. If successful, the pilot should transform into institution, with implementation of integrated teams across the program.

### 7.5 Develop Housing-Specific Key Performance Indicators and Realign Contractor Targets with Capacity.

IDoA Colbert housing staff and members of our recommended Data Enterprise Workgroup and Housing Workgroup (See Recommendations 3.1 and 7.1) should define KPIs and include them in contracts with Colbert housing service providers. These will assess key process and outcome measures in the housing process and hold contractors accountable. They should include timeframe benchmarks for key steps in the housing location and transition process; rates of Class Members referred compared to those transitioned into community housing; number of new landlord relationships developed and number of housing units that result from those new relationships; percentage of time that the Class Members' geographic and other housing preferences are met; and rates of housing stability versus instability of Class Members post-transition. The Colbert Data Dashboard should include this regular KPI reporting and monitoring (See Recommendation 3.2) and transparently shared that with housing contractors.

Relatedly, IDoA and the Housing Workgroup should conduct a capacity and productivity assessment of current Colbert housing service contractors to determine if programs work at full capacity, assignments leverage each agency's strengths, and the parameters and costs needed to properly increase Colbert Class transitions are met. The housing locator agency staff we interviewed indicated that they are prepared and willing to accept more referrals of Class Members needing community housing; after assurance that capacity exits to do this, quality should be acted upon immediately.

### 7.6 Implement a Landlord Engagement Initiative.

Chicago and Cook County lack affordable housing units. Although Colbert-funded housing locators are required to maintain a current list of housing options for Class Members, they often lack adequate capacity or resources to network on a regular basis with potentially large landlord groups that could offer housing units and/or resources to Class Members. We recommend IDoA Colbert housing staff and the Housing Workgroup (See Recommendation 7.1) explore successful landlord engagement models (e.g., Pathways to Housing) and use them to create and implement a robust landlord engagement and communications plan that describes the Colbert program and emphasizes incentives and benefits for landlord participation. This plan will engage leasing agents, apartment

*Behavioral Health Policy Collaborative, LLC*

associations, local board of realtors, and other organizations that provide professional services to landlords, leasing agents, and property management companies. The plan should delineate regular outreach activities, identify key housing events that IDoA housing staff and contractors should attend to increase engagement, marketing outreach, and relationship development opportunities with leasing agents and landlords.

**7.7  Increase Special Housing and Accessible Housing Inventory.**

As mentioned, a dearth of fully accessible units exists in both Chicago and Cook County, limiting options for Class Members overall and, particularly, for those with physical disabilities. We recommend that the Housing Workgroup explore and identify strategies to increase accessible housing for this Class Member cohort by using LIHTC, garnering commitment from current landlords to modify units to meet accessibility standards, and identifying interest from high-rise building management to modify a percentage of their existing inventory. Once units are approved for modifications, IDoA should ensure performance process and prompt modifications so a Class Member does not lose a unit, frustrating and losing cooperative landlords and incurring unnecessary delays to Class Member move-in. The current timeline runs up to 90 days.

In addition to accessible units, to meet the needs of Class Members with complex medical needs who require access to reliable medical care, albeit not 24-hour medical services such as those provided in nursing homes, we recommend the State add units under cluster housing models for people with medical comorbidities and master lease housing for people with negative credit or criminal justice histories to the Colbert Special Housing Inventory.

**7.8  Address Common Rental Barriers.**

Key Informants from both housing locator agencies and CMHCs spoke of barriers to Class Members' housing, poor credit backgrounds, and criminal justice histories. We concur with their recommendation that, instead of waiting for a landlord to conduct background checks and risk losing the unit if negative, a more efficient and effective system be implemented. Their agencies conduct these checks before beginning the housing search process to employ strategies to best address these barriers and, then, target more lenient landlords. Another solution is for the State to invest in more master lease housing in which landlords are traditionally more lenient with background issues because of their relationship with State agencies. In addition, IDoA Colbert staff and relevant housing stakeholders should identify and use existing resources to address Class Members' housing barriers such as landlord education, legal clinics, and Federal, State, and local legislation addressing housing discrimination.

**7.9  Expedite Transition Funds and HQS Inspections**.

Each Class Member is eligible for up to $4,000 in transition funds to cover the costs of approved housing- and transition-related expenses such as unit security deposits, utility deposits, purchase of furniture and household items, and other costs directly related to the move. This is a unique and important aspect of the Colbert program and its existence plays a crucial role in enabling the transition process.

Both housing locator organizations and CMHCs depend on HACC to issue transition funds through debit cards and conduct HQS inspections on units prior to Class Member move-in. We contend that the current approval process for physical access to these debit cards — now taking up to 30 days — is too long and Colbert housing service providers are frequently required to front the transition fund monies to avoid losing the unit; then, they seek reimbursed later. We recommend examining the process for accessing transition funds for ways to expedite it.



*Behavioral Health Policy Collaborative, LLC*

# GOAL 8
# Knowledgeable and Skilled Staff Are Prepared to Address Class Members' Complex Needs

In addition to Class Members' own roles in achieving successful community tenures, it is the caliber of staff that will be one of the most important determinants of whether Class Members successfully transition and remain in the community. Systems transformation often requires significant shifts in the workforce, which includes addressing staff attitudinal barriers and biases, engaging staff in training and skills enhancement, introducing evidence-based practices and fidelity standards, encouraging the adoption of new philosophical frameworks (i.e., recovery orientation), and building knowledge and competencies needed to succeed in interlinking systems and cross-systems collaboration and coordination.

This is especially true for successfully implementing the Colbert Consent Decree, as staff who support the various activities, from outreach, evaluation, pre- and post-transition skills development to health, behavioral health, and housing services, must — while representing different agencies and functions — commit to learning and deploying the skills needed to provide high-quality care. Such a workforce fundamentally influences and contributes to achieving the goal of transitioning individuals into the community.

The path to building and maintaining a strong and knowledgeable workforce includes ongoing workforce training that focuses on providing appropriate training to new staff entering various arenas within the system. It also requires continually enhancing staff skills. A Colbert-funded Training Institute recently began and serves this important function. However, important opportunities remain to expand the Colbert workforce (See Recommendations 1.4, 1.5, 3.4, 4.4, 6.3, 6.4, 7.2, and 9.2) and ensure that new providers, including peers and others, receive appropriate and adequate training through a variety of new and existing mechanisms, including those addressed in previous recommendations.

## Recommendations

**8.1 Expand Training Offered Under Existing Training Institute.**

We recommend that IDoA Colbert staff engage all stakeholders in the Colbert implementation process to devise and prioritize additional training topics that the Colbert Training Institute should offer. These could include: educational offerings designed to raise awareness and reduce stigma toward individuals with disabilities — including serious mental illness and physical disabilities — as well as research that quells misconceptions about the capabilities of individuals with disabilities to live successfully in the community. Other training topics could include disability awareness, peer services' role in community transition and retention, compliance issues with Federal and State laws designed to protect individuals with disabilities (i.e., PASSR, ADA, Fair Housing), adjusting business models under systems rebalancing, bi-directional primary and behavioral healthcare integration, and specific



*Behavioral Health Policy Collaborative, LLC*

49

evidence-based practices, among others. To minimize costs, training providers should explore technical assistance and training available to States, providers, and other from the many existing Federal- and other-funded resources (i.e. SAMHSA-HRSA Center for Integrated Health Solutions[34], Bringing Recovery Supports to Scale Technical Assistance Center (BRSS-TACS)[35], BHbusiness[36]).

Further, the audience of prospective training recipients should be broadened from the current limited cadre of outreach, evaluation, and Colbert service and housing providers to include nursing home administrators and staff, advocates, family members, and other key allies. A range of training mechanism should be used such as webinars, online courses, conferences and workshops, and one-on-one or group coaching. Whenever possible, trainings should offer Continuing Education Credits to incentive participation among disciplines required to acquire them.

### 8.2  Launch Colbert Learning Collaboratives.

The Institute for Healthcare Improvement (IHI) conceptualized the "collaborative" model to facilitate structured and shared learning, convening organizations to work with each other and expert faculty to rapidly test and implement changes that drive them toward improvement and sustainable change within a specific topic area.[37] IDoA Colbert staff, with input from the new Task Force (See Recommendation 1.1) and other key parties, should use project data to identify particular "pain points" that jeopardize achievement of Colbert goals and launch a series of Colbert Learning Collaboratives for Colbert-funded providers and others to address these obstacles by sharing strategies to overcome barriers, technical assistance or other helpful resources, and establishing a culture that promotes shared learning and adaptation. Potential topics include integrating primary care services into CMHCs for medically vulnerable clients, innovative financing models and approaches, understanding and collaborating with housing systems and providers, using population health and treat-to-target strategies, emerging research on best practices in maintaining successful community tenure, and data-driven clinical decision-making.

---

[34] See: /www.integration.samhsa.gov
[35] See: www.samhsa.gov/brss-tacs
[36] See: https://bhbusiness.org/home


*Behavioral Health Policy Collaborative, LLC*

# GOAL 9
# Independent Quality Assurance Mechanisms Ensure Colbert Program and Service Integrity

Under the Colbert Consent Decree, it is critical that every touchpoint with staff — whether outreach staff, assessors/evaluators, referral specialists, housing locators, or community-based social service and healthcare providers — Class Members receive high-quality services from staff who value and offer customer service, reliability, integrity, and respect. So much of a person's entrance into the community and success living there is contingent on the integrity and appropriate conduct of staff because interactions and determinations can drastically impact a Class Member's trajectory into successful community living or return to institutional living.

Careful attention must be paid, and mechanisms put in place, to promote professional and lawful conduct and to guard against negative conduct (e.g., intimidation, negative persuasion) and illegal acts (e.g., bribery, extortion, theft). Some mechanisms exist for implementing safeguards at the State-level (e.g., long-term care ombudsman, independent reviews of adverse events, and "unable to serve" determinations) but we are unaware of Colbert State-level (i.e., IDoA) staff or independent contractors who are responsible for conducting regular and thorough program monitoring and quality assurance assessments.

As such, we recommend that every appropriate Colbert process and workflow incorporate strong, independent, and data-informed quality assurance mechanisms and staff. We offer specific recommendations below, including ensuring proper venues for reporting abuse allegations, neglect, and improper conduct, among others; defining and strengthening appeals and complaints processes; using project data to identify program and service integrity red flags; and monitoring "unable to serve" designations.

## *Recommendations*

**9.1 Ensure Adequate Access to and Authority of State Long-term Care Ombudsman or Appoint Colbert Ombudsman**.

Among such clinically and socially marginalized and disenfranchised populations as those represented by Class Members, it is critical that an independent individual remain accessible to Class Members who may be vulnerable to, fear, or experience retribution and intimidation by lodging complaints against agencies that control their livelihoods (e.g., access to food, shelter, and social connection). This process must be in place and effective not only for Class Members but also for family members, providers, advocates, and others.

Through our review of Colbert processes, we assumed nursing home residents are apprised of their rights upon entry into the facility. However, during Key Informant interviews across multiple stakeholders they were not



*Behavioral Health Policy Collaborative, LLC*

51

certain if Class Members were covered by the Illinois Long-Term Care Ombudsman and could they identify any meetings, communications, linkages, or data sharing with that Office.

Authorized and funded through the Older American Act of 1965, states are mandated to institute Long-Term Care Ombudsman Programs to visit long-term care facilities, monitor conditions of care, and provide direct advocacy services to nursing home residents. Illinois also provides a Home Care Ombudsman Program. In developing our report, we contacted the Illinois Long-Term Care Ombudsman's office to inquire about whether Class Members who are discharged from nursing homes are covered by the Office's authority. We were informed that once they are discharged from nursing homes Class Members are not eligible. This contradicts information posted on the Illinois Department of Aging website.[38] We asked the Ombudsman's Office representative if they knew about and understood the Colbert Consent Decree and found that the official had limited information. We also placed calls to the three Regional Long-Term Care Ombudsman Offices in Cook County and left messages requesting return calls, receiving only one call back to date.

Our inquiries revealed that there does not appear to be a link between Class Members once they are transitioned and existing ombudsman services; ombudsman staff do not understand Colbert's intricacies or definitively whether Class Members are eligible, and they may not have capacity to address the needs of hundreds of additional individuals such as Class Members who have complex histories and health statuses.

We recommend that the Colbert Court Monitor, IDoA, and the Task Force either expand the scope and resources of the Long-term Care Ombudsman Program for Class Members, or designate a dedicated Colbert Consent Decree Ombudsman. If they elect to collaborate with the State-level Long-term Care Ombudsman, they should ensure that this office's scope extends beyond nursing home walls since rights violations can occur in services and housing-related processes outside of the facility (e.g., in-unit audits to verify that funds from Class Members' housing transition debit cards were expended for security deposit, furniture, household and other approved items).

We recommend that IDoA, the new Colbert Task Force, and the Colbert Court Monitor establish a strong collaborative relationship with the Long-term Care Ombudsman to ensure enforcement of Class Members' rights and protections, even if their access to this Ombudsman is only while they reside in the nursing facility. If this Ombudsman does not have jurisdiction over Class Members once they transition to community housing, then other existing Ombudsman-type relationships should be identified, established, and coordinated. If these do not exist or are deemed inappropriate or insufficient for Colbert purposes, the State should consider appointing a dedicated Colbert Ombudsman.

Once an Ombudsman(s) is clarified or newly identified, we recommend that the Ombudsman and IDoA together establish clear mechanisms and processes for reporting concerns regarding quality of care and intimidation or abuse of Class Members. The Ombudsman and Colbert program administrators should meet regularly to review complaint data and dispositions and determine if corrective actions or program adjustments to increase Class Members' protections are needed and devise action plans to accomplish this. This data should become part of the Colbert Data Dashboard (See Recommendation 3.2) and regularly reported to the Colbert Court Monitor and other stakeholders. Once the Ombudsman role is designated and clarified, IDoA and the Task Force should develop and

---

[38] *Long-Term Care Ombudsman Program. "Long Term Care Ombudsman: Long-Term Care Ombudsman Program." n.d. Web. Retrieved March 23, 2017 from: www.illinois.gov/aging/ProtectionAdvocacy/LTCombudsman/Pages/default.aspx. "The Ombudsman program services are available free of charge to: ...Person(s) 18 or older who is either a current resident, a prospective resident, or a former resident of a long-term care facility..."*



**Behavioral Health Policy Collaborative, LLC**

implement a communications plan to notify all Class Members and their families, agency and nursing home staff, and other stakeholders about how to navigate the complaints process.

**9.2  Hire Independent Staff or Contractors to Conduct Contractor/Provider Monitoring and Quality Reviews.**

In our view, the Colbert program should consider adding staff or independent contractors to conduct service and expenditure audits to authenticate appropriate use of Colbert resources. For example, random, unannounced site visits should be made to where the Class Members' reside before they transition and move-in to community housing. This will ensure verification that funds used from Class Members' debit cards for security deposits, furnishings, household goods, other allowable purchases (e.g., first month of food) are paid and items are in the housing unit. Similarly, a random sample of clinical record reviews and site visits should be conducted to ensure that Colbert-funded ACT teams and CST services make the required number and type of Class Member contacts and that these match billing records. Processes and procedures used to conduct quality assurance must be transparent to the monitored individuals and agencies.

Colbert's quality assurance program and its staff that perform quality assurance functions should use the Colbert Data Enterprise Program (See Goal 3) to inform this work. By regularly reviewing and analyzing Colbert data, program managers and quality assurance staff can identify bottlenecks, agency and individual staff attainment of KPIs, timelines between different stages of pre- and post-transition, rates and trends with Class Members placed on "unable to serve" lists, and overturn rates of ready to transition and not ready to transition rates, among others. After reviewing this data, the Task Force should recommend further investigation or appropriate course corrections or actions designed to address identified barriers.

**9.3  Increase Oversight for "Unable to Serve" Designations.**

When an individual is rejected for transition services, Colbert-funded CMHCs use the "unable to serve" designation.   Without strong oversight, this label is at-risk for inappropriate assignment; agencies can approve Class Members for transition who are perceived as easier to manage, meanwhile negatively labelling those with complex challenges; and transition decisions are contingent upon whether the CMHCs believe that challenges can be managed in the community and whether resources are available there to support the Class Member.

This is contrary to best practice, which expects all CMHCs to be able to admit and serve most people with serious mental illness with support and funding, by the State, as necessary. A robust community mental health service system requires the ability to wrap needed services around all potential clients. To do that, the provider agency requires additional, special funding to do this work well. There does not appear to be any formal data used or plans to identify the ideal number of ACT teams for Cook County; it appears the current number is not based on data-based projections and, at this time, lack sufficient numbers.

Beyond adding oversight, analysis, and review to this process, we recommend changing the label "unable to serve" to "complex transition needs," which is accompanied by a list of specific challenges, potential solutions, and funding required to serve the person. The new senior-level clinical expert (See Recommendation 1.5) —  whether IDoA staff or contractor — should work with community providers to offer clinical case consultations to determine if and how the Class Member can maintain community placement. It is imperative that the clinical staff/consultant assigned this role is an expert and experienced in factors, methods, and services fundamentals to successfully transitioning people with disabilities from institutions to community settings, including deep familiarization with community-based healthcare and behavioral health systems.

53

**Behavioral Health Policy Collaborative, LLC**

# Goal 10
## Diversion Strategies Prevent Inappropriate Nursing Home Placements for People with Disabilities and Redress System "Front Door" Issues

The recommendations offered under Goals 1-9 are designed to improve appropriateness, capacity, quality, and outcomes for current Class Members residing in Cook County nursing homes. They should result in more individuals successfully transitioning into the community. However, while not included among the Colbert Consent Decree requirements, it will be essential to consider and address the upstream, front-door issues that currently permit and even incentivize the flow of individuals with disabilities into nursing homes and other institutions when many can and should flow into community-based housing and supports.

Further delays in actively addressing front-door issues and replacing them with appropriate diversion pathways and resources will continually result in resources going to inappropriate nursing home care (and other institutional care) for Class Members, already established as costlier than community-based services. Similarly, neither compliance with the Supreme Court's Olmstead decision, the ADA, and other Federal laws can be achieved or exit from the Colbert Consent Decree be likely, as it is difficult to envision a system that perpetually and successfully identifies and transitions Class Members without a specific plan for diverting them from the system's current front-doors.

Our recommended strategies for diversion include educating nursing home referral sources about existing viable community-based options, investigating the reliability and administration of PASRR screens designed to divert individuals with serious mental illness from nursing homes and increasing oversight for nursing home admissions through more rigorous utilization review and preauthorization processes.

## *Recommendations*

### 10.1 Educate and Engage Nursing Home Referral Sources.

Referral sources in hospitals and other settings are critical allies in nursing home diversion — they determine whether an individual is appropriate for discharge to a nursing home or to a community agency. While our Key Informants indicated that nursing home administrators seem to have robust relationships with referral sources often responding to their request to come to the hospital to interview prospective residents that same day, the same breadth and depth of these relationships did not appear to be the case for Colbert-funded outreach,

*Behavioral Health Policy Collaborative, LLC*

evaluation, and other community-based agency staff. Changing the referral practices of local hospitals and other nursing home referral agencies can occur only when the alternative works as seamlessly as the original process.

We recommend that an active engagement and education process be established and implemented on an ongoing basis so that: (1) referral sources are educated on existing community-based services and the areas in the County served by each of them and (2) discharge to community-based housing and agencies is the more appropriate — and Olmstead compliant — treatment and discharge decision, unless an individual specifically requires nursing home level of care. The training provided under this recommendation should be both in-person and supplemented by brief, written material that clarify criteria for community versus nursing home referrals.

Because referral source may be unaware of community treatment and support options, as part of the above, we recommend IDoA identify the most common Cook County nursing home referral sources (e.g., hospital systems) and examine their knowledge of community resources and beliefs about whether community-based services can address the complex needs of individuals they discharge. Using this data, we recommend that IDoA design the education initiative so referral staff and administrators strengthen their knowledge about availability of diversionary resources and operational strategies (e.g., referral workflows, memoranda of understanding, coordinated care models) that can facilitate strong connections between referral sources and the community-based system.

### 10.2 Conduct Retrospective Examination of PASRR Screens.

Pre-admission Screening and Annual Resident Review (PASRR) is a Federal screening requirement designed to prevent individuals with serious mental illness from being inappropriately assigned to nursing home care. The PASRR program prohibits nursing facilities from admitting any individual with a serious mental illness unless the State Mental Health Authority determines that the individual requires nursing home-level care.[39] PASRR helps determine whether specialized mental health services are needed for nursing home residents. However, fewer than half of nursing home residents with a serious mental illness receives appropriate preadmission screening. In national, state-by-state PASSR ratings, Illinois' use is in the third quartile, with only 26 to 50 percent of Illinois nursing homes implementing and reporting PASSR screening.[40]

While PASSR is designed to ensure that individuals with mental health needs are identified prior to nursing home entry to safeguard them from inappropriate placement, this safeguard is only effective if the screening is accurate and completely objective, as mistakes in administration or interpretation of results can drastically change a person's treatment options and pathways. CMHCs, under contract with DMH, conduct PASRR screens impacting Class Members, as may other organizations funded by other agencies. Yet, these CMHCs are among the same agencies that may become the service provider that determines a Class Member's appropriateness for transition and provides a host of post-transition services. We are concerned this may present actual or perceived conflict of interest and suggest it be reconsidered from that perspective.

During our work, we noted questions and concerns about the accuracy and appropriateness of PASRR implementation. As such, we recommend that IDoA and DMH collaborate to design and conduct a one-year retrospective administrative review of PASRR determinations of individuals in Cook County. We also recommend

---

[39] Linkins et al., (2001).
[40] PASRR Technical Assistance Center. (December, 2015). 2015 PASRR National Report: A Review of Preadmission Screening and Resident Review (PASRR) Programs.

*Behavioral Health Policy Collaborative, LLC*

that the State request technical assistance from the Federal PASSR Technical Assistance Center,[41] which provides training and technical assistance to states to improve the PASSR implementation and more closely mirror its Federal intent.

The review should include clinical assessment of the accuracy of PASRR determinations at its Level 1 and Level 2 stages; appropriateness of PASRR findings for nursing home placement, other institution, or the community (e.g., self-care, family, agency); determination and the rates and proportions for each; comparison of these PASRR administration rates and proportions benchmarked against other Illinois counties, U.S. counties of like size, and national standards; demographic and clinical characteristics associated with Level 1 and Level 2 determinations. This examination's findings should elucidate key themes such as setting-specific trends, provider bias, if any, demographic trends in cohorts, PASRR implementation rates, and other issues that may necessitate prompt correction. The review's results should be considered to form an assessment of the current PASRR administration's overall appropriateness and effectiveness and whether it can be better used to stem the flow of inappropriate nursing home placements as part of its impact on Class Members and the larger population of people with serious mental illness.

Depending upon the review's results, it may be appropriate for the State to consider shifting contracts for PASRR work to independent agencies or organizations that do not have actual or perceived stake in the outcome of each PASRR determination and that can ensure uniform and reliable administration. A strong training protocol should be used for PASRR administrators to ensure reliability, along with a rigorous and regular review and monitoring process in which PASRR data is routinely examined for efficacy and used to identify potential trends of concern.

---

[41] *See* www.pasrrassist.org



*Behavioral Health Policy Collaborative, LLC*

# CONCLUSION

As we approach a decade since the filing of *Colbert v. Williams* and six years since the Consent Decree, the State of Illinois and the many other Colbert stakeholders, including Class Members themselves, have successfully accomplished transitions for more than 1,500 individuals with disabilities from nursing homes to communities.

Colbert stakeholders are facing an acute dichotomy. Many are frustrated by the current pace of transitions. They estimate that it could take almost 10 years for individuals in the current Colbert Class to be moved into communities; not accounting for any new nursing home residents who will grow the Class size. They want the number and pace of transitions to significantly increase. Others see capacity shortages, funding and reimbursement limitations, and overall concern for Class Member safety and well-being -- without adequate community-based services and appropriate and affordable housing -- as hindrances to achieving current transition targets and factors that stymie future significant transition expansion efforts. Both views are valid.

It remains difficult to quantify, assess, and predict the system's capacity for the type and degree of expansion that would be required to transition significantly more Class Members. Under current resources and progress, there are serious concerns as to if the 2017 transition targets will be met, even more so 2018's increased targets. We believe that implementing at least some of the recommendations offered herein will alleviate several bottlenecks in current transition processes.

For example, devising and utilizing a much shorter, yet reliable screening tool, for initial Class Member transition readiness assessment should free-up considerable time and resources, allowing for more Class Members to be evaluated and recommended for transition. Similarly, increasing referrals to housing locators to get them up to current capacity; employing more master leases; establishing relationships with significantly more landlords, especially to bring more accessible rental units online; and using currently budgeted expansion funds to add more essential services (e.g., ACT teams, CST, integrated care, nursing support) to existing providers and to new providers from county government and FQHCs. This should result in transitioning more Class Members into the community within shorter timeframes. Similarly, attending to the significant issues we expect exist with PASSR compliance, educating referral sources about diversion pathways to community versus nursing home care, and actively using managed care tools and techniques (e.g., pre-authorization, risk bearing) should help stem the flow of people away from inappropriate, costly nursing home placements and to community services and housing, thereby relieving some of the pressures that the continuing addition of new Class Members continue to create.

However, in our opinion, the State will not see a successful resolution to the Colbert Consent Decree without significant increases to the upfront investments necessary to build and sustain the range of community-based medical, behavioral health, housing, and other services needed to serve vulnerable Class Members with complex needs and simultaneous interventions to change the inappropriate customs and practices that contribute to inappropriate nursing home and other institutional placements. While financially difficult given the State's budget circumstances, we contend that transitioning significantly more Class Members will require implementation of several of BHPC's recommendations in addition to those mentioned above, including examining and considering increasing Medicaid reimbursement rates, exploring rate exceptions and incentives, and investing more in affordable and accessible housing.

*Behavioral Health Policy Collaborative, LLC*

While considering and devising solutions to these complex issues, it is imperative that the State and others pay careful attention to maintaining a system-wide view. Without such, corrections or fixes to one area or process can result in perverse consequences in other areas. For example, simply forbidding future nursing home referrals/placements without investment and assurance of appropriate diversion alternatives could easily lead to increased institutionalizations in other settings or homelessness for Class Members.

Finally, we acknowledge that the 45 recommendations that BHPC developed and offers herein can seem daunting to those charged with implementing and overseeing the Consent Decree. While we stand behind the importance of each one, we respectfully offer the following "top 10" list of the recommendations we see as requiring priority action. These recommendations are in the order in which they appear and are discussed in the body of the report.

- Appoint a Colbert Task Force (Recommendation 1.1)
- Convene a Data Enterprise Workgroup and Create a Data Enterprise Program (Recommendation 3.1)
- Garner a Formal Savings Reinvestment Commitment (Recommendation 4.1)
- Identify and Act Upon Inappropriate System Incentives and Disincentives (Recommendation 4.3)
- Assess Medicaid Reimbursement Rates and Incentives (Recommendation 4.4) and Augment System Capacity by Quantifying Need and Increasing Funding for Evidence-based Services, Promising Practices, and Supports (Recommendation 6.3)
- Create and Use a Short Screening Tool and Simplify Current Evaluation/Assessment Tool (Recommendation 5.1)
- Establish Outreach and Evaluation Targets (Recommendation 5.3)
- Expand Pool of Colbert Service Providers to Increase Capacity and Integrated Care (Recommendation 6.4)
- Develop Housing-specific Key Performance Indicators and Realign Contractor Targets with Capacity (Recommendation 7.5)
- Increase Special Housing and Accessible Housing Inventory (Recommendation 7.7)

The forthcoming second generation of Colbert will be judged by the successes or failures that result from the commitments, investments, implementation, and outcomes realized under Colbert. As such, the Colbert Court Monitor engaged the Behavioral Health Policy Collaborative to review accessible areas of the system using mutli-pronged approaches. BHPC's findings, observations, and goals and recommendations aim to significantly and meaningfully contribute to the vision inherent in the Colbert Decree and to its success.

Illinois has much work to do, as does the nation, but the commitment to this end is the motivator that will influence both compliance and success; thus, improving the lives of thousands.

*Behavioral Health Policy Collaborative, LLC*