# *Colbert v. Pritzker*

**Case No. 07-C4737 (N.D. Ill.)**

**Court Monitor FY2020 Compliance Assessment
Annual Report to the Court**

**Gail P. Hutchings, MPA**
**Court Monitor**

**February 22, 2021**

# Table of Contents

Executive Summary………………………………………….…………………….……Page ii

Section I: Introduction.…………………………….………….…………………...……Page 1

Section II: Overview of FY2020 Compliance Assessment Findings………………Page 10

Section III: Outreach to *Colbert* Class Members…………………..….….…….…Page 13

Section IV: Assessment of *Colbert* Class Members……………….……....…….…Page 20

Section V: Service Planning for *Colbert* Class Members…...……………..………Page 29

Section VI: Transition Activities to Support Class Members………………….……Page 37

Section VII: Community-Based Services and Housing Development………...…..Page 50

Section VIII: Administrative Requirements……………..........................................Page 60

Section IX: Implementation Planning……………….............................................…Page 72

Section XI: Quality Assurance - Class Member Quality of Life, Safety and Mortality……………………………………………………………………….……...…Page 80

Conclusion……………………………………………..........................................…Page 83

Appendix A: Compliance Assessment Ratings for All *Colbert* Consent Decree and FY2020 Implementation Plan Requirements…………………………..………...Appendix 1

## Executive Summary

This report provides Judge Joan Lefkow, Senior United States District Judge, Northern District of Illinois, and the *Colbert* Consent Decree Parties with the Court Monitor's detailed assessment of the Defendants' fiscal year 2020 (FY2020) compliance performance under *Colbert v. Pritzker* (Case No. 07 4737). Within this report, the Court Monitor endeavors to provide the Court and others with a fair and neutral assessment of the Defendants' performance relative to 159 compliance requirements contained in the *Colbert* Consent Decree and the FY2020 Implementation Plan, as well as the Court Monitor's performance relative to four additional requirements. This is the current Court Monitor's fourth report to the Court under the *Colbert* Consent Decree.

In 2007, a class of Medicaid-eligible adult residents with disabilities in Cook County, Illinois nursing homes, filed suit against the State of Illinois under *Colbert* v. Blagojevich, alleging that the State of Illinois was in violation of Title II of the American with Disabilities Act and Section 504 of the Rehabilitation Act. The suit contended that adults with psychiatric and physical disabilities were being needlessly segregated in institutional settings and denied the opportunity to receive services in more integrated community-based settings. In 2011, the *Colbert* Consent Decree was approved, which specified the State's obligations to afford Class Members the rights to live in the most integrated settings possible, through concerted efforts to transition eligible individuals out of Cook County nursing facilities.

The *Colbert* Consent Decree and Updated Cost Neutral Plan, through 53 unique requirements, lays out the path for the State of Illinois to build a set of approaches to transition individuals out of nursing facilities. These requirements focus on compliance across several interconnected domains, including outreach, assessment, service planning, transitions, community services and housing development, administration, and implementation planning. Further, there are 106 requirements applicable to FY2020 per their inclusion in the Defendants' FY2020 Implementation Plan, which is enforceable under the Decree.

Two major and influential developments occurred during the FY2020 compliance period: the COVID-19 public health crisis and the Defendants' transition to a new service delivery model – the Comprehensive Class Member Transition Program ("Comprehensive Program").

The impact of COVID-19 during the past year has been tragic for *Colbert* Class Members. While data continues to be refined, IDPH reports that as of February 19, 2021, 3,304 Cook County nursing facility residents died due to COVID-19. This represents approximately 34 percent of all fatalities in long-term care statewide due to COVID-19 and 16 percent of all COVID-19 deaths statewide. As the data we provide in the introductory section indicates, those who resided in long-term care facilities – including *Colbert* Class Members - were at substantially higher mortality risk due to COVID-19 than the general population.

In FY2019, the Defendants acknowledged that the extant system for serving Class Members was ineffective, as transition performance under the Decree reached an all-time low with that system requiring a number of hand-offs between layers of service providers resulting in prolonged delays, miscommunications, and otherwise contributing to poor performance (see Figure 1). In response, the Defendants designed a new model that vested the responsibility of the various Consent Decree processes – from outreach in nursing facilities to the provision of post-transition community-based services – into single service provider agency or a consortium of agencies with one lead agency.

The new Comprehensive Program's start-up – originally slated for February 2020 - was significantly derailed by the onset of the COVID-19 public health crisis, continuing through today. For the last quarter of FY2020 and as of the writing of this report, service providers have acutely experienced the impact of COVID-19, resulting in staffing shortages, hindered access to Class Members in nursing facilities and in the community due to social distancing rules, and the urgent need to adapt their service delivery model to telehealth.

These factors, taken together, substantially slowed transition activities and brought the program to a near halt in the last four months of FY2020. This was preceded by eight months of poor performance. If COVID-19 had not occurred, and thus pre-COVID transition performance trends had held constant across all of FY2020, the Defendants would have been on pace to achieve only 31 percent (281 out of 900) of Court required transitions under the *Colbert* Consent Decree. However, given COVID-19's impact on the last four months of the fiscal year, the Defendants achieved only 25 percent (223) of the Court required 900 transitions in FY2020. This compares to a 37 percent transition performance percentage in FY2019 (312 out of 850 required transitions).

Amid slowed and stalled diversions and transitions, the COVID-19 crisis also wreaked havoc on long-term and congregate care facilities, including SMHRFs. IDPH data as of January 1, 2021, reveals that those residing in Illinois long-term care facilities — which are comprised of SMHRFs and Skilled Nursing Facilities — represent only 6.8 percent (65,078) of all COVID-19 cases in Illinois but comprise half (50%, or 8,297) of all deaths due to COVID-19 statewide, placing Class Members at significantly higher mortality risk than the general population. There can be no doubt that the COVID-19 pandemic decimated Consent Decree implementation efforts and directly and severely harmed thousands of Class Members and those who serve them. However, caution should be exercised to recognize that serious flaws with Colbert program processes and performance occurred before the



**Figure 2. Defendants' FY20 Compliance with** *Colbert* **Consent Decree Requirements**
*Total Requirements = 159*

76 (48%)
47 (29%)
36 (23%)

■ In Compliance
■ Partial Compliance
■ Out-of-Compliance

onset of COVID-19 and thus it is not the sole cause of everything that remains amiss with the program. It is incumbent upon the Defendants to continue and even expand their efforts to make program adjustments and find creative solutions to improve their performance under the *Colbert* Consent Decree, including and especially effectuating Class Member transitions.

Figure 2 summarizes the Court Monitor's FY2020 compliance determinations relative to all Colbert Consent Decree requirements, including those of the FY2020 Implementation Plan. Of the 159 distinct requirements applicable to FY2020 (i.e., 53 Consent Decree requirements and 106 Implementation Plan requirements) the Defendants are in compliance with 76 requirements (48%), in partial compliance with 36 (23%), and out-of-compliance 47 (29%).

Throughout this report, the Court Monitor provides compliance assessment ratings for FY2018, FY2019, and FY2020 to allow readers to compare, make judgments, and assess trends relative to three consecutive years of compliance data and performance ratings. Figure 3 provides a comparison of compliance assessment ratings – only for those Consent Decree requirements which remained constant throughout the three years of FY2018, FY2019, and FY2020.

Overall, the data indicates mixed outcomes in terms of the Defendants' overall compliance with program improvement and regression indicated in FY2020 versus the prior two fiscal years.

| Figure 3. Comparison of Compliance Assessment Ratings for *Colbert* Consent Decree Requirements Only: FY2018-FY2020 | | | |
|---|---|---|---|
| *Compliance Rating* | *FY2018* | *FY2019* | *FY2020* |
| **In Compliance** | 26% | 32% | 26% |
| **Partial Compliance** | 24% | 28% | 38% |
| **Out-of-Compliance** | 50% | 40% | 36% |

The Defendants slightly improved in the percentage of in compliance ratings, decreased in the percentage of partial compliance ratings, and increased slightly in the percentage of out-of-compliance ratings from last year, yet it was down from FY2018.

Figure 4 illustrates the FY2020 compliance determinations relative to each domain, aggregated to the number of requirements falling within each compliance category. This report contains a dedicated section for each of the compliance domains listed below and includes the Court Monitor's rationale for each compliance assessment rating.

| Figure 4. Synopsis of FY2020 Compliance Assessments for *Colbert* Consent Decree and Implementation Plan Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Outreach Requirements (15) | In Compliance | 11 | Partial Compliance | 2 | Out-of-Compliance | 2 |
| Evaluation Requirements (21) | In Compliance | 9 | Partial Compliance | 7 | Out-of-Compliance | 5 |
| Service Plan Requirements (20) | In Compliance | 6 | Partial Compliance | 5 | Out-of-Compliance | 9 |
| Transition Requirements (38) | In Compliance | 13 | Partial Compliance | 8 | Out-of-Compliance | 17 |
| Community-Based Services/Housing Requirements (25) | In Compliance | 8 | Partial Compliance | 5 | Out-of-Compliance | 12 |

| Administrative Requirements (27) | In Compliance | 23 | Partial Compliance | 4 | Out-of-Compliance | 0 |
|---|---|---|---|---|---|---|
| Implementation Plan Requirements (13) | In Compliance | 6 | Partial Compliance | 5 | Out-of-Compliance | 2 |
| | | | | | | |
| Total Requirements (159) | In Compliance | 76 | Partial Compliance | 36 | Out-of-Compliance | 47 |
| FY2020 Performance | In Compliance | 48% | Partial Compliance | 23% | Out-of-Compliance | 29% |

The Court Monitor's FY2019 Compliance Assessment Annual Report to the Court identified five major contributors of Defendant's significant non-compliance: the need for a systems transformation initiative to promote a culture of community integration for individuals with disabilities, the lack of research and application of other States' models to comply with and exit *Olmstead* programs, the dearth of a data-driven community-based service and housing plan to inform targeted investments, a lack of knowledge of and remedies to issues that stall or remove Class Members from the transition pipeline, and a paucity of skilled State staff and contractors to operate the program.

In FY2020, the Defendants made some progress toward those areas of weakness yet many of the same issues remained. Positive developments include their design of a capacity development plan for the first time in Consent Decree history that, while it needs to be strengthened, can be built upon to inform systems and service planning. The Defendants also substantially expanded the hospital-based diversion program in late FY2019 and into FY2020, although the expansion has not yielded great benefit in terms of diverted Class Members. Areas that remain weak relative to last year's recommendations include an inadequate staffing array to support effective program planning and implementation of the multi-faceted Consent Decree program. This continued to undermine Defendants' ability to properly oversee providers and hold them accountable for performance. At a systems level, Illinois' community-based mental health system, including crisis response, remains under-developed, under-resourced, risk-averse, often paternalistic and thus stays overly reliant on institutional options.

The writing and filing of this report occur in FY2021 (February 2021). This marks nine and one half years since the approval of the *Colbert* Consent Decree (filed September 2011). It is the Court Monitor's earnest hope that the COVID-19 crisis begins to subside in late FY2021, giving the State the opportunity to restructure and rebuild Consent Decree implementation processes and significantly improve compliance via performance. This must start with examining the design, implementation, and quality assurance of the transition program continuum and will require the Defendants to:

▪ Build on progress to fully staff – via State staff and contractors - the Consent Decree with systems planning, program evaluation, quality improvement, service delivery design, and data analysis experts. Too much responsibility for Consent Decree operations continues to rest on too few individuals, stretching their capacity and undermining the extent and quality operations of the program.

- Influence the culture of Illinois' mental health system by introducing new and innovative approaches and service and housing providers in FY2021 and FY2022. Illinois has a long-standing legacy of institutional and paternalistic philosophies among its healthcare and mental health system stakeholders, including government officials, payers, providers, and community members. These views are amplified and reinforced in a closed and self-contained system, often insulating it from fresh, modern perspectives and approaches from other localities. Illinois should welcome thought leadership and provider capacity in evidence-based models, in areas such as housing first, peer services, long-term care diversion, private landlord engagement, and medication-assisted treatment.

At its most rudimentary level, success relative to the *Colbert* Consent Decree traces back to two principal issues: leadership and accountability. Engendering a cultural shift in a State disability systems is difficult work, especially given the overwhelming reality that Class Members are actually negatively impacted by several broken systems in Illinois, including mental health, addictions, crisis, disability, social service, long-term care, and housing systems. However, the Pritzker administration has an important duty to design and administer systems that support Class Members' self-direction, choice, and ability to live in the community. This report provides specific recommendations for the Defendants' consideration to achieve or enhance compliance, and as such, advance Class Members' civil rights, while facilitating their full participation in, contribution to, and, in fact, enrichment of community life.

Gail P. Hutchings, MPA
Court Monitor, Williams v. Pritzker
February 22, 2021

## Section I. Introduction — Background and Context

This report presents the Court Monitor's assessment ratings and relevant discussions of the Defendants' compliance under *Colbert v. Pritzker* (Case No. 07 C 4737; United States District Court for the Northern District of Illinois – Eastern Division) based on the assessment period of fiscal year (FY) 2020. The report's bases for compliance assessment include the original *Colbert* Consent Decree requirements and *Colbert* Updated Cost Neutral Plan requirements [2018], as well as commitments made by the Defendants via the *Colbert* FY2020 Implementation Plan,[1] which are enforceable as requirements pursuant to the *Colbert* Consent Decree.

The report is issued in fulfillment of the *Colbert* Consent Decree's requirement for the Court Monitor to, "file a written report at least annually with the Court and the Parties regarding compliance with the Decree."[2] The report is designed to, "include the information necessary, in the Monitor's professional judgment, for the Court and Class Counsel to evaluate the Defendants' compliance or non-compliance with the terms of the Decree."[3] Judge Lefkow appointed Gail P. Hutchings, MPA, as Court Monitor for *Colbert v. Rauner* on September 29, 2017[4]; this is her fourth[5] compliance assessment report to the Court under the *Colbert* case.[6]

**Compliance Assessment Period.** The period subject to compliance assessment in this report is July 1, 2019 to June 30, 2020, otherwise referred to as FY2020. Significant developments that occurred prior to or subsequent to that timeframe are mentioned when deemed relevant to readers' understanding of context, trends, and the like.

**Case in Brief.** In 2007, Plaintiffs brought suit in the United States District Court -- Northern District of Illinois, alleging violations of Title II of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act, and the Social Security Act by segregating and institutionalizing people with physical and psychiatric disabilities in Cook County,[7] Illinois nursing facilities and failing to provide opportunities for those individuals to live in integrated community settings. The lawsuit named five Defendants in Illinois State government, including the Governor, Secretary of the Illinois Department

---

[1] *Colbert* FY2020 Implementation Plan. Filed June 28, 2019.

[2] *Colbert v. Quinn*. No. 07 C 4737, United States District Court for the Northern District of Illinois, Eastern Division. Order. Filed December 31, 2011. Pg. 24

[3] *Colbert v. Quinn*. No. 07 C 4737, United States District Court for the Northern District of Illinois, Eastern Division. Order. Filed December 31, 2011. Pg. 25

[4] Judge Lefkow appointed Ms. Hutchings to also serve as Court Monitor for *Williams v. Rauner* (Case No. 05 C4673) on September 29, 2017.

[5] Since its inception and until 2017, the *Colbert* Consent Decree compliance was assessed on a calendar year basis. At the end of calendar year 2017, the Defendants shifted their Consent Decree reporting from a calendar year basis to a State fiscal year basis. This created a six-month gap period between calendar year 2017 (CY2017) and FY2019 (January to June 2018). As such, since her appointment in September of 2017, the Court Monitor has produced the *Court Monitor CY2017 Compliance Assessment Annual Report to the Court,* a special six-month "gap" compliance report (*Court Monitor Compliance Assessment Report to the Court, Compliance Period: January 1, 2018-June 30, 2018), Court Monitor FY2019 Compliance Assessment Annual Report to the Court,* and this report, covering the FY2020 compliance assessment period.

[6] The work and contributions of Jake Bowling, MSW, to the compliance assessment report are gratefully acknowledged.

[7] The *Colbert* Consent Decree includes only those Cook County nursing facilities that are certified by Medicaid.

of Human Services IDHS, Director of the Illinois Department of Public Health (IDPH), Director of the Illinois Department of Aging (IDoA), and Director of the Illinois Department of Healthcare and Family Services (HFS), including any head or any successor to the departments listed herein.

The Defendants did not admit to the alleged violations, and a Consent Decree was ultimately negotiated and agreed upon by the Parties[8] and entered by the Court on December 21, 2011. The lead implementation agency for the *Colbert* Consent Decree was vested with HFS in November 2012, transferred to IDoA in January 2014, and reassigned in phases to IDHS in during FY2019 and FY2020.

The Consent Decree defines *Colbert* Class Members as, "all Medicaid-eligible adults with disabilities, who are being, or may in the future be, unnecessarily confined to Nursing Facilities located in Cook County, Illinois, and who with appropriate supports and services may be able to live in a Community-Based Setting."[9]

The Decree enumerates specific requirements placed on the Defendants, some time-limited and others ongoing, pertaining to activities required by the Consent Decree, which range from outreach, assessments, service plans, and transitions, as well as reporting and other implementation obligations. The Consent Decree also identifies the process to hire a Court Monitor, specifies her duties, grants to her specific powers, and states obligations for compliance with requests relevant to the fulfillment of the Court Monitor's duties. The Consent Decree also names specific instances in which the Class Plaintiffs and the Court Monitor must be involved in processes and empowers the Court to make final determinations on matters that the Parties cannot agree.

Various court orders filed before the end of the FY2020 compliance assessment period that impacted requirements under the *Colbert* Consent Decree have been recorded and include (but are not limited to):

- *Colbert* Consent Decree Order signed by the Honorable Joan H. Lefkow on December 21, 2011;
- Joint motion to appoint Dennis Jones as Court Monitor filed on February 16, 2012;
- Initial Implementation Plan submitted by Defendants on November 8, 2012;
- Order signed by Honorable Joan H. Lefkow to amend the *Colbert* Consent Decree on July 24, 2014;
- Order to substitute Bruce Rauner for Pat Quinn as a named Defendant (Governor) on July 6, 2015;
- Order signed by the Honorable Joan H. Lefkow to amend the *Colbert* Consent Decree on December 1, 2015;
- Order approving the Cost Neutral Plan on November 16, 2016;

---

[8] The original Parties to *Colbert v. Rauner* include Class Counsel (SNR Denton US LLP, Access Living of Metropolitan Chicago, Equip for Equality, Roger Baldwin Foundation of ACLU, Inc., and Law Offices of Stephen Gold); Class Representatives; Court Monitor; and Defendants (Governor, Secretary of IDHS, and Directors from IDPH, IDoA, and HFS).

[9] *Colbert v. Quinn*. No. 07 C 4737, United States District Court for the Northern District of Illinois – Eastern Division. Order filed December 31, 2011. Pg. 2.

- Order signed by the Honorable Joan H. Lefkow approving Gail Hutchings as Court Monitor on September 26, 2017;
- Order approving the Updated Cost Neutral Plan on March 5, 2018; and
- Order to substitute J.B. Pritzker for Bruce Rauner as a named Defendant (Governor), signed on April 10, 2019.

**Major Developments During the FY2020 Compliance Assessment Period — COVID-19 Public Health Crisis and Transition to the Comprehensive Class Member Transition Program.** FY2020 introduced a number of unique and formidable challenges and changes impacting *Colbert* Consent Decree compliance and implementation. This report and its findings should be considered within the context of these circumstances, especially the COVID-19 pandemic and the Defendants' transition to a new service delivery approach.

On March 9, 2020, Governor J.B. Pritzker declared a state of emergency in Illinois, granting him certain emergency powers to address the COVID-19 crisis. According to IDPH, as of February 19, 2021, Illinois had confirmed 1.175 million positive COVID-19 cases and 20,303 deaths due to COVID-19 statewide.[10] Cook County had the highest number of confirmed cases (470,391) and deaths (9,278) out of any county in Illinois. Further, those residing in Illinois long-term care facilities — which include Skilled Nursing Facilities and Specialized Mental Health Rehabilitation Facilities (SMHRFs) - comprised only 16 percent (74,588) of all COVID-19 cases but were nearly half (48%, or 9,689) of all deaths due to COVID-19 statewide.

Finally, in terms of direct impact on *Colbert* Class Members, 24,044 Cook County nursing facility residents were infected with COVID-19 and 3,304 died because of it. Thus, Cook County nursing facility residents represented one in three deaths in long-term care facilities throughout Illinoi and 16 percent of all COVID-19 deaths statewide. This data indicates that those who resided in long-term care facilities were at substantially higher mortality risk due to COVID-19 than the general population.

To understand COVID-19's impact on Class Members and prepare to inform the Court of such, the Court Monitor requested both informally and, by necessity formally, *Colbert* Class Member-specific COVID-19 infection and mortality data, which IDPH ultimately delivered in part in June and November 2020. The data requests were necessary because published IDPH data addresses "Long-Term Care Facility Outbreaks COVID-19"[11] and includes all residents in Cook County facilities, as opposed to "only" Class Members covered under the *Colbert* Consent Decree. The COVID-19 infection count from February to May 2020 was 6,916, with 1,609 COVID-related deaths. For November 2020 only, Cook County nursing facilities saw 1,927 infections and 152 mortalities.

---

[10] IDPH reported an additional 1,526 "probable deaths" due to COVID-19. All data found at dph.illinois.gov/covid19.
[11] Data found at https://www.dph.illinois.gov/covid19/long-term-care-facility-outbreaks-covid-19

In addition to directly affecting Class Member's health, mortality, living conditions, and degree of social engagement, the COVID-19 pandemic also impacted Consent Decree operations from March to June of 2020 (the last four months of FY2020), as well as into FY2021. The new Comprehensive Class Member Transition Program ("Comprehensive Program") had been re-slated to begin in full in March 2020, after at least one month of contracting delays. The Comprehensive Program was designed to consolidate and streamline all major Consent Decree requirements and activities impacting Class Members under "prime" agencies, with the goal of reducing "hand-offs" between outreach entities, evaluators, service providers, and housing locators, and create more seamless workflows, increased coordination, and enhanced accountability.

Unfortunately, the timing for the Comprehensive Program's launch and the COVID-19 crisis' onset were synchronous, compromising the program's ability to effectively initiate and assume full operations. This came after months of very weak transition performance, caused, according to the Defendants, as their service providers responsible for transitions focused on preparing applications to compete for selection and funding under the new Comprehensive Program.

After the Comprehensive Program began in March 2020, prime staff could not conduct in-person outreach, assessment, service planning, or transition activities with Class Members residing in Cook County nursing facilities due to restrictions on non-essential personnel visits to long-term care facilities. Further, for those Class Members who previously transitioned to the community, service providers faced challenges with continuing to provide face-to-face services — as required in many Class Members' service plans — due to COVID-19-related staffing shortages stemming from actual or feared infection, quarantining due to virus exposures, and inadequate supply of the personal protective equipment to conduct safe interactions.

These factors resulted in a virtual halt in transitioning Class Members to the community upon COVID-19's emergence, which continues to today. Essential activities, including outreach, assessments, and transition readiness, also remain halted or severely diminished. However, while COVID-19 significantly impaired Consent Decrees' transition processes and outcomes, pre-COVID transitions and performance were already largely compromised and far below required numbers.

If COVID-19 had not occurred and pre-COVID transition performance trends held constant across all of FY2020, the Defendants would have been on pace to achieve only 31 percent (281 out of 900) of required transitions under the *Colbert* Consent Decree. However, given COVID-19's impact on the last four months of the fiscal year, the Defendants achieved only 25 percent (223) of required transitions in FY2020. Even in the former scenario with no occurrence of COVID-19, Defendants' transition performance was on pace to drop by five percent from the previous fiscal year, adding to a troubling multiyear decline.[12] With COVID-19, the impact was a 12 percent decline in transition performance between FY2019 and FY2020.

---

[12] The number of required transitions increased between FY2019 and FY2020, from 850 to 900.

In response to these and other challenges and impediments presented by COVID-19, the Defendants are credited with implementing several measures to adapt and attempt continuation with Consent Decree operations during the pandemic. These included: launching a telehealth pilot to prompt access to Class Members in nursing facilities, implementing weekly check-in/wellness calls conducted by State staff to Class Members already transitioned to the community, and creating standards for the engagement frequency of Class Members living in the community based on acuity and assigned level of care. They also convened a new workgroup to explore reinventing transition processes in the COVID-19 context.

Throughout the COVID-19 crisis, the Court Monitor remained in close communication with the Parties, providing recommendations for how best to adapt service delivery — ranging from designating prime service providers' agency staff as essential workers to enable direct interaction with Class Members, reduce their isolation, and redefine meaningful access in the COVID era. In this report, the Court Monitor endeavors to provide pragmatic priority recommendations that the Parties can plan and/or implement, acknowledging that COVID-19's impact will likely consume most, if not all of FY2021, as well.

***Colbert* Class Size: 2011-2020.** Determination of the *Colbert* Member Class's total size often entails counting two subgroups: those residing in Cook County nursing facilities and those who transitioned out of facilities under Consent Decree into community-based housing and services. As of the end of the FY2020 compliance assessment period — and since the *Colbert* Consent Decree's inception — the State transitioned a total of 2,640 Class Members.[13] Figure 4 provides data on Cook County nursing facilities' total census by year from 2012[14] to 2020. Due to Defendants' inability to determine the actual number of Class Members, the nursing facility resident census has been used as the proxy figure representing the *Colbert* Class size. At the beginning of this compliance period, HFS data indicated a Cook County nursing facility census of 20,740 residents.

As indicated in footnote 5, the *Colbert* Consent Decree compliance was assessed on a calendar year basis between its inception in 2012 to CY2017; to that end, years 2012 to 2017 refer to calendar years in Figure 4. Year 2018 in Figure 4 refers to the six-month gap period (January to June 2018) that was created as the Defendants shifted Consent Decree reporting from a calendar year to a fiscal year basis. Finally, FY2019 and FY2020 in Figure 4 refers to fiscal years.

---

[13] Data provided by IDoA.
[14] According to HFS, while Consent Decree implementation began in 2011, 2013 is the earliest period with available census data.

| Figure 4. *Colbert* Class Size: CY2013-FY2020 Cook County Nursing Facility Census & Number and Percentage of Class Members Transitioned by Year | | | | | |
|---|---|---|---|---|---|
| Year[15] | Cook County Nursing Facility (NF) Census | Year-to-Year Change % (NF Census Only) | Cumulative Average Change % 2013-2020 | Annual # of Transitioned Class Members | % of Transitioned Class Members based on Total Class Size |
| CY2012 | *Data not available* | | | | |
| CY2013 | 21,355 | *(baseline)* | | 111 | 0.5% |
| CY2014 | 20,846 | -2.4 | -2.4 | 464 | 2.2% |
| CY2015 | 20,220 | -3.0 | -5.4 | 537 | 2.7% |
| CY2016 | 20,761 | +2.6 | -2.8 | 384 | 1.8% |
| CY2017 | 20,691 | -0.3 | -3.1 | 428 | 2.1% |
| CY2018[16] | 20,618 | -0.3 | -3.4 | 181 | N/A |
| FY2019 | 20,725 | +0.5 | -2.9 | 312 | 1.5% |
| FY2020 | 20,740 | +0.1 | -2.8 | 223 | 1.1% |

**Cook County Nursing Facility Resident Census Trends Analysis.** One can examine the census data of Cook County nursing facility residents on Medicaid to determine the trends within set timeframes as an indication of the State's progress toward overall long-term care systems rebalancing that moves away from institutional care toward community-based care. Based on HFS' reported data in Figure 4, between 2012 and 2020, the total Medicaid resident census of Cook County nursing facilities declined by 615 residents, representing a decrease of 2.8%. During the same timeframe, the annual number of Class Members transitioned to community living as a percentage of the portion of the Class size comprised by Class Members in nursing facilities ranged from 0.5% to 2.7%.[17]

One potential cause for the Cook County nursing facility census' slow, slight downward trend is an uncontrolled system front door issue, specifically as it relates to the inappropriate admission of people with serious mental illness into nursing facilities, people who could have lived in the community with appropriate supports. Because the *Colbert* Class is defined in the Consent Decree as "Medicaid eligible adults with disabilities who are being *or may in the future be* [emphasis added], unnecessarily confined to nursing facilities located in Cook County, Illinois, and who with appropriate supports and services may be able to live in a Community Based Setting," it is the Defendants' obligation to institute the needed processes to avoid inappropriate nursing facility placements.

This includes renewed attention and action related to fixing the State's long broken Pre-Admission Screening and Resident Review (PASRR) system, strengthening long-term care diversion efforts in psychiatric units and emergency departments within acute care

---

[15] The census total is calculated the day before the period begins (e.g., 2017 figure was calculated on 12/31/2016). Years 2012 to 2018 operated on a calendar year basis, while 2019 operated on a fiscal year basis.

[16] This period reflects the 6-month "gap" period between CY2017 and FY2019, as the Defendants transitioned their compliance assessment period from a calendar year to a fiscal year basis.

[17] In their review of the *Williams* annual report, the Department of Healthcare and Family Services (HFS) indicated that this trends analysis does not consider other factors – such as Medicaid expansion – that "meaningfully changed the denominator of the number of individuals that might receive care in a SMHRF." It is unclear whether they would make a similar argument as it relates to Cook County nursing facilities. HFS did not provide data on the impact of Medicaid expansion on SMHRF census.

hospitals, ensuring much stricter involvement of Medicaid Managed Care Organizations (MCOs) in preauthorization decisions about hospital discharge setting placements, and aligning financial incentives and disincentives.[18] In FY2021, the Defendants made progress toward PASRR reform, developing specifications for a new PASRR program, in collaboration with the Court Monitor and Parties and releasing a request for proposals to potential bidders. The Court Monitor continues to emphasize the importance of effective long-term care screening and review tools, as they are consistent with the best practices of high-quality health and mental health systems, as well as an integral — and required — strategy to help Defendants comply with and eventually exit the Decree.

| Figure 5. Class Member Transitions: CY2013-FY2020 | | | |
|---|---|---|---|
| Year | # Transitions Required by CY/FY[19] | # Actual Transitions by CY/FY | Performance % |
| CY2013 | 300 | 114 | 38% |
| CY2014 | 500 | 464 | 93% |
| CY2015 | 300 | 537 | 179%[20] |
| CY2016 | 504 | 383 | 76% |
| CY2017 | 550 | 428 | 78% |
| Jan-June 2018 | 300 | 181 | 60% |
| FY2019 | 850 | 312 | 37% |
| FY2020 | 900 | 223 | 25% |

**Number of Transitions by Year: Required vs. Achieved.** Figure 5 depicts the number of Court-required Class Member transitions from Cook County nursing facilities to community-based settings versus the transitions achieved each year since the Consent Decree's implementation's beginning.[21] Between CY2013 and FY2020, 2,640 Class Members were transitioned, with the Defendants meeting or exceeding transition requirements, as had been amended, in only one year (CY2015) out of the seven full years of *Colbert* implementation for which data was supplied. For this report's compliance assessment period, FY2020, the Defendants transitioned only 223 Class Members out of the required 900, resulting in a performance rate of only 25 percent. This is the lowest transition performance outcome in the history of the *Colbert* Consent Decree.

*Colbert* **Program Budgeted vs. Actual Expenditures.** In FY2020, the *Colbert* program was allocated a $39 million budget to cover staff costs, contractors (e.g., organizations that provide outreach, assessment, and transition services), assessment and quality improvement support, and other key program activities. Notably, this budget does not include costs for mainstream resources (e.g., Medicaid spending/ reimbursement, primary healthcare, and housing services developed or paid for outside of Consent Decree implementation activities) that — while available to and used by some *Colbert* Class Members — were not exclusively developed or designated for them.

---

[18] More detail on the rationale and implementation of these diversion-related strategies can be found in the *Williams v. Pritzker Court Monitor FY2020 Compliance Assessment Annual Report to the Court.*
[19] The number of required Class Member transitions has historically not been based upon the entire calendar year, but instead on six-month allotments and other timeframes. Data on the number of transitions required has been segmented by calendar year.
[20] During this period, the Defendants significantly exceeded the amended numeric transition requirement by 237 Class Members; it is important to note, however, that this number includes the 225 Class Members who were not transitioned in 2013 and 2014 (per amended transition requirements), plus the 300 Class Members required in 2015 (and an additional 14 Class Members beyond the requirement).
[21] Data provided by IDoA.

The Defendants' fiscal and performance data indicates that while their performance on transition and other requirements hit historical lows, they allowed, year-after-year, significant budgeted and allocated resources to lapse that should have supported compliance in a number of areas, ranging from investing in the development of additional community-based provider and housing capacity, to hiring state staff or contractors to provide operational and quality assurance support to Consent Decree planning and operations, or to improving their data enterprise system.

As shown in Figure 6, across the past three fiscal years, despite poor and decreasing transition performance, the Defendants left $25.9 million in unspent appropriations that then lapsed back into the State treasury. Again, this continued to occur despite Defendants' poor and declining performance during those years.

| Figure 6. Fiscal Year Budget Allocations, Actual Expenditures, Lapsed Appropriations (FY2018-FY2020)[22] and Concurrent Transition Performance | | | | |
|---|---|---|---|---|
| Fiscal Year | Budget Allocation | Spent Funds | Lapsed Appropriation | Transition Performance % |
| FY2018 | $34.3 million | $22.2 million | $12.1 million | 60%[23] |
| FY2019 | $34.3 million | $30.5 million | $3.8 million | 37% |
| FY2020 | $39 million | $29 million | $10 million | 25% |
| *Total Lapsed Appropriation FY2018-FY2020* | | | **$25.9 million** | |

For FY2020, the Defendants' committed to the Parties, the Court Monitor, and the Court that no budgeted and allocated funds would lapse by the end of the fiscal year, but nearly ten million dollars ultimately did. While some of FY2020 lapsed appropriation can be attributed to the impact of COVID-19 on slowing down Class Member outreach, assessments, and transitions, the Court Monitor contends that significant underspending occurred in the first three quarters of the fiscal year, before the COVID-19's onset; thus, significant lapse would have still occurred. Despite her repeated requests, IDHS has not provided quarter-by-quarter FY2020 spending data as of this report's writing.

**Compliance Assessment Approach.** The Court Monitor endeavored to use a straightforward and transparent approach to plan and carry out compliance assessment under *Colbert* for FY2020. Consistent with the FY2018 and FY2019 compliance assessment approach, the Court Monitor informed the Parties that compliance assessment would be conducted for each required element in the original Consent Decree and Updated Cost Neutral Plan, as well as for each requirement pursuant to the *Colbert* FY2020 Implementation Plan. The stated expectation was that the Defendants would demonstrate compliance under each contemporary requirement with data (in all possible circumstances) and relevant information that provides context for a fair and neutral compliance assessment.

In October 2020, the Defendants submitted a combined semiannual report covering the entire prior fiscal year. The Court Monitor conducted an analysis of required versus submitted information needed to assess compliance and provided the Defendants with

---

[22] Fiscal data for FY2019 and FY2020 was provided by DMH on November 2, 2020. FY2018 data provided for previous compliance assessment report.
[23] See Footnote 15.

additional opportunities to submit missing data and information. Despite some data gaps due to data collection and analysis limitations posed by the COVID-19 crisis, the report included most of the information required for the Court Monitor to assess compliance.

**Compliance Assessment Report Development Process.** The Court Monitor and her staff relied upon a variety of information and data sources in developing this report, including information provided by the Parties during monthly alternating Small and Large Parties Meetings and other ad hoc meetings; court status hearings; semiannual compliance reports; *Colbert* Implementation Plans and Amendments; various reports and documents issued by the State and its contractors; other data and information reported by the State; and Illinois State statutes, policies, and administrative rules. The Court Monitor did not audit or otherwise independently verify data provided by the State or other sources.

To ensure the report's data and other factual content accuracy, the Court Monitor shared a draft of the report with the Defendants and Plaintiffs on February 9, 2021, affording them an opportunity to identify factual errors or omissions. In their responses, the Defendants via the Department of Human Services questioned performance assessment ratings on four requirements and HFS requested that the Court Monitor reference FY2021 work on several requirements that were found out-of-compliance in this FY2020 report. Plaintiffs Counsels' response did not identify any factual errors or omissions.

The Court Monitor closely considered each of the Defendants' objections and as a result raised one of the four ratings they questioned. For the remaining three compliance assessment ratings, disagreements between the Court Monitor and Defendants are indicated in footnotes in the relevant sections of the text. Context regarding HFS compliance actions that occurred in FY2021 was added in three places.

## Section II. Overview of FY2020 Compliance Assessment Findings

The *Colbert* Consent Decree and FY2020 Implementation Plan contain 159 specific numeric-, process-, and quality-related requirements of the Defendants that focus on designing, developing, and implementing a program that facilitates and operationalizes opportunities for eligible Class Members to re-enter the community after residing in Cook County nursing facilities.

These requirements span seven domains of the Defendants' obligations pursuant to the *Colbert* Consent Decree, including outreach, assessment, service planning, transition support, expansion or development of community-based housing and services, implementation planning, and administrative support. Two additional Consent Decree requirements focus on Court Monitor duties and the Parties and Court Monitor's involvement in various planning and reporting aspects.

This report's following four sections address the individual domains of outreach, assessment, service planning, and transition support, respectively, and reflect the step-by-step sequence by which a Class Member might interface with *Colbert* program processes (Figure 7). Following these four report sections, three subsequent ones focus on the Defendants' compliance in the domains involving expansion of community-based services and housing, implementation planning, and administration and reporting.

**Figure 7. Sequence of Basic *Colbert* Processes by Domain**



Within each domain, its specific requirements, as dictated by the Consent Decree and FY2020 Implementation Plan, are listed sequentially as they align with the process itself; thus, they may not reflect the order of the compliance requirement(s) as they appeared in source documents (i.e., Consent Decree, Implementation Plan). Finally, the Court Monitor did not seek to assess and report compliance on duplicated requirements, which likely worked to benefit the Defendants. The individual compliance domains illustrated in Figure 8 include the subsequent elements of their dedicated sections, which include:

1. A description of how the domain relates to overall Consent Decree compliance.
2. A compliance assessment ratings grid that depicts the Court Monitor's assessment of whether the Defendants (or others, when relevant) achieved compliance with

specific requirements associated with that domain during the FY2020 assessment period. Each compliance criterion correlates to the Consent Decree or Implementation Plan. The grid also includes FY2018 and FY2019 ratings for comparison and an indication (using an "X") of compliance mandates that have remained out-of-compliance across the past three fiscal years.

3. Relevant data and information used by the Court Monitor to reach the compliance determination and assessment rating, with additional narrative and analysis.

4. Recommendations offered by the Court Monitor for consideration on actions and/or activities intended to help the Defendants achieve or strengthen compliance with any specific domain's requirements and increase transitions.

For this report's purposes, one of three compliance assessment determinations (i.e., in compliance, partial compliance, out-of-compliance) was assigned to each requirement applicable to the FY2020 compliance assessment period. Consent Decree language or provisions that do not apply to the reporting period, reflect Court Monitor or Class Counsel obligations, or represent repeat language are coded as such. Figure 8 displays the compliance assessment determination categories used by the Court Monitor and their definition of use.

| Figure 8. Court Monitor Compliance Assessment Rating Categories and Definitions | | |
|---|---|---|
| Compliance Assessment Rating Category | Definition | Legend |
| In Compliance | The Defendants' performance[43] was substantially in accordance with the criterion, requirement, or obligation. | Green |
| Partial Compliance | The Defendants met some aspects, but not other aspects, of the criterion, requirement, or obligation. For numeric requirements, the Court Monitor generally assigned this rating in instances where the Defendants achieved more than 50 percent compliance balanced with whether the Defendants had a system or process in place relative to the specific requirement. | Yellow |
| Out-of-Compliance | The Defendants either failed to comply with the requirement or failed to demonstrate compliance with the standard. In instances in which the Defendants have been on notice for multiple years of partial compliance and have taken no or too few steps to come into compliance, those ratings may have shifted to out-of-compliance. An "X" was added to indicate requirements that have been out-of-compliance for all three of the most recent fiscal years (FY2018-FY2020). | Red |
| Other Categories | | |
| N/A | The Defendants were not required to demonstrate compliance, as the requirement is applicable only before or after the FY2020 assessment period. | |
| Court Monitor Requirement | Requirements reflect the Court Monitor's obligations. | |
| Duplicate Requirement | Requirements have already been represented and rated (either separately or with other requirements) and double counting would skew the overall compliance determination; in some cases, these requirements represent a Consent Decree section's overall purpose. | |



**Figure 9. Defendants' FY20 Compliance with *Colbert* Consent Decree Requirements**
*Total Requirements = 159*

- 76 (48%)
- 47 (29%)
- 36 (23%)

- 🟩 In Compliance
- 🟨 Partial Compliance
- 🟥 Out-of-Compliance

Some requirements under the *Colbert* Consent Decree are clearly numeric/quantitative in nature (e.g., number of required Class Member transitions), while others require the Court Monitor's assessment and compliance determination on professional judgment using the best available data. In all circumstances, data and information are provided, with source citation, to support or justify the compliance assessment determinations. Figure 9 shows that among the 159 distinct requirements applicable to FY2020, the Defendants were assessed to be in compliance with 76 requirements (48%), in partial compliance with 36 requirements (23%), and out-of-compliance with 47 requirements (29%).

Below is a snapshot from the full set of requirements from the Consent Decree and FY2020 Implementation Plan, the entirety of which is found in Appendix A. The appendix provides the Court Monitor's FY2020 compliance assessment rating for each compliance requirement, compared with the compliance ratings from the previous compliance periods. The requirements, compliance assessment ratings, and relevant discussions for each domain are found in the sections to follow.

**Appendix A**
Compliance Assessment Ratings for All *Colbert* Consent Decree and FY2018 Implementation Plan Requirements

| | | | CY2018-FY2020 Compliance Assessment Ratings for ALL *Colbert* Consent Decree, Updated Cost Neutral Plan, and Implementation Plan (IP) Requirements | | |
|---|---|---|---|---|---|
| Req # | Source/ Citation | ***Colbert* Consent Decree, Updated Cost Neutral Plan, or IP Requirement Language** | Court Monitor Compliance Assessment Ratings | | |
| | | | First-Half CY2018 | FY2019 | FY2020 |
| **Compliance Domain: Outreach-Related Requirements** | | | | | |
| 1 | Consent Decree Section VII | Defendants shall ensure that Class Members receive complete and accurate information regarding rights to live in Community-Based Settings and/or receive Community-Based Services, Transition Costs, Home Accessibility Adaptation Costs and/or Housing Assistance, and the available options/opportunities for doing so. | **Partial Compliance** | **Partial Compliance** | **Out-of-Compliance** |
| 2a | *Cost Neutral Plan (2016) Section A* | *By November 10, 2016, Defendants shall create a list of all Class Members living in Nursing Facilities as of September 30, 2016 and shall update that list at least annually during the life of the Decree during the time period the Consent Decree, as amended and supplemented, and the Cost Neutral Plan is in effect.* | **N/A** | **N/A** | **N/A** |

## Section III: Outreach to *Colbert* Class Members

The *Colbert* Consent Decree requires the Defendants to design and implement an outreach program that reaches each Class Member in Cook County nursing facilities to allow a Class Member to consider transitioning to the community. The *Colbert* outreach policy aims to reach every Class Member at least twice per year. Therefore, the outreach program envisioned by the Decree would inform Class Members of their rights for assessment and transition into the community; identify the types of services, supports, and housing that can help them successfully transition to and live in the community; and connect them to assessors, if Class Members express interest in the program.

Outreach is a critical phase in the *Colbert* continuum as it introduces Class Members — a population that often has deep concerns about their self-efficacy and ability to live independently — to the *Colbert* program and raises their consciousness of their rights to live in the least restrictive setting appropriate to their needs, including, for many, the community. A proficient outreach process provides individuals with low-pressure opportunities to receive information regarding the program; deploys frequent structured contact to share information, build trust, and unearth motivation; uses evidence-based assertive engagement and motivational interviewing principles to explore or build readiness among those who may have ambivalence or fear; and always respects Class Member decisions, choices and boundaries.

From July 2019 to February 2020, the *Colbert* program continued employing nine outreach provider organizations, each assigned to specific nursing facilities. In addition, the two *Colbert* Managed Care Organizations (MCOs) responsible for assessment — IlliniCare and Aetna — engaged Class Members who self-referred to the program. Starting in February 2020, the Defendants implemented a new Comprehensive Class Member Transition Program ("Comprehensive Program"), engaging nine new service delivery and housing locator organizations to serve as "prime agencies." As designed under the new program, prime agencies are responsible for a streamlined and coordinated approach to supplying transition-related services — including outreach, assessment, service planning, support to transition into community-based housing and services.

During the first eight months of FY2020, outreach staff distributed promotional *Colbert* program materials and conducted private interviews with Class Members who expressed interest in transitioning to the community, providing them with information on their rights and responsibilities under the Decree. A team of peer mentors — comprised of hired staff with mental health diagnoses similar to some Class Members' and who have successfully transitioned from institutional to community living — also supported outreach efforts by completing 941 contacts[24] to Class Members from July 2019 to January 2020.

---

[24] Despite instructions for peer mentors to provide data on the unduplicated number of Class Members they engaged, the Defendants indicated in their semiannual report that this data, "appears to be duplicated."

There are four *Colbert* Consent Decree and Updated Cost Neutral Plan outreach requirements that apply to FY2020. These requirements obligate the Defendants to ensure that Class Members receive accurate and comprehensive information about their rights to live in the community, as well as to provide detailed information on the types of community-based services and housing that will be availed to them if they elect to transition. Further, the Defendants are required to create a list of Class Members who are in Cook County nursing facilities and eligible for annual outreach. They must also design an outreach program sufficient to achieve the number of Court required transitions and bear the full cost of such a program.

In addition to these four requirements, the Defendants were required, pursuant to their FY2020 Implementation Plan, to develop a new outreach frequency protocol, improve documentation and reporting, strengthen training, expand the number of available peer mentors, hold workshops with nursing facility administrators, increase reporting on instances of retaliation toward Class Members who engage in outreach, among other key activities.

**Outreach-Related Requirements: FY2020 Compliance Assessments**
As displayed in Figure 10, of the 15 outreach-related requirements (four in the Consent Decree and 11 in the FY2020 Implementation Plan), the Defendants were found in compliance with 11 outreach requirements, in partial compliance for two, and out-of-compliance for two.

| Figure 10. Synopsis of FY2020 Compliance Assessments for Outreach-Related *Colbert* Consent Decree and Implementation Plan Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (4) | In Compliance➜ | 2 | Partial Compliance➜ | 1 | Out-of-Compliance➜ | 1 |
| Implementation Plan Requirements (11) | In Compliance➜ | 9 | Partial Compliance➜ | 1 | Out-of-Compliance➜ | 1 |
| Total Requirements (15) | In Compliance➜ | 11 | Partial Compliance➜ | 2 | Out-of-Compliance➜ | 2 |

Figure 11 contains the language for each outreach-related requirement in the *Colbert* Consent Decree and Implementation Plan, along with the Court Monitor's compliance ratings. It also contains FY2018 and FY2019 ratings to demonstrate whether compliance improved or worsened since the last assessment period; for the four requirements applicable to all three periods, performance on one requirement worsened.

| Req # | Source/ Citation | *Colbert* Consent Decree, Updated Cost Neutral Plan, or IP Requirement Language | Court Monitor Compliance Assessment Ratings | | |
|---|---|---|---|---|---|
| | | | First-Half CY2018 | FY2019 | FY2020 |

**Figure 11. CY2018-FY2020 Compliance Assessment Ratings for Outreach Related to *Colbert* Consent Decree, Updated Cost Neutral Plan, and Implementation Plan (IP) Requirements**

| Req # | Source/ Citation | *Colbert* Consent Decree, Updated Cost Neutral Plan, or IP Requirement Language | First-Half CY2018 | FY2019 | FY2020 |
|---|---|---|---|---|---|
| **Compliance Domain: Outreach-Related Requirements** | | | | | |
| 1 | Consent Decree Section VII | Defendants shall ensure that Class Members receive complete and accurate information regarding rights to live in Community-Based Settings and/or receive Community-Based Services, Transition Costs, Home Accessibility Adaptation Costs and/or Housing Assistance, and the available options/opportunities for doing so. | Partial Compliance | Partial Compliance | Out-of-Compliance |
| 2a | *Cost Neutral Plan (2016) Section A* | *By November 10, 2016, Defendants shall create a list of all Class Members living in Nursing Facilities as of September 30, 2016 and shall update that list at least annually during the life of the Decree during the time period the Consent Decree, as amended and supplemented, and the Cost Neutral Plan is in effect.* | N/A | N/A | N/A |
| 2b | Updated Cost Neutral Plan (2018) Section A | By April 15, 2018, Defendants shall create a list of all Class Members living in Nursing Facilities as of December 31, 2017 and shall update that list at least annually during the life of the Decree during the time period the Consent Decree, as amended and supplemented, and the Cost Neutral Plan is in effect. | In Compliance | In Compliance | In Compliance |
| 3a | *Cost Neutral Plan (2016) Section B* | *Defendants shall create and perform the outreach activities required to comply with the requirements of this Plan and the Consent Decree to achieve the transitions required. Defendants will inform all Class Members of their rights under the Consent Decree and this Plan. Details of the Defendants' specific outreach activities shall be contained in the Implementation Plan to be developed and outlined in paragraph H.* | N/A | N/A | N/A |
| 3b | Updated Cost Neutral Plan (2018) Section B | Defendants shall create and perform the outreach activities required to comply with the requirements of this Plan and the Consent Decree to achieve the transitions required. | Partial Compliance | Partial Compliance | Partial Compliance |
| 4 | Consent Decree Section VII | All costs for outreach shall be borne by Defendants. | In Compliance | In Compliance | In Compliance |
| O-1 | FY2020 Implementation Plan | Develop written outreach frequency protocol.<br><br>*This was completed and provided during the quarterly outreach meeting on 10/10/19, two months after the due date.* | N/A | N/A | In Compliance |
| O-2 | FY2020 Implementation Plan | Develop and communicate outreach-related quality indicators.<br><br>*This was completed and announced to providers during the 10/10/19 quarterly outreach meeting.* | N/A | N/A | In Compliance |

| | | | | | |
|---|---|---|---|---|---|
| O-3 | FY2020 Implementation Plan | Develop new outreach tracking system.<br><br>*The Defendants incorporated new outreach metrics and developed a new outreach tracking system for the Comprehensive Program.* | **N/A** | **N/A** | **In Compliance** |
| O-4 | FY2020 Implementation Plan | Develop and implement outreach training.<br><br>*The Defendants did not complete this training by the due date of 10/31/19 due to the transition to the Comprehensive Program. New outreach training, however, was included in the Comprehensive Program.* | **N/A** | **N/A** | **In Compliance** |
| O-5 | FY2020 Implementation Plan | Meet with Division of Rehabilitation Services (DRS) to cross-pollenate with existing programs and approaches.<br><br>*The Defendants reported that this was completed by 8/1/19 and that a cross-agency dialogue on best practices is ongoing.* | **N/A** | **N/A** | **In Compliance** |
| O-6 | FY2020 Implementation Plan | Expand peer mentor program.<br><br>*This did not occur by the due date of 8/1/19 but the expansion of peer services was incorporated into the Comprehensive Program.* | **N/A** | **N/A** | **In Compliance** |
| O-7 | FY2020 Implementation Plan | Strengthen marketing campaign.<br><br>*This did not occur by the due date of 9/30/19 but new marketing materials were developed as part of the Comprehensive Program.* | **N/A** | **N/A** | **In Compliance** |
| O-8 | FY2020 Implementation Plan | Update outreach materials to reflect shift in administration to Department of Human Services.<br><br>*This did not occur by the due date of 9/30/19, but the Comprehensive Program updated materials to reflect the change in agency oversight.* | **N/A** | **N/A** | **In Compliance** |
| O-9 | FY2020 Implementation Plan | Facilitate workshops for nursing facility and Consent Decree staff.<br><br>*The first workshop was held on 9/4/18 and the second was held on 9/9/19 (via participation of nursing facility staff in the Provider Summit).* | **N/A** | **N/A** | **In Compliance** |
| O-10 | FY2020 Implementation Plan | Convene monthly meetings with IDPH on regulatory impediments and remediation strategies.<br><br>*The Defendants reported that meetings were held for portions of FY2020 but some were canceled.* | **N/A** | **N/A** | **Partial Compliance** |
| O-11 | FY2020 Implementation Plan | Develop a system to track and report on allegations and findings associated with retaliation.<br><br>*This was not completed in FY2020.* | **N/A** | **N/A** | **Out-of-Compliance** |

Two FY2020 developments significantly hampered the Defendants' outreach performance: their transition from the legacy Consent Decree program to the new Comprehensive Program and the COVID-19 public health crisis. According to the Defendants, current providers applying to participate in the Comprehensive Program turned their efforts away from their contract obligations in Consent Decree program operations, including outreach, toward the preparation of their competitive applications for the new program, compromising their performance and outcomes. Also, after Comprehensive Program agencies were awarded, "hand offs" of Class Members between previous and new provider agencies did not go smoothly; providers recently reported that critical information, like Class Member medical records and information on where specific Class Members were in the outreach-to-transition pipeline, was often not provided by legacy agencies promptly and accurately to the new prime agency responsible. Finally, the COVID-19 crisis thwarted outreach activities because in-person outreach services in nursing facilities were banned in March 2020 (and continuing to be as of the writing of this report).

<u>Out-of-Compliance: Requirement 1, Delivery of Complete and Accurate Information During Outreach.</u> The Consent Decree requires that the Defendants supply complete and accurate information to Class Members during their outreach process. In FY2020, Defendants identified 16,148 unique Class Members for outreach, which is a significant proportion (78%) of the Class Members that were living in nursing facilities at the beginning of FY2020 (20,740). Of those identified, it appears outreach workers attempted to engage 13,710 Class Members in outreach. While this shows that a significant proportion of Class Members were engaged in outreach, the data does not show that each Class Member received his or her required two outreach attempts in the year or that the attempts included all necessary outreach activities.

Among the Class Members who received outreach attempts (13,710), the Defendants did not proceed with engaging a significant number of Class Members who did not speak English, were described as having communications-related deficits, or were suspected to have Dementia. Defendants reported that 299 Class Members were excluded from outreach due to "language barriers" (e.g., Class Members whose spoken language was Korean, Polish, Spanish, or "other"); 660 because of some type of communications deficits; and 3,355 due to suspected Dementia or other cognitive barriers. Collectively, this represents 4,314 Class Members disqualified from outreach, or 31 percent of those identified in FY2020 for outreach.

These exclusions occurred despite the Consent Decree's specific requirement that an independent physician — unaffiliated with nursing facilities — must confirm or refute Dementia diagnoses to permanently disqualify Class Members from assessment and, if appropriate, transition. Of note, despite the Court Monitor's urging that the Defendants comply with this requirement, after eight years of Consent Decree implementation, they have yet to do so.

Further, at end of FY2020, the Defendants were 21 months behind a requirement to implement new processes for interpreter services and communications aides and tools to engage all Class Members. It remains unacceptable to disqualify Class Members from transitioning because of their cultural and linguistic characteristics and preferences, communications challenges, or untested perceptions of cognitive challenges. Thus, the Defendants are found out-of-compliance for this requirement. The rating places the Defendants out-of-compliance with this for at least three consecutive past years.

In Compliance: Requirement 2, Creating of Class Member Outreach List. In FY2020, the Defendants continued to comply with the requirement to develop a list of Class Members in nursing facilities to guide targeted outreach efforts for the first three months of the fiscal year. They exceeded this requirement by generating a quarterly list of residents in Cook County nursing facilities on Medicaid and thus are eligible for outreach. After the onset of the Comprehensive Program, prime agencies were assigned specific nursing facilities and continued to use census lists to drive outreach to Class Members.

Partial Compliance: Requirement 3, Outreach Program Sufficient to Achieve Transitions. The Defendants' outreach policy requires outreach to every Class Member in a Cook County nursing facility at least twice a year. As indicated above, it is unclear how many outreach contacts occurred for each Class Member or the quality of that outreach, but the Defendants attempted outreach with 78 percent of those identified for outreach. Further, peer mentors — another outreach-related resource — contacted 941 Class Members in facilities, after a significant expansion of that program in FY2020.

Despite the gap in data on the number of outreach contacts per Class Member, they have a credible outreach penetration rate. However, after the outreach attempt, the Defendants have meager engagement rates relate to Class Member willingness to participate in assessments. As indicated above, there were 16,148 Class Members identified for outreach and 13,710 to which outreach attempts were made. Of the 13,710, 2,478 Class Members were excluded as they were already discharged at the time of outreach, deceased, unable to locate, or already in transition. An additional 4,314 were deemed "unable to engage" due to communication-related issues, including linguistic barriers and cognitive issues. Another 1,244 Class Members previously received outreach from another agency or were not on Medicaid. This left approximately half of all those identified for outreach who were actually engaged. Among those, only 2,332 (14%) agreed to assessment. This percentage is dramatically lower than in prior years and must be assessed as to why.

In Compliance: Requirement 4, Bearing All Outreach Costs. The Defendants continued to bear all outreach-related costs, earning an in compliance rating.

**Court Monitor Recommendations for Achieving or Enhancing Compliance with Outreach-Related Requirements**

In Figure 12, the Court Monitor provides four priority outreach recommendations for the Defendants' consideration. While these recommendations are not exhaustive, they represent critical actions that — in the Court Monitor's view — will enhance Consent Decree compliance in the outreach domain. Several of these recommendations are duplicative or refinements of those offered in prior years but have not yet been fully explored or implemented.

| Figure 12. Outreach-Related Priority Recommendations to Apply in FY2021 and FY2022 | |
|---|---|
| **Recommendation** | **Description** |
| 1) Examine why so many Class Members decline to participate in the *Colbert* program and are not considered for transition during the outreach phase. | The number of Class Members who consent to outreach and later consent to assessment is plummeting. This concerning trend impacts the pipeline of Class Members who can ultimately transition. Thus, the Court Monitor reiterates her position that the outreach process should be enhanced through training on motivational interviewing, active engagement best practices, and other evidence-based practices designed to help individuals build trust and rapport, as well as process and resolve any ambivalence around transition. |
| 2) Fully leverage the peer role in outreach efforts, beyond the current use of peer mentors. | In several states, peer staff — or persons with direct experience of serious mental illness, substance use disorders, or other disabilities — play an instrumental role in outreach and engagement efforts within institutional and long-term care settings. While the *Colbert* outreach program does utilize peer mentors, by adding full-time peer workers with specialized training in motivational interviewing, active engagement, and other key competencies will likely prove effective, if other states' research applies to Illinois. Peer staff are uniquely positioned to build trusting relationships with Class Members, imbuing hope and self-efficacy, and complement other providers' work. As such, Illinois should consult with other relevant states to design an evidence-based peer in-reach model and otherwise leverage peers' roles across all Decree programming. |
| 3) Come into compliance by securing independent physicians to confirm or refute severe Dementia diagnoses. | Outreach resources are currently used to conduct repeated outreach to individuals with dementia, many of whom may not be appropriate for transition. This reinforces that the Defendants should finally invest sufficient resources in identifying an independent physician (or group of physicians) that can verify or refute Class Member's severe dementia diagnosis, thus allowing the outreach program to target its resources toward those Class Members appropriate for transition. |
| 4) Promptly address issues related to Class Members deemed "unable to engage." | In FY2019, the Court Monitor expressed deep concern regarding the Defendants' exclusion of non-English speakers and individuals with "communications deficits" from Consent Decree programming. There remains hundreds of Class Members excluded from outreach due to the lack of outreach capacity to effectively engage them. This must be resolved imminently through dedicated training and other resources. |

## Section IV. Assessment of *Colbert* Class Members

The *Colbert* Consent Decree requires the Defendants to design and implement an assessment[25] process to identify a Class Member's medical and psychiatric conditions and his or her ability to perform activities of daily living. This process enables the Defendants to determine what the person may need to transition into the community. Per the Consent Decree, the assessment process should occur after a Class Member affirms his or her interest in *Colbert* transition consideration. Per the Consent Decree, the Defendants must ensure that qualified professionals conduct person-centered assessments for every Class Member who agrees to such, culminating in an indication as to whether the person is or is not recommended for transition.

Class Members who decline an assessment or those who meet specific categorical or clinical criteria such as those with Dementia diagnoses or clinically significant and progressive cognitive disorders are excluded from further consideration under the transition process, including assessment activities. Those who decline an assessment can have the right to request an assessment or reassessment at a later point. If recommended for transition during the assessment process, a Class Member must receive a service plan that delineates the services and supports needed to facilitate community transition and tenure. If not recommended for transition, the Class Member must receive a service plan designed to identify supports and services to address transition barriers and prepare him or her for future transition.

The *Colbert* Consent Decree contains the following assessment requirements:

- A sufficient number of assessments must be completed to reach Court-established or -approved transition requirements (Requirement 5);
- Assessments must be conducted annually (Requirement 6), including for those who remain in nursing facilities for a year after their transition approval (Requirement 13);
- Qualified assessment professionals must inform Class Members of their rights and opportunity to transition and specify the types of services and supports available to support transition (Requirement 7);
- Qualified assessment professionals must engage Class Members at an "appropriate frequency" to address their concerns about leaving nursing facilities (Requirement 8), fully exploring and addressing reasons for opposition (Requirement 11);
- Assessments must be completed on a timely basis, as well as the subsequent service plans (Requirements 9);
- Class Members can appeal evaluators' decisions and must be availed of informal and formal opportunities to appeal (Requirement 10); and
- Class Members approved for community placement who then decide to remain in nursing facilities — and those who reject assessments altogether — can re-request an assessment and must have opportunity to complete the assessments within 120 days (Requirements 12 and 14).

---

[25] Historically, "assessment," "evaluation," and "resident review" were used interchangeably. While previous Court Monitor compliance assessment reports and briefings used the term "assessment," in FY2020, the Defendants made a programmatic decision to use "assessment" to describe this Consent Decree process.

The *Colbert* FY2020 Implementation Plan contained 12 additional assessment-related requirements primarily centered on improved data tracking, reporting, and training for assessment staff.

**Assessment-Related Requirements: FY2020 Compliance Assessments**
As displayed in Figure 13, the Defendants were found in compliance with nine requirements, in partial compliance for seven, and out-of-compliance for five.

| Figure 13. Synopsis of FY2020 Compliance Assessments for Assessment-Related *Colbert* Consent Decree and Implementation Plan Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (10) | In Compliance➔ | 1 | Partial Compliance➔ | 7 | Out-of-Compliance➔ | 2 |
| Implementation Plan Requirements (11) | In Compliance➔ | 8 | Partial Compliance➔ | 0 | Out-of-Compliance➔ | 3 |
| Total Requirements (21) | In Compliance➔ | 9 | Partial Compliance➔ | 7 | Out-of-Compliance➔ | 5 |

Figure 14 contains the language of each *Colbert* Consent Decree's assessment-related requirement, along with the Court Monitor's compliance rating. Figure 14 also contains FY2018 and FY2019 ratings to demonstrate whether compliance improved or worsened since the last compliance period.

| Req # | Source/ Citation | *Colbert* Consent Decree, Cost Neutral Plan, or IP Requirement Language | Court Monitor Compliance Assessment Ratings | | |
|---|---|---|---|---|---|
| | | | First-Half CY2018 | FY2019 | FY2020 |
| Figure 14. Compliance Assessment Ratings for Assessment-Related *Colbert* Consent Decree, Cost Neutral Plan, and Implementation Plan (IP) Requirements | | | | | |
| **Compliance Domain: Assessment-Related Requirements** | | | | | |
| 5a | *Consent Decree Section VI(A)(1)* | *Each Class Member is eligible for an Assessment to determine what Community-Based Services are required for the Class Member to transition to a Community-Based Setting. Within 180 days following the finalization of the Implementation Plan, at least 500 Class Members then residing in a Nursing Facility shall receive an Assessment by a Qualified Professional. (Referred to as Req. 16 in CY2017 Report.)* | N/A | N/A | N/A |
| 5b | *Consent Decree Section VI(A)(2)* | *Within 18 months following the finalization of the Implementation Plan, a total of at least 2,000 Class Members then residing in a Nursing Facility shall have received an Assessment by a Qualified Professional. (Referred to as Req. 17 in CY2017 Report.)* | N/A | N/A | N/A |
| 5c | *Cost Neutral Plan (2016) Section D* | *Defendants shall complete at least 1,000 Assessments of Class Members on the Schedule by June 30, 2017, and thereafter continue to complete a sufficient number of Assessments in a timely manner in order to achieve the transitions required under Paragraph F.* | N/A | N/A | N/A |

| | | | | | |
|---|---|---|---|---|---|
| 5d | Updated Cost Neutral Plan (2018) Section D | Defendants shall complete at least 1,000 Assessments of Class Members on the Schedule between March 1 and June 30, 2017, and thereafter continue to complete a sufficient number of Assessments in a timely manner to achieve the transitions required under Paragraph F. | **Partial Compliance** | **Partial Compliance** | **In Compliance** |
| 6a | *Consent Decree Section VI(A)(3)* | *Subject to approval of and consistent with the Cost Neutral Plan, every Class Member then residing in a Nursing Facility shall receive an Assessment by a Qualified Professional within the time period determined as part of the development of the Cost Neutral Plan. (Referred to as Req. 18 in the CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 6b | Consent Decree Section VI(A)(7) | Subject to approval of and consistent with the Cost Neutral Plan, beginning four years following the Approval Date, the assessments for every Class Member then residing in a Nursing Facility shall be conducted at least annually, except for Class Members who decline to receive assessments and for Class Members who have been determined by a medical doctor to have a condition such as severe Dementia or other clinically significant and progressive cognitive disorders and are unlikely to improve. | **Out-of-Compliance** | **Out-of-Compliance** | **Partial Compliance** |
| 7 | Consent Decree Section VII | The Qualified Professionals shall inform each Class Member during the assessments about the existence, nature, and availability of Community-Based Services, and shall describe the Community-Based Settings, transition costs, and/or housing assistance available to Class Members in those settings. | **Partial Compliance** | **In Compliance** | **Partial Compliance** |
| 8a | *Consent Decree Section VII* | *Defendants shall also ensure that the Qualified Professionals conducting assessments provide outreach with appropriate frequency to Class Members who express concern about leaving Nursing Facilities. (Referred to as Req. 15 in the CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 8b | *Cost Neutral Plan (2016) Section B* | *Defendants shall also ensure that the Qualified Professionals conducting the assessments provide outreach with the appropriate frequency to Class Members who express concerns about leaving Nursing Facilities, and that, as has previously been recommended by the Monitor, the Peer Mentor program receives appropriate support.* | **N/A** | **N/A** | **N/A** |
| 8c | Updated Cost Neutral Plan (2018) Section B | Defendants shall also ensure that the Qualified Professionals conducting the assessments provide outreach with the appropriate frequency to Class Members who express concerns about leaving Nursing Facilities, and that, as has previously been recommended by the Monitor, the Peer Mentor program receives appropriate support. | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** |
| 9 | Consent Decree Section VI(A)(5) | Assessments shall be done in a timely manner and so as not to delay, where applicable, the development of the Class Member's Service Plan. | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 10 | Consent Decree Section VI(A)(6) | Any Class Member who disputes a decision regarding eligibility for, or approval of, Community-Based Services, transition costs, and/or housing assistance or placement in a Community-Based Settings shall, pursuant to governing law, have a right to appeal through administrative review of such decisions through Defendants' existing Fair Hearings process (as set forth in 89III.Adm.Code Parts 102 and 104) or as otherwise provided law. Class Members also may avail themselves of any informal review or appeal process that currently exists. | **Partial Compliance** | **In Compliance** | **Partial Compliance** |
| 11 | Consent Decree Section VI(A)(7) | For those Class Members who have been offered a Community-Based Setting but have opposed moving from a nursing facility to a Community-Based Setting, the reasons for the Class Member's opposition shall be fully explored and appropriately addressed as a part of the Class Member's annual assessment and as described in Section VII herein. | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** |
| 12 | Consent Decree Section VI(A)(7) | Any Class Member who has received an Assessment but has declined to move to a Community-Based Setting may thereafter request to be re-Evaluated for transition to a Community-Based Setting. Any such re-Assessment must be conducted within 120 days of the request. | **Out-of-Compliance** | **In Compliance** | **Out-of-Compliance** |
| 13 | Cost Neutral Plan (2016) Section D | For any Class Member who remains on the Schedule a year after their Assessment, Defendants shall update the Assessment at least annually, except as provided in Section VI.A.7 and VI.A.8 of the Decree. These updates shall not be included in calculating the 1000 minimum required above. | **Out-of-Compliance** | **Out-of-Compliance** | **Partial Compliance** |
| 14 | Consent Decree Section VI(A)(8) | With respect to Assessments and re-Assessments described in this Section VI.A, any Class Member has the right to decline to take part in an Assessment or re-Assessment. A Class Member declining an Assessment or re-Assessment shall have the right to receive an Assessment or re-Assessment within 120 days of making a new request. | **Partial Compliance** | **In Compliance** | **Out-of-Compliance** |
| E-1 | FY2020 Implementation Plan | Reaffirm "Qualified Professional" definition. *This was completed via an informational bulletin promulgated to providers in July 2019.* | **N/A** | **N/A** | **In Compliance** |
| E-2 | FY2020 Implementation Plan | Enhance provider training and clearly outline compliance standards. *This was completed by 10/31/19.* | **N/A** | **N/A** | **In Compliance** |
| E-3 | FY2020 Implementation Plan | Develop and implement guideline matrix and tracking tool. *This was completed by 10/1/19.* | **N/A** | **N/A** | **In Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| E-4 | FY2020 Implementation Plan | Develop centralized tracking system for re-assessments.<br><br>*This was not completed by the due date, but a new tracking system was designed for the Comprehensive Program.* | **N/A** | **N/A** | **In Compliance** |
| E-5 | FY2020 Implementation Plan | Utilize data reports during calls with assessment providers.<br><br>*The Defendants indicate that these calls occurred in FY2020 and that data reports were utilized to review provider performance.* | **N/A** | **N/A** | **In Compliance** |
| E-6 | FY2020 Implementation Plan | Partner with Division of Rehabilitation Services on approaches to serve individuals with physical disabilities.<br><br>*This was not completed.* | **N/A** | **N/A** | **Out-of-Compliance** |
| E-7 | FY2020 Implementation Plan | Confirm Class Members not referred to permanent supportive housing meet Consent Decree exclusionary criteria.<br><br>*This was not completed. The Defendants reported that providers continued to recommend housing options based on providers' determination of Class Member need even when Consent Decree exclusionary criteria were not met, although emphasis is placed on permanent supportive housing. This was not compliant with the requirement.* | **N/A** | **N/A** | **Out-of-Compliance** |
| E-8 | FY2020 Implementation Plan | Streamline assessment process and documentation requirements.<br><br>*New assessment forms and procedures were rolled out on 7/1/19.* | **N/A** | **N/A** | **In Compliance** |
| E-9 | FY2020 Implementation Plan | Plan and test care navigator system; study and expand if effective.<br><br>*This was not completed, but the Comprehensive Program replaced the care navigator system by providing a streamlined and centralized approach to Class Member transitions.* | **N/A** | **N/A** | **N/A** |
| E-10 | FY2020 Implementation Plan | Update assessment tool.<br><br>*Updates to the assessment tool were made on 10/24/19 to better capture Class Member preferences and assessors' rationale for not recommending Class Members for transition.* | **N/A** | **N/A** | **In Compliance** |
| E-11 | FY2020 Implementation Plan | Develop specialized training content on how assessors can appropriately address Class Members' reason for opposition to transition.<br><br>*While motivational interviewing training was provided, there appears to have been no specialized training content on how to address Class Member opposition to transition.* | **N/A** | **N/A** | **Out-of-Compliance** |

| E-12 | FY2020 Implementation Plan | Provide training to assessors to strengthen Class Member knowledge on their right to appeal.<br><br>*These trainings were provided on 9/4/19 and 9/9/19.* | **N/A** | **N/A** | **In Compliance** |
|------|---------|---------|---------|---------|---------|

Figure 15 delineates the number of Class Members who were eligible for and ultimately participated in assessment-related processes during FY2020, including attempted assessments, completed assessments, and assessment outcomes. The figure combines data from the legacy program (from July 2019 to February 2020) and the Comprehensive Program (from March to June 2020).

*Figure 15. FY2020 Assessment Pipeline*



Of the 2,023[26] Class Members identified for assessment, approximately 1,313 (65%) remained eligible after several exclusions: exclusionary criteria imposed by the Defendants, transfers/discharges, guardian refusals, Class Member refusals, or Class Member deaths, 1,293 Class Members participated in assessments. Ultimately, 681 Class Members were recommended for transition, while 588 were not. Among those Class Members not recommended for transition, the assessors identified lack of insight/self-management skills, poorly controlled symptoms, memory impairments, needed assistance for daily living activities, and memory impairments as the primary reasons.

<u>In Compliance: Requirement 5, Adequate Number of Assessments to Achieve Required Transitions.</u> The Consent Decree acknowledges the importance of generating a sufficient number of assessments so that an adequate number of Class Members can be recommended to – and ultimately – transition. A like comparison of completed assessments and achieved transitions, however, is not exact because there is a lag between assessments and transitions; an assessment can occur in one fiscal year and the transition occur in the next fiscal year, especially given that the Defendants have 120 days to transition Class Members after their recommendation for transition via the assessment process. However, identifying the number of assessments that resulted in recommendation for transition in the second half of fiscal year 2019 and first half of FY2020 can provide a proxy indicator of how many Class Members should be in the transition pipeline during FY2020.

---

[26] It was difficult to distinguish between duplicated assessments versus unduplicated number of Class Members participating in assessments in this data, so some calculations herein may be slightly inaccurate.

There were 1,078 assessments completed in the second half of FY2019 and 1,028 completed in the first half of FY2020, totaling 2,106. Of those, 1,049 assessments reflect Class Members recommended for transition. Thus, the number of assessments that resulted in a transition recommendation actually exceeds the FY2020 numeric transition requirement of 900 Class Members. However, as discussed in detail in Section VI, the Defendants transitioned only 223 Class Members during FY2020.

This data demonstrates that in FY2020 the Defendants, through their contractors, technically completed an adequate number of assessments to meet their transition requirements. It appears that what happens after a recommendation for transition is what stalls or altogether prevents Class Member transitions. There are multiple steps necessary to prepare Class Members for and effectuate their transition such as linkages to community-based treatment and services, housing search, landlord application, apartment inspections, credit checks, documentation gathering, and acquisition of funds for furniture and other moving expenses. The Defendants' new Comprehensive Program model was designed to simplify the transition pipeline by reducing hand-offs between providers, but it has yet to be seen whether it will improve efficiency and address the transition pipeline bottlenecks.

The number of completed assessments obligates the Court Monitor to find the Defendants in compliance. In reality, however, the spirit of this requirement was not met because so few of those who were assessed and recommended actually transitioned. This points to the Defendants' need to remedy the barriers between assessment recommendations and actual transitions.

Partial Compliance: Requirements 6 and 13, Annual Assessment Updates. For Class Members who remain on the transition schedule a year after their assessment, as well as those who remain in nursing facilities because they were not recommended for transition, the Consent Decree and Updated Cost Neutral Plan requires an annual assessment update. Prior to the Comprehensive Program, distinguishing annual assessment updates from initial assessments in the State's database was contingent upon the assessor self-reporting the assessment type, which was rare.

In the first half of the fiscal year, for instance, data shows that there were only 13 annual assessment updates attempted by assessors. For the Comprehensive Program, the Defendants began to track annual assessment updates, but only 22 were attempted due to the COVID-19 crisis. Due to the data collection issue during the first half of the fiscal year, the Defendants are found in partial compliance.

Partial Compliance: Requirement 7, Qualified Professionals Making Class Members Aware of Supports/Services. One strategy to ensure that Class Members are aware of their rights and opportunities under the *Colbert* Consent Decree is to implement an informed consent process whereby Class Members attest to their understanding and acceptance of key information provided during the assessment process. In FY2020, at appears that at least 85 percent of Class Members who consented to assessments signed a *Colbert* informed consent form that identified their rights and responsibilities

under the Decree, a significant increase in performance from the previous compliance period. For this reason, the Defendants are assigned a partial compliance rating for this requirement.

Partial Compliance: Requirement 8, Qualified Professionals and Appropriate Frequency. This requirement has two parts: the requirement that qualified professionals administer assessments and that they engage Class Members at an "appropriate frequency" to process, support, and if appropriate, address their concerns about transition. For the first part of the requirement, the Defendants indicated in their semiannual report that 76 percent of all assessment attempts were conducted by qualified professionals. For the second part of the requirement, while the Defendants technically do not utilize assessors to engage Class Members at an appropriate frequency, they do use outreach workers for this function. Appropriate frequency is defined, per the Defendants' policy, as semiannual outreach attempt to each Class Member. In addition to their partial compliance with the first part of the requirement, they are also unable to provide data to demonstrate that two outreach attempts per Class Member occurred in FY2020. Thus, they are found in partial compliance for this requirement.

Partial Compliance: Requirement 9, Timely Completion of Assessments. The Defendants reported that — for the first half of the fiscal year — 68 percent of all administered assessments were completed within 30 days of the outreach worker's referral. They did not provide data for the other half of the fiscal year assumedly because of reporting issues associated with COVID-19. Taken together, these result in a partial compliance rating.

Partial Compliance: Requirement 10, Processes for Class Members to Appeal Assessment Determinations. The Defendants reported that in FY2020 there were 14 appeals of Class Member assessment determinations. Of those, eight were processed and in those cases the original decisions were upheld. Given that six appeals were not processed (per the Defendants, due to the COVID-19 crisis), the Defendants are found in partial compliance.

Partial Compliance: Requirement 11, Fully Exploring and Addressing Class Member Opposition to Transition. In FY2020, the Defendants tracked the reasons Class Members declined assessments. Most of the reasons fell under two vague and potentially overlapping categories: "not interested/refuses *Colbert* services" and "preference to remain in facility/declines assessment." While the Defendants' new ability to track reasons that Class Members oppose transition represents a positive step, there is no evidence that Class Member opposition to transitions have been "appropriately addressed," as is required.

Given that no such protocols or any other policy or data to support that the Defendants "fully explore and address Class Member opposition to transition" appear to exist, the Court Monitor assigns a rating of partial compliance.

<u>Out-of-Compliance: Requirements 12 and 14, Class Members Requests for Reassessments.</u> Class Members approved for community placement who then decide to remain in the nursing facilities — and those who initially reject to participate in assessments altogether — can re-request assessments. In these two circumstances, they must receive the assessment within 120 days. In FY2020, data on these requirements was only reported for the first half of the fiscal year. Twenty-six Class Members requested reassessments and 15 received them within 120 days. It is unclear whether the other 11 Class Members received attempts within the 120-day requirement. Because 42 percent of Class Members who requested assessments did not receive them within the Consent Decree-mandated timeframe, compounded by the absence of data from the second half of the fiscal year, the Defendants are found out-of-compliance.

**Court Monitor Recommendations for Achieving or Enhancing Compliance with Assessment-Related Requirements**
In Figure 16, the Court Monitor provides three priority recommendations for the Defendants' consideration pertaining to assessments. While not exhaustive, these recommendations represent critical actions to enhance Consent Decree compliance relative to the assessment domain. As occurred in other domains, several of these recommendations are carried forward from prior years' reports as they have yet to be adequately explore

| Figure 16. Assessment-Related Priority Recommendations to Apply in FY2021 and FY2022 | |
|---|---|
| **Recommendation** | **Description** |
| 1) Come into compliance by correcting issues related to Class Members' annual assessments. | Defendants need to ensure that the requirement to provide annual assessments is met. They should explore regular, perhaps monthly, use of a data system by quality assurance staff to review whether contractors comport with reassessment requirements and take corrective actions directly with contractors, if necessary. |
| 2) Revisit the entire assessment process to ensure that the assessment protocol is based on national best practices and limited in subjectivity. | There is no field-wide consensus on how to objectively predict a person's ability to live successfully in the community following institutionalization. However, the Defendants need a process whereby they attempt to gather relevant information to determine a person's transition appropriateness. As such, the Defendants should review assessment models from other states currently subject to or that have successfully exited consent decrees. These models may prove more efficient, accurate, or complete, and could offer dimensions that are relevant specifically to institutionalized disability populations. It is important, in this process, that Defendants rely on only Consent Decree-authorized considerations and not stray into subjective considerations that may hinder Class Members' appropriate consideration for transition or actually transition. |
| 3) Implement active engagement protocols that explore Class Member reasons for not transitioning and seek to remedy stated barriers and enhance motivation for transition. | It is not surprising that many Class Members might initially oppose transition given the often-occurring negative perception of their ability to live in the community and erosion of self-efficacy driven by years of life in institutions. For this reason, assessment staff must treat "no" as an opportunity to learn more about a Class Member's fears and concerns and provide options to allay those concerns before fully shutting the door to assessment and transition. Obviously, Class Members can elect to remain in facilities, but qualified professionals must have protocols to deepen engagement and unearth and address motivation and confidence. |

## Section V. Service Planning

After Class Members are assessed to determine their transition readiness, the assessments result in one of two outcomes: the Class Member is either recommended for transition or not. Both groups (i.e., recommended versus not recommended) are to participate in a person-centered service planning process designed to identify Class Member's needs, vision, and goals. For those not recommended, the assessor develops the service plan that includes the supports and services needed to prepare Class Members remaining in nursing facilities for potential future transition. For those who are recommended for transition, the contracted agency staff responsible for effectuating transitions must complete the service plans that articulate necessary support and services to facilitate entry and successful tenure in the community.

Per the *Colbert* Consent Decree, service plans must also meet several quality/content, timeliness, and other procedural requirements, including:

- All service plans must be completed within three months of the Class Members' assessment (Requirement 15);
- Service plans must be provided to those who are approved for transition through the assessment process (Requirement 16);
- Service plans must identify the needed community-based services and a transition timetable (Requirement 17);
- Service plans should be periodically updated (i.e., every 180 days), reflective of Class Members' changing needs and preferences and include services that support the acquisition of independent living and self-management skills (Requirement 18);
- For Class Members transitioned into non-permanent supportive housing settings, the service plan must justify such placement and include community-based services to support the most possible and appropriate integrated setting (Requirement 19);
- Service plans must be person-centered and reflect what a Class Member needs at home, work, and in the community to fully participate in community life; Class Members with independently verified Dementia are excluded from future assessments, while those who decline (who do not have Dementia) must receive an annual assessment update (Requirement 20);
- For Class Members without independently confirmed Dementia diagnoses who were transitioned to non-permanent supportive housing settings, they should participate in treatment planning that prepares them to transition to the most integrated setting appropriate to their needs (Requirement 21);
- Service plans must be completed by qualified professionals and include legal representatives, if requested (Requirement 22); and
- Service plans must focus on the Class Member's "vision, preferences, strengths and needs in home, community, and work environments" (Requirement 23).

The Defendants were also obligated to 12 additional service plan-related requirements in the FY2020 Implementation Plan. These requirements primarily center on developing and implementing new data collection and quality assurance processes to ensure content, quality, and timeliness standards of service plans are met — a historical weakness in the Consent Decree program.

**Service Plan-Related Requirements: FY2020 Compliance Assessments**
As displayed in Figure 17, the Defendants are in compliance with six requirements, in partial compliance for five, and out-of-compliance for nine.

| Figure 17. Synopsis of FY2020 Compliance Assessments for Service Plan-Related *Colbert* Consent Decree and Implementation Plan Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (9) | In Compliance➔ | 1 | Partial Compliance➔ | 4 | Out-of-Compliance➔ | 4 |
| Implementation Plan Requirements (11) | In Compliance➔ | 5 | Partial Compliance➔ | 1 | Out-of-Compliance➔ | 5 |
| Total Requirements (20) | In Compliance➔ | 6 | Partial Compliance➔ | 5 | Out-of-Compliance➔ | 9 |

Figure 18 contains the language of each service plan-related requirement in the Colbert Consent Decree and Implementation Plan, along with the Court Monitor's compliance rating. Figure 18 also contains CY2018 and FY2019 ratings to demonstrate whether compliance improved or worsened since the last compliance period. Compared to FY2019, the Defendants' performance improved slightly. The Defendants have been out-of-compliance for two Consent Decree requirements in this domain for at least the past three consecutive years.

| Figure 18. Compliance Assessment Ratings for Service Plan-Related *Colbert* Consent Decree, Updated Cost Neutral Plan, and Implementation Plan (IP) Requirements | | | | | |
|---|---|---|---|---|---|
| Req # | Source/ Citation | *Colbert* Consent Decree, Cost Neutral Plan, or IP Requirement Language | Court Monitor Compliance Assessment Ratings | | |
| | | | First-Half CY2018 | FY2019 | FY2020 |
| **Compliance Domain: Service Plan-Related Requirements** | | | | | |
| 15a | *Consent Decree Section VI(B)(1)* | *Pursuant to the Evaluations and with Class Member's input, Defendants shall develop, within 90 days after each evaluation, Service Plans specific to each Class Member. (Referred to as Req. 19 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 15b | Updated Cost Neutral Plan (2018) Section E | These Service Plans shall be completed within three months of the Class Member's Evaluations. | **Partial Compliance** | **Partial Compliance** | **Out-of-Compliance** |
| 16a | *Cost Neutral Plan (2016) Section E* | *Qualified Professionals shall develop Service Plans, as provided in the Consent Decree, for Class Members with Evaluations indicating they are able to move to Community-Based Settings. These Service Plans shall be completed within three months of Class Members' Evaluations. (Referred to as Req. 20 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |

| 16b | Updated Cost Neutral Plan (2018) Section E | Qualified Professionals shall develop Service Plans, as provided in the Consent Decree, for Class Members with Evaluations indicating they are able to move to Community-Based Setting. | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** |
|---|---|---|---|---|---|
| 17 | Consent Decree Section VI(B)(1) | For those Class Members whose Service Plans include transitioning into a Community-Based setting, each Service Plan shall set forth with specificity the Community-Based Services, transition costs, home accessibility adaptation costs and/or housing assistance the Class Member needs in a Community-Based setting, including a projected timetable to complete the transition. *(Referred to as Req. 21 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Partial Compliance** |
| 18 | Consent Decree Section VI(B)(1) | Each Service Plan shall be updated at least every 180 days to reflect any changes in needs and preferences of the Class Member, including his or her desire to move to a Community-Based Setting after declining to do so, and shall incorporate, where appropriate, services to assist in acquisition of basic activities of daily living skills and illness self-management. | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** |
| 19 | Consent Decree Section VI(B)(3) | If there has been a determination that a Class Member will not be transitioning to PSH [permanent supportive housing] or Private Residence (except for those Class Members who have declined transitions), the Service Plan shall specify what services the Class Member needs that could not be provided in PSH or a Private Residence and shall describe the Community-Based Services the Class Member needs to live in another Community-Based Setting that is the most integrated setting appropriate to that Class Member's needs and preferences or shall specify what services the Class Member needs and preferences or shall specify what the Class Member needs that cannot be provided in any Community-Based setting. | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 20 | *Colbert* Consent Decree Amendment | Service Plan means a Person-Centered plan with the goal of moving a Class Members to a Community-Based Setting, strategies to employed to achieve that goal and a description of all Community-Based Services, transition needs, home accessibility adaptation needs, and/or housing assistance necessary to support that goal; provided, however, that a Service Plan for a Class Member declining to be evaluated for transition shall simply state "declined to be evaluated" and shall be updated at least annually; and a Service Plan for a Class Member determined by a physician not affiliated with a Nursing Facility to have a condition such as severe Dementia or other severe cognitive impairments requiring such as high level of staffing to assist with activities of daily living or self-care management that they cannot effectively be served in PSH or a Private residence or who have an irreversible medical condition requiring such medical care that they cannot effectively be served in PSH or a Private residence shall simply state "severe Dementia or other severe cognitive impairments or irreversible medical condition" and need not be regularly updated as provided herein. *(Referred to as Req. 24 in the CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Partial Compliance** |
| 21 | Consent Decree Section VI(D)(3) | Those Class Members not transitioning from Nursing Facilities into PSH or Private Residence shall have periodic re-evaluations with treatment objectives to prepare them for subsequent transition to the most integrated setting appropriate, including PSH or a Private Residence, except for Class Members who have chosen other living arrangements or have been determined by a physician not affiliated with a Nursing Facility to have a condition such as severe Dementia or other clinically significant progressive cognitive disorders and are unlikely to improve. *(Referred to as Req. 25 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** ✗ |
| 22 | Consent Decree Section VI(B)(4) | The Service Plan must be developed by a Qualified Professional in conjunction with Class Member and/or his or her legal representative, if any. *(Referred to as Req. 26 in CY2017 Report.)* | **Partial Compliance** | **In Compliance** | **In Compliance** |
| 23 | Consent Decree Section VI(B)(5) | Each Service Plan shall focus on Class Member's personal vision, preferences, strengths and needs in home, community, and work environments. *(Referred to as Req. 27 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Partial Compliance** |
| SP-1 | FY2020 Implementation Plan | Enhance *Colbert* Tracking System to improve service plan-related tracking.<br><br>*Due to protracted and serious problems with the defendants' ability to reliably report service planning data, ascribable at least in part to an inadequate tracking system, the Defendants are found in partial compliance.* | **N/A** | **N/A** | **Partial Compliance** |

| SP-2 | FY2020 Implementation Plan | Determine feasibility of using an existing or new data management system to assess outcomes.<br><br>*The Defendants began using a new data system for the Comprehensive Program on 10/1/19.* | **N/A** | **N/A** | In Compliance |
|------|------|------|------|------|------|
| SP-3 | FY2020 Implementation Plan | Review and expand quality assurance processes.<br><br>*The Defendants began using new quality assurance protocols for the Comprehensive Program on 10/24/19, less than a month after the original due date.* | **N/A** | **N/A** | In Compliance |
| SP-4 | FY2020 Implementation Plan | Determine and document feasibility of using peer mentors for service planning.<br><br>*The Defendants provided no evidence that they investigated using peer mentors to conduct service planning.* | **N/A** | **N/A** | Out-of-Compliance |
| SP-5 | FY2020 Implementation Plan | If feasible, develop, and implement peer mentor service planning program.<br><br>*This requirement is not applicable as the Defendants did not proceed with using peer mentors to conduct service planning.* | **N/A** | **N/A** | **N/A** |
| SP-6 | FY2020 Implementation Plan | Train service planning staff on types of representatives who can support Class Members in service planning process.<br><br>*The Defendants indicated that "training will be continued under the Comprehensive Program on the types of representatives Class Members may include in the service planning process.* | **N/A** | **N/A** | In Compliance |
| SP-7 | FY2020 Implementation Plan | Create and implement process to provide service plan updates to prepare Class Members for transition into permanent supportive housing.<br><br>*This process was released on 4/8/20 and providers were trained on 4/20/20.* | **N/A** | **N/A** | In Compliance |
| SP-8 | FY2020 Implementation Plan | Implement process to use service plan data to inform community-based housing development efforts.<br><br>*The Defendants indicate that the "process is under development" for the Comprehensive Program. It was neither completed or implemented in FY2020 nor was evidence of its partial development provided, resulting in an out-of-compliance rating.* | **N/A** | **N/A** | Out-of-Compliance |
| SP-9 | FY2020 Implementation Plan | Create and publicize opportunity for Class Members to observe community-based settings.<br><br>*Defendants did not proceed with the implementation of off-site Class Members visits, choosing instead to unilaterally categorize this as clinically unsound. This does not comply with the Consent Decree requirement or best practice to permit Class Members to observe community-based housing and services prior to transition.* | **N/A** | **N/A** | Out-of-Compliance |

| | | | | | |
|---|---|---|---|---|---|
| SP-10 | FY2020 Implementation Plan | Determine whether IM+CAMS can replace service plans.<br><br>*Defendants determined in September 2019 that this tool does not satisfy Consent Decree reporting requirements.* | **N/A** | **N/A** | **In Compliance** |
| SP-11 | FY2020 Implementation Plan | Complete personnel process to identify medical evaluator candidates.<br><br>*This requirement — to identify and hire a medical evaluator to assess Class Members for Dementia or other cognitive disorders — was not met.* | **N/A** | **N/A** | **Out-of-Compliance** |
| SP-12 | FY2020 Implementation Plan | Engage a medical evaluator.<br><br>*This requirement — to identify and hire a medical evaluator to assess Class Members for Dementia or other cognitive disorders — was not met again this year.* | **N/A** | **N/A** | **Out-of-Compliance** |

During this compliance period, *Colbert* provider agencies complained that the Consent Decree service planning tool was duplicative of another required Medicaid-related service planning tool, called the Illinois Medicaid Comprehensive Assessment of Needs and Strengths (IM+CANS). The Defendants agreed to allow providers to pilot using the IM+CANS for Consent Decree service planning and collect additional information on an addendum document. Only one agency participated in the pilot and the Defendants ultimately determined that the modified process did not meet Consent Decree service planning requirements. Amid provider complaints about duplicative efforts, the Defendants cited that as the reason they reported no service plan data for the first half of the fiscal year and did not adequately enforce requirements for *Colbert* provider agencies to submit data on the quality, completeness, or existence of service plans for the second half of the fiscal year. The Defendants, however, were able to report other data regarding service plans, including:

- Approximately 49 percent — or 332 of 680 — of service plans for Class Members recommended for transition (i.e., "initial service plans") were submitted to UIC-CON in FY2020.
- The submitted initial service plans were generally rated highly for service plan timeliness (98%), presence of transition timelines (96%), and projected move dates for Class Members (96%).
- Initial service plans were not rated highly across the 12 domains of quality established by the Defendants' quality review process; the average score (with maximum 100%) was 49 percent for the first half of the fiscal year and 65 percent for the second half.
- For the 223 Class Members who ultimately transitioned in FY2020, the Defendants were able to identify 60 percent of Class Members' transition service plans completed at least two months prior to transition or one month after.

- For those Class Members not recommended for transition, the Defendants are required to create service plans and do so in the form of service plan goals after the assessment is completed. The Defendants reported that 563 of 568 (99%) of Class Members who were assessed as not appropriate for transition did have service plan goals appended to their assessments.
- Class Members not recommended for transition must receive a service plan update or reassessment within six months. The Defendants' data indicates that 46 percent either received a service plan update or were reassessed within that timeframe.
- Class Members who remained in facilities after being recommended for transition are entitled to a 180-day service plan update. The Defendants provided data that 82 such plans were completed but were unable to provide the number of Class Members who should have received an update in FY2020 — thus a performance percentage cannot be assessed.

It is difficult to assess the Defendants' performance on these requirements given that the data is based on a sampling of service plans that vary based on the type of service plan (i.e., initial, transitional, or service). Further, the submitted service plans are limited to those organizations that elected to submit them and comply with the State's requirements. Community mental health centers were disproportionately noncompliant with this requirement. Thus, this data is both incomplete and unrepresentative.

Out-of-Compliance: Requirement 15, Timeliness of Initial Service Plans. During this reporting period, the Defendants provided data on 332 out of 680 (49%) service plans, reflecting those that were submitted by providers to the University of Illinois at Chicago College of Nursing (UIC-CON). Out of the 680 initial service plans, the Defendants could only demonstrate that 327 (or 48%) were within the required timeframe, resulting in an out-of-compliance rating.

Partial Compliance: Requirement 16, Qualified Professionals. The Defendants reported that 1,059 of the 1,622 (65%) of all service plans reviewed by UIC-CON — which represent initial service plans, transition service plans, and service plan updates — were administered by qualified professionals. While this does not represent all service plans, the Court Monitor credited the Defendants with partial compliance.

Partial Compliance: Requirements 17, 20, and 23, Person-Centered and Strengths-Based Service Plans. The Defendants' data demonstrated that for the first half of the fiscal year, the quality of service plans' grounding in person-centered and strengths-based approaches were 49 percent and 65 percent, respectively. The outcomes result in a partial compliance rating.

Out-of-Compliance: Requirement 18, 180-Day Service Plan Updates. Class Members who remained in facilities after being recommended for transition are entitled to a 180-day service plan update. The Defendants provided data that 82 such plans were completed, but they were unable to provide the number of Class Members who should have received updated plans in FY2020 — thus a performance percentage cannot be assessed. They were found out-of-compliance.

<u>Out-of-Compliance: Requirements 19 and 21, Service Plan Requirements for Those Not Referred to Permanent Supportive Housing.</u> The Consent Decree requires the Defendants to identify the services that permanent supportive housing (PSH) cannot furnish when a Class Member is placed in a non-PSH setting such as a congregate residential setting. The Consent Decree also requires that those who transition to non-PSH residential settings receive regular service plan updates to prepare them for PSH. The Defendants semiannual reports did not include data on these requirements, and thus, they were found out-of-compliance for both.

<u>In Compliance: Requirement 22, Inclusion of other Representatives in Service Planning Process Upon Request.</u> The Consent Decree affords Class Members the right to include a legal representative in their service planning process. Information regarding this right is included in the *Colbert* informed consent document, which was signed by the majority of those Class Members who agreed to assessments in FY2020. This demonstrates that the Defendants have apprised the vast majority of Class Members who agreed to an assessment of their rights to include a legal representative in the service planning process, leading to an in-compliance rating.

**Court Monitor Recommendations for Achieving or Enhancing Compliance with Service Plan-Related Requirements**
In Figure 19, the Court Monitor provides two priority recommendations for the Defendants' consideration pertaining to service plans. Some of these recommendations were also offered in FY2018 and FY2019 yet have not been adequately explored or implemented. While these recommendations are not exhaustive, they represent critical actions that can enhance Consent Decree compliance in the service planning domain.

| Figure 19. Service Plan-Related Priority Recommendations to Apply in FY2021 and FY2022 ||
|---|---|
| **Recommendation** | **Description** |
| 1) Implement a strategy to comply with each service plan requirement, including a methodology to collect and report data necessary to demonstrate compliance regarding service plan timeliness, frequency, completeness, and quality. | The Defendants identified several areas relating to the timeliness, frequency, and quality of service plans where data is not currently collected and, thus, could not be reported. The Consent Decree includes a clear obligation for the Defendants to monitor and demonstrate compliance with service planning aspects. Their failure to do so has led not only to out-of-compliance ratings for most of this domain's requirements, but also precluded program managers and assessors from the benefit of information and insights such data could have provided to the service planning process and outcomes. Performance was especially low as related to service plan quality and timeliness. Improving this process will help identify strengths and weaknesses, address quality deviations among the contractors that develop service plans, and address barriers to timeliness and their impact on Class Member transitions. The Defendants should consider developing a methodology to collect, analyze, and report data assessing the inclusion of required content and the timeliness of completing service plans. |
| 2) Develop clear standards for all service plans in a Class Member's journey, from the PASRR-linked initial service plan to the post-discharge service plan. | The crucial step of assigning responsibility to who should develop service plans along the long-term care admission-to-transition continuum — as well as who should ensure the implementation of the various clinical treatments and skills development documented in service plans — appears to be lacking. Establishing clear lines of accountability and standards (including content and timeliness standards), along with processes for monitoring provider performance relative to those standards, will ensure that Class Members receive focused, person-centered service plans at appropriate intervals to support specific phases of their journeys. This exercise will also require the State — particularly the Illinois Department of Public Health (IDPH) — to provide oversight to ensure that nursing facilities have the proper clinical staffing to conduct pre-transition skills building, effectuate service plans, partner with community-based organizations, and comply with regulatory and credentialing requirements. |

## Section VI. Transitions for *Colbert* Class Members

The *Colbert* Consent Decree's central purpose is to transition Class Members who choose and are deemed appropriate to move into the community, creating a pathway for them to rejoin and fully participate in society. As such, the *Colbert* Consent Decree through the FY2020 Implementation Plan included a numeric transition requirement of 900 Class Member transitions during FY2020. This requirement is often viewed as the most important, or at least the most visible, indicators of compliance. Success or failure to achieve the number of required transitions signals the Defendants' ability to effectively reach and identify appropriate Class Members, prepare for and effectuate transitions, and, at the systems-level, move toward rebalancing the long-term care and mental health services system away from its historic over-reliance on institution-based and restrictive care settings to community-based services, supports, and housing.

In FY2019 to FY2020 alone, 1,743 Class Members were recommended for transition, while only 535 (31 percent) were transitioned. The compounding effects of this poor performance are that over 1,500 Class Members who were mandated by the Court to be transitioned have remained in institutions since the inception of the Decree — some dying there — who could live or have lived in the community.

From July 2019 to February 2020, agencies operating under contract to the Illinois Department of Human Services (IDHS) were required to effectuate transitions — both "full array" agencies provide transition-specific and ongoing services to transitioned Class Members (e.g., Assertive Community Treatment) and "transition-only" agencies that specifically support transition and then hand-off to other service providers post-transition. From March to June 2020, under the Defendants' new Comprehensive Program, nine Prime Agencies (some new and most legacy providers from the former program) were responsible for transitions. In addition to reaching the numeric transition requirements, the Defendants were required to:

- Offer all Class Members timely transition/community placement (Requirement 26);
- Utilize PSH for all Class Members, except for those who have dementia or other cognitive impairments, require skilled nursing care, or are a danger to themselves or others (Requirement 28);
- Utilize buildings where fewer than 25 percent of all tenants have a mental illness;
- Hold housing units available by paying rent for Class Members who are temporarily hospitalized (Requirement 30);
- Ensure Class Members amid transition receive added support and are not left without options when nursing facilities close or if they are discharged during the transition process (Requirement 31); and
- Take measures to prevent, protect, and provide recourse in instances of retaliation by nursing facility staff as Class Members consider or elect nursing facility alternatives (Requirement 32).

In addition to these Consent Decree requirements, the Defendants, pursuant to their FY2020 Implementation Plan, were required to analyze the transition pipeline (i.e., the series of steps ranging from outreach to transition) to identify and remedy bottlenecks and impediments to Class Member transitions, build provider capacity to provide assistance to Class Members applying for Supplemental Security Income or Social Security Disability Income, expand transition provider contracts, provide bonus and retention funding to staff in provider organizations, and continue to monitor and address issues related to disruption in Medicaid coverage for Class Members.

**Transition-Related Compliance Requirements: FY2020 Compliance Assessment**
As displayed in Figure 20 the Defendants were found in compliance with 13 requirements, in partial compliance for eight, and out-of-compliance for 17.

| Figure 20. Synopsis of FY2020 Compliance Assessments for Transition-Related *Colbert* Consent Decree and Implementation Planning Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (8) | In Compliance➔ | 1 | Partial Compliance➔ | 1 | Out-of-Compliance➔ | 6 |
| Implementation Plan Requirements (30) | In Compliance➔ | 12 | Partial Compliance➔ | 7 | Out-of-Compliance➔ | 11 |
| Total Requirements (38) | In Compliance➔ | 13 | Partial Compliance➔ | 8 | Out-of-Compliance➔ | 17 |

Figure 21 relays each transition-related requirement in the *Colbert* Consent Decree and FY2020 Implementation Plan, along with the Court Monitor's compliance rating. Figure 21 also contains CY2018 and FY2019 ratings to demonstrate whether compliance improved or worsened since those compliance periods. From FY2019 to FY2020, three compliance ratings worsened. Of note, Defendants have been out-of-compliance for three Consent Decree requirements in this domain for at least the past three consecutive years.

| Figure 21. Compliance Assessment Ratings for Transition-Related *Colbert* Consent Decree, Updated Cost Neutral Plan, and Implementation Plan (IP) Requirements | | | | | |
|---|---|---|---|---|---|
| Req # | Source/ Citation | *Colbert* Consent Decree, Cost Neutral Plan, or IP Requirement Language | Court Monitor Compliance Assessment Ratings | | |
| | | | First-Half CY2018 | FY2019 | FY2020 |
| Compliance Domain: Transition-Related Requirements | | | | | |
| 24a | *Consent Decree Section VI(C)(6)* | *Subject to the approval of and consistent with the Cost Neutral Plan described above, by the end of the third year following the finalization of the Implementation Plan, Defendants shall have created a Community Transition Schedule that lists all Class Members living in Nursing Facilities as of that date who do not oppose moving to a Community-Based Setting. (Referred to as Req. 42 in CY2017 Report.)* | N/A | N/A | N/A |

| | | | | | |
|---|---|---|---|---|---|
| 24b | *Cost Neutral Plan (2016) Section F* | *By December 30, 2016, Defendants shall create a Transition Activity Schedule (Schedule), including Class Members from the November 10, 2016, list that includes Class Members who do not oppose moving to a Community-Based Setting. The initial Schedule shall include at least 150 Class Members (excluding Class Members not yet transitioned but who are in the housing queue on December 30, 2016). (Referred to as Req. 28 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 24c | Cost Neutral Plan (2018) Section C | By April 22, 2018, Defendants shall create a Transition Activity Schedule (Schedule), including Class Members on the April 15, 2018 Master Class Member List, that includes Class Members who do not oppose moving to a Community-Based Setting. | **In Compliance** | **N/A** | **N/A** |
| 25a | *Cost Neutral Plan (2016) Section C* | *At least every six months following the creation of the Schedule, Defendants, through the outreach efforts described in Paragraph B and in the Implementation Plan set forth in Paragraph H, shall identify and add to the Schedule at least 1,000 Class Members who do not oppose moving to a Community-Based Setting. (Referred to as Req. 29 in CY2017 Report.)* | **N/A** | **In Compliance** | **In Compliance** |
| 25b | Updated Cost Neutral Plan (2018) Section C | The initial Schedule shall include at least 300 Class Members (excluding Class Members not yet transitioned but who are in the housing queue on March 1, 2018). | **In Compliance** | **N/A** | **N/A** |
| 26a | *Consent Decree Section VI(C)(6)* | *Defendants shall ensure that Class Members listed on the Community Transition Schedule will move to appropriate Community-Based Settings at a reasonable pace, with selection prioritized by the Class Member's urgency of need for Community- Based Services or placement in a Community-Based Settings, the length of time that has passed since the Class Member was placed on the Community Transition Schedule, geographical considerations and other appropriate factors. (Referred to as Req. 37 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 26b | *Cost Neutral Plan (2016) Section C* | *Defendants shall ensure that Class Members on the Schedule will be moved to appropriate Community- Based settings according to the time frames detailed in Paragraph F herein. Placements will be prioritized based on their urgency of need for Community-Based Services or placement in a Community-Based Setting, the length of time that the Class Member has resided in a Nursing Facility, geographical considerations, and other appropriate factors. (Referred to as Req. 30 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| 26c | Updated Cost Neutral Plan (2018) Section C | Defendants shall ensure that Class Members on the Schedule will be moved to appropriate Community-Based Settings according to the timeframes detailed in Paragraph F herein. Placements will be prioritized based on their urgency of need for Community-Based Services or placement in a Community-Based Setting, the length of time that the Class Member has resided in a Nursing Facility, geographical considerations, and other appropriate factors. | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** ✗ |
| 27a | *Consent Decree Section VI(C)(1)* | *By the end of the first year following the finalization of the Implementation Plan, Defendants will have moved to Community-Based Setting 300 Class Members who desire to live in Community-Based Settings and who have received an Evaluation and a Service Plan. (Referred to as Req. 38 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 27b | *Consent Decree Section VI(C)(2)* | *By the end of the second year following the finalization of the Implementation Plan, Defendants will have moved to a Community-Based Setting 800 Class Members who desire to live in Community- Based Settings and who have received an Evaluation and a Service Plan. (Referred to as Req. 39 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 27c | *Consent Decree Section VI(C)(3)* | *By the end of the thirtieth month following the finalization of the Implementation Plan, Defendants will have moved to a Community-Based Setting 1,100 Class Members who desire to live in Community-Based Settings and who have received an Evaluation and a Service Plan. (Referred to as Req. 40 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 27d | *Cost Neutral Plan (2016) Section F* | *Defendants will transition 250 additional Class Members to appropriate Community-Based Settings by June 30, 2017, and 300 additional Class Members by December 31, 2017. During the second quarter of 2017, the Parties and the Monitor shall discuss the proposals made by the consultant pursuant to his/her review outlined in paragraph I. (Referred to as Req. 31 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| 27e | Updated Cost Neutral Plan (2018) Section F | *Defendants will transition an additional 300 Class Members to appropriate Community-Based Settings between January 1 and June 30, 2018 (second half of FY2018), 400 additional Class Members by December 31, 2018 (first half of FY2019), an additional 450 Class Members by June 30, 2019 (second half of FY2019), and an additional 450 Class Members by December 31, 2019 (first half of FY2020). Until June 30, 2018, Defendants will continue to operate under the current Implementation Plan and will transition a sufficient number of Class Members to Community-Based Settings to comply with the Order Granting Agreed Motion to Amend Consent Decree dated December 1, 2015, Paragraph C.3.* | Out-of-Compliance | Out-of-Compliance | Out-of-Compliance |
| 28 | Consent Decree Section VI(D)(3) | For Class Members with Mental Illness, PSH or Private Residence chosen by the Class Member shall be considered most integrated Community- Based Setting appropriate for Class Members except that for any Class Members with Mental Illness (i) who have been determined by a physician not affiliated with a Nursing Facility to have a condition such as severe Dementia or other severe cognitive impairments requiring such a high level of staffing to assist with activities of daily living or self- care management and that they cannot effectively be served in PSH or Private Residence, (ii) who have medical needs requiring such a high level of skilled nursing care that they cannot effectively be served in PSH or a Private Residence, or (iii) who present an imminent danger to themselves or others, the Qualified Professional will determine, through the Evaluation process, the most integrated setting appropriate. *(Referred to as Req. 32 in CY2017 Report.)* | Out-of-Compliance | Out-of-Compliance | Out-of-Compliance |
| 29 | Consent Decree Section VI(B)(2) | If there has been a determination that a Class Member will be transitioning to PSH, PSH options must include one or more appropriate buildings in which fewer than 25 percent of the building's units are occupied by persons known by the Defendants to have disabilities. *(Referred to as Req. 33 in CY2017 Report.)* | In Compliance | Partial Compliance | Out-of-Compliance |
| 30 | Consent Decree Section VI(D)(1) | And shall take appropriate measures to keep their housing available in the event they are placed in a hospital, Nursing Facility, or other treatment facility up to 60 days. *(Referred to as Req. 34 in CY2017 Report.)* | In Compliance | In Compliance | Out-of-Compliance |

| | | | | | |
|---|---|---|---|---|---|
| 31 | Consent Decree Section VIII(E) | In the event that any Nursing Facility seeks to discharge any Class Member before a Community- Based Settings is available, including but not limited to, circumstances in which a Nursing Facility owner decides to close the Nursing Facility, Defendants shall take appropriate and necessary actions to ensure that such Class Members are not left without appropriate housing options based on their preferences, strengths and needs. *(Referred to as Req. 35 in CY2017 Report.)* | **In Compliance** | **Out-of-Compliance** | **Out-of-Compliance** |
| 32 | Consent Decree Section VI(D)(2) | Defendants shall take all necessary and reasonable measures to protect Class Members from being pressured not to consider appropriate alternatives to Nursing Facilities or from being subjected to retaliation in any form by Nursing Facilities for seeking alternatives to Nursing Facilities. *(Referred to as Req. 36 in CY2017 Report.)* | **Partial Compliance** | **In Compliance** | **Partial Compliance** |
| 33a | Updated Cost Neutral Plan (2018) Section F | *Prior to December 31, 2018, the Parties and the Monitor shall agree upon a reasonable pace for moving all Class Members determined appropriate for transition to Community-Based Settings beginning in January 2019, and such pace shall be presented in an addendum to this Plan to be filed with the Court. If the Parties cannot agree about what constitutes a reasonable pace, the issue will be presented for the Court for resolution. (Referred to as Req. 45 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 33b | *Cost Neutral Plan (2016) Section F* | *Prior to December 31, 2020, the Parties and the Monitor shall agree upon a reasonable pace for moving all Class Members determined appropriate for transition to Community-Based Settings beginning January 2021, and such pace shall be presented in an addendum to this Plan to be filed with the Court. If the Parties cannot agree about what constitutes a reasonable pace, the issue will be presented to the Court for resolution.* | **N/A** | **N/A** | **N/A** |
| 34a | *Cost Neutral Plan (2016) Section F* | *Benchmarks for transitions in calendar 2018 and 2019 shall be determined by the Parties in conjunction with the Monitor or the Court if the Parties are unable to agree based on the Monitor's findings and systemic enhancements made as a result thereof. (Referred to as Req. 44 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 34b | *Updated Cost Neutral Plan (2018) Section F* | *Benchmarks for transitions for the remainder of FY2020 and FY2021 shall be determined by the Parties in conjunction with the Monitor or the Court if the Parties are unable to agree based on the Monitor's findings and systemic enhancements made as a result thereof.* | **N/A** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| 35 | *Consent Decree Section VI(C)(5)* | *If the Defendants, Monitor and Counsel for Class Plaintiffs are unable, for any reason, to agree on a Cost Neutral Plan as described above at the 30th month after finalization of the Implementation Plan, Defendants and Counsel for Class Plaintiffs shall each file a proposed Cost Neutral Plan with the Court not later than 31 months after finalization of the Implementation Plan. The Court will set appropriate schedules and proceedings to determine the Cost Neutral Plan to be effected. (Referred to as Req. 46 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 36 | *Updated Cost Neutral Plan (2018) Section F* | *During the fourth quarter of calendar year 2018, the Parties and the Monitor shall discuss the proposals made by the consultant and the Monitor pursuant to paragraph I.* | **N/A** | **N/A** | **N/A** |
| T-1 | FY2020 Implementation Plan | Implement review of 150 Class Members recommended for transition through March 2019 but not yet transitioned to identify pipeline barriers and solutions.<br><br>*This analysis was not completed.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-2 | FY2020 Implementation Plan | Implement review of 1,000+ Class Members recommended in the past but not transitioned to identify pipeline barriers and solutions.<br><br>*This analysis was not completed.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-3 | FY2020 Implementation Plan | Draft and distribute letter to nursing facilities regarding access to Class Members and their records.<br><br>*This letter was disseminated to nursing facilities on 8/1/19.* | **N/A** | **N/A** | **In Compliance** |
| T-4 | FY2020 Implementation Plan | Conduct aggregate analysis of Class Member choices to identify trends.<br><br>*This was not completed.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-5 | FY2020 Implementation Plan | Develop centralized monitoring tool for pre-transition contact.<br><br>*This monitoring tool was created for the Comprehensive Program.* | **N/A** | **N/A** | **In Compliance** |
| T-6 | FY2020 Implementation Plan | Research and analyze feasibility of a Care Navigator System. | **N/A** | **N/A** | **N/A** |
| T-7 | FY2020 Implementation Plan | Develop and implement system if supported by research.<br><br>*This is not applicable, per above.* | **N/A** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| T-8 | FY2020 Implementation Plan | Complete review and documentation of pipeline analysis.<br><br>*A pipeline reporting tool was completed by the due date, but the tool had very little practical value in understanding pipeline issues and was not put into use regularly.* | **N/A** | **N/A** | **Partial Compliance** |
| T-9 | FY2020 Implementation Plan | Identify and take steps to address pipeline barriers.<br><br>*This was completed through November but not continued into the Comprehensive Program.* | **N/A** | **N/A** | **Partial Compliance** |
| T-10 | FY2020 Implementation Plan | Update pipeline reporting tool.<br><br>*Per assessment rating in T-8 above, the tool was not updated and regularly used.* | **N/A** | **N/A** | **Partial Compliance** |
| T-11 | FY2020 Implementation Plan | Identify DMH staff for pipeline analysis.<br><br>*Two DMH staff were identified to lead the pipeline analysis efforts. However, they did not devote sufficient time and resources to conducting a practically useful analysis and did not implement the analysis regularly.* | **N/A** | **N/A** | **Partial Compliance** |
| T-12 | FY2020 Implementation Plan | Analyze quarterly pipeline issues and potential interventions.<br><br>*While a partial analysis was conducted on 8/27/19 and presented to the Parties, it was confusing and had limited utility; after August 2019, Defendants reported that the analysis was not replicated due to provider reporting issues.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-13 | FY2020 Implementation Plan | Distribute informational bulletin on spend-down grant.<br><br>*The Defendants reported that this was not completed.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-14 | FY2020 Implementation Plan | Distribute spend-down guidance to local Medicaid offices.<br><br>*Instead of providing guidance to local offices, the Defendants designated one office for all Class Member issues related to Medicaid coverage; the new process was activated on 1/1/20. While this represents a different strategy than was required in the Implementation Plan, it does match the intent of the original requirement and as such a rating of in compliance was assigned.* | **N/A** | **N/A** | **In Compliance** |
| T-15 | FY2020 Implementation Plan | Identify DMH [Division of Mental Health] staff to expedite Medicaid issues among Class Members.<br><br>*Staff were identified to address Class Member Medicaid issues.* | **N/A** | **N/A** | **In Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| T-16 | FY2020 Implementation Plan | Update Parties and Monitor on Class Member Medicaid application and redetermination data.<br><br>*The Defendants provided monthly reports to the Parties on Class Member Medicaid issues and resolution status.* | **N/A** | **N/A** | **In Compliance** |
| T-17 | FY2020 Implementation Plan | Determine needed Supplemental Security Income/Social Security Disability Insurance Outreach, Access, and Recovery (SOAR) program staffing for each provider.<br><br>*SOAR funding was included in 7/1/19 provider contracts.* | **N/A** | **N/A** | **In Compliance** |
| T-18 | FY2020 Implementation Plan | Include SOAR staffing in provider contracts.<br><br>*SOAR staffing was included in 7/1/19 provider contracts, but implementation was very weak due to poor management, a lack of mechanisms for provider accountability, and the payment structure.* | **N/A** | **N/A** | **Partial Compliance** |
| T-19 | FY2020 Implementation Plan | Explore feasibility of Department of Human Services-funded attorney referral process for benefits acquisition.<br><br>*After internal deliberations, the Defendants determined not to pursue this program.* | **N/A** | **N/A** | **In Compliance** |
| T-20 | FY2020 Implementation Plan | If feasible, establish DHS-funded attorney referral process for benefits acquisition.<br><br>*The Defendants determined this as unfeasible in requirement T-11, negating the applicability of this requirement.* | **N/A** | **N/A** | **N/A** |
| T-21 | FY2020 Implementation Plan | Draft and release Notice of Funding Opportunity (NOFO) for flexible funding for providers.<br><br>*Defendants determined that a NOFO was not necessary and instead amended provider contracts to allow for use of flexible funds.* | **N/A** | **N/A** | **In Compliance** |
| T-22 | FY2020 Implementation Plan | Include flexible funding in provider contracts.<br><br>*Flexible funding was added to provider contracts two months after the due date.* | **N/A** | **N/A** | **In Compliance** |
| T-23 | FY2020 Implementation Plan | Review flexible funding utilization on a monthly basis.<br><br>*During FY2020, the Defendants did not monitor flexible funding utilization; they developed a data infrastructure to collect and analyze this information, but did not do so during the fiscal year, in part because of reporting extensions granted to Comprehensive Program providers during the COVID-19 crisis.* | **N/A** | **N/A** | **Partial Compliance** |

| T-24 | FY2020 Implementation Plan | Provide bonus/retention funding for defined positions.<br><br>*Bonus and retention funding was included in Comprehensive Program contracts.* | **N/A** | **N/A** | **In Compliance** |
|------|------|------|------|------|------|
| T-25 | FY2020 Implementation Plan | Analyze impact of bonus/retention funding.<br><br>*Utilization of funding was not reviewed or analyzed given reporting issues due to COVID-19. However, since a reporting structure was setup, the Defendants receive a partial compliance rating.* | **N/A** | **N/A** | **Partial Compliance** |
| T-26 | FY2020 Implementation Plan | Implement incentive payment program to enhance Medicaid Managed Care Organization (MCO) role in transitions from nursing facilities.<br><br>*This was not completed in FY2020.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-27 | FY2020 Implementation Plan | Review and address MCO contracts.<br><br>*This activity was not completed but was later completed in FY2021.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-28 | FY2020 Implementation Plan | Convene DHS, HFS, MCOs, and *Colbert* providers<br><br>*These stakeholders convened a meeting on June 30, 2020 and held other meetings with subgroups throughout FY2020.* | **N/A** | **N/A** | **In Compliance** |
| T-29 | FY2020 Implementation Plan | Complete development of PASRR redesign.<br><br>*PASRR was not redesigned in FY2020, but HFS did engage consultants to analyze the existing PASRR system.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-30 | FY2020 Implementation Plan | Implement PASRR redesign.<br><br>*PASRR redesign activities were not executed in FY2020.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-31 | FY2020 Implementation Plan | Convert to new PASRR assessment system.<br><br>*PASRR redesign activities were not executed in FY2020.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-32 | FY2020 Implementation Plan | Add three new staff to support PASRR redesign implementation.<br><br>*HFS did not hire new staff but did engage a consulting firm to provide subject matter expertise on project support.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-33 | FY2020 Implementation Plan | Analyze IPS [Individual Placement Support] enrollment and employment data and establish baselines and benchmarks.<br><br>*The Defendants provided an employment briefing in January 2020 that included baseline data and performance benchmarks.* | **N/A** | **N/A** | **In Compliance** |

In Compliance: Requirement 25, Transition Activity Schedule. The Defendants remained in compliance with the development of a transition activity schedule by placing 2,194 Class Members on the required schedule when only 2,000 were required in the Updated Cost Neutral Plan. They are found in compliance with this requirement.

Out-of-Compliance: Requirement 26, Transition Timeliness. The Defendants reported that the average duration between a Class Members' agreement to assessment and transition was 360 days in the first half of the fiscal year. They did not provide data for the second half of the fiscal year. Further, the average duration of time between a Class Members' completed assessment and transition for the two halves of the fiscal year is was 292 days. While there is no specific duration of time identified in the Consent Decree for transition, these figures represent protracted delays between assessment and transition. The Defendants are found out-of-compliance.

Out-of-Compliance: Requirement 27, First-Half FY2020 Numeric Transition Requirement. The Updated Cost Neutral Plan requires 450 transitions for the first half of the fiscal year; 145 (32%) transitions were achieved. This requirement only applies to the first half of the fiscal year because the Updated Cost Neutral Plan filed in 2018 included transition requirements only until CY2019's end. The second half transition requirement was included in the FY2020 Implementation Plan, also 450. For the entire fiscal year, the Defendants achieved 223 transitions or 25 percent of the requirement.

Out-of-Compliance: Requirement 28, Limiting Permanent Supportive Housing Exclusions to Specific Circumstances. Ensuring and tracking exclusionary criteria is a requirement that must precede making non-permanent supportive housing referrals. The Consent Decree requires that Class Members be referred to PSH, with exceptions granted only under three conditions: dementia or other cognitive impairments, need for skilled nursing care, or danger to self or others. During this reporting period, 181 of 223 transitioned Class Members (or 81%) were transitioned to PSH, which shows a significant reliance on PSH in accordance with the Consent Decree. The Defendants cannot provide data that demonstrates that Class Members were placed in non-PSH settings based on these three exceptions. As such, they are found out-of-compliance.

Out-of-Compliance: Requirement 29, Disability Segregation Rule. The Defendants have historically demonstrated compliance in their use of housing units in PSH buildings that follow the rule that no more than 25 percent of residents are known to have disabilities. For FY2020, the Defendants did not provide any data to demonstrate compliance to this requirement and thus are found out-of-compliance.

Out-of-Compliance: Requirement 30, Retention of PSH Units During Hospitalization. The Defendants are required to retain continued residence for Class Members in PSH units who experience short-term hospitalizations. The Defendants indicated that they covered rent for two individuals in the first half of the fiscal year. While seven Class Members needed rental coverage due to nursing facility admission in the second half of the fiscal year, the Defendants were unable to provide data that they covered those rental payments. This results in an out-of-compliance finding.

Out-of-Compliance: Requirement 31, Support for Class Members Subject to Involuntary Discharges. For the first half of the fiscal year, the Defendants did not provide data on the number of involuntary discharges of Class Members from Cook County nursing facilities. For the second half, they reported that 412 involuntary discharges took place but that the dispositions of those Class Members were unclear. Thus, for the entirety of FY2020, the Defendants did not demonstrate that any support was provided to Class Members who were involuntarily discharged. They are found out-of-compliance.

Partial Compliance: Requirement 32, Protect Class Members from Nursing Facility Staff Retaliation. The informed consent form includes information on who Class Members should contact in instances of alleged retaliation for their interest in participating in the transition program — their care coordinator or the Ombudsman. The Defendants reported only one instance of alleged retaliation in FY2020 but it is unclear whether complaints were also made through the standard nursing facility complaint process. Further, data was not provided on the number, type, or disposition of complaints lodged with the Ombudsman. The Defendants should have a mechanism to review the complaints Class Members submit via the standard nursing facility complaint process to determine whether they reflect instances of retaliation, and then address those circumstances. As such, they are found only in partial compliance with this requirement.

**Court Monitor Recommendations for Achieving Compliance with Transition-Related Requirements**
In Figure 22, the Court Monitor reiterates four priority transition recommendations offered during past years and provides a new recommendation for the Defendants' consideration. While these recommendations are not exhaustive, they represent critical actions that will enhance Consent Decree compliance relative to the transition domain.

| Figure 22. Transition-Related Priority Recommendations to Apply to FY2021 and FY2022 | |
| --- | --- |
| Recommendation | Description |
| 1) Investigate and remedy pipeline issues and remove barriers with dedicated resource development to meet the timeliness requirement for moving from service plan to achieved transitions (120 days). | The Court Monitor recommends that the Defendants develop strategies to increase transition timeliness, by conducting regular and thorough pipeline analyses and developing resources to address the issues identified in the analyses. The new Comprehensive Program (implemented in March 2020) was designed to simplify the transition process, and the Defendants should develop a methodology to regularly identify where Class Members continue to get delayed (e.g., housing search issues, low- or no-incomes, and attainment of durable medical equipment) and implement remedies for such. Further, the Defendants must immediately develop and implement the data collection necessary to report the timeframes between Class Member recommendation for transition and actual transition. |
| 2) Develop a tracking mechanism to ensure that Class Members not referred to PSH meet Consent Decree PSH exception criteria. | The Defendants should invest time and attention to developing a methodology to indicate whether those Class Members not referred to PSH or private residences meet the three conditions allowing exclusion or have chosen to live in a different type of residential setting. They should outline steps to develop the methodology, track this data, and ultimately demonstrate compliance. |

| 3) Investigate reasons for involuntary discharges, create or enforce mechanisms to hold facilities accountable for inappropriate discharges, and develop service delivery model for rapid access to community-based services and housing to serve Class Members subject to unexpected discharges. | The escalation in involuntary discharges during the second half of FY2020 raises several questions. The Defendants should investigate the causes of involuntary discharges to ensure that they occur for acceptable reasons. If the Defendants deem discharges as inappropriate, they should apply, enforce, or create mechanisms to hold accountable these facilities who receive public funds to care for vulnerable individuals with serious mental illness. Finally, the Defendants should create a service delivery model — using rapid re-housing and Housing First principles, as well as the Comprehensive Program service infrastructure — to engage Class Members who have been involuntarily discharged into stabilization services. |
|---|---|
| 4) Strengthen ability to track and remedy instances of harassment and retaliation. | It is important that Class Members have recourse in instances where they face harassment due to their decision to participate in the *Colbert* program. As such, the Defendants should enhance their ability to track such events by pulling data from the existing nursing facility complaint system, creating a methodology to determine whether those complaints link with Consent Decree-connected retaliation, and implementing strategies to protect Class Members both proactively and responsively. |

## Section VII. Community-Based Services and Housing Capacity Development

The *Colbert* Consent Decree issued a clear imperative that the Defendants ensure the array and quantity of community-based services and housing opportunities needed to successfully transition appropriate Class Members from nursing facilities. From the onset, the Parties, the Court Monitor, and other stakeholders agreed that the current types and quantities of available services and housing in the community are insufficient to adequately support transition.

Beyond the development of services and housing that specifically serve Class Members, the *Colbert* Consent Decree also provides an opportunity for Illinois to begin rebalancing its mental health and disability services system, moving away from heavy reliance on institutional care toward community-based, recovery-oriented, and person-centered services and housing. By using Class Member data, other states' best practices, and a multimillion-dollar funding allocation for Consent Decree operations, the Illinois systems' leaders can leverage the Consent Decree for real and lasting systems change that strengthens its community-based mental health, other disability, and housing systems.

The *Colbert* Consent Decree has four requirements within the community-based housing and services domain, centered on the identification and creation of needed services and housing and Class Member linkage to community-based services that address needs specified in their service plans. Further, there were 24 additional requirements contained in the FY2020 Implementation Plan centered on improving analysis and reporting of existing and needed capacity, expanding provider contracts, reviewing Medicaid rates, and convening providers.

### Community Services and Housing Development-Related Compliance Requirements: FY2020 Compliance Assessment

As displayed in Figure 23, the Defendants were found in compliance with eight requirements, in partial compliance for five, and out-of-compliance for 12 in this domain.

| Figure 23. Synopsis of FY2020 Compliance Assessments for Community-Based Services and Housing Capacity-Related Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (4) | In Compliance➔ | 0 | Partial Compliance➔ | 0 | Out-of-Compliance➔ | 4 |
| Implementation Plan Requirements (21) | In Compliance➔ | 8 | Partial Compliance➔ | 5 | Out-of-Compliance➔ | 8 |
| Total Requirements (25) | In Compliance➔ | 8 | Partial Compliance➔ | 5 | Out-of-Compliance➔ | 12 |

Figure 24 contains the language of each of this domain's requirements in the *Colbert* Consent Decree and Implementation Plan, along with the Court Monitor's compliance rating. Figure 24 also contains FY2018 and FY2019 ratings to demonstrate whether compliance improved or worsened since the last two compliance periods. For the four requirements that apply to CY2018, FY2019, and FY2020 under this domain, the Defendants' performance for FY2020 remained the same, with all requirements still out-of-compliance.

| | | | Court Monitor Compliance Assessment Ratings | | |
|---|---|---|---|---|---|
| **Req #** | **Source/ Citation** | ***Colbert* Consent Decree, Cost Neutral Plan, or IP Requirement Language** | **First-Half CY2018** | **FY2019** | **FY2020** |

**Figure 24. Compliance Assessment Ratings for Community-Based Services and Housing Capacity Development-Related *Colbert* Consent Decree, Updated Cost Neutral Plan, and Implementation Plans (IP) Requirements**

| Req # | Source/ Citation | *Colbert* Consent Decree, Cost Neutral Plan, or IP Requirement Language | First-Half CY2018 | FY2019 | FY2020 |
|---|---|---|---|---|---|
| 37 | Cost Neutral Plan (2016) Section I | The Defendants, within 30 days of the entry of this Cost Neutral Plan, shall take any and all necessary steps to amend the contract of the Monitor to allow him to hire, retain, and pay the consultant. *(Referred to as Req. 47 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 38 | Cost Neutral Plan (2016) Section I | The Parties and the Monitor shall discuss the consultant's findings and incorporate the Monitor's recommendations based on those findings into or as an Amendment to the updated Implementation Plan. *(Referred to as Req. 48 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 39 | Cost Neutral Plan (2016) Section F | During the second quarter of calendar year 2017, the Parties and the Monitor shall discuss the proposals made by the consultant pursuant to his/her review outlined in paragraph I. *(Referred to as Req. 52 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 40a | *Cost Neutral Plan (2016) Section G* | *The Defendants' responsibility to continue development of an increasing community capacity necessary and appropriate to comply with the Consent Decree and this Plan shall continue under this Plan and shall incorporate and respond to findings by the Monitor and the consultant pursuant to Paragraph I herein. (Referred to as Req. 53 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 40b | Updated Cost Neutral Plan (2018) Section G | The Defendants' responsibility to continue development of an increasing Community Capacity necessary and appropriate to comply with the Consent Decree and this Plan shall continue under this Plan and shall incorporate and respond to findings by the Monitor and the consultant pursuant to paragraph I herein. | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** ✖ |

| | | | | | |
|---|---|---|---|---|---|
| 41 | Consent Decree Section V | Defendants shall develop and implement necessary and sufficient measures, services, supports, and other resources, such as having service providers available for and able to locate affordable housing, to arrange for transition into Community-Based Settings, and to assist Class Members with accessing Community-Based Services, consistent with the choices of Class Members, to ensure that the Defendants will meet their obligations under the Decree and the Implementation Plan. Nothing in this Consent Decree shall reduce, impair or infringe on any rights or entitlements of any Class Members in any State program or in any Medicaid program. *(Referred to as Req. 54 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** ✕ |
| 42a | *Consent Decree Section VI(C)(6)* | *The Defendants shall identify or develop sufficient numbers of appropriate Community-Based Settings so that Class Members placed on the Community Transition Schedule will be able to move to appropriate Community-Based Settings as quickly as possible consistent with the Cost Neutral Plan. (Referred to as Req. 56 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 42b | *Cost Neutral Plan (2016) Section C* | *The Defendants shall identify or develop sufficient and appropriate Community-Based Settings and services so that Class Members placed on the Schedule will be able to move to appropriate Community-Based Settings in the time frames stated in this plan, or at a reasonable pace to be determined as set forth in Paragraph E below. (Referred to as Req. 55 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 42c | *Updated Cost Neutral Plan (2018) Section C* | The Defendants shall identify or develop appropriate Community-Based Settings and services so that Class Members placed on the Schedule will be able to move to appropriate Community-Based Settings in the time frames stated in this plan, or at a reasonable pace to be determined as set forth in paragraph F below. | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** ✕ |
| 43 | Consent Decree Section VI(D)(1) | Defendants shall ensure that Class Members who move to a Community-Based Setting have access to all appropriate Community-Based Services, Transition Costs, Home Accessibility Adaptation Costs and/or Housing Assistance specified in their Service Plan. *(Referred to as Req. 57 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** ✕ |

| | | | | | |
|---|---|---|---|---|---|
| C-1 | FY2020 Implementation Plan | Complete geo-map to identify gaps in housing and service needs.<br><br>*The Defendants are assigned an out-of-compliance rating for several reasons. While they did include geo-maps in their capacity development plan (submitted on 6/3/20), the geo-maps only identified the proximity of 811/Statewide Referral Network (SNR) housing locations relative to long-term care facilities and drop-in centers, which constitutes a marginal percentage of all Colbert Class Member housing, according to data from FY2017 to FY2019. Further, the geo-maps did not identify potential providers relative to Class Members' preferred housing locations.[27]* | N/A | N/A | **Out-of-Compliance** |
| C-2 | FY2020 Implementation Plan | Improve Statewide Referral Network (SRN) reporting.<br><br>*This was partially completed. While housing waitlist data is reported monthly, the analysis of SRN was not completed.* | N/A | N/A | **Partial Compliance** |
| C-3 | FY2020 Implementation Plan | Reconvene housing workgroup/taskforce.<br><br>*Defendants reported holding housing workgroup meetings throughout the fiscal year.* | N/A | N/A | **In Compliance** |
| C-4 | FY2020 Implementation Plan | Research and apply for Housing and Urban Development (HUD) mainstream voucher program.<br><br>*The Illinois HUD was ineligible to apply directly for the mainstream voucher program but did contact local housing authorities to offer application support.* | N/A | N/A | **In Compliance** |
| C-5 | FY2020 Implementation Plan | Track and report on granted waivers to landlords.<br><br>*Waivers granted to landlords to suspend disability residential segregation rules were tracked during FY2020.* | N/A | N/A | **In Compliance** |
| C-6 | FY2020 Implementation Plan | Improve ability to track housing need and availability data through SRN/811 waiting list.<br><br>*The Defendants developed new referral and reporting processes and provided data regularly in data dashboards.* | N/A | N/A | **In Compliance** |
| C-7 | FY2020 Implementation Plan | Issue solicitation to identify housing experts.<br><br>*The Defendants decided to use their in-house housing experts, as well as the Corporation for Supportive Housing; they stated that no new procurement of outside expert services was needed.* | N/A | N/A | **N/A** |

[27] The Defendants disagreed with this compliance rating, citing that the "Capacity Development Plan submitted on 6/30/20 contained nine (9) separate geo-maps, four (4) of which identified Class Member housing locations in the community in relation to the most significant community-based resource: Drop-In Centers.

| | | | | | |
|---|---|---|---|---|---|
| C-8 | FY2020 Implementation Plan | Contract with housing experts.<br><br>*Not applicable due to the outcome of S-26.* | **N/A** | **N/A** | **N/A** |
| C-9 | FY2020 Implementation Plan | Issue report from housing experts.<br><br>*Not applicable due to the outcome of S-26.* | **N/A** | **N/A** | **N/A** |
| C-10 | FY2020 Implementation Plan | Issue plan and recommended actions from housing experts.<br><br>*Not applicable due to the outcome of S-26.* | **N/A** | **N/A** | **N/A** |
| C-11 | FY2020 Implementation Plan | Review all steps in the housing process.<br><br>*The Defendants did conduct provider-centered visits and observed of transition services and the housing process, to inform the design of the Comprehensive Class Member Transition Program. The Court Monitor provides a partial compliance rating given that pipeline issues still persist.*[28] | **N/A** | **N/A** | <span style="background-color:yellow">**Partial Compliance**</span> |
| C-12 | FY2020 Implementation Plan | Convene a core housing locator/housing options organization workgroup.<br><br>*This was not completed. The Defendants indicated that the housing locator model was modified under the new Comprehensive Program but the objective of this workgroup — even if the housing model changed — would have still been helpful for the Defendants.* | **N/A** | **N/A** | <span style="background-color:red">**Out-of-Compliance**</span> |
| C-13 | FY2020 Implementation Plan | Update data management system to track community-based housing choices, including SRN/811 units.<br><br>*The data management system was updated to track housing choices by 10/23/19.* | **N/A** | **N/A** | <span style="background-color:green">**In Compliance**</span> |
| C-14 | FY2020 Implementation Plan | Expand housing options available to members with complex co-morbid conditions.<br><br>*This was not completed.* | **N/A** | **N/A** | <span style="background-color:red">**Out-of-Compliance**</span> |
| C-15 | FY2020 Implementation Plan | Develop and implement standardized process for obtaining necessary documentation.<br><br>*This was not completed.* | **N/A** | **N/A** | <span style="background-color:red">**Out-of-Compliance**</span> |

---

[28] The compliance rating was changed from out-of-compliance to partial compliance. The Defendants requested an in compliance rating.

| | | | | | |
|---|---|---|---|---|---|
| C-16 | FY2020 Implementation Plan | Work with 811 match to move Class Members from bridge subsidies to housing choice vouchers.<br><br>*The Defendants implemented a policy to enroll Class Members with housing bridge subsidies in the SRN nine months after this requirement's due date. Given the minuscule utilization of these units among Class Members, this is not an adequate response/strategy to move Class Members from bridge subsidies to more sustainable rental assistance programs. The Defendants provided no data on Class Members who transitioned from bridge subsidies to other housing financing programs in FY2020.* | N/A | N/A | **Out-of-Compliance** |
| C-17 | FY2020 Implementation Plan | Schedule and hold first provider summit.<br><br>*The Defendants held the first provider summit on 8/20/19, before the due date.* | N/A | N/A | **In Compliance** |
| C-18 | FY2020 Implementation Plan | Create initial service and housing capacity development plan.<br><br>*The Defendants submitted a capacity development plan on 12/31/19, by the Implementation Plan deadline of 1/1/20. However, the plan was poor in quality and scope, prompting the Court Monitor to formally request a revised plan, which was substantially improved and submitted to the Parties and Court Monitor on 6/30/20.* | N/A | N/A | **Partial Compliance** |
| C-19 | FY2020 Implementation Plan | Review and analyze contracts and identify needed modifications.<br><br>*In lieu of modifying existing service provider contracts, the Defendants executed new provider contracts through the Comprehensive Program in February 2020.* | N/A | N/A | N/A |
| C-20 | FY2020 Implementation Plan | Schedule and hold second provider summit.<br><br>*The Defendants held the second provider summit on 12/9/19, by the due date of 12/15/19.* | N/A | N/A | **In Compliance** |
| C-21 | FY2020 Implementation Plan | Prepare summary of recommendations for contract modifications.<br><br>*In lieu of modifying existing provider contracts, the Defendants executed new provider contracts through the Comprehensive Program in February 2020.* | N/A | N/A | N/A |
| C-22 | FY2020 Implementation Plan | Identify needed modifications for FY2021 provider contracts.<br><br>*In lieu of modifying existing provider contracts, the Defendants executed new provider contracts through the Comprehensive Program in February 2020. Those contracts were renewed for FY2021 and included an expansion of peer support services as requested by the Court Monitor.* | N/A | N/A | N/A |

| | | | | | |
|---|---|---|---|---|---|
| C-23 | FY2020 Implementation Plan | Schedule and hold third and fourth provider summits.<br><br>*The third provider summit was canceled due to COVID-19. The fourth provider summit was not scheduled, but a "Restore and Reinvent" Workgroup was assembled starting 6/3/20 and met on a weekly basis for the remainder of FY2020. The Defendants good faith effort to comply with the intention of and actual requirement earned an in compliance rating.* | **N/A** | **N/A** | **In Compliance** |
| C-24 | FY2020 Implementation Plan | Identify rates for rate review.<br><br>*The Department of Healthcare and Family Services (HFS) shared summaries of provider input on rates they proposed to be reviewed on 12/19/19, three-and-a-half months past the deadline.* | **N/A** | **N/A** | **Partial Compliance** |
| C-25 | FY2020 Implementation Plan | Provide report to Plaintiffs and Monitor on which rates will be subject to review.<br><br>*HFS shared proposed rates for review with the Court Monitor nearly three months late. The Court Monitor, after requesting additional information on the link between provider input and HFS identified rates, did not receive a response from HFS for another two months.* | **N/A** | **N/A** | **Partial Compliance** |
| C-26 | FY2020 Implementation Plan | Conduct review of identified rates.<br><br>*HFS was required to complete this activity by 11/15/19, but it was not completed in all of FY2020, despite this being a FY2019 carry-over Implementation Plan requirement. HFS completed the rate study in FY2021.* | **N/A** | **N/A** | **Out-of-Compliance** |
| C-27 | FY2020 Implementation Plan | Provide rate recommendations to Governor's Office of Management and Budget in conjunction with FY2020 budget.<br><br>*HFS was required to complete this by 12/31/19; it was not completed in FY2020.* | **N/A** | **N/A** | **Out-of-Compliance** |
| C-28 | FY2020 Implementation Plan | Provide report to Parties and Monitor on final rate changes.<br><br>*HFS was required to complete this around 2/20/20 or when it was cleared by the Governor's Office for release; it was not completed in FY2020. The report was shared with Parties and the Court Monitor on 10/14/20.* | **N/A** | **N/A** | **Out-of-Compliance** |
| Court Monitor Requirements | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| CM1 | Cost Neutral Plan (2016) Section I | *The Monitor, at the State's expense, with the input of the Defendants and Class Counsel, will retain an appropriate independent consultant (who will be solely chosen by, directly supervised by, report to, be directed by and solely responsible to the Monitor) to advise the Monitor on how the Defendants can develop Community Capacity sufficient to transition the required number of Class Members under the Consent Decree and the Cost Neutral Plan. The consultant will determine the current barriers to the Defendants' development of Community Capacity required to achieve compliance with the Consent Decree and the Cost Neutral Plan and to transition greater numbers of Class Members to Community-Based Settings in the future. (Referred to as Reqs. 49 and 50 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| CM2 | Cost Neutral Plan (2016) Section I | *Within six months of the Court's approval of this Cost Neutral Plan Order, the Monitor will submit a proposal to the Defendants and Class Counsel which includes recommendations for addressing barriers to the development of Community Capacity and recommendations for substantially expanding Community Capacity in order to transition Class Members as required by the Consent Decree and the Cost Neutral Plan. (Referred to as Req. 51 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |

<u>Out-of-Compliance: Requirements 40, 41, 42, and 43, Design, Develop, and Make Available Services and Housing to Match Class Member Needs and Preferences.</u>
These requirements obligate the Defendants to provide sufficient types and quantities of services and housing options, and then, match Class Members to those resources based on the preferences and needs delineated in service plans. The Defendants are found out-of-compliance for these requirements because they did not utilize extant data and information to design a comprehensive services and housing plan.

Since the Decree's onset, in lieu of a statewide plan, housing and services investments were most often piecemeal, reactive, and provider initiated. While the State's responsiveness to service and housing providers is a positive attribute, it is, by itself, insufficient. The Consent Decree obligates the Defendants to use Class Member data as a needs assessment (e.g., the number of Class Members already in the community who need these services, in the transition pipeline, required to transition in that fiscal year or in the subsequent year) to inform services and housing capacity development.

An important development in this domain during FY2020, the Defendants, for the first time since the onset of the Decree — formally designed a services and housing capacity development plan. The initial plan, completed on December 31, 2019, was poor in quality and scope; it neither used data to quantify housing and services needs nor made commitments regarding the quantity, quality, and timing surrounding

investments in new services and housing, as required. After the Court Monitor supplied a template to collect capacity and needs data and identify gaps, the Defendants submitted a much-improved iteration of the plan six months later, on the last day of FY2020 (June 30, 2020). The revised plan moved them closer to a data-driven approach to systematically assess the adequacy of the current services and housing systems, determine gaps, identify needed services and housing resources and associated costs to close these gaps. In FY2021, the Defendants presented key findings from the plan and implications for services and housing enhancements in FY2021.

The newer FY2020 capacity development plan presents a framework on which to build a higher quality and more comprehensive FY2021 plan. After reviewing it, the Court Monitor offered the Defendants the following recommendations for future plans:

- Incorporate services outside of Assertive Community Treatment and Community Support Teams such as peer services, physical health services, occupational therapy, and physical disability services.
- Include a plan for housing resources to support the diversion program.
- Provide plans to expand evidence-based substance use disorder and/or co-occurring services.
- Consistently structure the plan to present easy-to-follow data on need, current capacity, and gaps.
- Beyond identifying the numeric delta between housing and services capacity versus need, factor in Class Member preferences, Class Member clinical needs/acuity level, and other information to move past "sufficient quantity" to "adequate quality."
- Use service plan and demographic data to inform housing and services capacity development, a Consent Decree requirement.

This enhanced capacity development planning approach is expected to benefit Consent Decree planning, implementation, and compliance moving forward.

**Court Monitor Recommendations for Achieving Compliance with Community-Based Services and Housing Development-Related Requirements**
In Figure 25, the Court Monitor provides two priority recommendations offered in prior years' reports for the Defendants' consideration pertaining community-based housing and services development. While these recommendations are not exhaustive, they represent critical actions that will enhance Consent Decree compliance in this domain.

| Figure 25. Community-Based Services and Housing Development-Related Priority Recommendations to Apply to FY2021 and FY2022 | |
| --- | --- |
| **Recommendation** | **Description** |
| 1) Improve data-driven needs assessment and capacity development planning in the FY2022 Capacity Development Plan. | Using Class Member-, program-, and system-level data, the Defendants should build upon their FY2020/FY2021 Capacity Development Plan to determine the specific types and numbers of services, supports, and housing investment(s) needed to support and sustain required Class Member transitions. This plan should also incorporate information on Class Member acuity and geographic locations and preferences into the planning process. |

| 2) Implement a housing first[29]-oriented program, including a landlord engagement program, to facilitate access to high-quality rental units that match Class Member location preferences. | It is not uncommon for Class Members to reject units on Statewide Referral Network (SNR)/811 listings because of the units' location or quality. As such, the Defendants should implement a concerted effort to recruit landlords in highly desired areas, using national best practices from housing first organizations. Further, the Defendants should deploy a housing first approach, prioritizing prompt and low-demand access to PSH, wrapping supports around each individual, and qualifying individuals for housing without any preconditions. |
|---|---|

---

[29] According to the National Alliance to End Homelessness, housing first is defined as a homeless assistance approach that prioritizes providing permanent housing to people experiencing homelessness, thus ending their homelessness and serving as a platform from which they can pursue personal goals and improve their quality of life.

## Section VIII. Administrative Requirements

It is critical that the Defendants support *Colbert* Consent Decree planning and operations with strong management and administrative processes. As such, the Consent Decree includes a number of administrative requirements, including obligations for timely reporting on performance relative to Consent Decree and Implementation Plan requirements, responsiveness to the Court Monitor and Plaintiffs' data and information requests, and unfettered access to Class Members and their records, as well as to various staff and stakeholders related to Consent Decree planning, operations, and implementation. The Defendants' administrative requirements during the FY2020 compliance period include:

▪ Delivering semiannual reports containing the information and data agreed to by the Court Monitor and Parties (Requirement 38).
▪ Providing the Court Monitor unrestricted access to documents, information, and staff involved with the Consent Decree, without counsel present (Requirement 39).
▪ Ensuring the Court Monitor's unrestricted access to Class Members and their records (Requirement 40).
▪ Providing data and information requested by Plaintiffs (Requirement 41).
▪ Compensating the Court Monitor and her staff consistent with their customary rates (Requirement 42).
▪ Covering all costs associated with the Decree (Requirement 43).

The FY2020 Implementation Plan contains additional requirements related to staffing analyses and hiring, regular Consent Decree meetings, development of the FY2021 Implementation Plan, and required reporting. The administrative domain also includes two Court Monitor-related requirements involving her obligation to identify issues of non-compliance, produce an annual report within 60 days after each year of service, and mediate issues of non-compliance, including when Plaintiffs raise allegations of the Defendants' non-compliance.

**Administrative Compliance Requirements: Compliance Assessment for FY2020**
As displayed in Figure 26, the Defendants were found in compliance with 23 requirements, in partial compliance for four requirements, and out-of-compliance with no requirements. The two requirements of the Court Monitor are also in compliance.

| Figure 26. Synopsis of FY2020 Compliance Assessments for Administration-Related *Colbert* Consent Decree and Implementation Plan Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (7) | In Compliance➔ | 5 | Partial Compliance➔ | 2 | Out-of-Compliance➔ | 0 |
| Implementation Plan Requirements (20) | In Compliance➔ | 18 | Partial Compliance➔ | 2 | Out-of-Compliance➔ | 0 |
| Total Requirements (27) | In Compliance➔ | 23 | Partial Compliance➔ | 4 | Out-of-Compliance➔ | 0 |

Figure 27 contains the language of each administration-related requirement in the *Colbert* Consent Decree and the FY2020 Implementation Plan, along with the Court Monitor's compliance ratings. Figure 27 also contains CY2018 and FY2019 ratings to

demonstrate whether compliance improved or worsened since those compliance periods. For the six requirements that apply to the three consecutive periods, the Defendants' improved on one compliance rating and worsened on another and the remaining four were unchanged.

| | | | Court Monitor Compliance Assessment Ratings | | |
|---|---|---|---|---|---|
| Req # | Source/ Citation | *Colbert* Consent Decree, Cost Neutral Plan, or IP Requirement Language | First-Half CY2018 | FY2019 | FY2020 |
| **Figure 27. Compliance Assessment Ratings for Administration-Related** *Colbert* **Consent Decree, Updated Cost Neutral Plan, and Implementation Plan (IP) Requirements** | | | | | |
| Compliance Domain: Administration-Related Requirements | | | | | |
| 44 | Consent Decree Section IX(C) | Defendants will not refuse any request by the Monitor for documents or other information that are reasonably related to the Monitor's review and evaluation of Defendant's compliance with the Decree, and Defendants will, upon reasonable notice, permit confidential interviews of Defendant's staff or consultants, except their *attorneys. (Referred to as Req. 58 in CY2017 Report.)* | **In Compliance** | **Partial Compliance** | **Partial Compliance** |
| 45 | Consent Decree Section IX(A) | The Court will appoint an independent and impartial Monitor who is knowledgeable concerning the management and oversight of programs, including waiver programs that serve Individuals with Mental Illness and Physical Disabilities of all ages. The Parties shall attempt to agree on the selection of a Monitor to propose to the Court. If the Parties are unable to reach agreement, each party will nominate at least one person to serve as Monitor, and the Court will select the Monitor. Within 21 days of the Approval of the Decree, the Parties shall submit their joint recommendation or separate nominations for a Monitor to the Court. In the event the Monitor resigns or otherwise becomes unavailable, the process described above will be used to select a replacement. *(Referred to as Req. 59 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| 46 | Consent Decree Section IX(C) | The Monitor shall review and evaluate the Defendants' compliance with the terms of the Decree. Not less than every six months, starting no later than three months after finalization of the Implementation Plan, Defendants shall provide the Monitor and Plaintiffs with detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and progress toward achieving compliance, with Parties and Monitor agreeing in advance of the first report of the data and information that must be included in such report. *(Referred to as Req. 60 in CY2017 Report.)* | **In Compliance** | **In Compliance** | **In Compliance** |
| 47 | Consent Decree Section IX(C) | The Defendants shall comply with the Class Counsel's requests for information that are reasonably related to Defendants' compliance with Decree, including without limitation requests for records and other relevant documents pertinent to the implementation of the Decree or to Class Members. Class Counsel also shall be permitted to review the information provided to the Monitor. All information provided to the Monitor and/or Class Counsel pursuant to the Decree shall be provided subject to the Protective Order and any applicable HIPAA requirements. *(Referred to as Req. 61 in CY2017 Report.)* | **In Compliance** | **In Compliance** | **Partial Compliance** |
| 48 | Consent Decree Section IX(E) | The Monitor may hire staff as necessary to fulfill his or her duties under the Decree. Defendants shall compensate Monitor and his/her staff and consultants at their usual and customary rate; reimburse all reasonable expenses to the Monitor and the Monitor's staff; consistent with guidelines set forth in "Governor's Travel Control Board Travel Guide for State Employees." After negotiation, comment and a good faith attempt to resolve all differences, Defendants may seek relief from the Court if Defendants believe that any of the Monitor's charges is inappropriate or unreasonable. *(Referred to as Req. 62 in CY2017 Report.)* | **In Compliance** | **In Compliance** | **In Compliance** |
| 49a | *Cost Neutral Plan (2016) Section J* | *All provisions of the Consent Decree and the current Implementation Plan not specifically changed or modified by this Cost Neutral Plan or the updated Implementation Plan described in paragraph H, shall remain in full force and effect. The Parties and the Monitor, after filing their reports, shall meet with the Court at least annually to discuss and report on their progress. (Referred to as Req. 64 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |

| 49b | Updated Cost Neutral Plan (2018) Section J | All provisions of the Consent Decree and the current Implementation Plan not specifically changed or modified by this Updated Cost Neutral Plan shall remain in full force and effective. The Parties and the Court Monitor shall meet with the Court at least annually to discuss and report on their progress. | In Compliance | In Compliance | In Compliance |
|---|---|---|---|---|---|
| 50 | Consent Decree Section IX(C) | The Monitor will have access to all Class Members and their records and files, as well as to those service providers, facilities, buildings, and premises that serve, or are otherwise pertinent to, Class Members, where such access is reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree. *(Referred to as Req. 66 in CY2017 Report.)* | In Compliance | Partial Compliance | In Compliance |
| 51 | Consent Decree Section XII(B) | The cost of all notices hereunder or otherwise ordered by the Court shall be borne by the Defendants. *(Referred to as Req. 63 in CY2017 Report.)* | In Compliance | In Compliance | In Compliance |
| 52 | Consent Decree Section IX(C) | *Within 60 days of Approval of the Decree, Defendants shall offer each of the Class Representatives the opportunity to receive appropriate services in the most integrated setting appropriate to his or her needs. Provision of services to the Class Representatives pursuant to this paragraph shall not be used to determine any other individual's eligibility for services under the terms of this Decree. (Referred to as Req. 69 in CY2017 Report.)* | N/A | N/A | N/A |
| 52 | *Consent Decree Section X* | *Within 60 days of Approval of the Decree, Defendants shall offer each of the Class Representatives the opportunity to receive appropriate services in the most integrated setting appropriate to his or her needs. Provision of services to the Class Representatives pursuant to this paragraph shall not be used to determine any other individual's eligibility for services under the terms of this Decree. (Referred to as Req. 69 in CY2017 Report.)* | N/A | N/A | N/A |

| | | | | | |
|---|---|---|---|---|---|
| 53 | *Consent Decree Section XI(A)* | *In full settlement of all attorney fees and costs incurred in connection with the litigation, Defendants shall pay $1,200,000 to Class Counsel in three equal payments. Defendants shall make the first payment in State Fiscal Year 2012 (which begins on July 1, 2011), the second payment in State Fiscal Year 2013 (which begins July 1, 2012), and the third payment in State Fiscal Year 2014 (which begins July 1, 2013). All of the payments shall be distributed to Class Counsel in the manner set forth in written instructions provided by Class Counsel. Furthermore, such amounts shall be set forth in one or more Judgment Orders to be entered by the Court within 14 days after Approval of the Decree. Defendants shall complete and submit all paperwork necessary for the first payment, plus applicable statutory post-judgment interest within (a) five business days after expiration of the time to appeal the Decree without the filing of a Notice of Appeal, or after the issuance of the mandate by the highest reviewing court, whichever is later, or (b) April 1, 2012, whichever is later. Defendants shall complete and submit all paperwork necessary for the second payment no later than July 1, 2012 and the paperwork necessary for the third payment, no later than July 1, 2013. (Referred to as Req. 70 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 54 | *Cost Neutral Plan (2016) Section K* | *Until the Consent Decree is terminated, the Court shall retain exclusive jurisdiction to fully oversee, supervise, modify and enforce the terms of the Consent Decree, the current and updated Implementation Plan and this Cost Neutral Plan. (Referred to as Req. 71 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 55 | *Cost Neutral Plan (2016) Section K* | *Pursuant to Section XIII of the Consent Decree, the Parties, jointly or separately, may request termination of the monitoring process described in Section XIII of the Consent Decree, the Consent Decree, the updated Implementation Plan and this Cost Neutral Plan at any time after December 31, 2019, if the Monitor agrees that Defendants have substantially complied with the terms of the Consent Decree, the Implementation Plan and this Cost Neutral Plan. (Referred to as Req. 72 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 56 | *Cost Neutral Plan (2016) Section K* | *Defendants shall notify Class Counsel in writing if they intend to seek termination of the Consent Decree. (Referred to as Req. 73 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |

| 57 | *Cost Neutral Plan (2016) Section K* | *Class Counsel shall have 120 days from receipt of the Termination Request to conduct reasonable discovery concerning issues relevant to the determination of compliance. If Class Counsel oppose the Termination Request, Class Counsel may file a response within 120 days from the date of receipt of all information reasonably requested from defendants in the conduct of discovery. (Referred to as Req. 74 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
|---|---|---|---|---|---|
| 58 | *Cost Neutral Plan (2016) Section K* | *The Court may grant Defendants' Termination request if the Court finds that Defendants have substantially complied with the terms of the Consent Decree, and the Court determines that Defendants have implemented and are maintaining a system that complies with the Consent Decree, the Implementation Plan and this Cost Neutral Plan. (Referred to as Req. 75 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 59 | *Cost Neutral Plan (2016) Section K* | *The Consent Decree, the Implementation Plan and this Cost Neutral Plan shall remain in effect, and the Court shall retain its jurisdiction over the Consent Decree, the Implementation Plan and this Cost Neutral Plan, until a final order is entered granting a Termination and all appellate rights have been exhausted. (Referred to as Req. 76 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 60 | *Consent Decree Section XII(A)* | *Approval of this Decree shall be deemed to occur on the date of the Court enters the Decree. (Referred to as Req. 77 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 61 | *Consent Decree Section XII(C)* | *Each undersigned representative of a Defendant to this litigation and the Attorney General for the State of Illinois certifies that he or she is authorized to enter into the terms and conditions of the Decree and to execute and bind legally such Defendant to this document. Each undersigned representative of Plaintiffs certifies that he or she is authorized to enter into the terms and conditions of the Decree and to execute and bind legally the Plaintiffs to his document. (Referred to as Req. 78 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 62 | *Consent Decree Section XII(D)* | *Unless otherwise ordered by the Court, this Decree shall terminate at the earliest to the following: (1) as specified in the Parties' joint motion to terminate the Decree, as provided in Section VI.C.4, or (2) as specified in the Cost Neutral Plan approved by the Court. (Referred to as Req. 79 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| A-1 | FY2020 Implementation Plan | Hire Olmstead Compliance Officer.<br><br>*The Olmstead Compliance Officer began her role on 6/17/19, shortly before the deadline of 7/1/19.* | **N/A** | **N/A** | **In Compliance** |
| A-2 | FY2020 Implementation Plan | Support efforts to hire Williams Administrator/Deputy Director of Systems Rebalancing.<br><br>*The Defendants hired this position on 9/20/19. After that individual's departure soon after the hire, they re-filled the position on 2/24/19.* | **N/A** | **N/A** | **In Compliance** |
| A-3 | FY2020 Implementation Plan | Transition *Colbert* budget from IDoA [Illinois Department on Ageing] to DHS [Department of Human Services].<br><br>*Most of the Colbert budget transitioned to IDHS by 12/1/19 with the rest remaining with IDoA until the close of FY20. The Comprehensive Program was solely funded by IDHS.* | **N/A** | **N/A** | **In Compliance** |
| A-4 | FY2020 Implementation Plan | Identify organizational structure for *Colbert* staff within DHS.<br><br>*Colbert staff moved to IDHS under DMH [Department of Mental Health] by 7/1/19. An integrated Williams/Colbert staffing approach was implemented to support the Comprehensive Program.* | **N/A** | **N/A** | **In Compliance** |
| A-5 | FY2020 Implementation Plan | Complete NOFO [Notice of Funding Opportunities] process to enter into contracts between IDHS and *Colbert* providers.<br><br>*This was achieved through the shift to the Comprehensive Program in early 2020.* | **N/A** | **N/A** | **In Compliance** |
| A-6 | FY2020 Implementation Plan | Identify physical location for and relocate *Colbert* staff.<br><br>*Colbert staff relocated to the IDHS office on 12/16/19.* | **N/A** | **N/A** | **In Compliance** |
| A-7 | FY2020 Implementation Plan | Complete comprehensive analysis of staffing needs and resources.[30]<br><br>*The Defendants provided no evidence that they conducted a thorough staffing analysis. They reported that they restructured staff to support monitoring the new Comprehensive Program. However, in the Court Monitor's view, the staffing assigned to Consent Decree operations was (and still is) inadequate, as she specified more than four years ago.* | **N/A** | **N/A** | **Partial Compliance** |

[30] The Defendants disagreed with the compliance ratings for A-7 and A-8, citing that a staffing analysis was conducted to re-structure the *Colbert* team for the Comprehensive Program, resulting in 30 staff being assigned to new roles to meet the the needs of the Comprehensive Program during the COVID-19 pandemic.

| | | | | | |
|---|---|---|---|---|---|
| A-8 | FY2020 Implementation Plan | Reassign and fill additional positions as needed.<br><br>*A number of staffing areas were informally identified but not addressed in FY2020, including needed administrative and contract management assistance, communications and marketing experts, quality review and quality assurance support, and management level staff. While the Defendants reported restructuring staff to monitor the new Comprehensive Program, these other important functions remained unaddressed in the form of dedicated staff hires. The partial compliance rating resulted from the staffing reassignments that were reported.* | **N/A** | **N/A** | **Partial Compliance** |
| A-9 | FY2020 Implementation Plan | Convene monthly Large Parties Meetings.<br><br>*There was agreement between the Court Monitor and Parties to hold bimonthly Large Parties Meetings, alternating with smaller topic-focused Small Parties Meetings to provide opportunity for in-depth discussions and negotiations. These meetings occurred within their schedules during the fiscal year.* | **N/A** | **N/A** | **In Compliance** |
| A-10 | FY2020 Implementation Plan | Convene monthly State-Only Meetings.<br><br>*The Defendants, via IDHS, convened monthly meetings of Defendant and other state agencies relevant to Consent Decree operations in FY2020.* | **N/A** | **N/A** | **In Compliance** |
| A-11 | FY2020 Implementation Plan | Convene monthly DHS and Court Monitor Meetings.<br><br>*These meetings were held monthly in FY2020.* | **N/A** | **N/A** | **In Compliance** |
| A-12 | FY2020 Implementation Plan | Convene meetings between Olmstead Compliance Officer and her staff and Court Monitor.<br><br>*These meetings were held weekly in FY2020.* | **N/A** | **N/A** | **In Compliance** |
| A-13 | FY2020 Implementation Plan | Identify and execute intergovernmental agreement (IGA) with housing authority of Cook County.<br><br>*This IGA was executed on 6/28/19.* | **N/A** | **N/A** | **In Compliance** |
| A-14 | FY2020 Implementation Plan | Enter into new agreements with providers.<br><br>*The Defendants entered into new agreements with nine new "prime" provider agencies under the Comprehensive Program.* | **N/A** | **N/A** | **In Compliance** |
| A-15 | FY2020 Implementation Plan | Move filled personnel positions and contracts to DHS.<br><br>*All positions were moved to IDHS effective 7/1/19 with the exception of the administrative assistant.* | **N/A** | **N/A** | **In Compliance** |
| A-16 | FY2020 Implementation Plan | Move vacant personal service contracts to DHS.<br><br>*These staff positions were also moved by 7/1/19.* | **N/A** | **N/A** | **In Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| A-17 | FY2020 Implementation Plan | Move IT systems and provide training.<br><br>*The legacy IT system was not brought forward into the Comprehensive Program, rendering this requirement and the associated training not applicable.* | **N/A** | **N/A** | **N/A** |
| A-18 | FY2020 Implementation Plan | Determine budget split between DHS and IDOA.<br><br>*This was completed by 12/1/19.* | **N/A** | **N/A** | **In Compliance** |
| A-19 | FY2020 Implementation Plan | Determine operational location with DHS.<br><br>*The physical location was identified, and staff relocated by 12/16/19.* | **N/A** | **N/A** | **In Compliance** |
| A-20 | FY2020 Implementation Plan | Finalize physical location and move at DHS.<br><br>*The physical location was identified, and staff relocated by 12/16/19.* | **N/A** | **N/A** | **In Compliance** |
| A-21 | FY2020 Implementation Plan | Revise and submit semi-annual reports in consultation with the Monitor.<br><br>*Semiannual reports were submitted on 8/22/19 for the compliance period covering the last half of FY2019 and originally on 3/20/20 for coverage of the first half of FY2020 period.* | **N/A** | **N/A** | **In Compliance** |
| **Court Monitor Requirements** | | | | | |
| CM3 | Consent Decree Section IX(D) | In the event the Monitor finds Defendants not in compliance with the Decree, the Monitor shall promptly meet and confer with the Parties in an effort to agree on steps necessary to achieve compliance. In the event that Class Counsel believe that Defendants are not complying with the terms of the Decree, Class Counsel shall notify the Monitor and Defendants of Defendants' potential non-compliance. The Monitor then shall review Plaintiff's claims of actual or potential noncompliance and, as the Monitor deems appropriate in his or her professional judgment, meet and confer with Defendants and Plaintiffs in an effort to agree on steps necessary to achieve compliance with the Decree. If the Monitor and Parties agree, such steps shall be memorialized in writing and incorporated into, and become enforceable as part of, the Decree. In the event that the Monitor is unable to reach agreement with Defendants and Plaintiffs, the Monitor or either Party may seek appropriate relief from the Court. In the event that Plaintiffs believe that Defendants are not in compliance with the Decree and that the Monitor has not requested appropriate relief from the Court, Plaintiffs may seek relief from the Court. The Monitor shall not communicate with the Court without advance notice to the Parties. (Referred to as Req. 68 in CY2017 Report.) | **In Compliance** | **In Compliance** | **In Compliance** |

| CM4 | Consent Decree Section IX(B) | The Monitor's duties include evaluating Defendants' compliance with the Decree, identifying actual and potential areas of noncompliance with the Decree, mediating disputes between the Parties, and bringing issues and recommendations for their resolution to the Court. The Monitor will file a written report at least annually with the Court and the Parties regarding compliance with the Decree. Such reports shall include the information necessary, in the Monitor's professional judgment, for the Court and Class Counsel to evaluate Defendants' compliance with the terms of the Decree. Reports of the Monitor shall be filed with the Court and served on all Parties. The Monitor may redact any portions of the Report necessary to make certain confidential matters and information is not disclosed. (Referred to as Req. 65 in CY2017 Report.) | In Compliance | In Compliance | In Compliance |
| --- | --- | --- | --- | --- | --- |

Partial Compliance: Requirements 44, Defendants' Providing Requested Data, and Information to the Court Monitor. In response to a data request to understand the impact of COVID-19 on *Colbert* Class Members, the Defendants did not supply comprehensive data on COVID-19 infections and mortalities among Class Members or involuntary and voluntary discharges that took place before and after the onset of the COVID public health crisis. The Court Monitor provided extended timeframes, given the circumstances, but detailed data has yet to be provided. For this reason, the Defendants are found in partial compliance.

In Compliance: Requirement 46, Semiannual Reports. During each fiscal year, the Defendants must submit a detailed semiannual report to the Court Monitor and Parties. These reports must contain data and information sufficient to evaluate the Defendants' Decree compliance. They submitted drafts of both semiannual reports in FY2020, which contained much of the data and information needed for the Court Monitor to assess performance relative to the Consent Decree. During this compliance period, the Defendants improved their semiannual reporting process and content significantly, providing more complete, accurate, and transparent information on performance relative to Consent Decree and Implementation Plan requirements.

Partial Compliance: Requirement 47, Ensuring Plaintiffs' Counsel Access to Information. The Court Monitor inquired with Class Plaintiffs' Counsel regarding the Defendants' timely provision of requested data and information. The Class Plaintiffs' Counsel indicated that, despite numerous requests, the Defendants did not provide accurate and up-to-date data and information on the names and numbers of Class Members who contracted and/or died from COVID-19. For this reason, Class Plaintiffs' Counsel gained access to only data and information from publicly available sources on all nursing facilities residents, not Class Members specifically. The Defendants are assigned a partial compliance rating since this was the only example provided by the Class Plaintiffs' Counsel of non-responsiveness.

In Compliance: Requirement 48, Payment of Court Monitor and Staff. This requirement obligates the Defendants to pay the Court Monitor and his or her staff their customary rates. In FY2020, the Defendants paid the Court Monitor and her staff in accordance with the requirement. Thus, they are found in compliance.

In Compliance: Requirement 49, Annual Status Hearings with the Court. There were regular Court status hearings, presided over by Judge Lefkow, that occurred in FY2020; each included the Defendants' Counsel, Class Plaintiffs' Counsel, and the Court Monitor. As such, they are found in compliance with this requirement.

In Compliance: Requirement 50, Access to Class Members, Their Records/Files, and Providers. The Defendants are required to provide the Court Monitor access to Class Members, Class Member records, and Consent Decree-related staff. In FY2020, the Defendants provided such access and are found in compliance.

In Compliance: Requirement 51, Defendants' Cover Consent Decree-Related Costs. The Defendants complied with the requirement that they borne all costs associated with the Consent Decree. It is important to note, however, that the Defendants have — for yet another year — significantly underspent the Consent Decree's appropriated budget despite ongoing poor and continued declining performance.

In Compliance: Requirements on the Court Monitor, CM1 and CM2: The Court Monitor is required to address with the Parties issues of non-compliance and submit annual reports to the Court. The Court Monitor convened regular Large Parties, Small Parties, and ad hoc meetings to identify and attempt to resolve issues of disagreement and/or non-compliance. The Court Monitor led a meeting dedicated specifically to Defendants' FY2019 areas of partial and non-compliance on February 18, 2020. Other meetings held during FY2020 included those with ongoing focus on areas judged by the Court Monitor as high-risk for out-of-compliance determinations. As required, the Court Monitor will also request a meeting with the Parties within 30 days of this report's issuance to discuss areas of partial and non-compliance and the Defendants' plans to remedy these during the remainder of FY2021 and into FY2022.

In FY2020, the Court Monitor filed the Court Monitor FY2019 Compliance Assessment Annual Report to the Court on November 15, 2019 and filed this report covering FY2020 on February 22, 2021. This report was slightly delayed due to the Court's directive for the Court Monitor to engage the Parties and produce an *Amended Action Plan in Light of COVID-19 Pandemic Conditions*, which was submitted in December 2020.

**Court Monitor Recommendations for Achieving Compliance with Administration-Related Requirements**
In Figure 28, the Court Monitor provides five priority recommendations for the Defendants' consideration pertaining to administration; several were provided in past reports. While these recommendations are not exhaustive, they represent critical actions that will enhance Consent Decree compliance relative to this domain.

| Figure 28. FY2020 Administration-Related Priority Recommendations to Apply in FY2021 and FY2022 | |
|---|---|
| **Recommendation** | **Description** |
| 1) Through State leadership, build a recovery- and strengths-oriented system of care that espouses the philosophy that people with disabilities can live full lives in the community. | The State of Illinois needs a fresh vision for a recovery-oriented and strengths-based system of care and services. This could include developing recovery-oriented tenets for the behavioral health system; creating practice guidelines for providers; building a robust training, communications, and professional development initiative; elevating the role of peer staff in the service system; and aligning systems and provider key performance indicators with recovery and community integration outcomes. |
| 2) Identify the *Colbert* Class to properly target human and financial resources. | The Defendants have not developed an approach to understand who comprises the *Colbert* Class — particularly the Class segment residing in nursing facilities. This leads them to apply Consent Decree resources and processes to the general nursing facility resident population rather than those who meet Class Member criteria. For the portion of the Class that transitioned into the community, the Defendants should also implement a process to track high-level outcomes that would result in their removal from that Class subgroup, including loss of Medicaid eligibility, death, or readmission into an institution. |
| 3) Improve timely compliance with Court Monitor and Plaintiffs' Counsel requests for data and information. | Overall, Pritzker Administration officials have been more responsive and transparent with regard to data and information requests than the Rauner Administration, but this year showed some regression on timely provision of needed data and information. Some delays were acceptable to the Court Monitor and Plaintiffs' Counsel due to competing demands relative to the COVID-19 crisis; however, basic information on the impact of COVID-19 on Class Members has still not been provided. All Named Defendant agencies should recommit themselves to timely provision of data and information by dedicating the appropriate staff resources — including data staff — to respond to these requests in a complete and timely manner. |
| 4) Conduct a thorough staffing analysis and make needed hires. | The Defendants need a thorough staffing analysis to address long-standing gaps in Consent Decree planning and operations. The Court Monitor observes that staff competent in data management and analysis, health systems planning, and provider performance management and accountability are especially needed. This staffing detail could strengthen the State's ability to conduct timely program management and programmatic oversight. The Defendants should also hire staff capable of overseeing budget resources and identifying reallocation strategies if budget resources lapse amid poor performance. |
| 5) Develop a process to collect, report on, and analyze critical incident data from nursing facilities to inform comparative analysis. | In October of 2019, the Court Monitor was informed that the Illinois Department of Public Health (IDPH) was unable to provide data on critical incidents that occur within nursing facilities. This data would lend itself to a comparative analysis between the rates of certain types of incidents – such as psychiatric hospital admissions, suicides, allegations of harassment, fires, and emergency department utilization – in the nursing facility versus in the community. In FY2020, limited data was provided, but the Court Monitor was still unable to conduct a true comparative analysis given its incompleteness. In partnership with IDPH, the Department of Human Services should develop a framework to collect and report on this data. |

## Section VIII. Implementation Planning

The Defendants are required to develop an annual Implementation Plan in consultation with the Court Monitor and Class Plaintiff's Counsel, an integral deliverable that identifies a work plan to guide actions for the coming fiscal year and includes desired performance indicators and outcome measures, key tasks and action steps, stakeholder/responsible parties, and timeframes/due dates. The *Colbert* Consent Decree contains a requirement that Defendants "shall create and implement an Implementation Plan" that outlines how they intend to operationalize concrete strategies to satisfy their Consent Decree obligations. The Implementation Plan is filed with the Court and the commitments contained therein become enforceable under the Decree. As such, on an annual basis, the Court Monitor conducts and reports on her compliance assessment and rating of each Implementation Plan item as well as Consent Decree and Updated Cost Neutral Plan requirements relevant during the assessment period. The results of those assessments are codified in this annual report to the Court.

The *Colbert* Consent Decree contains several requirements that dictate the requisite components of the Implementation Plan, obligate its development and timely filing, and sanction its enforceability under the Decree. The requirements cover different phases, ranging from Implementation Plan development to its filing with the Court; these efforts start during one fiscal year and conclude in the following fiscal year. The Court Monitor determined that some Consent Decree requirements (Requirements 64-71) apply to the FY2020 Implementation Plan and thus included them in this report. Other Implementation Plan-related requirements (Requirements 63, 72, and 73), however, apply to the FY2021 Implementation Plan and thus will be assessed in next year's report. The Court Monitor has assessed the following domain requirements for this FY2020 report:

- The Implementation Plan's delineation of specific tasks, timetables, goals, and plans to assure the Defendants' fulfillment of the Consent Decree (Requirement 64), as well as methods overall to ensure compliance with the Decree (Requirement 69);
- The FY2020 Implementation Plan's inclusion of hiring, training, and supervision sufficient to fulfill the Decree's obligations and operate the Consent Decree overall (Requirement 65);
- The FY2020 Implementation Plan's description of activities required to develop community-based services and housing in sufficient measure (Requirement 66);
- The FY2020 Implementation Plan's description of a data-driven process that utilizes Class Member service plan data to inform the development of community-based services and housing (Requirement 67);
- The FY2020 Implementation Plan's inclusion of methods for conducting outreach and engaging Class Members in nursing facilities (Requirement 70), as well as making Class Members aware of their rights (Requirement 71);
- The FY2020 Implementation Plan's inclusion of key changes to regulations governing nursing facilities that can facilitate stronger Consent Decree compliance (Requirement 68); and

▪ Whether the FY2020 Implementation Plan was developed (Requirement 63), disagreements were resolved (Requirement 72), and the plan was filed with the Court (Requirement 73) during the FY2019 compliance period.

**Implementation Plan Compliance Requirements: FY2020 Compliance Assessment**
As displayed in Figure 29, the Defendants were found in compliance with six requirements, in partial compliance with five, and in out-of-compliance with two.

| Figure 29. Synopsis of FY2020 Compliance Assessments for Implementation Plan-Related *Colbert* Consent Decree and Implementation Plan Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (11) | In Compliance➔ | 4 | Partial Compliance➔ | 5 | Out-of-Compliance➔ | 2 |
| Implementation Plan Requirements (2) | In Compliance➔ | 2 | Partial Compliance➔ | 0 | Out-of-Compliance➔ | 0 |
| Total Requirements (13) | In Compliance➔ | 6 | Partial Compliance➔ | 5 | Out-of-Compliance➔ | 2 |

Figure 30 contains the language of each Implementation Plan-related requirement in the *Colbert* Consent Decree and Implementation Plan, along with the Court Monitor's compliance rating. Figure 30 also contains CY2018 and FY2019 ratings to demonstrate whether compliance improved or worsened since the past two compliance periods. For the 13 requirements that apply to all three periods, the Defendants' performance improved for two requirements from FY2019 to FY2020. Of note, the Defendants have been out-of-compliance for two Consent Decree requirements in this domain for at least the past three consecutive years.

| Figure 30. Compliance Assessment Ratings for Implementation Planning-Related *Colbert* Consent Decree, Updated Cost Neutral Plan, and Implementation Plan (IP) Requirements | | | | | |
|---|---|---|---|---|---|
| Req # | Source/ Citation | *Colbert* Consent Decree, Cost Neutral Plan, or IP Requirement Language | Court Monitor Compliance Assessment Ratings | | |
| | | | First-Half CY2018 | FY2019 | FY2020 |
| 63 | Consent Decree Section VIII(A) | Defendants, with input of Monitor and Plaintiffs, shall create and implement an Implementation Plan to accomplish the obligations and objectives set forth in the Decree. The Implementation Plan must, at a minimum: *(Referred to as Req. 81 in CY2017 Report.)* | Out-of-Compliance | In Compliance | In Compliance |
| 64 | Consent Decree Section VIII(A)(1) | Establish specific tasks, timetables, goals, programs, plans, strategies, and protocols to assure the Defendants fulfill the requirements of the Decree. *(Referred to as Req. 82 in CY2017 Report.)* | Out-of-Compliance | Partial Compliance | Partial Compliance |
| 65 | Consent Decree Section VIII(A)(2) | Describe hiring, training, and supervision of the personnel necessary to implement the Decree. *(Referred to as Req. 83 in CY2017 Report.)* | Out-of-Compliance | Partial Compliance | In Compliance |

| | | | | | |
|---|---|---|---|---|---|
| 66 | Consent Decree Section VIII(A)(3) | Describe the activities required to develop Community-Based Services, Transition Costs, Home Accessibility Adaptation Costs and/or Housing Assistance and Community-Based Settings, including inter-agency agreements, requests for proposals, mechanisms for housing assistance, and other actions necessary to implement the Decree. *(Referred to as Req. 85 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Partial Compliance** |
| 67 | Consent Decree Section VIII(A)(4) | Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services or supports anticipated or required in Service Plans developed pursuant to the Decree that are not currently available in the appropriate quantity, quality, or geographic location, and might be required to meet the obligations of the Decree. *(Referred to as Req. 86 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** ✕ |
| 68 | Consent Decree Section VIII(A)(5) | Identify any necessary changes to regulations that govern Nursing Facilities in order to strengthen and clarify requirements for services to Nursing Facility residents and to provide for effective oversight and enforcement of all regulations and laws. *(Referred to as Req. 87 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** ✕ |
| 69 | Consent Decree Section VIII(A)(6) | Describe the methods by which Defendants shall ensure compliance with their obligations of the Decree. *(Referred to as Req. 88 in CY2017 Report.)* | **Out-of-Compliance** | **Partial Compliance** | **Partial Compliance** |
| 70 | Consent Decree Section VII | The Implementation Plan shall describe methods for providing outreach to Class Members. *(Referred to as Req. 84 in CY2017 Report.)* | **Out-of-Compliance** | **Partial Compliance** | **Partial Compliance** |
| 71 | Consent Decree Section VII | The Implementation Plan shall describe the method by which such information will be disseminated, the process by which Class Members may request services, and the manner in which Defendants will maintain records of these requests. The Implementation Plan shall describe methods for providing outreach to Class Members. *(Referred to as Req. 90 in CY2017 Report.)* | **Out-of-Compliance** | **Partial Compliance** | **Partial Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 72 | Consent Decree Section VIII(C) | The Implementation Plan shall be updated and amended at least annually. The Monitor and Counsel for Class Plaintiffs shall review and comment upon any proposed updates or amendments at least 60 days before the effective date of any updates or amendments. In the event the Monitor or Counsel for Class Plaintiffs disagree with the Defendants' proposed updates or amendments, the Monitor or Counsel for Class Plaintiffs shall state all objections in writing at least 30 days before the effective date of any updates or amendments. In the event that Defendants, the Monitor, and Counsel for Class Plaintiffs do not agree on updates and amendments, the Court shall resolve any and all disputes before any updates or amendments become effective. *(Referred to as Req. 91 in CY2017 Report.)* | **Out-of-Compliance** | **In Compliance** | **In Compliance** |
| 73 | Consent Decree Section VIII(D) | The Implementation Plan, and all amendments or updates thereto, shall be filed with the Court and shall be incorporated into and become enforceable as part of the Decree. *(Referred to as Req. 92 in CY2017 Report.)* | **Out-of-Compliance** | **In Compliance** | **In Compliance** |
| 74a | *Cost Neutral Plan (2016) Section H* | *The updated Implementation Plan will detail Defendants' plan to increase the pace of transitions from benchmarks required by the Consent Decree to those in the Cost Neutral Plan. Detailed plans will be set out to achieve the requirement to reach all Class Members. Specific targets for the pace of Evaluations, development of Service Plans, development of additional Community-Based Services and Settings, and all other actions and activities necessary to comply with this Cost Neutral Plan will be detailed in the updated Implementation Plan. (Referred to as Req. 89 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 74b | Updated Cost Neutral Plan (2018) Section H | The Phase 4 Implementation Plan will detail Defendants' plan to increase the pace of transitions from the benchmarks required by the Consent Decree to those in this Cost Neutral Plan. Detailed plans will be set out to achieve the requirement to reach all Class Members. Specific targets for the pace of Evaluations, development of Service Plans, development of additional Community-Based Services and Settings, and all other actions and activities necessary to comply with this Cost Neutral Plan and the Consent Decree will be detailed in the Phase 4 Implementation Plan. | **Out-of-Compliance** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| 75a | *Consent Decree Section VIII(B)* | *Within 180 days of Approval of the Decree, Defendants shall provide the Monitor and Counsel for Class Plaintiffs with a draft Implementation Plan. The Monitor and Counsel for Class Plaintiffs shall participate in developing and finalizing the Implementation Plan, which shall be finalized not later than nine months following the Approval Date. If, after negotiation and comment, the Monitor or Counsel for Class Plaintiffs disagrees with the Defendants' proposed Implementation Plan, the Court shall resolve all disputes and finalize the Implementation Plan. (Referred to as Req. 93 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 75b | *Cost Neutral Plan (2016) Section H* | *By November 2016, Defendants shall send to Class Counsel and the Court Monitor a proposed, updated Implementation Plan that will include detailed plans and programs to achieve compliance with this Cost Neutral Plan and the Consent Decree. (Referred to as Req. 94 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 75c | Updated Cost Neutral Plan (2018) Section H | By April 30, 2018, Defendants shall send Class Counsel and the Monitor a proposed, updated Phase 4 Implementation Plan that will include detailed plans and programs to achieve compliance with this Cost Neutral Plan and the Consent Decree. | **In Compliance** | **N/A** | **N/A** |
| 76a | *Cost Neutral Plan (2016) Section H* | *The provisions of the Consent Decree regarding review and approval of the proposed Implementation Plan updates remain in effect. This updated Implementation Plan shall be finalized by the Parties and the Monitor and filed with the Court by December 30, 2016. (Referred to as Req. 95 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 76b | Updated Cost Neutral Plan (2018) Section H | The provisions of the Consent Decree regarding review and approval of proposed Implementation Plan updates remain in effect. The Phase 4 Implementation Plan shall be finalized by the Parties and the Monitor and filed with the Court by June 30, 2018, or, if the Parties are unable to agree on an Implementation Plan, the Parties shall submit their proposed Implementation Plans to the Court no later than July 13, 2018. | **Out-of-Compliance** | **N/A** | **N/A** |
| 77 | Updated Cost Neutral Plan (2018) Section I | In respectful reliance on the reports issued by the consultant in April 2017 and the Court Monitor in May 2017, the Phase 4 Implementation Plan shall include detailed and precise steps and plans to address barriers to development of Community Capacity and to expand substantially Community Capacity in order to transition Class Members as required by the Consent Decree and this Updated Cost Neutral Plan. | **Out-of-Compliance** | **N/A** | **N/A** |
| I-1 | | Establish IP oversight process between IDOA and DHS.<br><br>*This is not applicable to the reporting period as the plan was filed before FY2020.* | **N/A** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| I-2 | FY2020 Implementation Plan | Prepare and submit initial FY21 Implementation Plan draft to Parties and Monitor.<br><br>*The FY2021 Implementation Plan draft was submitted to Parties and Court Monitor on 5/15/20. The due date in the FY2020 Implementation Plan was originally 5/1/20 but was adjusted based on agreement between the Parties and Monitor.* | N/A | N/A | **In Compliance** |
| I-3 | FY2020 Implementation Plan | File final compliant FY2021 Implementation Plan.<br><br>*The final FY2021 Implementation Plan was filed with the Court on 7/15/20. Although the submission was two weeks past the deadline, the Defendants worked in good faith with the Parties and Court Monitor on a near-timely submission and, thus, are found in compliance.* | N/A | N/A | **In Compliance** |

The compliance assessments provided below refer to whether the Implementation Plan (the FY2020 plan, in most cases) included Consent Decree required elements.

In Compliance: Requirements 63, 72, and 73, Development, Filing, and Incorporation of FY2021 Implementation Plan. These requirements pertain to whether the Defendants developed and filed the FY2021 Implementation Plan (due near the end of the FY2020 compliance period) to identify commitments for FY2021. They did so, as the Implementation Plan was filed on July 15, 2020. As such, they are found in compliance with these requirements.

Partial Compliance: Requirements 64 and 69, Identifying Specific Plans and Tasks to Operate Decree Programming. The Implementation Plan is required to include a robust set of detailed tasks with associated timeframes that crosswalk directly with Consent Decree requirements. Defendants did offer some plans focused on complying with all the Decree's requirements and meeting its objectives, including goals, timelines, responsible parties, strategies, and approaches. However, the final FY2020 Implementation Plan lacked sufficient content and commitments relative to the development of additional community-based services and settings, a critical aspect to Consent Decree compliance. Given the absence of a strong plan to develop community-based housing and services, the Court Monitor assigned a rating of partial compliance.

In Compliance: Requirement 65, Hiring, Training, and Supervision Plans. The Implementation Plan must identify key staff responsible for Consent Decree operations, as well as plans to provide them with appropriate training, professional development support, and supervision to perform their duties. The Defendants identified staffing positions needed to operate the Decree and committed to the staffing analysis that was required in FY2020. They also identified several training opportunities in their Implementation Plan, including those focused on the Statewide (Housing) Referral Network, Social Security benefits acquisition support, and substance use disorder services. As such, they are found in compliance.

<u>Partial Compliance: Requirement 66, Plans to Develop Community-Based Services and Housing Capacity.</u> The Implementation Plan requires Defendants to use the previous year's data on needed versus existing services and housing to inform deliberate and data-driven investments in insufficient or nonexistent community-based services and housing. They did include several activities to expand housing and services, including procuring additional transition providers, expanding disability benefits services, investing in resources to prevent disruption in Medicaid services, and expanding housing units (e.g., SRN/811). However, this plan was not comprehensive or rooted in Class Member data, as required, and thus is assigned a partial compliance rating.

<u>Out-of-Compliance: Requirements 67, Service Plan Data to Inform Expansion of Community-Based Services and Housing.</u> The FY2020 Implementation Plan must use Class Member service plans to identify services "anticipated or required that are not currently available in appropriate quantity, quality, or geographic location," as well as use Class Member demographic data to ensure that real data informs plans. The Defendant's FY2020 Implementation Plan makes no clear link between Class Member service needs data or efforts and activities outlined in the plan. This data can and should be used to understand resource gaps and, subsequently, support rapid expansion of community service and housing provider capacity. As such, the Defendants are found out-of-compliance.

<u>Out-of-Compliance: Requirement 68, Needed Regulatory Changes</u>. The Defendants are required to explore regulations or rules that govern nursing facilities that could strengthen, clarify, or buttress the *Colbert* program. However, the Implementation Plan lacked any meaningful effort to engage stakeholders to identify the range of other needed regulatory changes, including those recommended for consideration during past years by the Court Monitor. As such, the Defendants are found in out-of-compliance.

<u>Partial Compliance: Requirements 70 and 71, Class Member Outreach and Engagement Strategies, Including Observation of Community-Based Settings.</u>
The Implementation Plan is required to include the Defendants' strategies for actively engaging Class Members, as well as the process by which Class Members can observe community-based services and housing options for which they are eligible. In the FY2020 Implementation Plan, the Defendants identified strategies for Class Members outreach and engagement and agreed to explore the opportunity for Class Members — prior to assignment to a transition agency — to visit and observe community-based housing and service settings. However, they determined that it was not a "clinically safe activity," but that off-site activities could be permitted. The Court Monitor disagreed with this decision stating that enabling Class Member visits to prospective housing and services sites is not only an explicit Consent Decree requirement, but also represents best practice for *Olmstead*-related outreach and engagement approaches. Given that the Implementation Plan content was limited to only exploring this requirement instead of implementing change, the Defendants are found in partial compliance.

**Court Monitor Recommendations for Achieving Compliance with Administration-Related Requirements**

In Figure 31, Court Monitor provides priority recommendations; two carried forward from past years' reports and one is new for the Defendants' consideration pertaining to administration. While these recommendations are not exhaustive, they represent critical actions that will enhance Consent Decree compliance in this domain.

| Figure 31. Implementation Plan-Related Priority Recommendations to Apply in FY2021 and FY2022 ||
| Recommendation | Description |
| --- | --- |
| 1) Explain in future implementation plans how service plans and demographic data will inform development of community-based housing and services. | The Defendants can improve *Colbert* compliance by establishing a methodology for regularly review of individual and aggregate data from Class Member service plans, as well as demographic data. The regular review of service plans and demographic data creates an infrastructure to assess, identify, and understand any gaps or shortages in services, supports, or housing on an ongoing basis; helps identify immediate actions and resources needed to address known and understood system gaps (e.g., ACT teams, occupational therapy, medication management services); and see where to expand services based on this data. Using this approach, it is envisioned that during the Implementation Plan's development, the Defendants would have already fully analyzed this data and developed a plan to ensure that the appropriate type, quantity, and locations of services are available to meet Class Member needs. |
| 2) Identify nursing facility regulations that could improve quality of care and enhance their cooperation with the Consent Decree. | IDPH — the regulatory oversight agency for nursing facilities — contends that they are limited in their statutory and regulatory authority to influence operations and clinical quality. The Consent Decree requires that the Implementation Plan include regulatory changes necessary to achieve the Consent Decree's goals; yet, to date, very little regulatory action has been taken to improve nursing facility clinical quality, mandate their participation in *Olmstead* and other rebalancing efforts, or design a clear admission criterion, which undermines Consent Decree compliance. |

## Section IX. Quality Assurance - Class Member Safety and Mortality

Class Members, as individuals with diagnoses of serious mental illness and/or physical disabilities, often co-occurring with substance use disorders, medical co-morbidities and histories of poverty, represent some of the most vulnerable members of society. Ensuring that they are provided with quality services and supports in safe environments, whether in community-based settings or in nursing facilities, is a fundamental responsibility of the Defendants. Use of quality assurance mechanisms and tools buttressed by a commitment to examining process and outcome data to inform decision-making and program implementation is key to successfully meeting this responsibility.

Several data sources enable one to examine Class Member quality of life and safety. These include pre- and post-transition quality of life survey data, post-transition reportable incident data, and annual mortality data.

*Quality of Life Surveys.* The Defendants administer quality of life surveys to Class Members at two points: at the time of transition (designed to elicit information regarding quality of life in the nursing facility) and one year after transition to the community. Defendants only submitted data for the first half of FY2020, providing no reason for the absence of data for the remainder of the fiscal year. While the Defendants transitioned 145 Class Members during this six-month period, they only completed 68 surveys to those Class Members immediately preceding transition for a response rate of 47 percent. The Defendants did not provide a baseline figure for the number of Class Members who transitioned to the community within 12 months and thus should have been surveyed. They reported completing 97 one year after transition surveys. No response rate for this cohort can be provided due to the absence of needed data.

Overall, Class Members' perception and ratings on several key quality of life indicators were substantially higher for those transitioned into the community versus those living in nursing facilities. Key quality of life survey findings included:

- There were three quality-of-life measures related to Class Member living situations, including their satisfaction with where they live, perceptions of safety, and ability to sleep without disturbances. On average, Class Members in the community provided ratings of 89 percent satisfaction across these three measures versus 50 percent for those residing in nursing facilities.
- On quality measures related to Class Members' sense of choice and control of living arrangements, the satisfaction rate for those living in the community was 92 percent compared to 46 percent for those residing in nursing facilities.
- Class Members' ratings for access to baths/showers, meals, medications, and bathrooms were seven points higher among those in the community versus those residing in nursing facilities.
- Class Members rated their satisfaction with how they were treated by their caregivers at 76 percent for those in nursing facilities versus 81 percent for those in the community, on average.

- Class Members living in the community reported higher rates of happiness (87 percent) versus those living in nursing facilities (51 percent), as well as a 14-point improvement in mood and health status between those living environments, respectively.
- Class Member rates of perceived community integration and inclusion were similar between those living in nursing facilities and in the community (51 percent and 53 percent, respectively).

*Reportable Incident Data.* Reportable incident data is captured separately based on whether the incident occurred in the community or in a nursing facility. They reflect actual or alleged events or situations that create significant risk for substantial or serious harm to the physical or mental health, safety, or wellbeing of Class Members.

For community-based incidents, the Defendants collect data in the reportable incident categories for Class Members only for the first 12-months following their transition into the community as required by the Consent Decree. Defendants' policy requires that after each reportable incident, conference calls are held between state-level staff who comprise the Colbert team, representatives from UIC-CON in their role as quality review contractor to DHS, and Defendant- or other state agencies applicable to review the incident. The calls are to result in action plans to mitigate identified risks and prevent future reportable incidents. The reportable incidents that occurred among Class Members in FY2020 in the community can be summarized as follows:

- There were 289 confirmed incidents in FY2020.
- The 289 incidents were linked to 165 Class Members; sixty-five of whom had two or more incidents.
- Eleven incidents related to COVID-19 exposure, quarantine, hospitalization, emergency room visits, or death.
- Twenty-four incidents were classified as level one (urgent) as they reflected deaths, physical and sexual assaults, felony arrests, and missing persons.
- There were 164 level two incidents, which included emergency department visits, psychiatric hospital admissions, falls, substance use incidents and treatment admissions, injuries to self and others, suicidal ideation or threat, and accidental fires.
- There were eight level three incidents which included victimization of financial abuse, non-criminal eviction, missing persons (with no law enforcement contact necessary), vehicle accidents, alleged fraud/misuse of funds, and property damage.
- More than half (52 percent) of all incidents reflected medical hospital admissions and emergency department visits, followed by psychiatric hospital admissions (13 percent), falls (10 percent), and nursing facility placements (8 percent).
- The remaining other categories collectively reflected 17 percent of reportable incidents.

For reportable incidents that occurred in nursing facilities, the Defendants provided data for the second half of the fiscal year only, with no reason provided for six months of missing data. The Defendants indicated that the data they did provide may be

incomplete as it is wholly reliant upon nursing facility reports to IDPH. The data included thirteen reports of sexual assault; fifty reports of abuse, neglect or maltreatment; three deaths; one assault; three missing person events; and four instances of criminal conduct. Due to the incompleteness of this data and the Court Monitor's questions about whether it reflects Class Members only or the entire nursing facility general population, she was not provided with the data necessary to provide a comparative analysis of safety in facilities and the community.

*Mortality Data.* Data that is reported regarding Class Member deaths is limited to those transitioned Class Members who died within 12-months of their transition date. The Defendants reported that there were 24 Class Member mortalities for those who transitioned in FY2020. The 24 decedents represented an average age of 59. Cardiovascular disease/failure was the primary cause of death for 13 of the 24 Class Members (54 percent), followed by substance use (17 percent). Seventy-five percent of the decedents were males (18 of 24). There is no data source available to compare mortality causes or rates among Class Members in the community to those in nursing facilities.

For the past three years, the Court Monitor has emphasized with the Defendants the importance of examining data to assess Class Member satisfaction, safety, and overall experience and outcomes. While on one hand, the Defendants' data reporting of critical incidents during FY2020 improved to the extent they reported six months of adverse event data from Colbert nursing facilities, it simultaneously regressed due to their lack of providing a full year of critical incident data based in the community. Their work must progress in FY2021 to provide complete data here and elsewhere and to demonstrate that such data is examined and used to support quality improvement and quality assurance.

## Conclusion

This report is submitted to the Court in fulfillment of the Court Monitor's duty to assess compliance with the *Colbert* Consent Decree and Implementation Plan requirements at least annually; it represents the effort to conduct a fair and impartial assessment. The compliance assessment period covered is fiscal year 2020 (FY2020). Based on FY2020 performance data and outcomes on the 159 requirements in the Consent Decree and FY2020 Implementation Plan combined, the Defendants have been found to be in compliance with 48% of requirements, in partial compliance with 23%, and out-of-compliance with 29%.

Now nine years since the approval of the *Colbert* Consent Decree, the Defendants have not yet rebalanced the Illinois disability system away from institutional care. While the Pritzker Administration has sought to revise Consent Decree operations and processes intended to transition Class Members who want to and are able avoid or exit nursing facilities for community living, they also inherited a multiyear divestment in community-based mental health and physical disability services including a dismantled crisis stabilization system, an under-developed and poor performing long-term care diversion mechanisms, an affordable housing shortage, a subjective long-term care admissions process, and many other systems, policy, and practice issues that span the Defendant agencies.

Beginning in FY2020, the COVID-19 crisis has exacerbated these pre-existing issues and added a host of formidable new issues (e.g., accessing personal protective equipment), further destabilizing the mental health and overall healthcare systems and causing a virtual halt to essential Consent Decree operations including outreach, assessments, and transitions. The results, however, were the same as in past years of such poor compliance performance but with even higher numbers of Class Members impacted. Hundreds more adults with serious mental illnesses and physical disabilities who want and deserve a life in the community continue to be funneled into Illinois' behemoth long-term care system where they remain stuck long past the time that they express choice to live in the community and are assessed as clinically safe to do so – in violation of the *Colbert* Consent Decree.

As referenced throughout this report, dynamic and sustainable change requires a full, dedicated and skilled staffing detail to manage the operations and quality of the Consent Decree program; innovative new approaches and service and housing providers that comport with evidence-based practices; and long-term care diversion approaches that prevent needless admission into institutional settings.

To their credit, the Defendants have attempted to re-imagine several Consent Decree processes during the COVID-19 pandemic in an attempt to adjust and re-start program operations. To date these efforts have had limited results, yet they must continue. Once the containment of the public health crisis appears on the horizon, the Defendants must rededicate themselves to reversing the past multiyear pattern of unacceptably low Consent Decree compliance and performance, including and especially for those

requirements that have been out-of-compliance for at least the past three consecutive fiscal years (see Section II and Appendix A). Addressing the *Colbert* program shortcomings identified herein will undoubtedly result in improved compliance and performance.

Class Members deserve no less than demonstrable respect of their rights to live in the least restrictive setting appropriate for their needs. When achieved, this will prevent the inappropriate admission of adults with disabilities into nursing facilities and other institutions and transition those who are currently institutionalized, as appropriate, into the communities of their choice. When accomplished, this will forge a new path for the State of Illinois and the *Colbert* Class. The Court Monitor remains eager to support this path forward.

Compliance Assessment Ratings for All *Colbert* Consent Decree and
FY2020 Implementation Plan Requirements

| Req # | Source/ Citation | *Colbert* Consent Decree, Updated Cost Neutral Plan, or IP Requirement Language | Court Monitor Compliance Assessment Ratings | | |
|---|---|---|---|---|---|
| | | | First-Half CY2018 | FY2019 | FY2020 |
|  | | | | | |

**CY2018-FY2020 Compliance Assessment Ratings for ALL
*Colbert* Consent Decree, Updated Cost Neutral Plan, and Implementation Plan (IP) Requirements**

| Req # | Source/ Citation | *Colbert* Consent Decree, Updated Cost Neutral Plan, or IP Requirement Language | First-Half CY2018 | FY2019 | FY2020 |
|---|---|---|---|---|---|
| **Compliance Domain: Outreach-Related Requirements** | | | | | |
| 1 | Consent Decree Section VII | Defendants shall ensure that Class Members receive complete and accurate information regarding rights to live in Community-Based Settings and/or receive Community-Based Services, Transition Costs, Home Accessibility Adaptation Costs and/or Housing Assistance, and the available options/opportunities for doing so. | Partial Compliance | Partial Compliance | Out-of-Compliance |
| 2a | *Cost Neutral Plan (2016) Section A* | *By November 10, 2016, Defendants shall create a list of all Class Members living in Nursing Facilities as of September 30, 2016 and shall update that list at least annually during the life of the Decree during the time period the Consent Decree, as amended and supplemented, and the Cost Neutral Plan is in effect.* | N/A | N/A | N/A |
| 2b | Updated Cost Neutral Plan (2018) Section A | By April 15, 2018, Defendants shall create a list of all Class Members living in Nursing Facilities as of December 31, 2017 and shall update that list at least annually during the life of the Decree during the time period the Consent Decree, as amended and supplemented, and the Cost Neutral Plan is in effect. | In Compliance | In Compliance | In Compliance |
| 3a | *Cost Neutral Plan (2016) Section B* | *Defendants shall create and perform the outreach activities required to comply with the requirements of this Plan and the Consent Decree to achieve the transitions required. Defendants will inform all Class Members of their rights under the Consent Decree and this Plan. Details of the Defendants' specific outreach activities shall be contained in the Implementation Plan to be developed and outlined in paragraph H.* | N/A | N/A | N/A |
| 3b | Updated Cost Neutral Plan (2018) Section B | Defendants shall create and perform the outreach activities required to comply with the requirements of this Plan and the Consent Decree to achieve the transitions required. | Partial Compliance | Partial Compliance | Partial Compliance |
| 4 | Consent Decree Section VII | All costs for outreach shall be borne by Defendants. | In Compliance | In Compliance | In Compliance |
| O-1 | FY2020 Implementation Plan | Develop written outreach frequency protocol.<br><br>*This was completed and provided during the quarterly outreach meeting on 10/10/19, two months after the due date.* | N/A | N/A | In Compliance |

| | | | | | |
|---|---|---|---|---|---|
| O-2 | FY2020 Implementation Plan | Develop and communicate outreach-related quality indicators.<br><br>*This was completed and announced to providers during the 10/10/19 quarterly outreach meeting.* | **N/A** | **N/A** | In Compliance |
| O-3 | FY2020 Implementation Plan | Develop new outreach tracking system.<br><br>*The Defendants incorporated new outreach metrics and developed a new tracking system for the Comprehensive Program.* | **N/A** | **N/A** | In Compliance |
| O-4 | FY2020 Implementation Plan | Develop and implement outreach training.<br><br>*The Defendants did not complete this training by the due date of 10/31/19 due to the transition to the Comprehensive Program. New outreach training, however, was included in the Comprehensive Program.* | **N/A** | **N/A** | In Compliance |
| O-5 | FY2020 Implementation Plan | Meet with Division of Rehabilitation Services (DRS) to cross-pollenate with existing programs and approaches.<br><br>*The Defendants reported that this was completed by 8/1/19 and that a cross-agency dialogue on best practices is ongoing.* | **N/A** | **N/A** | In Compliance |
| O-6 | FY2020 Implementation Plan | Expand peer mentor program.<br><br>*This did not occur by the due date of 8/1/19 but the expansion of peer services was incorporated into the Comprehensive Program.* | **N/A** | **N/A** | In Compliance |
| O-7 | FY2020 Implementation Plan | Strengthen marketing campaign.<br><br>*This did not occur by the due date of 9/30/19 but new marketing materials were developed as part of the Comprehensive Program.* | **N/A** | **N/A** | In Compliance |
| O-8 | FY2020 Implementation Plan | Update outreach materials to reflect shift in administration to Department of Human Services.<br><br>*This did not occur by the due date of 9/30/19, but the Comprehensive Program updated materials to reflect the change in agency oversight.* | **N/A** | **N/A** | In Compliance |
| O-9 | FY2020 Implementation Plan | Facilitate workshops for nursing facility and Consent Decree staff.<br><br>*The first workshop was held on 9/4/18 and the second was held on 9/9/19 (via participation of nursing facility staff in the Provider Summit).* | **N/A** | **N/A** | In Compliance |
| O-10 | FY2020 Implementation Plan | Convene monthly meetings with IDPH on regulatory impediments and remediation strategies.<br><br>*The Defendants reported that meetings were held for portions of FY2020 but some were canceled.* | **N/A** | **N/A** | Partial Compliance |
| O-11 | FY2020 Implementation Plan | Develop a system to track and report on allegations and findings associated with retaliation.<br><br>*This was not completed in FY2020.* | **N/A** | **N/A** | Out-of-Compliance |

| | | Compliance Domain: Assessment-Related Requirements | | | |
|---|---|---|---|---|---|
| 5a | *Consent Decree Section VI(A)(1)* | *Each Class Member is eligible for an Assessment to determine what Community-Based Services are required for the Class Member to transition to a Community-Based Setting. Within 180 days following the finalization of the Implementation Plan, at least 500 Class Members then residing in a Nursing Facility shall receive an Assessment by a Qualified Professional. (Referred to as Req. 16 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 5b | *Consent Decree Section VI(A)(2)* | *Within 18 months following the finalization of the Implementation Plan, a total of at least 2,000 Class Members then residing in a Nursing Facility shall have received an Assessment by a Qualified Professional. (Referred to as Req. 17 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 5c | *Cost Neutral Plan (2016) Section D* | *Defendants shall complete at least 1,000 Assessments of Class Members on the Schedule by June 30, 2017, and thereafter continue to complete a sufficient number of Assessments in a timely manner in order to achieve the transitions required under Paragraph F.* | **N/A** | **N/A** | **N/A** |
| 5d | Updated Cost Neutral Plan (2018) Section D | Defendants shall complete at least 1,000 Assessments of Class Members on the Schedule between March 1 and June 30, 2017, and thereafter continue to complete a sufficient number of Assessments in a timely manner to achieve the transitions required under Paragraph F. | **Partial Compliance** | **Partial Compliance** | **In Compliance** |
| 6a | *Consent Decree Section VI(A)(3)* | *Subject to approval of and consistent with the Cost Neutral Plan, every Class Member then residing in a Nursing Facility shall receive an Assessment by a Qualified Professional within the time period determined as part of the development of the Cost Neutral Plan. (Referred to as Req. 18 in the CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 6b | Consent Decree Section VI(A)(7) | Subject to approval of and consistent with the Cost Neutral Plan, beginning four years following the Approval Date, the assessments for every Class Member then residing in a Nursing Facility shall be conducted at least annually, except for Class Members who decline to receive assessments and for Class Members who have been determined by a medical doctor to have a condition such as severe Dementia or other clinically significant and progressive cognitive disorders and are unlikely to improve. | **Out-of-Compliance** | **Out-of-Compliance** | **Partial Compliance** |
| 7 | Consent Decree Section VII | The Qualified Professionals shall inform each Class Member during the assessments about the existence, nature, and availability of Community-Based Services, and shall describe the Community-Based Settings, transition costs, and/or housing assistance available to Class Members in those settings. | **Partial Compliance** | **In Compliance** | **Partial Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 8a | *Consent Decree Section VII* | *Defendants shall also ensure that the Qualified Professionals conducting assessments provide outreach with appropriate frequency to Class Members who express concern about leaving Nursing Facilities. (Referred to as Req. 15 in the CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 8b | *Cost Neutral Plan (2016) Section B* | *Defendants shall also ensure that the Qualified Professionals conducting the assessments provide outreach with the appropriate frequency to Class Members who express concern about leaving Nursing Facilities, and that, as has previously been recommended by the Monitor, the Peer Mentor program receives appropriate support.* | **N/A** | **N/A** | **N/A** |
| 8c | Updated Cost Neutral Plan (2018) Section B | Defendants shall also ensure that the Qualified Professionals conducting the assessments provide outreach with the appropriate frequency to Class Members who express concerns about leaving Nursing Facilities, and that, as has previously been recommended by the Monitor, the Peer Mentor program receives appropriate support. | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** |
| 9 | Consent Decree Section VI(A)(5) | Assessments shall be done in a timely manner and so as not to delay, where applicable, the development of the Class Member's Service Plan. | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** |
| 10 | Consent Decree Section VI(A)(6) | Any Class Member who disputes a decision regarding eligibility for, or approval of, Community-Based Services, transition costs, and/or housing assistance or placement in a Community-Based Settings shall, pursuant to governing law, have a right to appeal through administrative review of such decisions through Defendants' existing Fair Hearings process (as set forth in 89Ill.Adm.Code Parts 102 and 104) or as otherwise provided law. Class Members also may avail themselves of any informal review or appeal process that currently exists. | **Partial Compliance** | **In Compliance** | **Partial Compliance** |
| 11 | Consent Decree Section VI(A)(7) | For those Class Members who have been offered a Community-Based Setting but have opposed moving from a nursing facility to a Community-Based Setting, the reasons for the Class Member's opposition shall be fully explored and appropriately addressed as a part of the Class Member's annual assessment and as described in Section VII herein. | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** |
| 12 | Consent Decree Section VI(A)(7) | Any Class Member who has received an Assessment but has declined to move to a Community-Based Setting may thereafter request to be re-Evaluated for transition to a Community-Based Setting. Any such re-Assessment must be conducted within 120 days of the request. | **Out-of-Compliance** | **In Compliance** | **Out-of-Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 13 | Cost Neutral Plan (2016) Section D | For any Class Member who remains on the Schedule a year after their Assessment, Defendants shall update the Assessment at least annually, except as provided in Section VI.A.7 and VI.A.8 of the Decree. These updates shall not be included in calculating the 1000 minimum required above. | **Out-of-Compliance** | **Out-of-Compliance** | **Partial Compliance** |
| 14 | Consent Decree Section VI(A)(8) | With respect to Assessments and re-Assessments described in this Section VI.A, any Class Member has the right to decline to take part in an Assessment or re-Assessment. A Class Member declining an Assessment or re-Assessment shall have the right to receive an Assessment or re-Assessment within 120 days of making a new request. | **Partial Compliance** | **In Compliance** | **Out-of-Compliance** |
| E-1 | FY2020 Implementation Plan | Reaffirm "Qualified Professional" definition. *This was completed via an informational bulletin promulgated to providers in July 2019.* | **N/A** | **N/A** | **In Compliance** |
| E-2 | FY2020 Implementation Plan | Enhance provider training and clearly outline compliance standards. *This was completed by 10/31/19.* | **N/A** | **N/A** | **In Compliance** |
| E-3 | FY2020 Implementation Plan | Develop and implement guideline matrix and tracking tool. *This was completed by 10/1/19.* | **N/A** | **N/A** | **In Compliance** |
| E-4 | FY2020 Implementation Plan | Develop centralized tracking system for re-assessments. *This was not completed by the due date, but a new tracking system was designed for the Comprehensive Program.* | **N/A** | **N/A** | **In Compliance** |
| E-5 | FY2020 Implementation Plan | Utilize data reports during calls with assessment providers. *The Defendants indicate that these calls occurred in FY2020 and that data reports were utilized to review provider performance.* | **N/A** | **N/A** | **In Compliance** |
| E-6 | FY2020 Implementation Plan | Partner with Division of Rehabilitation Services on approaches to serve individuals with physical disabilities. *This was not completed.* | **N/A** | **N/A** | **Out-of-Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| E-7 | FY2020 Implementation Plan | Confirm Class Members not referred to permanent supportive housing meet Consent Decree exclusionary criteria.<br><br>*This was not completed. The Defendants reported that providers continued to recommend housing options based on providers' determination of Class Member need even when Consent Decree exclusionary criteria were not met, although emphasis is placed on permanent supportive housing. This was not compliant with the requirement.* | **N/A** | **N/A** | **Out-of-Compliance** |
| E-8 | FY2020 Implementation Plan | Streamline assessment process and documentation requirements.<br><br>*New assessment forms and procedures were rolled out on 7/1/19.* | **N/A** | **N/A** | **In Compliance** |
| E-9 | FY2020 Implementation Plan | Plan and test care navigator system; study and expand if effective.<br><br>*This was not completed, but the Comprehensive Program replaced the care navigator system by providing a streamlined and centralized approach to Class Member transitions.* | **N/A** | **N/A** | N/A |
| E-10 | FY2020 Implementation Plan | Update assessment tool.<br><br>*Updates to the assessment tool were made on 10/24/19 to better capture Class Member preferences and assessors' rationale for not recommending Class Members for transition.* | **N/A** | **N/A** | **In Compliance** |
| E-11 | FY2020 Implementation Plan | Develop specialized training content on how assessors can appropriately address Class Members' reason for opposition to transition.<br><br>*While motivational interviewing training was provided, there appears to have been no specialized training content on how to address Class Member opposition to transition.* | **N/A** | **N/A** | **Out-of-Compliance** |
| E-12 | FY2020 Implementation Plan | Provide training to assessors to strengthen Class Member knowledge on their right to appeal.<br><br>*These trainings were provided on 9/4/19 and 9/9/19.* | **N/A** | **N/A** | **In Compliance** |
| **Compliance Domain: Service Plan-Related Requirements** | | | | | |
| 15a | *Consent Decree Section VI(B)(1)* | *Pursuant to the Evaluations and with Class Member's input, Defendants shall develop, within 90 days after each evaluation, Service Plans specific to each Class Member. (Referred to as Req. 19 in CY2017 Report.)* | **N/A** | **N/A** | N/A |
| 15b | Updated Cost Neutral Plan (2018) Section E | These Service Plans shall be completed within three months of the Class Member's Evaluations. | **Partial Compliance** | **Partial Compliance** | **Out-of-Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 16a | Cost Neutral Plan (2016) Section E | *Qualified Professionals shall develop Service Plans, as provided in the Consent Decree, for Class Members with Evaluations indicating they are able to move to Community-Based Settings. These Service Plans shall be completed within three months of Class Members' Evaluations. (Referred to as Req. 20 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 16b | Updated Cost Neutral Plan (2018) Section E | Qualified Professionals shall develop Service Plans, as provided in the Consent Decree, for Class Members with Evaluations indicating they are able to move to Community-Based Setting. | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** |
| 17 | Consent Decree Section VI(B)(1) | For those Class Members whose Service Plans include transitioning into a Community-Based setting, each Service Plan shall set forth with specificity the Community-Based Services, transition costs, home accessibility adaptation costs and/or housing assistance the Class Member needs in a Community-Based setting, including a projected timetable to complete the transition. *(Referred to as Req. 21 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Partial Compliance** |
| 18 | Consent Decree Section VI(B)(1) | Each Service Plan shall be updated at least every 180 days to reflect any changes in needs and preferences of the Class Member, including his or her desire to move to a Community-Based Setting after declining to do so, and shall incorporate, where appropriate, services to assist in acquisition of basic activities of daily living skills and illness self-management. | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** |
| 19 | Consent Decree Section VI(B)(3) | If there has been a determination that a Class Member will not be transitioning to PSH [permanent supportive housing] or Private Residence (except for those Class Members who have declined transitions), the Service Plan shall specify what services the Class Member needs that could not be provided in PSH or a Private Residence and shall describe the Community-Based Services the Class Member needs to live in another Community-Based Setting that is the most integrated setting appropriate to that Class Member's needs and preferences or shall specify what services the Class Member needs and preferences or shall specify what the Class Member needs that cannot be provided in any Community-Based setting. | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 20 | *Colbert* Consent Decree Amendment | Service Plan means a Person-Centered plan with the goal of moving a Class Members to a Community-Based Setting, strategies to employed to achieve that goal and a description of all Community-Based Services, transition needs, home accessibility adaptation needs, and/or housing assistance necessary to support that goal; provided, however, that a Service Plan for a Class Member declining to be evaluated for transition shall simply state "declined to be evaluated" and shall be updated at least annually; and a Service Plan for a Class Member determined by a physician not affiliated with a Nursing Facility to have a condition such as severe Dementia or other severe cognitive impairments requiring such as high level of staffing to assist with activities of daily living or self-care management that they cannot effectively be served in PSH or a Private residence or who have an irreversible medical condition requiring such medical care that they cannot effectively be served in PSH or a Private residence shall simply state "severe Dementia or other severe cognitive impairments or irreversible medical condition" and need not be regularly updated as provided herein. *(Referred to as Req. 24 in the CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Partial Compliance** |
| 21 | Consent Decree Section VI(D)(3) | Those Class Members not transitioning from Nursing Facilities into PSH or Private Residence shall have periodic re-evaluations with treatment objectives to prepare them for subsequent transition to the most integrated setting appropriate, including PSH or a Private Residence, except for Class Members who have chosen other living arrangements or have been determined by a physician not affiliated with a Nursing Facility to have a condition such as severe Dementia or other clinically significant progressive cognitive disorders and are unlikely to improve. *(Referred to as Req. 25 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** |
| 22 | Consent Decree Section VI(B)(4) | The Service Plan must be developed by a Qualified Professional in conjunction with Class Member and/or his or her legal representative, if any. *(Referred to as Req. 26 in CY2017 Report.)* | **Partial Compliance** | **In Compliance** | **In Compliance** |
| 23 | Consent Decree Section VI(B)(5) | Each Service Plan shall focus on Class Member's personal vision, preferences, strengths and needs in home, community, and work environments. *(Referred to as Req. 27 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Partial Compliance** |
| SP-1 | FY2020 Implementation Plan | Enhance *Colbert* Tracking System to improve service plan-related tracking.<br><br>*Due to protracted and serious problems with the defendants' ability to reliably report service planning data, ascribable at least in part to an* | **N/A** | **N/A** | **Partial Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| | | *inadequate tracking system, the Defendants are found in partial compliance.* | | | |
| SP-2 | FY2020 Implementation Plan | Determine feasibility of using an existing or new data management system to assess outcomes.<br><br>*The Defendants began using a new data system for the Comprehensive Program on 10/1/19.* | **N/A** | **N/A** | **In Compliance** |
| SP-3 | FY2020 Implementation Plan | Review and expand quality assurance processes.<br><br>*The Defendants began using new quality assurance protocols for the Comprehensive Program on 10/24/19, less than a month after the original due date.* | **N/A** | **N/A** | **In Compliance** |
| SP-4 | FY2020 Implementation Plan | Determine and document feasibility of using peer mentors for service planning.<br><br>*The Defendants provided no evidence that they investigated using peer mentors to conduct service planning.* | **N/A** | **N/A** | **Out-of-Compliance** |
| SP-5 | FY2020 Implementation Plan | If feasible, develop, and implement peer mentor service planning program.<br><br>*This requirement is not applicable as the Defendants did not proceed with using peer mentors to conduct service planning.* | **N/A** | **N/A** | **N/A** |
| SP-6 | FY2020 Implementation Plan | Train service planning staff on types of representatives who can support Class Members in service planning process.<br><br>*The Defendants indicated that "training will be continued under the Comprehensive Program on the types of representatives Class Members may include in the service planning process.* | **N/A** | **N/A** | **In Compliance** |
| SP-7 | FY2020 Implementation Plan | Create and implement process to provide service plan updates to prepare Class Members for transition into permanent supportive housing.<br><br>*This process was released on 4/8/20 and providers were trained on 4/20/20.* | **N/A** | **N/A** | **In Compliance** |
| SP-8 | FY2020 Implementation Plan | Implement process to use service plan data to inform community-based housing development efforts.<br><br>*The Defendants indicate that the "process is under development" for the Comprehensive Program. It was neither completed or implemented in FY2020 nor was evidence of its partial development provided, resulting in an out-of-compliance rating.* | **N/A** | **N/A** | **Out-of-Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| SP-9 | FY2020 Implementation Plan | Create and publicize opportunity for Class Members to observe community-based settings.<br><br>*Defendants did not proceed with the implementation of off-site Class Members visits, choosing instead to unilaterally categorize this as clinically unsound. This does not comply with the Consent Decree requirement or best practice to permit Class Members to observe community-based housing and services prior to transition.* | N/A | N/A | **Out-of-Compliance** |
| SP-10 | FY2020 Implementation Plan | Determine whether IM+CAMS can replace service plans.<br><br>*Defendants determined in September 2019 that this tool does not satisfy Consent Decree reporting requirements.* | N/A | N/A | **In Compliance** |
| SP-11 | FY2020 Implementation Plan | Complete personnel process to identify medical evaluator candidates.<br><br>*This requirement — to identify and hire a medical evaluator to assess Class Members for Dementia or other cognitive disorders — was not met.* | N/A | N/A | **Out-of-Compliance** |
| SP-12 | FY2020 Implementation Plan | Engage a medical evaluator.<br><br>*This requirement — to identify and hire a medical evaluator to assess Class Members for Dementia or other cognitive disorders — was not met again this year.* | N/A | N/A | **Out-of-Compliance** |
| **Compliance Domain: Transition-Related Requirements** | | | | | |
| 24a | *Consent Decree Section VI(C)(6)* | *Subject to the approval of and consistent with the Cost Neutral Plan described above, by the end of the third year following the finalization of the Implementation Plan, Defendants shall have created a Community Transition Schedule that lists all Class Members living in Nursing Facilities as of that date who do not oppose moving to a Community-Based Setting. (Referred to as Req. 42 in CY2017 Report.)* | N/A | N/A | N/A |
| 24b | *Cost Neutral Plan (2016) Section F* | *By December 30, 2016, Defendants shall create a Transition Activity Schedule (Schedule), including Class Members from the November 10, 2016, list that includes Class Members who do not oppose moving to a Community-Based Setting. The initial Schedule shall include at least 150 Class Members (excluding Class Members not yet transitioned but who are in the housing queue on December 30, 2016). (Referred to as Req. 28 in CY2017 Report.)* | N/A | N/A | N/A |

| | | | | | |
|---|---|---|---|---|---|
| 24c | Cost Neutral Plan (2018) Section C | By April 22, 2018, Defendants shall create a Transition Activity Schedule (Schedule), including Class Members on the April 15, 2018 Master Class Member List, that includes Class Members who do not oppose moving to a Community-Based Setting. | **In Compliance** | **N/A** | **N/A** |
| 25a | *Cost Neutral Plan (2016) Section C* | *At least every six months following the creation of the Schedule, Defendants, through the outreach efforts described in Paragraph B and in the Implementation Plan set forth in Paragraph H, shall identify and add to the Schedule at least 1,000 Class Members who do not oppose moving to a Community-Based Setting. (Referred to as Req. 29 in CY2017 Report.)* | **N/A** | **In Compliance** | **In Compliance** |
| 25b | Updated Cost Neutral Plan (2018) Section C | The initial Schedule shall include at least 300 Class Members (excluding Class Members not yet transitioned but who are in the housing queue on March 1, 2018). | **In Compliance** | **N/A** | **N/A** |
| 26a | *Consent Decree Section VI(C)(6)* | *Defendants shall ensure that Class Members listed on the Community Transition Schedule will move to appropriate Community-Based Settings at a reasonable pace, with selection prioritized by the Class Member's urgency of need for Community- Based Services or placement in a Community-Based Settings, the length of time that has passed since the Class Member was placed on the Community Transition Schedule, geographical considerations and other appropriate factors. (Referred to as Req. 37 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 26b | *Cost Neutral Plan (2016) Section C* | *Defendants shall ensure that Class Members on the Schedule will be moved to appropriate Community- Based settings according to the time frames detailed in Paragraph F herein. Placements will be prioritized based on their urgency of need for Community-Based Services or placement in a Community-Based Setting, the length of time that the Class Member has resided in a Nursing Facility, geographical considerations, and other appropriate factors. (Referred to as Req. 30 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 26c | Updated Cost Neutral Plan (2018) Section C | Defendants shall ensure that Class Members on the Schedule will be moved to appropriate Community-Based Settings according to the timeframes detailed in Paragraph F herein. Placements will be prioritized based on their urgency of need for Community-Based Services or placement in a Community-Based Setting, the length of time that the Class Member has resided in a Nursing Facility, geographical considerations, and other appropriate factors. | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 27a | *Consent Decree Section VI(C)(1)* | *By the end of the first year following the finalization of the Implementation Plan, Defendants will have moved to Community-Based Setting 300 Class Members who desire to live in Community-Based Settings and who have received an Evaluation and a Service Plan. (Referred to as Req. 38 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 27b | *Consent Decree Section VI(C)(2)* | *By the end of the second year following the finalization of the Implementation Plan, Defendants will have moved to a Community-Based Setting 800 Class Members who desire to live in Community- Based Settings and who have received an Evaluation and a Service Plan. (Referred to as Req. 39 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 27c | *Consent Decree Section VI(C)(3)* | *By the end of the thirtieth month following the finalization of the Implementation Plan, Defendants will have moved to a Community-Based Setting 1,100 Class Members who desire to live in Community-Based Settings and who have received an Evaluation and a Service Plan. (Referred to as Req. 40 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 27d | *Cost Neutral Plan (2016) Section F* | *Defendants will transition 250 additional Class Members to appropriate Community-Based Settings by June 30, 2017, and 300 additional Class Members by December 31, 2017. During the second quarter of 2017, the Parties and the Monitor shall discuss the proposals made by the consultant pursuant to his/her review outlined in paragraph I. (Referred to as Req. 31 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 27e | Updated Cost Neutral Plan (2018) Section F | *Defendants will transition an additional 300 Class Members to appropriate Community-Based Settings between January 1 and June 30, 2018 (second half of FY2018), 400 additional Class Members by December 31, 2018 (first half of FY2019), an additional 450 Class Members by June 30, 2019 (second half of FY2019), and an additional 450 Class Members by December 31, 2019 (first half of FY2020). Until June 30, 2018, Defendants will continue to operate under the current Implementation Plan and will transition a sufficient number of Class Members to Community-Based Settings to comply with the Order Granting Agreed Motion to Amend Consent Decree dated December 1, 2015, Paragraph C.3.* | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 28 | Consent Decree Section VI(D)(3) | For Class Members with Mental Illness, PSH or Private Residence chosen by the Class Member shall be considered most integrated Community- Based Setting appropriate for Class Members except that for any Class Members with Mental Illness (i) who have been determined by a physician not affiliated with a Nursing Facility to have a condition such as severe Dementia or other severe cognitive impairments requiring such a high level of staffing to assist with activities of daily living or self- care management and that they cannot effectively be served in PSH or Private Residence, (ii) who have medical needs requiring such a high level of skilled nursing care that they cannot effectively be served in PSH or a Private Residence, or (iii) who present an imminent danger to themselves or others, the Qualified Professional will determine, through the Evaluation process, the most integrated setting appropriate. *(Referred to as Req. 32 in CY2017 Report.)* | Out-of-Compliance | Out-of-Compliance | Out-of-Compliance |
| 29 | Consent Decree Section VI(B)(2) | If there has been a determination that a Class Member will be transitioning to PSH, PSH options must include one or more appropriate buildings in which fewer than 25 percent of the building's units are occupied by persons known by the Defendants to have disabilities. *(Referred to as Req. 33 in CY2017 Report.)* | In Compliance | Partial Compliance | Out-of-Compliance |
| 30 | Consent Decree Section VI(D)(1) | And shall take appropriate measures to keep their housing available in the event they are placed in a hospital, Nursing Facility, or other treatment facility up to 60 days. *(Referred to as Req. 34 in CY2017 Report.)* | In Compliance | In Compliance | Out-of-Compliance |
| 31 | Consent Decree Section VIII(E) | In the event that any Nursing Facility seeks to discharge any Class Member before a Community- Based Settings is available, including but not limited to, circumstances in which a Nursing Facility owner decides to close the Nursing Facility, Defendants shall take appropriate and necessary actions to ensure that such Class Members are not left without appropriate housing options based on their preferences, strengths and needs. *(Referred to as Req. 35 in CY2017 Report.)* | In Compliance | Out-of-Compliance | Out-of-Compliance |
| 32 | Consent Decree Section VI(D)(2) | Defendants shall take all necessary and reasonable measures to protect Class Members from being pressured not to consider appropriate alternatives to Nursing Facilities or from being subjected to retaliation in any form by Nursing Facilities for seeking alternatives to Nursing Facilities. | Partial Compliance | In Compliance | Partial Compliance |

| | | | | | |
|---|---|---|---|---|---|
| 33a | Updated Cost Neutral Plan (2018) Section F | *Prior to December 31, 2018, the Parties and the Monitor shall agree upon a reasonable pace for moving all Class Members determined appropriate for transition to Community-Based Settings beginning in January 2019, and such pace shall be presented in an addendum to this Plan to be filed with the Court. If the Parties cannot agree about what constitutes a reasonable pace, the issue will be presented for the Court for resolution. (Referred to as Req. 45 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 33b | *Cost Neutral Plan (2016) Section F* | *Prior to December 31, 2020, the Parties and the Monitor shall agree upon a reasonable pace for moving all Class Members determined appropriate for transition to Community-Based Settings beginning January 2021, and such pace shall be presented in an addendum to this Plan to be filed with the Court. If the Parties cannot agree about what constitutes a reasonable pace, the issue will be presented to the Court for resolution.* | **N/A** | **N/A** | **N/A** |
| 34a | *Cost Neutral Plan (2016) Section F* | *Benchmarks for transitions in calendar 2018 and 2019 shall be determined by the Parties in conjunction with the Monitor or the Court if the Parties are unable to agree based on the Monitor's findings and systemic enhancements made as a result thereof. (Referred to as Req. 44 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 34b | *Updated Cost Neutral Plan (2018) Section F* | *Benchmarks for transitions for the remainder of FY2020 and FY2021 shall be determined by the Parties in conjunction with the Monitor or the Court if the Parties are unable to agree based on the Monitor's findings and systemic enhancements made as a result thereof.* | **N/A** | **N/A** | **N/A** |
| 35 | *Consent Decree Section VI(C)(5)* | *If the Defendants, Monitor and Counsel for Class Plaintiffs are unable, for any reason, to agree on a Cost Neutral Plan as described above at the 30th month after finalization of the Implementation Plan, Defendants and Counsel for Class Plaintiffs shall each file a proposed Cost Neutral Plan with the Court not later than 31 months after finalization of the Implementation Plan. The Court will set appropriate schedules and proceedings to determine the Cost Neutral Plan to be effected. (Referred to as Req. 46 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 36 | *Updated Cost Neutral Plan (2018) Section F* | *During the fourth quarter of calendar year 2018, the Parties and the Monitor shall discuss the proposals made by the consultant and the Monitor pursuant to paragraph I.* | **N/A** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| T-1 | FY2020 Implementation Plan | Implement review of 150 Class Members recommended for transition through March 2019 but not yet transitioned to identify pipeline barriers and solutions.<br><br>*This analysis was not completed.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-2 | FY2020 Implementation Plan | Implement review of 1,000+ Class Members recommended in the past but not transitioned to identify pipeline barriers and solutions.<br><br>*This analysis was not completed.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-3 | FY2020 Implementation Plan | Draft and distribute letter to nursing facilities regarding access to Class Members and their records.<br><br>*This letter was disseminated to nursing facilities on 8/1/19.* | **N/A** | **N/A** | **In Compliance** |
| T-4 | FY2020 Implementation Plan | Conduct aggregate analysis of Class Member choices to identify trends.<br><br>*This was not completed.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-5 | FY2020 Implementation Plan | Develop centralized monitoring tool for pre-transition contact.<br><br>*This monitoring tool was created for the Comprehensive Program.* | **N/A** | **N/A** | **In Compliance** |
| T-6 | FY2020 Implementation Plan | Research and analyze feasibility of a Care Navigator System. | **N/A** | **N/A** | **N/A** |
| T-7 | FY2020 Implementation Plan | Develop and implement system if supported by research.<br><br>*This is not applicable, per above.* | **N/A** | **N/A** | **N/A** |
| T-8 | FY2020 Implementation Plan | Complete review and documentation of pipeline analysis.<br><br>*A pipeline reporting tool was completed by the due date, but the tool had very little practical value in understanding pipeline issues and was not put into use regularly.* | **N/A** | **N/A** | **Partial Compliance** |
| T-9 | FY2020 Implementation Plan | Identify and take steps to address pipeline barriers.<br><br>*This was completed through November but not continued into the Comprehensive Program.* | **N/A** | **N/A** | **Partial Compliance** |
| T-10 | FY2020 Implementation Plan | Update pipeline reporting tool.<br><br>*Per assessment rating in T-8 above, the tool was not updated and regularly used.* | **N/A** | **N/A** | **Partial Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| T-11 | FY2020 Implementation Plan | Identify DMH staff for pipeline analysis.<br><br>*Two DMH staff were identified to lead the pipeline analysis efforts. However, they did not devote sufficient time and resources to conducting a practically useful analysis and did not implement the analysis regularly.* | **N/A** | **N/A** | **Partial Compliance** |
| T-12 | FY2020 Implementation Plan | Analyze quarterly pipeline issues and potential interventions.<br><br>*While a partial analysis was conducted on 8/27/19 and presented to the Parties, it was confusing and had limited utility; after August 2019, Defendants reported that the analysis was not replicated due to provider reporting issues.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-13 | FY2020 Implementation Plan | Distribute informational bulletin on spend-down grant.<br><br>*The Defendants reported that this was not completed.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-14 | FY2020 Implementation Plan | Distribute spend-down guidance to local Medicaid offices.<br><br>*Instead of providing guidance to local offices, the Defendants designated one office for all Class Member issues related to Medicaid coverage; the new process was activated on 1/1/20. While this represents a different strategy than was required in the Implementation Plan, it does match the intent of the original requirement and as such a rating of in compliance was assigned.* | **N/A** | **N/A** | **In Compliance** |
| T-15 | FY2020 Implementation Plan | Identify DMH [Division of Mental Health] staff to expedite Medicaid issues among Class Members.<br><br>*Staff were identified to address Class Member Medicaid issues.* | **N/A** | **N/A** | **In Compliance** |
| T-16 | FY2020 Implementation Plan | Update Parties and Monitor on Class Member Medicaid application and redetermination data.<br><br>*The Defendants provided monthly reports to the Parties on Class Member Medicaid issues and resolution status.* | **N/A** | **N/A** | **In Compliance** |
| T-17 | FY2020 Implementation Plan | Determine needed Supplemental Security Income/Social Security Disability Insurance Outreach, Access, and Recovery (SOAR) program staffing for each provider.<br><br>*SOAR funding was included in 7/1/19 provider contracts.* | **N/A** | **N/A** | **In Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| T-18 | FY2020 Implementation Plan | Include SOAR staffing in provider contracts.<br><br>*SOAR staffing was included in 7/1/19 provider contracts, but implementation was very weak due to poor management, a lack of mechanisms for provider accountability, and the payment structure.* | N/A | N/A | **Partial Compliance** |
| T-19 | FY2020 Implementation Plan | Explore feasibility of Department of Human Services-funded attorney referral process for benefits acquisition.<br><br>*After internal deliberations, the Defendants determined not to pursue this program.* | N/A | N/A | **In Compliance** |
| T-20 | FY2020 Implementation Plan | If feasible, establish DHS-funded attorney referral process for benefits acquisition.<br><br>*The Defendants determined this as unfeasible in requirement T-11, negating the applicability of this requirement.* | N/A | N/A | N/A |
| T-21 | FY2020 Implementation Plan | Draft and release Notice of Funding Opportunity (NOFO) for flexible funding for providers.<br><br>*Defendants determined that a NOFO was not necessary and instead amended provider contracts to allow for use of flexible funds.* | N/A | N/A | **In Compliance** |
| T-22 | FY2020 Implementation Plan | Include flexible funding in provider contracts.<br><br>*Flexible funding was added to provider contracts two months after the due date.* | N/A | N/A | **In Compliance** |
| T-23 | FY2020 Implementation Plan | Review flexible funding utilization on a monthly basis.<br><br>*During FY2020, the Defendants did not monitor flexible funding utilization; they developed a data infrastructure to collect and analyze this information, but did not do so during the fiscal year, in part because of reporting extensions granted to Comprehensive Program providers during the COVID-19 crisis.* | N/A | N/A | **Partial Compliance** |
| T-24 | FY2020 Implementation Plan | Provide bonus/retention funding for defined positions.<br><br>*Bonus and retention funding was included in Comprehensive Program contracts.* | N/A | N/A | **In Compliance** |
| T-25 | FY2020 Implementation Plan | Analyze impact of bonus/retention funding.<br><br>*Utilization of funding was not reviewed or analyzed given reporting issues due to COVID-19. However, since a reporting structure was setup, the Defendants receive a partial compliance rating.* | N/A | N/A | **Partial Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| T-26 | FY2020 Implementation Plan | Implement incentive payment program to enhance Medicaid Managed Care Organization (MCO) role in transitions from nursing facilities.<br><br>*This was not completed in FY2020.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-27 | FY2020 Implementation Plan | Review and address MCO contracts.<br><br>*This activity was not completed but was later completed in FY2021.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-28 | FY2020 Implementation Plan | Convene DHS, HFS, MCOs, and *Colbert* providers<br><br>*These stakeholders convened a meeting on June 30, 2020 and held other meetings with subgroups throughout FY2020.* | **N/A** | **N/A** | **In Compliance** |
| T-29 | FY2020 Implementation Plan | Complete development of PASRR redesign.<br><br>*PASRR was not redesigned in FY2020, but HFS did engage consultants to analyze the existing PASRR system.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-30 | FY2020 Implementation Plan | Implement PASRR redesign.<br><br>*PASRR redesign activities were not executed in FY2020.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-31 | FY2020 Implementation Plan | Convert to new PASRR assessment system.<br><br>*PASRR redesign activities were not executed in FY2020.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-32 | FY2020 Implementation Plan | Add three new staff to support PASRR redesign implementation.<br><br>*HFS did not hire new staff but did engage a consulting firm to provide subject matter expertise on project support.* | **N/A** | **N/A** | **Out-of-Compliance** |
| T-33 | FY2020 Implementation Plan | Analyze IPS [Individual Placement Support] enrollment and employment data and establish baselines and benchmarks.<br><br>*The Defendants provided an employment briefing in January 2020 that included baseline data and performance benchmarks.* | **N/A** | **N/A** | **In Compliance** |
| **Compliance Domain: Community-Based Services and Housing Capacity Development** | | | | | |
| 37 | Cost Neutral Plan (2016) Section I | The Defendants, within 30 days of the entry of this Cost Neutral Plan, shall take any and all necessary steps to amend the contract of the Monitor to allow him to hire, retain, and pay the consultant. *(Referred to as Req. 47 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| 38 | Cost Neutral Plan (2016) Section I | The Parties and the Monitor shall discuss the consultant's findings and incorporate the Monitor's recommendations based on those findings into or as an Amendment to the updated Implementation Plan. *(Referred to as Req. 48 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 39 | Cost Neutral Plan (2016) Section F | During the second quarter of calendar year 2017, the Parties and the Monitor shall discuss the proposals made by the consultant pursuant to his/her review outlined in paragraph I. *(Referred to as Req. 52 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 40a | *Cost Neutral Plan (2016) Section G* | *The Defendants' responsibility to continue development of an increasing community capacity necessary and appropriate to comply with the Consent Decree and this Plan shall continue under this Plan and shall incorporate and respond to findings by the Monitor and the consultant pursuant to Paragraph I herein. (Referred to as Req. 53 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 40b | Updated Cost Neutral Plan (2018) Section G | The Defendants' responsibility to continue development of an increasing Community Capacity necessary and appropriate to comply with the Consent Decree and this Plan shall continue under this Plan and shall incorporate and respond to findings by the Monitor and the consultant pursuant to paragraph I herein. | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** |
| 41 | Consent Decree Section V | Defendants shall develop and implement necessary and sufficient measures, services, supports, and other resources, such as having service providers available for and able to locate affordable housing, to arrange for transition into Community-Based Settings, and to assist Class Members with accessing Community-Based Services, consistent with the choices of Class Members, to ensure that the Defendants will meet their obligations under the Decree and the Implementation Plan. Nothing in this Consent Decree shall reduce, impair or infringe on any rights or entitlements of any Class Members in any State program or in any Medicaid program. *(Referred to as Req. 54 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 42a | *Consent Decree Section VI(C)(6)* | *The Defendants shall identify or develop sufficient numbers of appropriate Community-Based Settings so that Class Members placed on the Community Transition Schedule will be able to move to appropriate Community-Based Settings as quickly as possible consistent with the Cost Neutral Plan. (Referred to as Req. 56 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 42b | *Cost Neutral Plan (2016) Section C* | *The Defendants shall identify or develop sufficient and appropriate Community-Based Settings and services so that Class Members placed on the Schedule will be able to move to appropriate Community-Based Settings in the time frames stated in this plan, or at a reasonable pace to be determined as set forth in Paragraph E below. (Referred to as Req. 55 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 42c | *Updated Cost Neutral Plan (2018) Section C* | The Defendants shall identify or develop appropriate Community-Based Settings and services so that Class Members placed on the Schedule will be able to move to appropriate Community-Based Settings in the time frames stated in this plan, or at a reasonable pace to be determined as set forth in paragraph F below. | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** |
| 43 | Consent Decree Section VI(D)(1) | Defendants shall ensure that Class Members who move to a Community-Based Setting have access to all appropriate Community-Based Services, Transition Costs, Home Accessibility Adaptation Costs and/or Housing Assistance specified in their Service Plan. *(Referred to as Req. 57 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** |
| C-1 | FY2020 Implementation Plan | Complete geo-map to identify gaps in housing and service needs.<br><br>*The Defendants are assigned an out-of-compliance rating for several reasons. While they did include geo-maps in their capacity development plan (submitted on 6/3/20), the geo-maps only identified the proximity of 811/Statewide Referral Network (SNR) housing locations relative to long-term care facilities and drop-in centers, which constitutes a marginal percentage of all Colbert Class Member housing, according to data from FY2017 to FY2019. Further, the geo-maps did not identify potential providers relative to Class Members' preferred housing locations.[31]* | **N/A** | **N/A** | **Out-of-Compliance** |

[31] The Defendants disagreed with this compliance rating, citing that the "Capacity Development Plan submitted on 6/30/20 contained nine (9) separate geo-maps, four (4) of which identified Class Member housing locations in the community in relation to the most significant community-based resource: Drop-In Centers.

| | | | | | |
|---|---|---|---|---|---|
| C-2 | FY2020 Implementation Plan | Improve Statewide Referral Network (SRN) reporting.<br><br>*This was partially completed. While housing waitlist data is reported monthly, the analysis of SRN was not completed.* | **N/A** | **N/A** | **Partial Compliance** |
| C-3 | FY2020 Implementation Plan | Reconvene housing workgroup/taskforce.<br><br>*Defendants reported holding housing workgroup meetings throughout the fiscal year.* | **N/A** | **N/A** | **In Compliance** |
| C-4 | FY2020 Implementation Plan | Research and apply for Housing and Urban Development (HUD) mainstream voucher program.<br><br>*The Illinois HUD was ineligible to apply directly for the mainstream voucher program but did contact local housing authorities to offer application support.* | **N/A** | **N/A** | **In Compliance** |
| C-5 | FY2020 Implementation Plan | Track and report on granted waivers to landlords.<br><br>*Waivers granted to landlords to suspend disability residential segregation rules were tracked during FY2020.* | **N/A** | **N/A** | **In Compliance** |
| C-6 | FY2020 Implementation Plan | Improve ability to track housing need and availability data through SRN/811 waiting list.<br><br>*The Defendants developed new referral and reporting processes and provided data regularly in data dashboards.* | **N/A** | **N/A** | **In Compliance** |
| C-7 | FY2020 Implementation Plan | Issue solicitation to identify housing experts.<br><br>*The Defendants decided to use their in-house housing experts, as well as the Corporation for Supportive Housing; they stated that no new procurement of outside expert services was needed.* | **N/A** | **N/A** | **N/A** |
| C-8 | FY2020 Implementation Plan | Contract with housing experts.<br><br>*Not applicable due to the outcome of S-26.* | **N/A** | **N/A** | **N/A** |
| C-9 | FY2020 Implementation Plan | Issue report from housing experts.<br><br>*Not applicable due to the outcome of S-26.* | **N/A** | **N/A** | **N/A** |
| C-10 | FY2020 Implementation Plan | Issue plan and recommended actions from housing experts.<br><br>*Not applicable due to the outcome of S-26.* | **N/A** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| C-11 | FY2020 Implementation Plan | Review all steps in the housing process.<br><br>*The Defendants did conduct provider-centered visits and observed of transition services and the housing process, to inform the design of the Comprehensive Class Member Transition Program. The Court Monitor provides a partial compliance rating given that pipeline issues still persist.[32]* | **N/A** | **N/A** | **Partial Compliance** |
| C-12 | FY2020 Implementation Plan | Convene a core housing locator/housing options organization workgroup.<br><br>*This was not completed. The Defendants indicated that the housing locator model was modified under the new Comprehensive Program but the objective of this workgroup — even if the housing model changed — would have still been helpful for the Defendants.* | **N/A** | **N/A** | **Out-of-Compliance** |
| C-13 | FY2020 Implementation Plan | Update data management system to track community-based housing choices, including SRN/811 units.<br><br>*The data management system was updated to track housing choices by 10/23/19.* | **N/A** | **N/A** | **In Compliance** |
| C-14 | FY2020 Implementation Plan | Expand housing options available to members with complex co-morbid conditions.<br><br>*This was not completed.* | **N/A** | **N/A** | **Out-of-Compliance** |
| C-15 | FY2020 Implementation Plan | Develop and implement standardized process for obtaining necessary documentation.<br><br>*This was not completed.* | **N/A** | **N/A** | **Out-of-Compliance** |
| C-16 | FY2020 Implementation Plan | Work with 811 match to move Class Members from bridge subsidies to housing choice vouchers.<br><br>*The Defendants implemented a policy to enroll Class Members with housing bridge subsidies in the SRN nine months after this requirement's due date. Given the minuscule utilization of these units among Class Members, this is not an adequate response/strategy to move Class Members from bridge subsidies to more sustainable rental assistance programs. The Defendants provided no data on Class Members who transitioned from bridge subsidies to other housing financing programs in FY2020.* | **N/A** | **N/A** | **Out-of-Compliance** |
| C-17 | FY2020 Implementation Plan | Schedule and hold first provider summit.<br><br>*The Defendants held the first provider summit on 8/20/19, before the due date.* | **N/A** | **N/A** | **In Compliance** |

---

[32] The compliance rating was changed from out-of-compliance to partial compliance. The Defendants requested an in compliance rating.

| C-18 | FY2020 Implementation Plan | Create initial service and housing capacity development plan.<br><br>*The Defendants submitted a capacity development plan on 12/31/19, by the Implementation Plan deadline of 1/1/20. However, the plan was poor in quality and scope, prompting the Court Monitor to formally request a revised plan, which was substantially improved and submitted to the Parties and Court Monitor on 6/30/20.* | N/A | N/A | **Partial Compliance** |
|---|---|---|---|---|---|
| C-19 | FY2020 Implementation Plan | Review and analyze contracts and identify needed modifications.<br><br>*In lieu of modifying existing service provider contracts, the Defendants executed new provider contracts through the Comprehensive Program in February 2020.* | N/A | N/A | N/A |
| C-20 | FY2020 Implementation Plan | Schedule and hold second provider summit.<br><br>*The Defendants held the second provider summit on 12/9/19, by the due date of 12/15/19.* | N/A | N/A | **In Compliance** |
| C-21 | FY2020 Implementation Plan | Prepare summary of recommendations for contract modifications.<br><br>*In lieu of modifying existing provider contracts, the Defendants executed new provider contracts through the Comprehensive Program in February 2020.* | N/A | N/A | N/A |
| C-22 | FY2020 Implementation Plan | Identify needed modifications for FY2021 provider contracts.<br><br>*In lieu of modifying existing provider contracts, the Defendants executed new provider contracts through the Comprehensive Program in February 2020. Those contracts were renewed for FY2021 and included an expansion of peer support services as requested by the Court Monitor.* | N/A | N/A | N/A |
| C-23 | FY2020 Implementation Plan | Schedule and hold third and fourth provider summits.<br><br>*The third provider summit was canceled due to COVID-19. The fourth provider summit was not scheduled, but a "Restore and Reinvent" Workgroup was assembled starting 6/3/20 and met on a weekly basis for the remainder of FY2020. The Defendants good faith effort to comply with the intention of and actual requirement earned an in compliance rating.* | N/A | N/A | **In Compliance** |

| C-24 | FY2020 Implementation Plan | Identify rates for rate review.<br><br>*The Department of Healthcare and Family Services (HFS) shared summaries of provider input on rates they proposed to be reviewed on 12/19/19, three-and-a-half months past the deadline.* | **N/A** | **N/A** | **Partial Compliance** |
|------|------|------|------|------|------|
| C-25 | FY2020 Implementation Plan | Provide report to Plaintiffs and Monitor on which rates will be subject to review.<br><br>*HFS shared proposed rates for review with the Court Monitor nearly three months late. The Court Monitor, after requesting additional information on the link between provider input and HFS identified rates, did not receive a response from HFS for another two months.* | **N/A** | **N/A** | **Partial Compliance** |
| C-26 | FY2020 Implementation Plan | Conduct review of identified rates.<br><br>*HFS was required to complete this activity by 11/15/19, but it was not completed in all of FY2020, despite this being a FY2019 carry-over Implementation Plan requirement. HFS completed the rate study in FY2021.* | **N/A** | **N/A** | **Out-of-Compliance** |
| C-27 | FY2020 Implementation Plan | Provide rate recommendations to Governor's Office of Management and Budget in conjunction with FY2020 budget.<br><br>*HFS was required to complete this by 12/31/19; it was not completed in FY2020.* | **N/A** | **N/A** | **Out-of-Compliance** |
| C-28 | FY2020 Implementation Plan | Provide report to Parties and Monitor on final rate changes.<br><br>*HFS was required to complete this around 2/20/20 or when it was cleared by the Governor's Office for release; it was not completed in FY2020. The report was shared with Parties and the Court Monitor on 10/14/20.* | **N/A** | **N/A** | **Out-of-Compliance** |
| Court Monitor Requirements | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| CM1 | Cost Neutral Plan (2016) Section I | *The Monitor, at the State's expense, with the input of the Defendants and Class Counsel, will retain an appropriate independent consultant (who will be solely chosen by, directly supervised by, report to, be directed by and solely responsible to the Monitor) to advise the Monitor on how the Defendants can develop Community Capacity sufficient to transition the required number of Class Members under the Consent Decree and the Cost Neutral Plan. The consultant will determine the current barriers to the Defendants' development of Community Capacity required to achieve compliance with the Consent Decree and the Cost Neutral Plan and to transition greater numbers of Class Members to Community-Based Settings in the future. (Referred to as Reqs. 49 and 50 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| CM2 | Cost Neutral Plan (2016) Section I | *Within six months of the Court's approval of this Cost Neutral Plan Order, the Monitor will submit a proposal to the Defendants and Class Counsel which includes recommendations for addressing barriers to the development of Community Capacity and recommendations for substantially expanding Community Capacity in order to transition Class Members as required by the Consent Decree and the Cost Neutral Plan. (Referred to as Req. 51 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| **Compliance Domain: Administration-Related Requirements** | | | | | |
| 44 | Consent Decree Section IX(C) | Defendants will not refuse any request by the Monitor for documents or other information that are reasonably related to the Monitor's review and evaluation of Defendant's compliance with the Decree, and Defendants will, upon reasonable notice, permit confidential interviews of Defendant's staff or consultants, except their *attorneys. (Referred to as Req. 58 in CY2017 Report.)* | **In Compliance** | **Partial Compliance** | **Partial Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 45 | Consent Decree Section IX(A) | The Court will appoint an independent and impartial Monitor who is knowledgeable concerning the management and oversight of programs, including waiver programs that serve Individuals with Mental Illness and Physical Disabilities of all ages. The Parties shall attempt to agree on the selection of a Monitor to propose to the Court. If the Parties are unable to reach agreement, each party will nominate at least one person to serve as Monitor, and the Court will select the Monitor. Within 21 days of the Approval of the Decree, the Parties shall submit their joint recommendation or separate nominations for a Monitor to the Court. In the event the Monitor resigns or otherwise becomes unavailable, the process described above will be used to select a replacement. *(Referred to as Req. 59 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 46 | Consent Decree Section IX(C) | The Monitor shall review and evaluate the Defendants' compliance with the terms of the Decree. Not less than every six months, starting no later than three months after finalization of the Implementation Plan, Defendants shall provide the Monitor and Plaintiffs with detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and progress toward achieving compliance, with Parties and Monitor agreeing in advance of the first report of the data and information that must be included in such report. *(Referred to as Req. 60 in CY2017 Report.)* | In Compliance | In Compliance | In Compliance |
| 47 | Consent Decree Section IX(C) | The Defendants shall comply with the Class Counsel's requests for information that are reasonably related to Defendants' compliance with Decree, including without limitation requests for records and other relevant documents pertinent to the implementation of the Decree or to Class Members. Class Counsel also shall be permitted to review the information provided to the Monitor. All information provided to the Monitor and/or Class Counsel pursuant to the Decree shall be provided subject to the Protective Order and any applicable HIPAA requirements. | In Compliance | In Compliance | Partial Compliance |

| | | | | | |
|---|---|---|---|---|---|
| 48 | Consent Decree Section IX(E) | The Monitor may hire staff as necessary to fulfill his or her duties under the Decree. Defendants shall compensate Monitor and his/her staff and consultants at their usual and customary rate; reimburse all reasonable expenses to the Monitor and the Monitor's staff; consistent with guidelines set forth in "Governor's Travel Control Board Travel Guide for State Employees." After negotiation, comment and a good faith attempt to resolve all differences, Defendants may seek relief from the Court if Defendants believe that any of the Monitor's charges is inappropriate or unreasonable. *(Referred to as Req. 62 in CY2017 Report.)* | **In Compliance** | **In Compliance** | **In Compliance** |
| 49a | *Cost Neutral Plan (2016) Section J* | *All provisions of the Consent Decree and the current Implementation Plan not specifically changed or modified by this Cost Neutral Plan or the updated Implementation Plan described in paragraph H, shall remain in full force and effect. The Parties and the Monitor, after filing their reports, shall meet with the Court at least annually to discuss and report on their progress. (Referred to as Req. 64 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 49b | Updated Cost Neutral Plan (2018) Section J | All provisions of the Consent Decree and the current Implementation Plan not specifically changed or modified by this Updated Cost Neutral Plan shall remain in full force and effective. The Parties and the Court Monitor shall meet with the Court at least annually to discuss and report on their progress. | **In Compliance** | **In Compliance** | **In Compliance** |
| 50 | Consent Decree Section IX(C) | The Monitor will have access to all Class Members and their records and files, as well as to those service providers, facilities, buildings, and premises that serve, or are otherwise pertinent to, Class Members, where such access is reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree. *(Referred to as Req. 66 in CY2017 Report.)* | **In Compliance** | **Partial Compliance** | **In Compliance** |
| 51 | Consent Decree Section XII(B) | The cost of all notices hereunder or otherwise ordered by the Court shall be borne by the Defendants. *(Referred to as Req. 63 in CY2017 Report.)* | **In Compliance** | **In Compliance** | **In Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 52 | Consent Decree Section IX(C) | *Within 60 days of Approval of the Decree, Defendants shall offer each of the Class Representatives the opportunity to receive appropriate services in the most integrated setting appropriate to his or her needs. Provision of services to the Class Representatives pursuant to this paragraph shall not be used to determine any other individual's eligibility for services under the terms of this Decree. (Referred to as Req. 69 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 52 | *Consent Decree Section X* | *Within 60 days of Approval of the Decree, Defendants shall offer each of the Class Representatives the opportunity to receive appropriate services in the most integrated setting appropriate to his or her needs. Provision of services to the Class Representatives pursuant to this paragraph shall not be used to determine any other individual's eligibility for services under the terms of this Decree. (Referred to as Req. 69 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 53 | *Consent Decree Section XI(A)* | *In full settlement of all attorney fees and costs incurred in connection with the litigation, Defendants shall pay $1,200,000 to Class Counsel in three equal payments. Defendants shall make the first payment in State Fiscal Year 2012 (which begins on July 1, 2011), the second payment in State Fiscal Year 2013 (which begins July 1, 2012), and the third payment in State Fiscal Year 2014 (which begins July 1, 2013). All of the payments shall be distributed to Class Counsel in the manner set forth in written instructions provided by Class Counsel. Furthermore, such amounts shall be set forth in one or more Judgment Orders to be entered by the Court within 14 days after Approval of the Decree. Defendants shall complete and submit all paperwork necessary for the first payment, plus applicable statutory post-judgment interest within (a) five business days after expiration of the time to appeal the Decree without the filing of a Notice of Appeal, or after the issuance of the mandate by the highest reviewing court, whichever is later, or (b) April 1, 2012, whichever is later. Defendants shall complete and submit all paperwork necessary for the second payment no later than July 1, 2012 and the paperwork necessary for the third payment, no later than July 1, 2013. (Referred to as Req. 70 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| 54 | *Cost Neutral Plan (2016) Section K* | *Until the Consent Decree is terminated, the Court shall retain exclusive jurisdiction to fully oversee, supervise, modify and enforce the terms of the Consent Decree, the current and updated Implementation Plan and this Cost Neutral Plan. (Referred to as Req. 71 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 55 | *Cost Neutral Plan (2016) Section K* | *Pursuant to Section XIII of the Consent Decree, the Parties, jointly or separately, may request termination of the monitoring process described in Section XIII of the Consent Decree, the Consent Decree, the updated Implementation Plan and this Cost Neutral Plan at any time after December 31, 2019, if the Monitor agrees that Defendants have substantially complied with the terms of the Consent Decree, the Implementation Plan and this Cost Neutral Plan. (Referred to as Req. 72 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 56 | *Cost Neutral Plan (2016) Section K* | *Defendants shall notify Class Counsel in writing if they intend to seek termination of the Consent Decree. (Referred to as Req. 73 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 57 | *Cost Neutral Plan (2016) Section K* | *Class Counsel shall have 120 days from receipt of the Termination Request to conduct reasonable discovery concerning issues relevant to the determination of compliance. If Class Counsel oppose the Termination Request, Class Counsel may file a response within 120 days from the date of receipt of all information reasonably requested from defendants in the conduct of discovery. (Referred to as Req. 74 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 58 | *Cost Neutral Plan (2016) Section K* | *The Court may grant Defendants' Termination request if the Court finds that Defendants have substantially complied with the terms of the Consent Decree, and the Court determines that Defendants have implemented and are maintaining a system that complies with the Consent Decree, the Implementation Plan and this Cost Neutral Plan. (Referred to as Req. 75 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 59 | *Cost Neutral Plan (2016) Section K* | *The Consent Decree, the Implementation Plan and this Cost Neutral Plan shall remain in effect, and the Court shall retain its jurisdiction over the Consent Decree, the Implementation Plan and this Cost Neutral Plan, until a final order is entered granting a Termination and all appellate rights have been exhausted. (Referred to as Req. 76 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| 60 | *Consent Decree Section XII(A)* | *Approval of this Decree shall be deemed to occur on the date of the Court enters the Decree. (Referred to as Req. 77 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 61 | *Consent Decree Section XII(C)* | *Each undersigned representative of a Defendant to this litigation and the Attorney General for the State of Illinois certifies that he or she is authorized to enter into the terms and conditions of the Decree and to execute and bind legally such Defendant to this document. Each undersigned representative of Plaintiffs certifies that he or she is authorized to enter into the terms and conditions of the Decree and to execute and bind legally the Plaintiffs to his document. (Referred to as Req. 78 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 62 | *Consent Decree Section XII(D)* | *Unless otherwise ordered by the Court, this Decree shall terminate at the earliest to the following: (1) as specified in the Parties' joint motion to terminate the Decree, as provided in Section VI.C.4, or (2) as specified in the Cost Neutral Plan approved by the Court. (Referred to as Req. 79 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| A-1 | FY2020 Implementation Plan | Hire Olmstead Compliance Officer.<br><br>*The Olmstead Compliance Officer began her role on 6/17/19, shortly before the deadline of 7/1/19.* | **N/A** | **N/A** | **In Compliance** |
| A-2 | FY2020 Implementation Plan | Support efforts to hire Williams Administrator/Deputy Director of Systems Rebalancing.<br><br>*The Defendants hired this position on 9/20/19. After that individual's departure soon after the hire, they re-filled the position on 2/24/19.* | **N/A** | **N/A** | **In Compliance** |
| A-3 | FY2020 Implementation Plan | Transition *Colbert* budget from IDoA [Illinois Department on Ageing] to DHS [Department of Human Services].<br><br>*Most of the Colbert budget transitioned to IDHS by 12/1/19 with the rest remaining with IDoA until the close of FY20. The Comprehensive Program was solely funded by IDHS.* | **N/A** | **N/A** | **In Compliance** |
| A-4 | FY2020 Implementation Plan | Identify organizational structure for *Colbert* staff within DHS.<br><br>*Colbert staff moved to IDHS under DMH [Department of Mental Health] by 7/1/19. An integrated Williams/Colbert staffing approach was implemented to support the Comprehensive Program.* | **N/A** | **N/A** | **In Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| A-5 | FY2020 Implementation Plan | Complete NOFO [Notice of Funding Opportunities] process to enter into contracts between IDHS and *Colbert* providers. *This was achieved through the shift to the Comprehensive Program in early 2020.* | **N/A** | **N/A** | **In Compliance** |
| A-6 | FY2020 Implementation Plan | Identify physical location for and relocate *Colbert* staff. *Colbert staff relocated to the IDHS office on 12/16/19.* | **N/A** | **N/A** | **In Compliance** |
| A-7 | FY2020 Implementation Plan | Complete comprehensive analysis of staffing needs and resources.[33] *The Defendants provided no evidence that they conducted a thorough staffing analysis. They reported that they restructured staff to support monitoring the new Comprehensive Program. However, in the Court Monitor's view, the staffing assigned to Consent Decree operations was (and still is) inadequate, as she specified more than four years ago.* | **N/A** | **N/A** | **Partial Compliance** |
| A-8 | FY2020 Implementation Plan | Reassign and fill additional positions as needed. *A number of staffing areas were informally identified but not addressed in FY2020, including needed administrative and contract management assistance, communications and marketing experts, quality review and quality assurance support, and management level staff. While the Defendants reported restructuring staff to monitor the new Comprehensive Program, these other important functions remained unaddressed in the form of dedicated staff hires. The partial compliance rating resulted from the staffing reassignments that were reported.* | **N/A** | **N/A** | **Partial Compliance** |
| A-9 | FY2020 Implementation Plan | Convene monthly Large Parties Meetings. *There was agreement between the Court Monitor and Parties to hold bimonthly Large Parties Meetings, alternating with smaller topic-focused Small Parties Meetings to provide opportunity for in-depth discussions and negotiations. These meetings occurred within their schedules during the fiscal year.* | **N/A** | **N/A** | **In Compliance** |
| A-10 | FY2020 Implementation Plan | Convene monthly State-Only Meetings. *The Defendants, via IDHS, convened monthly meetings of Defendant and other state agencies relevant to Consent Decree operations in FY2020.* | **N/A** | **N/A** | **In Compliance** |

[33] The Defendants disagreed with the compliance ratings for A-7 and A-8, citing that a staffing analysis was conducted to re-structure the *Colbert* team for the Comprehensive Program, resulting in 30 staff being assigned to new roles to meet the the needs of the Comprehensive Program during the COVID-19 pandemic.

| | | | | | |
|---|---|---|---|---|---|
| A-11 | FY2020 Implementation Plan | Convene monthly DHS and Court Monitor Meetings.<br><br>*These meetings were held monthly in FY2020.* | N/A | N/A | **In Compliance** |
| A-12 | FY2020 Implementation Plan | Convene meetings between Olmstead Compliance Officer and her staff and Court Monitor.<br><br>*These meetings were held weekly in FY2020.* | N/A | N/A | **In Compliance** |
| A-13 | FY2020 Implementation Plan | Identify and execute intergovernmental agreement (IGA) with housing authority of Cook County.<br><br>*This IGA was executed on 6/28/19.* | N/A | N/A | **In Compliance** |
| A-14 | FY2020 Implementation Plan | Enter into new agreements with providers.<br><br>*The Defendants entered into new agreements with nine new "prime" provider agencies under the Comprehensive Program.* | N/A | N/A | **In Compliance** |
| A-15 | FY2020 Implementation Plan | Move filled personnel positions and contracts to DHS.<br><br>*All positions were moved to IDHS effective 7/1/19 with the exception of the administrative assistant.* | N/A | N/A | **In Compliance** |
| A-16 | FY2020 Implementation Plan | Move vacant personal service contracts to DHS.<br><br>*These staff positions were also moved by 7/1/19.* | N/A | N/A | **In Compliance** |
| A-17 | FY2020 Implementation Plan | Move IT systems and provide training.<br><br>*The legacy IT system was not brought forward into the Comprehensive Program, rendering this requirement and the associated training not applicable.* | N/A | N/A | N/A |
| A-18 | FY2020 Implementation Plan | Determine budget split between DHS and IDOA.<br><br>*This was completed by 12/1/19.* | N/A | N/A | **In Compliance** |
| A-19 | FY2020 Implementation Plan | Determine operational location with DHS.<br><br>*The physical location was identified, and staff relocated by 12/16/19.* | N/A | N/A | **In Compliance** |
| A-20 | FY2020 Implementation Plan | Finalize physical location and move at DHS.<br><br>*The physical location was identified, and staff relocated by 12/16/19.* | N/A | N/A | **In Compliance** |
| A-21 | FY2020 Implementation Plan | Revise and submit semi-annual reports in consultation with the Monitor.<br><br>*Semiannual reports were submitted on 8/22/19 for the compliance period covering the last half of FY2019 and originally on 3/20/20 for coverage of the first half of FY2020 period.* | N/A | N/A | **In Compliance** |
| **Court Monitor Requirements** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| CM3 | Consent Decree Section IX(D) | In the event the Monitor finds Defendants not in compliance with the Decree, the Monitor shall promptly meet and confer with the Parties in an effort to agree on steps necessary to achieve compliance. In the event that Class Counsel believe that Defendants are not complying with the terms of the Decree, Class Counsel shall notify the Monitor and Defendants of Defendants' potential non-compliance. The Monitor then shall review Plaintiff's claims of actual or potential noncompliance and, as the Monitor deems appropriate in his or her professional judgment, meet and confer with Defendants and Plaintiffs in an effort to agree on steps necessary to achieve compliance with the Decree. If the Monitor and Parties agree, such steps shall be memorialized in writing and incorporated into, and become enforceable as part of, the Decree. In the event that the Monitor is unable to reach agreement with Defendants and Plaintiffs, the Monitor or either Party may seek appropriate relief from the Court. In the event that Plaintiffs believe that Defendants are not in compliance with the Decree and that the Monitor has not requested appropriate relief from the Court, Plaintiffs may seek relief from the Court. The Monitor shall not communicate with the Court without advance notice to the Parties. (Referred to as Req. 68 in CY2017 Report.) | **In Compliance** | **In Compliance** | **In Compliance** |
| CM4 | Consent Decree Section IX(B) | The Monitor's duties include evaluating Defendants' compliance with the Decree, identifying actual and potential areas of noncompliance with the Decree, mediating disputes between the Parties, and bringing issues and recommendations for their resolution to the Court. The Monitor will file a written report at least annually with the Court and the Parties regarding compliance with the Decree. Such reports shall include the information necessary, in the Monitor's professional judgment, for the Court and Class Counsel to evaluate Defendants' compliance with the terms of the Decree. Reports of the Monitor shall be filed with the Court and served on all Parties. The Monitor may redact any portions of the Report necessary to make certain confidential matters and information is not disclosed. (Referred to as Req. 65 in CY2017 Report.) | **In Compliance** | **In Compliance** | **In Compliance** |
| **Implementation Plan-Related Requirements** | | | | | |
| 63 | Consent Decree Section VIII(A) | Defendants, with input of Monitor and Plaintiffs, shall create and implement an Implementation Plan to accomplish the obligations and objectives set forth in the Decree. The Implementation Plan must, at a minimum: *(Referred to as Req. 81 in CY2017 Report.)* | **Out-of-Compliance** | **In Compliance** | **In Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 64 | Consent Decree Section VIII(A)(1) | Establish specific tasks, timetables, goals, programs, plans, strategies, and protocols to assure the Defendants fulfill the requirements of the Decree. *(Referred to as Req. 82 in CY2017 Report.)* | **Out-of-Compliance** | **Partial Compliance** | **Partial Compliance** |
| 65 | Consent Decree Section VIII(A)(2) | Describe hiring, training, and supervision of the personnel necessary to implement the Decree. *(Referred to as Req. 83 in CY2017 Report.)* | **Out-of-Compliance** | **Partial Compliance** | **In Compliance** |
| 66 | Consent Decree Section VIII(A)(3) | Describe the activities required to develop Community-Based Services, Transition Costs, Home Accessibility Adaptation Costs and/or Housing Assistance and Community-Based Settings, including inter-agency agreements, requests for proposals, mechanisms for housing assistance, and other actions necessary to implement the Decree. *(Referred to as Req. 85 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Partial Compliance** |
| 67 | Consent Decree Section VIII(A)(4) | Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services or supports anticipated or required in Service Plans developed pursuant to the Decree that are not currently available in the appropriate quantity, quality, or geographic location, and might be required to meet the obligations of the Decree. *(Referred to as Req. 86 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** ✕ |
| 68 | Consent Decree Section VIII(A)(5) | Identify any necessary changes to regulations that govern Nursing Facilities in order to strengthen and clarify requirements for services to Nursing Facility residents and to provide for effective oversight and enforcement of all regulations and laws. *(Referred to as Req. 87 in CY2017 Report.)* | **Out-of-Compliance** | **Out-of-Compliance** | **Out-of-Compliance** ✕ |
| 69 | Consent Decree Section VIII(A)(6) | Describe the methods by which Defendants shall ensure compliance with their obligations of the Decree. *(Referred to as Req. 88 in CY2017 Report.)* | **Out-of-Compliance** | **Partial Compliance** | **Partial Compliance** |
| 70 | Consent Decree Section VII | The Implementation Plan shall describe methods for providing outreach to Class Members. *(Referred to as Req. 84 in CY2017 Report.)* | **Out-of-Compliance** | **Partial Compliance** | **Partial Compliance** |
| 71 | Consent Decree Section VII | The Implementation Plan shall describe the method by which such information will be disseminated, the process by which Class Members may request services, and the manner in which Defendants will maintain records of these requests. The Implementation Plan shall describe methods for providing outreach to Class Members. *(Referred to as Req. 90 in CY2017 Report.)* | **Out-of-Compliance** | **Partial Compliance** | **Partial Compliance** |

| | | | | | |
|---|---|---|---|---|---|
| 72 | Consent Decree Section VIII(C) | The Implementation Plan shall be updated and amended at least annually. The Monitor and Counsel for Class Plaintiffs shall review and comment upon any proposed updates or amendments at least 60 days before the effective date of any updates or amendments. In the event the Monitor or Counsel for Class Plaintiffs disagree with the Defendants' proposed updates or amendments, the Monitor or Counsel for Class Plaintiffs shall state all objections in writing at least 30 days before the effective date of any updates or amendments. In the event that Defendants, the Monitor, and Counsel for Class Plaintiffs do not agree on updates and amendments, the Court shall resolve any and all disputes before any updates or amendments become effective. *(Referred to as Req. 91 in CY2017 Report.)* | **Out-of-Compliance** | **In Compliance** | **In Compliance** |
| 73 | Consent Decree Section VIII(D) | The Implementation Plan, and all amendments or updates thereto, shall be filed with the Court and shall be incorporated into and become enforceable as part of the Decree. *(Referred to as Req. 92 in CY2017 Report.)* | **Out-of-Compliance** | **In Compliance** | **In Compliance** |
| 74a | *Cost Neutral Plan (2016) Section H* | *The updated Implementation Plan will detail Defendants' plan to increase the pace of transitions from benchmarks required by the Consent Decree to those in the Cost Neutral Plan. Detailed plans will be set out to achieve the requirement to reach all Class Members. Specific targets for the pace of Evaluations, development of Service Plans, development of additional Community-Based Services and Settings, and all other actions and activities necessary to comply with this Cost Neutral Plan will be detailed in the updated Implementation Plan. (Referred to as Req. 89 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 74b | Updated Cost Neutral Plan (2018) Section H | The Phase 4 Implementation Plan will detail Defendants' plan to increase the pace of transitions from the benchmarks required by the Consent Decree to those in this Cost Neutral Plan. Detailed plans will be set out to achieve the requirement to reach all Class Members. Specific targets for the pace of Evaluations, development of Service Plans, development of additional Community-Based Services and Settings, and all other actions and activities necessary to comply with this Cost Neutral Plan and the Consent Decree will be detailed in the Phase 4 Implementation Plan. | **Out-of-Compliance** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| 75a | *Consent Decree Section VIII(B)* | *Within 180 days of Approval of the Decree, Defendants shall provide the Monitor and Counsel for Class Plaintiffs with a draft Implementation Plan. The Monitor and Counsel for Class Plaintiffs shall participate in developing and finalizing the Implementation Plan, which shall be finalized not later than nine months following the Approval Date. If, after negotiation and comment, the Monitor or Counsel for Class Plaintiffs disagrees with the Defendants' proposed Implementation Plan, the Court shall resolve all disputes and finalize the Implementation Plan. (Referred to as Req. 93 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 75b | *Cost Neutral Plan (2016) Section H* | *By November 2016, Defendants shall send to Class Counsel and the Court Monitor a proposed, updated Implementation Plan that will include detailed plans and programs to achieve compliance with this Cost Neutral Plan and the Consent Decree. (Referred to as Req. 94 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 75c | Updated Cost Neutral Plan (2018) Section H | By April 30, 2018, Defendants shall send Class Counsel and the Monitor a proposed, updated Phase 4 Implementation Plan that will include detailed plans and programs to achieve compliance with this Cost Neutral Plan and the Consent Decree. | **In Compliance** | **N/A** | **N/A** |
| 76a | *Cost Neutral Plan (2016) Section H* | *The provisions of the Consent Decree regarding review and approval of the proposed Implementation Plan updates remain in effect. This updated Implementation Plan shall be finalized by the Parties and the Monitor and filed with the Court by December 30, 2016. (Referred to as Req. 95 in CY2017 Report.)* | **N/A** | **N/A** | **N/A** |
| 76b | Updated Cost Neutral Plan (2018) Section H | The provisions of the Consent Decree regarding review and approval of proposed Implementation Plan updates remain in effect. The Phase 4 Implementation Plan shall be finalized by the Parties and the Monitor and filed with the Court by June 30, 2018, or, if the Parties are unable to agree on an Implementation Plan, the Parties shall submit their proposed Implementation Plans to the Court no later than July 13, 2018. | **Out-of-Compliance** | **N/A** | **N/A** |
| 77 | Updated Cost Neutral Plan (2018) Section I | In respectful reliance on the reports issued by the consultant in April 2017 and the Court Monitor in May 2017, the Phase 4 Implementation Plan shall include detailed and precise steps and plans to address barriers to development of Community Capacity and to expand substantially Community Capacity in order to transition Class Members as required by the Consent Decree and this Updated Cost Neutral Plan. | **Out-of-Compliance** | **N/A** | **N/A** |

| | | | | | |
|---|---|---|---|---|---|
| I-1 | | Establish IP oversight process between IDOA and DHS.<br><br>*This is not applicable to the reporting period as the plan was filed before FY2020.* | **N/A** | **N/A** | **N/A** |
| I-2 | FY2020 Implementation Plan | Prepare and submit initial FY21 Implementation Plan draft to Parties and Monitor.<br><br>*The FY2021 Implementation Plan draft was submitted to Parties and Court Monitor on 5/15/20. The due date in the FY2020 Implementation Plan was originally 5/1/20 but was adjusted based on agreement between the Parties and Monitor.* | **N/A** | **N/A** | **In Compliance** |
| I-3 | FY2020 Implementation Plan | File final compliant FY2021 Implementation Plan.<br><br>*The final FY2021 Implementation Plan was filed with the Court on 7/15/20. Although the submission was two weeks past the deadline, the Defendants worked in good faith with the Parties and Court Monitor on a near-timely submission and, thus, are found in compliance.* | **N/A** | **N/A** | **In Compliance** |