*Colbert v. Pritzker*

Case No. 07-C4737 (N.D. Ill.)

Court Monitor FY2024 Compliance Assessment
Annual Report to the Court
February 25, 2025

Kathryn du Pree, MPS
Court Monitor

**Table of Contents**

Executive Summary.................................................................................................Page ii

Section I: Introduction............................................................................................Page 1

Section II: Outreach to *Colbert* Class Members..................................................Page 7

Section III: Assessment for *Colbert* Class Members.........................................Page 16

Section IV: Service Planning for *Colbert* Class Members.................................Page 22

Section V: Transition Activities to Support Class *Colbert* Class Members...................Page 29

Section VI: Community-Based Services and Housing Development...........................Page 39

Section VII: Administrative Requirements...........................................................Page 42

Section VIII: Implementation Planning.................................................................Page 46

Section IX: Quality Assurance...............................................................................Page 51

Section X: Recommendations.................................................................................Page 55

Section XI: Conclusion........................................................................................... Page 60

**Executive Summary**

This report provides Judge Jenkins United States District Judge, Northern District of Illinois, and the *Colbert* Consent Decree Parties with the Court Monitor's detailed assessment of the Defendants' Fiscal Year 2024 (FY24) compliance under *Colbert* v. Pritzker (Case No. 07 C 4737). Within this report, the Court Monitor endeavors to provide the Court and others with a fair and neutral assessment of the Defendants' performance relative to fifty-nine compliance requirements contained in the *Colbert* Consent Decree and the FY24 Implementation Plan. This is the third annual report to the Court produced by Ms. Kathryn du Pree, appointed on August 1, 2022.

There were fifty-nine requirements in the *Colbert* Consent Decree and FY24 Implementation Plan applicable for compliance assessment and non-duplicative. As displayed in *Table 1*, 33 (56%) were found in compliance, 9 (15%) were found in partial compliance, and 17 (29%) were found out of compliance. Table 1 compares these results with previous fiscal years.

While this report covers the FY24 compliance period, it provides compliance assessment ratings for FY20-FY23 to allow readers to compare, make judgments, and assess trends relative to the four prior years of compliance data and performance ratings. *Table 1* provides a comparison of compliance assessment ratings – only for those Consent Decree requirements which remained constant throughout FY19-FY23. The State achieved the highest percentage of ratings in compliance in FY23 compared to the four previous fiscal years. While overall there was a slight reduction in compliance in FY24, from 57% in FY23 to 56% in FY24, the percentage of requirements that were out of compliance increased from 22% in FY23 to 29% in FY24.

**Table 1: Compliance Ratings FY19 – FY24**

| Rating | FY20 | FY21 | FY22 | FY23 | FY24 |
|---|---|---|---|---|---|
| In Compliance | 26% | 41% | 48% | 57% | 56% |
| Partial Compliance | 38% | 16% | 22% | 21% | 15% |
| Out-of-Compliance | 36% | 43% | 30% | 22% | 29% |

*Table 2* illustrates the FY24 determinations for each domain (for both Consent Decree and FY24 Implementation Plan requirements), aggregated to the number of requirements falling within each compliance category. This report contains a dedicated section for each of the compliance domains listed below and includes the Court Monitor's rationale for each rating. In these sections a comparison to FY23 ratings is offered where applicable. There were far fewer requirements in FY24 because the FY24 Implementation Plan included far fewer specific requirements as explained later in this report.

**Table 2: Summary of FY24 Requirements and Compliance Ratings**

| | | | | | | |
|---|---|---|---|---|---|---|
| Outreach Requirements 10 Rated | In Compliance | 3 | Partial Compliance | 1 | Out of Compliance | 6 |
| Assessment Requirements 9 Rated | In Compliance | 4 | Partial Compliance | 0 | Out of Compliance | 5 |
| Service Plan Requirements 8 Rated | In Compliance | 1 | Partial Compliance | 6 | Out of Compliance | 1 |
| Transition Requirements 9 Rated | In Compliance | 5 | Partial Compliance | 0 | Out of Compliance | 4 |
| Community-Based Services/Housing Requirements 4 Rated | In Compliance | 2 | Partial Compliance | 1 | Out of Compliance | 1 |
| Administrative Requirements 9 Rated | In Compliance | 9 | Partial Compliance | 0 | Out of Compliance | 0 |
| Implementation Plan Requirements 10 Rated | In Compliance | 9 | Partial Compliance | 1 | Out of Compliance | 0 |
| | | | | | | |
| Total Requirements 59 Rated | In Compliance | 33 | Partial Compliance | 9 | Out of Compliance | 17 |
| FY24 Performance | In Compliance | 56% | Partial Compliance | 15% | Out of Compliance | 29% |

At the time of this report's submission, it has been over thirteen years since the entry of the *Colbert* Consent Decree (filed December 2011). In FY24, the Defendants demonstrated a strong year since the inception of the Decree with repeated strong transition performance (achieving 99% of required transitions) and implementation of important strategic planning. It agreed to Compliance Indicators which identify measurable performance expectations that will be consistently applied, analyzed, and measured until the State meets the performance expectations. Seventy-one (71) percent of the requirements were either in compliance or in partial compliance compared to 78% in FY23, and of these 56% were in full compliance compared to 57% in FY23. There was a slight decrease in overall performance for the specific requirements of the Consent Decree.

Examining the requirements specific to outreach, assessment, service planning, transition and housing which are the key requirements most directly affecting Class Members, the State had more requirements either in partial compliance or out of compliance than in compliance. The State did well in the areas of administration and implementation requirements with all but one of the requirements in compliance.

Significant challenges persist, and the Court Monitor offers several recommendations in each Section for the State to ensure: all existing Class Members have been outreached; going forward Class Members, post-60 days from admission are outreached in the required timeframe; that assessments and service plans are completed for Class

Members who will be outreached in FY25 and going forward are completed in the required timeframe; and that transitions are planned and implemented so that Class Members who express the desire to return to the community do not wait for months or even years to transition. As of June 2024, 1,428 Class Members were in the pipeline including 556 waiting more than 120 days. There are historically more Class Members in the Pipeline than the State plans to transition in any one year. The State must identify all existing Class Members who want to transition; assure the needed resources for timely outreach, assessment and service planning; expand the housing capacity  and increase the capacity of all necessary community-based services the Class Members need to achieve successful transitions and significantly reduce the risk of reinstitutionalization; and develop a plan for the reasonable pace of transitions to address the needs of existing Class Members and future admissions, while diverting as many individuals as possible from initial admission to a skilled nursing facility (SNF).

These recommendations are made for the State's consideration in light of my analysis of current performance and my experiences both designing and evaluating service delivery systems in other states. Some of my recommendations support initiatives the State is planning for FY25 and FY26. I expect the State to respond, in writing, to each recommendation that does not already have a commitment from the State to address in FY25, within three months of receiving this report indicating which recommendations will be implemented and when and the reasons for not implementing any others. I understand the State may have strategies they believe will lead to higher performance given their knowledge of their existing system and resources. I expect the State to inform both the Court Monitor and the Plaintiffs of any different strategies they plan to pursue as an effective alternative to a recommendation contained in this report, so all Parties are aware of the State's specific plans for systemic change and improved performance.

**Section I. Introduction**

This report presents the Court Monitor's assessment ratings and relevant discussions of the Defendants' compliance under *Colbert* v. Pritzker (Case No. 07 C 4737; United States District Court for the Northern District of Illinois – Eastern Division) based on the assessment period of Fiscal Year 2024 (FY24) The report's basis for compliance assessment include the original *Colbert* Consent Decree requirements and commitments made by the Defendants via the *Colbert* FY24 Implementation Plan, which are enforceable as requirements pursuant to the *Colbert* Consent Decree. This report is issued in fulfillment of the Consent Decree's requirement for the Court Monitor to, "file a written report at least annually with the Court and the Parties regarding compliance with the Decree." Per the Consent Decree, such reports shall, "include the information necessary, in the Monitor's professional judgment, for the Court and the Class Counsel to evaluate Defendants' compliance or non-compliance with the terms of the Decree." This represents the third *Colbert* compliance assessment report to the Court from Ms. Kathryn du Pree, appointed as Court Monitor by Judge Lefkow on August 1, 2022.

Compliance Assessment Period. The period subject to compliance assessment in this report is July 1, 2023, to June 30, 2024, otherwise referred to as FY24. Where noted, data is as of the date indicated, as it represents a snapshot in time of a particular data point. Other significant developments that occurred prior to or after that timeframe are mentioned when deemed relevant to readers' understanding of context, trends, and initiatives.

FY24 Requirements. The *Colbert* Consent Decree and FY24 Implementation Plan contain specific numeric, process, and quality-related requirements of the Defendants that focus on designing, developing, and implementing a system that facilitates and operationalizes opportunities for eligible Class Members to re-enter the community from residing in Cook County nursing facilities. Fifty-nine requirements were assessed for the FY24 reporting period which was the total number after subtracting duplicated requirements and original Consent Decree requirements which only applied to previous reporting periods which were no longer applicable. These requirements span multiple domains of the Defendants' obligations pursuant to the *Colbert* Consent Decree, including outreach, assessment, service planning, transition support, development of community-based housing and services, implementation planning, and administrative support (see graphic below). Two additional Consent Decree requirements focus on Court Monitor duties and the Parties and Court Monitor's involvement in various planning and reporting aspects.

Typically, the Implementation Plan has numerous activities and outcomes listed that indicate how the State plans to implement various initiatives that will assist the State to meet the requirements of the Consent Decree. The Parties and Court Monitor agreed that much of FY24 would be devoted to agreeing on the measures and metrics of substantial compliance by the creation of Compliance Indicators, These were submitted to the Court in December 2023. The Parties and Court Monitor also agreed that significant time would be spent determining the best approaches to improve outreach and assessment and to redesign the system of service coordination, transition planning

1

and the implementation of transition services. As a result, the Parties and Court Monitor agreed to only five Implementation Plan requirements, in addition to regularly reporting the performance of outreach, assessment, service planning and transitions. These five requirements include: the transition of 550 *Colbert* Class Members; the review of Class Members who may meet exclusionary criteria as defined; a plan for completing outstanding outreach for over 7,000 Class Members who have no evidence of being outreached; data analysis to improve the reliability and validity of the data necessary to monitor substantial compliance; and the implementation of a pilot with measurable objectives to engage Class Members with Peers and to expand this approach to outreach.

**Of the 59 total applicable requirements, 33 (56%) were in compliance, 9 (15%) were in partial compliance, and 17 (29%) were out-of-compliance.**

<u>Structure of Report.</u> The Court Monitor has maintained the basic reporting structure used by her predecessor, Ms. Gail Hutchings. However, it should be noted, this is the last report that will be completed before the State begins reporting its progress meeting the Compliance Indicators which have been developed by the Court Monitor's Office with significant input and feedback from the Parties. The future reporting will require the format of the Monitor's Annual Reports to change so it seemed most practical to make those format changes only once starting with the FY25 Annual Report.

Within each domain, the requirements specific to that domain from the Consent Decree and FY24 Implementation Plan are identified. As shown in the graphic below, the first four sections of the report align with the chronological sequence of a Class Member's touch points with Consent Decree processes (e.g., outreach, assessment, service planning, and transition), followed by three additional sections: services and housing capacity development, administrative support, and implementation planning. Given that the report's sections are organized in this fashion, the order of the requirements in this report do not reflect the order of the requirements as they appear in source documents (i.e., Consent Decree, Implementation Plan).

Each of the domain-specific sections herein include the following components:

1. A description of the domain and how it relates to overall Consent Decree compliance.
2. A data highlights section that provides a brief synopsis of relevant data and information for the given domain.
3. A table that provides the text of each Consent Decree and Implementation Plan requirement, the Court Monitor's determination of whether the State achieved compliance with each requirement during FY24, and data/information that led the Court Monitor to make that determination. Each compliance criterion correlates to the Consent Decree or Implementation Plan. The grid also includes FY23 ratings to provide a comparison to the prior year. The previous Court Monitor included compliance ratings back to FY20.
4. A Summary and specific recommendations of the Court Monitor for improvement

2

where applicable.

Compliance Assessment Approach. For this report's purposes, one of three determinations was assigned to each requirement applicable to the FY24 compliance assessment period. *Table 3* displays the compliance assessment determination categories and their definition of use. Consent Decree language that has been determined not applicable in past annual reports or provisions and requirements that were associated with the Cost Neutral Plan of 2016 and the updated Plan of 2018, have not been included in this Annual Report for ease of reading.

Some requirements under the *Colbert* Consent Decree are clearly numeric/quantitative in nature, while others require the Court Monitor's evaluation and compliance determination based on the best available data and the Court Monitor's professional judgment. In both circumstances, data and information are provided, with source citation, to support the Court Monitor's compliance assessment determinations. In the FY24 Implementation Plan, the Defendants developed a set of multiple metrics and "expected outcome[s]" that fall under each strategy. Given that several strategies had multiple "expected outcomes," it was difficult to assign a unified rating at the strategy-level. As such, this Court Monitor elected to rate each "expected outcome" separately. Thus, the total count of requirements for FY24 includes the original Consent Decree requirements and the four expected improvements/outcomes from the FY24 Implementation Plan.

**Table 3: Compliance Assessment Rating Categories and Definitions**

| Compliance Assessment Rating | Definition |
|---|---|
| In Compliance | The Defendants' performance was substantially in accordance with the criterion, requirement, or obligation. |
| Partial Compliance | The Defendants met some aspects, but not other aspects, of the criterion, requirement, or obligation. For numeric requirements, the Court Monitor generally assigned this rating in instances where the Defendants achieved more than 50 percent compliance balanced with whether the Defendants had a system or process in place relative to the specific requirement. This is the last year that the Court Monitor will make determinations of partial compliance now that the level of performance has been agreed to by the Parties for rating the Compliance Indicators starting in FY25. |
| Out-of-Compliance | The Defendants either failed to comply with the requirement or failed to demonstrate compliance with the standard. |
| **Other Categories** | |
| Court Monitor Requirement | Requirements reflect the Court Monitor's obligations. |

*Achieved vs. Required Transitions. Table 4* depicts the number of required vs. achieved Court-required transitions since the Consent Decree's initial implementation. Between

FY12 and FY24, 4,393 Class Members were transitioned, with the Defendants exceeding transition requirements in one out of the 10 years of *Colbert* implementation. For this report's compliance period, FY24, the Defendants transitioned 545 Class Members out of the 550 that were required, achieving a consecutive year of high transition performance percentage (99%) since 2015.

**Table 4: Summary of Transition Requirements and Actual Performance**

| Year | # Transitions Required by CY/FY[1] | # Actual Transitions by CY/FY | Performance % |
|------|------|------|------|
| CY13 | 300 | 114 | 38% |
| CY14 | 500 | 464 | 93% |
| CY15 | 300 | 537 | 179%[1] |
| CY16 | 504 | 383 | 76% |
| CY17 | 550 | 428 | 78% |
| Jan-June 2018 | 300 | 181 | 60% |
| FY19 | 850 | 312 | 37% |
| FY20 | 900 | 223 | 25% |
| FY21 | N/A | 227 | N/A |
| FY22 | 450 | 431 | 96% |
| FY23 | 550 | 549 | 99.8% |
| FY24 | 550 | 545 | 99% |
| *Totals* | 5754 | 4393 | 76% |

*Colbert Class Size.* Determination of the *Colbert* Member Class's total size entails counting two subgroups: those eligible Class Members residing in Cook County SNFs and those who transitioned out of these facilities under the Consent Decree into community-based housing and services. As of the end of the FY24 compliance assessment period, the State has transitioned a total of 4,393 Class Members since the implementation of the Decree. *Table 5* provides data on Cook County NFs' total census by year from 2013 to 2024. At the beginning of this compliance assessment period, HFS data indicated a Cook County SNF status census of 20,278 residents.

4

**Table 5: A Summary of NF Census and Class Member Transitions by Year**

| Year | Cook County Nursing Facility Census | Year-to-Year Change % in SNF Census | Cumulative Average Change % 2013-2024 in SNF Census | Annual # of Transitioned Class Members | % of Transitioned Class Members based on Total Class Size |
|---|---|---|---|---|---|
| CY2012 | *Data not available* | | | | |
| CY2013 | 21,355 | (baseline) | | 111 | 0.5% |
| CY2014 | 20,846 | -2.4 | -2.4 | 464 | 2.2% |
| CY2015 | 20,220 | -3.0 | -5.4 | 537 | 2.7% |
| CY2016 | 20,761 | +2.6 | -2.8 | 384 | 1.8% |
| CY2017 | 20,691 | -0.3 | -3.1 | 428 | 2.1% |
| CY2018 | 20,618 | -0.3 | -3.4 | 181 | N/A |
| FY2019 | 20,725 | +0.5 | -2.9 | 312 | 1.5% |
| FY2020 | 20,740 | +0.1 | -2.8 | 223 | 1.1% |
| FY2021 | 19,196 | -9.3 | -9.0 | 227 | 1.2% |
| FY2022 | 19,867 | +3.5 | -7.0 | 431 | 2.2% |
| FY2023 | 20,962 | +5.5% | -1.7 | 548 | 2.6% |
| FY2024 | 20,278 | -3.2% | -5% | 545 | 2.7% |

Based on HFS' reported data in *Table 5*, between 2012 and 2024, the total resident census of Cook County SNFs declined by 1,077 residents, representing a cumulative decrease of 5%, which compares positively to the decrease of 1.7% in the previous fiscal year. During the same timeframe, the annual number of Class Members transitioned to community living as a percentage of the portion of the Class size comprised by Class Members in SNFs ranged from 0.5% to 2.7%. However, the census of Cook County SNFs remains relatively the same since the Consent Decree despite twelve years of transitions for *Colbert* Class Members. The lowest census occurred in FY 21 and 22 which in all probability was the result of COVID. After experiencing an increase of 5.5% in the census in FY23, it is encouraging to see a decrease in FY24. However, the State does not provide data to analyze and determine if this is the result of fewer admissions; short term stays for rehabilitation versus long-term stays; or an increase in deaths.

*Pre-Admission Screening and Resident Review (PASRR)*. While many Consent Decree initiatives focus on transitioning Class Members from institutions into the community, true systems rebalancing hinges upon stemming the tide of needless admissions into such facilities. Admissions to SNFs should be limited to those who require that level of care or elect to go there. The *Colbert* Class is defined in the Consent Decree as "Medicaid eligible adults with disabilities who are being *or may in the future be* [emphasis added], unnecessarily confined to nursing facilities located in Cook County, Illinois, and who with appropriate supports and services may be able to live in a Community Based Setting." While the Consent Decree does not include the PASRR requirement because PASRR was already a responsibility of Illinois as it is for every other state that receives Medicaid funding, the State's implementation of an effective PASRR system should help avoid inappropriate SNF placements.

5

PASRR is the federal requirement to help ensure that individuals are not inappropriately placed in nursing facilities for long term care. PASRR processes require that all applicants to Medicaid-certified nursing facilities be given a preliminary screening to determine whether they might have serious mental illness and/or intellectual disabilities. The State implemented a revised PASRR system in March 2022, engaging a new vendor, Maximus. Maximus coordinates its screening process with the existing Determination of Need (DON) process conducted by the Care Coordination Units (CCUs) under contract with the Department on Aging.  The result although not achieved yet, over time should be a decrease in admissions as appropriate community services are offered as a suitable alternative to SNF admission. The CCU staff are responsible to discuss community options with individuals who are screened for admission to nursing homes. If this process is successful in presenting viable community options to individuals considering admission to a SNF, Illinois should see a reduction in admissions to SNFs over time.

 *Allocated vs. Spent Budget Appropriations.* In FY24, the *Colbert* program was allocated a $58.2 million budget to cover staff costs, contractors (e.g., organizations that provide transition services), quality improvement support, and other key program activities. This was a substantial increase of $7.8 million compared to the FY23 budget of $50.4 million. Notably, this budget does not include costs for mainstream resources such as some Medicaid spending, housing subsidies, community-based behavioral health services, primary healthcare, and housing services developed or paid for outside of Consent Decree implementation activities but utilized by Class Members.

As shown in *Table 6*, across the past six fiscal years, the State allowed significant amounts of appropriated funds to lapse. However, in FY22, Defendants' lapsed appropriation was $10.4 million; in FY23 the lapsed amount was $4.4 million; and the lapsed amount was reduced to $3.3 million in FY24 representing steady improvement over previous years. It is critical that the State optimize their funds to support compliance in myriad areas, ranging from investing in the development of additional community-based services and housing; to adequately staffing the functions of outreach, assessment, and service planning to ensure timely performance, or improving their data enterprise.

**Table 6: Budget Allocations, Expenditures and Lapsed Appropriations FY18-FY24**

| Fiscal Year | Budget Allocation | Spent Funds | Lapsed Appropriation | Transition Performance % |
|---|---|---|---|---|
| FY18 | $34.3 million | $22.2 million | $12.1 million | 60% |
| FY19 | $34.3 million | $30.5 million | $3.8 million | 37% |
| FY20 | $39 million | $29 million | $10 million | 25% |
| FY21 | $58.1 million | $39.1 million | $19 million | N/A |
| FY22 | $58.4 million | $48 million | $10.4 million | 96% |
| FY23 | $50.4 million | $46 million | $4.4 million | 99% |
| FY24 | $58.2 million | $54.9 million | $3.3 million | 99% |
| *Total Lapsed Funds FY18-FY23* | | **$63.4 million** | | |

6

While the service delivery system continues to underperform in many of the requirements of the Decree, transition performance met expectations.

**Section II. Outreach**
The Consent Decree mandates that all Class Members receive outreach. The objectives of outreach are to effectively and with appropriate frequency help Class Members understand their rights and responsibilities under the Consent Decree; promote the availability of community-based supports and services; navigate any concerns a Class Member has about the process or ultimate transition; and provide opportunities to be educated about the supports and services including housing that the provisions of the Decree provide. Ultimately, the goal of outreach is to interest Class Members in the opportunity to return to the community with transition supports.

Each SNF has an assigned Prime agency responsible to conduct outreach within its facility. Prime agencies primarily utilize each SNF resident census list to inform who should receive outreach, but they also accept referrals directly from facility staff, NAMI ambassadors, and Class Members themselves. Newly admitted Class Members must receive outreach within 60 to 70 days of their admission. Class Members who decline transition are to have contact with a Peer Ambassador at day 90 and day 135 after declining and are to be outreached annually by their Prime agency.

<u>Outreach-Related Requirements.</u> There are ten *Colbert* Consent Decree requirements related to outreach. They obligate the Defendants to ensure that Class Members residing in SNFs receive comprehensive information about their rights to live in the community, as well as to provide detailed information on the types of community-based services and housing available to them (Requirement 1). They also require the Defendants to maintain a list of Class Members to whom to target outreach efforts and implement adequate outreach strategies to meet transition requirements (Requirement 2b and 3b). The State must also bear the full cost of outreach (Requirement 4). Other requirements include peer involvement in the outreach process, addressing outstanding outreach for Class Members never outreached, and assurances of no retaliation by SNF staff of Class Members who wish to transition.

<u>Outreach Data Highlights.</u> This section summarizes the Defendants' FY24 outreach data, provided in their semi-annual reports.
- All outreach staff were considered qualified professionals in accordance with the definition in Comprehensive Program grant agreements.
- 8,332 new admissions were identified for outreach of which a total of 2,288 (27%) had a completed outreach. This compares to 5,805 new admissions

identified for outreach of which a total of 741 (13%) had a completed outreach in FY23. The number does not accurately reflect the actual number of Class Members 60 days post admission who have never had initial outreach as discussed later in this report in greater detail.

- Of the 8,332 new admissions, only 357 (4%) were outreached within the required 70 days. This is similar to the 3% of newly admitted Class Members who were outreached within 70 days of admission in FY23
- Of the 2,288 Class Members who received outreach, only 375 (16%) expressed an interest in transition and were referred for an assessment. Eighty-four, 84 % of these newly admitted Class Members declined the opportunity to transition at the time of outreach, **which was completed past the required 70 days.**
- 8,343 other individuals were identified as needing follow up outreach. Of these Class Members, 6,201 (74%) were outreached in FY24. Only 1,879 (30%) wished to proceed to transition and were referred for an assessment. 4,322 (70%) Class Members receiving follow up outreach, declined to proceed to transition.
- A total of 8,489 (2,288 initial after admission and 6,201 existing) Class Members received outreach out of a census of 20,278. There are 1,428 Class Members in the Pipeline who are individuals who want to transition and have been assessed for transition. This total of 9,917 Class Members leaves the majority of Colbert CMs unidentified in terms of their interest in transition. The number of Class Members who receive outreach in a timely way is insignificant, as indicated by only 3% of new admissions in FY24 completing outreach within 70 days of admission. However, overall, the State made significant improvement in the overall number of Class Members who did complete outreach in FY 24, which was 8,489 compared to 4,557 Class Members who completed outreach in FY23. The State cannot report if all Class Members who are post 60-day admission to an SNF have ever received an outreach and therefore been informed of the opportunity to transition, but it appears from the numbers reported separately compared to the census that many Class Members still have never been outreached. The State reports in its FY24 Annual Compliance Report that outreach for these Class Members "was largely completed during FY24. There is no evidence that this outstanding outreach occurred for any substantive number of Class Members who had no record of completed outreach prior to June 30, 2023. In fact, it is the priority of the new vendor to complete outstanding outreach for Colbert CMs in FY25 and is projected to be finished by June 30, 2025.
- The State reports that 6,235 CMs declined transition at the time of outreach. The most common reasons for outreach refusals were lack of interest" (34%), "preference to remain in facility" (22%), and family/POA refusal (18%) collectively constituting 74% of all refusals.
- The State funded NAMI to employ 25 Peer Ambassadors in FY24. NAMI was able to maintain a team of 16 Peer Ambassadors (part time) which did not meet the obligations of the contract. The Peer Ambassadors are expected to provide

outreach to Class Members who decline transition during the initial outreach. The Peer Ambassador is expected to contact the CM 90 days after initial outreach and then 135 days after initial outreach if the CM continues to decline.

- The NAMI Ambassadors made 76 community visits in FY24 compared to 89 in FY23; and made 325 Class Member contacts in FY24 compared to 474 in FY23; and initiated 181 engagements in FY24 compared to 224 in FY23. These are duplicated counts so the State cannot report the actual number of Class Members involved in engagement or community visits. It is concerning that the number of contacts, engagements and visits decreased between FY23 and FY24. Of greater concern is that the State cannot report on the requirement that Peer Ambassadors follow up with all Class Members who decline outreach at 90 and 135 days following the completed outreach. It is evident from the number of contacts that follow up outreach is woefully inadequate when 6,235 Class Members declined transition and could have benefitted from talking to a Peer with lived experience who had successfully transitioned and lives in the community. The NAMI Peer Ambassador program is insufficiently staffed to support peer engagement with all Class Members who decline transition. The State cannot report whether the Class Members engaged or those who made community visits transitioned.

- The State researched Peer Bridger programs in other states, notably New York, and used this model to develop a proposal for Engagement and Support by People with Lived Expertise. The Division of Rehabilitation Services (DRS) contracted with two Centers for Independent Living (CILs) to implement a Peer Engagement and Support Pilot in four SNFs. Planning is underway but the Pilot was not initiated in FY24. The State reports it plans for the CILs to begin the Pilot in the second quarter of FY25. Peers will engage with Class Members who have either not been outreached yet or who have been outreached but either declined transition, have not proceeded to assessment, or have been determined unable to transition by the State's review process.

The State reports completing Outreach for a total of 8,489 Class Members out of the 20,278 individuals reported as admitted as of 6/30/23. The State identified 8,332 new admissions or other Class Members needing initial outreach, and 8,343 identified for follow up outreach for a total identification of 16,675 *Colbert* Class Members. There were 1,500 Class Members in the pipeline as of 6/30/24 which includes Class Members who were already outreached and want to transition. This total is 18,175 of the 6/30/23 census of 20,278, or 90% of the total number identified as residing in SNFs as of June 30, 2023. This is a significant increase in the number and percentage of the Class Members the State could identify in FY23, which was only 57%.

However, of the 18,175 Class Members identified, only 9,989 (55%) have been outreached, which includes the number of Class Members in the Pipeline.

 The State must complete outreaches within the required 70 days post admission to identify the number of Colbert Class Members who are interested in transition. This information is critical for the State to develop its plan for reasonable pace and determine the service and housing capacity it needs to transition all Class Member who wish to return to the community. Depending on how many of the Class Members want to proceed to transition, there may be a significant burden on those staff who are dedicated to assessment and service planning. In addition to the need for the State to have accurate data regarding the number of Class Members who at any time want to transition, it is more important for each Class Member to be outreached as close to their admission as is possible. The Parties agreed to wait until 60-70 days post admission to discuss outreach with each resident so residents who were admitted only for a short-term rehabilitation and could be discharged back home or using other community resources, **would not need transition services under the Colbert Decree.** The data reported this year regarding the number of Class Members who decline the opportunity to proceed to transition is similarly high to the reports of previous years. The State reports that 8,489 individuals either received initial outreach or follow up outreach in FY24. Of these Class Members, 6,235 (73%) declined to proceed to transition. Only a small percentage were outreached within 70 days of their admission. Others waited to hear about the community options and opportunities for support to return to the community until they had resided in a SNF for a sufficient period of time to become accustomed to facility living and possibly wary of living more independently. It is critical that individuals who have been institutionalized learn about transition as soon as possible to be open to the concept of returning to living in the community.

The State has recognized the inadequacy of the current system of both outreach and assessment (addressed later in his report) to be conducted in the timeframes required by the Consent Decree. It has therefore proposed a new approach to conducting outreach and assessment. One vendor is being hired to assume all of the responsibilities for outreach and assessment starting in FY25. The expectations for completing outreach within 70 days of a Class Members admission and then initiating the assessment within 14 days of outreach for any Class Member who wishes to transition, will be set in the contractual requirements.

The inadequacy of the Defendants' data continues to render it difficult to quantitatively assess whether all Class Members are receiving outreach, whether Class Members receive outreach often enough to facilitate rapport and education about their options to live the community, and whether that outreach is of sufficient quality. I do appreciate that the State is now able to report on completed outreaches and not rely on reporting attempted outreaches, not all of which were necessarily completed.

Since data collection starts with outreach activities, the serious concerns the Court Monitor has about the reliability and validity of the State's data will be summarized here but has implications for all areas of reporting. The data collection and analysis process

are the direct drivers and information sources that provide the information necessary to determine compliance and inform the system change process in any Consent Decree.

The data collection and analysis processes presently being used by the State of Illinois, to report on the requirements of the *Williams and Colbert* Consent Decrees have not been determined yet to be valid and reliable. Given the lack of process statements verifying that procedures are consistently implemented, the data and analysis for the decrees are unreliable and not valid. An example of this is the Outreach data collection process. As is noted in this report the State determined after being asked for reliable outreach data, that it could not verify that thousands of *Colbert* Class Members had ever been outreached. To its credit the State developed an initiative to rectify this. But it was not yet implemented in FY24.

Consequently, all the following areas: Assessment, Service Planning and Transition cannot possibly have reliable or valid data based on the Outreach data issues identified. The State does not have a data system that can reliably report by Class Member all aspects of transition planning. Therefore, it is important to emphasize that until the Illinois system achieves a confirmed data collection, analysis and reporting system of reliable and valid data, the Court Monitor can only report and analyze the states' findings related to Consent Decree requirements but cannot attest that the reports are accurate or valid. **This determination is relevant to each area reported in terms of compliance. Actual compliance cannot be ascertained until the data is determined to be reliable and valid. The State has committed to sharing its data processes with the Court Monitor's Office in FY25.**

The Court Monitor and Consultant began working with the State in FY24 to determine what data is necessary to report in the future on the achievement of the Compliance Indicators (to determine substantial compliance). The Court Monitor will require that the State creates and attests to processes that confirm data reliability and validity. We have relevant experience from our work in Connecticut, Texas and Virginia and offer to work with the Defendants to develop a similar system of reliable and valid data collection and analysis for both decrees. This creation and validation of data processes will be undertaken in FY25.

The State and its contractor UIC School of Nursing participated in a series of meetings that were initiated in FY24 and continue, to discuss data integrity. These meetings led to a more accurate description of what the data interprets and presents and led to a more understandable connection between related data Tables in the State's annual compliance report for FY24. The Court Monitor and her Consultant continue to work with the State, UIC CON, and the new vendor performing outreach and assessment in FY25 to agree on the methodology the State will use to attest and verify its data is both reliable and valid. The data processes have not as yet been attested to, nor validated by the Court Monitor Consultant. However, we believe there have been improvements in the data the State has used for its FY24 reporting.

11

It is understood that not every Class Member contact can or should be captured, given that an effective outreach program includes unstructured and informal engagements that do not lend themselves to onerous data collection requirements. However, as described in the recommendations, the Court Monitor believes that it is time to design an approach that is comprehensive and outcome-oriented so that the State can report the status of Outreach for every Class Member and can use this data to better comply with the requirements of the Decree.

<u>Outreach-Related Requirements and Compliance Ratings.</u> *Table 7* lists the specific requirements in this domain. Across the ten Consent Decree and FY24 IP requirements **Three are in compliance, one is in partial compliance and six are out of compliance.**

**Table 7: Consent Decree Outreach Requirements and Ratings**

| Req # | Source/ Citation | Consent Decree Language | FY23 Rating | FY24 Rating |
|---|---|---|---|---|
| 1 | Consent Decree Section VII | Defendants shall ensure that Class Members receive complete and accurate information regarding rights to live in Community-Based Settings and/or receive Community-Based Services, Transition Costs, Home Accessibility Adaptation Costs and/or Housing Assistance, and the available options/opportunities for doing so.<br><br>Expected Outcome<br>• The expected outcome is that 80% of newly admitted CMs receive initial outreach within 70 days of admission<br><br>***Out of Compliance***. The Defendants report that 357/8,332 (3%) of Class Members received outreach within 70 days of admission. | **Out of Compliance** | **Out of Compliance** |
| 2 | FY24 IP ongoing reporting | Expected Outcome: 85% of CMs not currently engaged in Transition services receive Outreach annually by a Prime agency<br><br>***Partial Compliance***. The Defendants report that 6201/8343 (74%) of existing CMs received outreach. This has improved performance since FY23 and is in partial compliance. The State cannot distinguish between existing CMs who received outreach for the first time, and the number needing follow up outreach. | **Out of Compliance** | **Partial Compliance** |

12

| 2b | Updated Cost Neutral Plan (2018) Section A<br><br>FY24 IP | By April 15, 2018, Defendants shall create a list of all Class Members living in Nursing Facilities as of December 31, 2017, and shall update that list at least annually during the life of the Decree during the time period the Consent Decree, as amended and supplemented, and the Cost Neutral Plan is in effect.<br><br>***In Compliance.*** In prior years, the Defendants created an annual list of Class Members in *Colbert* NFs utilizing Medicaid enrollee data from the Department of Healthcare and Family Service. To their credit, they devised and implemented a more accurate process in FY22, requiring NFs to provide census lists to Comprehensive Program providers to utilize for outreach. This improvement led to 98% of the SNFs submitted monthly census reports in FY24 | **Out of Compliance** | **In Compliance** |
|---|---|---|---|---|
| 3b | Updated Cost Neutral Plan (2018) Section B | Defendants shall create and perform the outreach activities required to comply with the requirements of this Plan and the Consent Decree to achieve the transitions required.<br><br>***Out of Compliance.*** As the data above indicates, the Defendants' outreach data shows low outreach penetration and poor timeliness. This resulted in a low rate of accomplished outreaches. | **Out of Compliance** | **Out of Compliance** |
| 4 | Consent Decree Section VII | All costs for outreach shall be borne by Defendants.<br><br>***In Compliance.*** The Defendants continued to bear all outreach-related costs, earning an in-compliance rating. | **In Compliance** | **In Compliance** |
| 5 | C1, 3b | Strategy: Provide peer ambassador follow-up to CM who refuse initial/annual Outreach by a Prime and follow-up Outreach by a Peer Ambassador within 90 days of refusal (90-day follow-up + 135-day follow-up), resulting in three Outreaches per year for refusing CMs, one by the Prime and two by a Peer Ambassador.<br><br>Expected Outcomes:<br>• 85% of CM who refuse Prime Outreach receive Peer Ambassador follow-up Outreach within 90 days of Prime Outreach refusal.<br><br>***Out of Compliance***. The State was unable to report on these expected outcomes as a result of NAMI's inability to provide the data. | **Out of Compliance** | **Out of Compliance** |

| 6 | C1,3b | Strategy: Continue to require Comprehensive Program staff to explore CM reasons for resistance to Transition, require documentation of reasons and responses in letter declining services.<br><br>Expected Outcome:<br>• 85% of Class Members hesitant about Transitioning to the community will have their concerns addressed by Outreach staff by providing additional information and education, with Class Member concerns and staff responses documented in the declination confirmation letter.<br><br>***Out of Compliance.*** The State reports only that it is the responsibility of Outreach staff to engage CMs who were hesitant about transition, and this is reinforced by Peers. The State cannot provide any data on how many CMs had their concerns addressed. The percentage of overall outreach is low which makes it doubtful that many CMs who expressed concern about transition had their concerns addressed. | **Partial Compliance** | **Out of Compliance** |
| 7 | FY24 IP | The State will implement a Pilot with measurable objectives to expand and improve outreach to CMs using Peers and report on the findings and recommendations by March 30,2024, with a plan for systemwide implementation to be provided by June 30, 2024.<br><br>***Out of Compliance***. The State did design the pilot and developed measurable objectives and a survey and interview process that will be implemented by the JACSW. However, the Pilot was not implemented in FY24. | **N/A** | **Out of Compliance** |
| 8 | C 32 | Strategy: IDPH will track, investigate, and report data on CM retaliation by NF or staff and enforce and track/report on recourse imposed by DPH on facilities.<br><br>Expected Improvements/Outcomes:<br>• 100% of reports by or on behalf of CMs alleging facility retaliation will have their claims investigated, provided those claims are reported to IDPH directly. All such investigations and outcomes will be reported in semi-annual compliance reports.<br><br>***In Compliance***. IDPH reports a total of 6 retaliation reports all of which were investigated. One report was substantiated. | **In Compliance** | **In Compliance** |

| 9 | FY24 IP | Based in part on the SNF census reported through Path Tracker, the State will identify each Class Member who has never received outreach, propose a schedule for providing Outreach, implement a strategy to ensure each of these CMs receives Outreach according to that schedule, and issue a written quarterly report on these efforts.<br><br>***Out of Compliance.*** The State identified the number of Class Members with no documented record of completed outreach. The State decided to contract with an external vendor to complete these outreaches. That contract was not initiated in FY24. | **N/A** | **Out of Compliance** |

**Summary**

The State acknowledges that the data regarding the outreach status for *Colbert* Class Members is not fully accurate, although improved since FY23. The current system of requiring Prime agencies to complete both initial outreach and follow up outreach with Class Members who have declined to transition is woefully inadequate. No more than 3% of the Class Members who are post 60-day admission received a timely outreach. A very high percentage of Class Members declined to pursue transition when outreached: 89% of first-time outreach and 62% of follow up outreach. The State cannot report uniquely on the number of new admissions within the cohort being outreached for the first time, so this may also reflect many Class Members who have resided in the facilities for a period of time and are hesitant about returning to the community. It is more likely that Class Members will decide to remain in the SNF after they have been there for a period of time and become comfortable with the routine while having no realistic belief that they have any options to be supported to return to community living. It is critical that Class Members receive information about community services as soon as possible and are linked with Peers to help them decide what is best for them with support from someone with lived experience.

My recommendations to improve outreach performance are:
- Implement the contract with Maximus in FY25 for the Outreach system and provide sufficient resources so that newly admitted CMs are routinely outreached 60-70 days post admission (*an FY25 commitment*).
- Complete the outstanding outreach initiative to outreach all Class Members who have no record of ever receiving outreach though the Maximus contract (*an FY25 commitment).*
- Continue to offer Class Members the opportunity to visit community programs and settings to help them to make an informed decision about transition. This is not a specific requirement of the *Colbert* Consent Decree but should be continued as a best practice.
- Develop future reports as required in the Compliance Indicators to include the status of all Class Members regarding Outreach including confirmation of outreach; results/outcome of outreach; the number proceeding to assessment;

the number to be outreached annually due to a declination; and the results of the annual outreach. While these elements are reported by the State, the report has never included data for all Class Members 60 days post-admission. It is the obligation of the State to report the status of all CMs. Once this is accomplished for outreach, the assessment and service planning data can be more accurate.

- Develop data processes for the reporting activities related to outreach to be verified by the Court Monitor's Consultant *(an FY25 commitment)*.


**Section III. Assessment**
The *Colbert* Consent Decree requires the Defendants to design and implement an assessment process to identify a Class Member's medical and psychiatric conditions and his or her ability to perform activities of daily living. This process enables the State to identify the services or supports a Class Member may need to transition into the community. Per the Consent Decree, the assessment process should occur after a Class Member affirms his or her interest in transition. Also, per the Consent Decree, the Defendants must ensure that qualified professionals conduct person-centered assessments for every Class Member who agrees to such, culminating in an indication as to whether the person is or is not recommended for transition.

Class Members who decline an assessment or who meet specific categorical or clinical criteria such as those with dementia diagnoses or clinically significant and progressive cognitive disorders are excluded from further consideration to transition, including assessment activities. Those who decline an assessment have the right to request an assessment or reassessment at a later point. If recommended for transition during the assessment process, a Class Member must receive a service plan that delineates the services and supports needed to facilitate community transition and tenure. If the assessor has clinical concerns, the Class Member must receive a service plan designed to identify supports and services to address transition barriers and prepare him or her for future transition.

Assessment-Related Requirements. The *Colbert* Consent Decree contains the following assessment requirements:
- A sufficient number of assessments must be completed to reach Court-established or -approved transition requirements (Requirement 5).
- Assessments must be conducted annually (Requirement 6), including for those who remain in nursing facilities (NFs) for a year after their transition approval (Requirement 13).
- Qualified assessment professionals must inform Class Members of their rights and opportunity to transition and specify the types of services and supports available to support transition (Requirement 7).
- Qualified assessment professionals must engage Class Members at an "appropriate frequency" to address their concerns about leaving NFs (Requirement 8), fully exploring, and addressing reasons for opposition (Requirement 11).

16

- Assessments must be completed in a timely basis (Requirement 9).
- Class Members can appeal assessors' decisions and must be availed of informal and formal opportunities to appeal (Requirement 10); and
- Class Members approved for community placement who then decide to remain in NFs, and those who reject assessments altogether, can re-request an assessment and must have opportunity to complete the assessments within 120 days of the request (Requirements 12 and 14).

The *Colbert* FY24 Implementation Plan contained additional requirements pertaining to conducting independent assessments to identify Class Members with severe dementia and/or clinically significant and progressive cognitive disorders unlikely to improve.

<u>Assessment Data Highlights.</u> This section summarizes the Defendants' FY24 assessment data provided in their semi-annual reports.

- In FY24, the State reported that 2,220 assessments were due to be conducted after Outreach assessment attempts, compared to 1,331 assessments due in FY23. 335 of these Class Members had their cases closed prior to the assessment, leaving 1,885 Class Members to be assessed.
- Of the 1,885 assessments due, 1,391 (74%) were initiated and 494 (26%) were not initiated. This is an improvement compared to FY23 when 68% of the assessments were initiated. The State also initiated far more assessments in FY24, 1386 compared to 909 in FY23.
- Of those 1,391 assessments initiated, 559 (30%) were initiated in 14 days or less and 832 (44%) were initiated after 14 days.
- The State reports that 494 (26%) of 1,885 assessments due to be completed were not initiated during the reporting period.
- IDHS funded a total of 73 Assessors of whom all (100%) were qualified professionals, defined as staff with a master's degree in counseling/social work, psychology, or another related field. The State funded 117 Assessors in FY23. This is a reduction of 44 positions at a time when the majority of assessments are not completed on time. The State does not offer an explanation for this significant decrease in funded positions.
- It appears that 1,180 Class Members completed the assessment process in FY24, (compared to 984 Class Members in FY23), resulting in 1,114 (94%) receiving a recommendation for transition in FY23 compared to 926 (94%) in FY23.
- The State's contractor undertook 6,425 reviews to determine if *Colbert* Class Members met the exclusionary criteria for a major cognitive disorder. Class Members who meet this criteria will no longer be considered for transition from a SNF. Of the 6,425 individuals, 1,041 met the exclusionary criteria. Of the remaining Class Members who were to be reviewed, 3,945 did not meet criteria, so they will continue to be eligible to transition. The reviews were cancelled for 1,439 of the Class Members due to discharge or death. Of the 4,986 Class Members who were reviewed, 21% met the exclusionary criteria. The State did not report the total number who were determined to need this screening in its Annual Compliance Report. While some reviews remained to be completed in FY25, the vast majority

were completed in FY24.

Assessment-Related Requirements and Compliance Ratings. *Table 8* lists the specific requirements in this domain. Across the nine Consent Decree and IP requirements rated for FY24, **four are in compliance and five are out of compliance.** We no longer rate 6b VI (A) (7) or the Cost Neutral Plan Section D 2016 as the Parties agreed to no longer require annual reassessments for all CMs who still had not transitioned after a year, but rather updated Service Plans.

**Table 8: Consent Decree Assessment Requirements and Ratings**

| Req # | Source/ Citation | Consent Decree Requirement Language | FY23 Rating | FY24 Rating |
|---|---|---|---|---|
| 5d | Updated Cost Neutral Plan (2018) Section D | Defendants shall complete at least 1,000 Assessments of Class Members on the Schedule between March 1 and June 30, 2017, and thereafter continue to complete a sufficient number of Assessments in a timely manner to achieve the transitions required under Paragraph F.<br><br>***In Compliance.*** The Defendants completed 1,180 assessments in FY24, of which 1,114 resulted in a recommendation to transition. | **In Compliance** | **In Compliance** |
| 7 | Consent Decree Section VII | The Qualified Professionals shall inform each Class Member during the assessments about the existence, nature, and availability of Community-Based Services, and shall describe the Community-Based Settings, transition costs, and/or housing assistance available to Class Members in those settings.<br><br>***In Compliance.*** 100% of the assessors are qualified. | **In Compliance** | **In Compliance** |

| | | | | |
|---|---|---|---|---|
| 8c | Updated Cost Neutral Plan (2018) Section B | Defendants shall also ensure that the Qualified Professionals conducting the assessments provide outreach with the appropriate frequency to Class Members who express concerns about leaving Nursing Facilities, and that, as has previously been recommended by the Monitor, the Peer Mentor program receives appropriate support.<br><br>***Out of Compliance.*** The Consent Decree requires that assessment staff should frequently engage Class Members who have concerns about transitioning into the community. However, the Defendants largely use peer workers or Prime Outreach staff. The 16 NAMI Ambassadors made 76 community visits, 325 Class Member contacts, and 181 CM engagements, which is fewer encounters with Class Members than occurred in FY23. These data points do not represent unique CMs. This means that on average, each Ambassador conducted 5 community visits and 11 Class Member engagements in the year. The State cannot report the number or percentage of CMs who declined transition who had their concerns addressed by Outreach staff. The State does not report how it verifies this data. | **Partial Compliance** | **Out of Compliance** |
| 9 | Consent Decree Section VI(A)(5) | Assessments shall be done in a timely manner and so as not to delay, where applicable, the development of the Class Member's Service Plan.<br><br>***Out of Compliance.*** In FY24, 1,885 assessments were due to be initiated after a positive outreach outcome. 559 (30%) were initiated within 14 days. 832 (44%) were initiated after 14 days and 494 (26%) have no record of being initiated. | **Out of Compliance** | **Out of Compliance** |
| 10 | Consent Decree Section VI(A)(6) | Any Class Member who disputes a decision regarding eligibility for, or approval of, Community-Based Services, transition costs, and/or housing assistance or placement in a Community-Based Settings shall, pursuant to governing law, have a right to appeal through administrative review of such decisions through Defendants' existing Fair Hearings process (as set forth in 89Ill.Adm.Code Parts 102 and 104) or as otherwise provided law. Class Members also may avail themselves of any informal review or appeal process that currently exists.<br><br>***In Compliance.*** The State reports there were only 2 appeals in FY24. The State has indicated that because the appeal of an assessment always results in the development of an SP, there are no denials, and no 22 further appeals. | **In Compliance** | **In Compliance** |

19

| 11 | Consent Decree Section VI(A)(7) | For those Class Members who have been offered a Community-Based Setting but have opposed moving from a nursing facility to a Community-Based Setting, the reasons for the Class Member's opposition shall be fully explored and appropriately addressed as a part of the Class Member's annual assessment and as described in Section VII herein.<br><br>***Out of Compliance***. This is addressed through annual outreach with Class Members who have declined transition during initial outreach. The State includes individuals who have previously declined transition in its report on "Other Outreach" in its annual report, but the State cannot report separately regarding those CMs who previously declined transition. | **Partial Compliance** | **Out of Compliance** |
| 12 | Consent Decree Section VI(A)(7) | Any Class Member who has received an Assessment but has declined to move to a Community-Based Setting may thereafter request to be re-Evaluated for transition to a Community-Based Setting. Any such re-Assessment must be conducted within 120 days of the request.<br><br>***Out of Compliance***. The State cannot report these data points. | **Partial Compliance** | **Out of Compliance** |
| 14 | Consent Decree Section VI(A)(8) | With respect to Assessments and re-Assessments described in this Section VI.A, any Class Member has the right to decline to take part in an Assessment or re-Assessment. A Class Member declining an Assessment or re-Assessment shall have the right to receive an Assessment or re-Assessment within 120 days of making a new request.<br><br>***Out of Compliance***. The State cannot report these data points. | **Partial Compliance** | **Out of Compliance** |
| D1 | C 6b, C 20 FY24 IP | Requirement: CMs who consent will receive annual Assessments unless they have been determined by a medical doctor to have severe dementia or other significant, progressive, and unlikely to improve cognitive disorder.<br><br>***In Compliance.*** The State reported a total of 6,425 major cognitive disorder (dementia) reviews identified to determine which Colbert Class Members met the exclusionary criteria. While the State has not identified the total number of Class Members having a marker for dementia, and therefore needing this review, 6,425 Class Members were identified for this screening in FY23 of whom 4,986 were reviewed and 1,439 were cancelled. | **Partial Compliance** | **In Compliance** |

20

**Summary**
Assessments are a critical part of the transition planning process for Class Members and should provide critical data to the State to plan for the capacity it needs within its community service array to ensure all Class Member who wish to transition can do so in a timely and successful way. The State improved its performance in both the number and percentage of assessments completed. It did not improve in the timeliness of assessments as the State continued to only initiate 30% of the assessments to be done within 14 days. Overall, the reporting for FY24 once again points to the need to both increase the number of assessments and to ensure they are completed in a timely way.

The acknowledgement that thousands of Class Members have not been outreached leads to the conclusion that a significant number of CMs may decide to transition through this outstanding outreach activity and will need to be assessed. The State has redesigned its assessment process to effectively respond to this future need for numerous assessments while more efficiently completing assessments in the future for newly admitted Class Members through its decision to centralize both outreach and assessment. The assessment process will now be conflict free as the assessments will no longer be completed by service providers. This new centralized process will begin in December 2024 for outreach and February 2025 for assessment and will be performed by Maximus. It is anticipated that the State's performance for both activities will increase significantly in the latter part of FY25.

I applaud the State for implementing a process to complete the thousands of reviews that need to be completed to determine how many Class Members meet the exclusionary criteria and have major neuro-cognitive disorders (previously labeled as severe dementia) that has been primarily accomplished in FY24. This is a process that is critical to the State's responsibility to develop its plan for the reasonable pace of transitions over the next several years.

My recommendations to improve assessment performance are:
- Continue the exclusionary criteria review process through FY25 to complete the review of all newly admitted *Colbert* Class Members who have a diagnosis of dementia to determine if they meet exclusionary criteria prior to initiating outreach or assessment *(an FY25 commitment)*.
- Use the results of this review to complete the State's plan for reasonable pace.
- Implement the proposed conflict-free assessment process to ensure timely assessments initiated within fourteen days of a positive outreach *(an FY25 commitment)*.
- Use future assessment data to determine the service capacity needed for Class Members to compliment the service and housing capacity study that is being conducted in FY25.
- Ensure that the new contractor who will be responsible to complete timely assessments is funded to staff this activity appropriately. The State dramatically reduced the number of assessors between FY23 and FY24, continuing to not

21

meet the requirements of the Consent Decree to initiate assessments within 14 days of a positive outreach.

## Section IV. Service Planning

After Class Members are assessed to determine their transition readiness, the Prime or CTI program are responsible to complete a Service Plan (SP). The Class Member participates in a person-centered service planning process designed to identify the Class Member's needs, vision, and goals. The contracted agency staff must complete the SP that articulates necessary support and services as well as housing to facilitate entry and successful tenure in the community. The State no longer allows providers to not recommend transition for any Class Member. Only Class Members who meet the exclusionary criteria will be considered ineligible to transition. All other Class Members for whom a Prime agency has a concern about transition need to be reviewed through the CAST (Complexities Affecting Seamless Transition) process which is conducted by the UIC College of Nursing. A Class Member needs an SP to be reviewed through CAST. The CAST process may result in a decision for the Class Member to proceed to transition or with agreement with the Prime recommendation that the transition be delayed. In this case the Class Member is reassessed and reviewed annually.

Per the *Colbert* Consent Decree, service plans must also meet several quality, content, timeliness, and other procedural requirements, including:

- All service plans must be completed within three months of the Class Member's outreach (Requirement 15).
- Service plans must be provided to those who are approved for transition through the assessment process (Requirement 16).
- Service plans must identify the needed community-based services and a transition timetable (Requirement 17).
- Service plans should be periodically updated (i.e., every 180 days), reflective of Class Members' changing needs and preferences and include services that support the acquisition of independent living and self-management skills (Requirement 18).
- For Class Members transitioned into non-permanent supportive housing settings, the service plan must justify such placement and include community-based services to support the most possible and appropriate integrated setting (Requirement 19).
- Service plans must be person-centered and reflect what a Class Member needs at home, work, and in the community to fully participate in community life. Class Members with independently verified dementia are excluded from future assessments, while those who decline (but do not have dementia) must receive an annual assessment update (Requirement 20).
- For Class Members without independently confirmed dementia diagnoses who were transitioned to non-permanent supportive housing settings, they should receive a treatment plan that prepares them to transition to the most integrated setting appropriate to their needs (Requirement 21).
- Service plans must be completed by qualified professionals and include legal representatives, if requested (Requirement 22).

22

- Service plans must focus on the Class Member's "vision, preferences, strengths and needs in home, community, and work environments" (Requirement 23).

<u>Service Plan Data Highlights.</u> This section summarizes the State's FY24 service plan data provided in their semi-annual reports.

- The State divides the Service Plans (SPs) into two phases. The first phase is the Initial Service Plan, and the second phase is the Transition Service Plan. The State reviews all these SPs for Proficiency, as well as SPs that have been modified. For this review period it was agreed that the state would choose a sample from all the SPs completed, rather than review every SP for proficiency. The State reported that 1,222 SPs were submitted, and they chose a sample of 453 (37%) SPs for the proficiency reviewed in FY24.
- Of the 453 service plans reviewed in FY24, only 308 (68%) met proficiency standards, demonstrating that the service plans collected Consent Decree-required information with adequate detail. This compares to 74% of the 931 SPs that met the proficiency standards in FY23. The SPs reviewed in FY24 included 283 initial SPs and 170 transitional SPs, which are developed within 30-60 days of the Class Member's transition and describe the activities that must occur for a successful transition. Only 59% of the transition SPs were found to be proficient. Far fewer SPs were reviewed in FY24 compared to FY23 because the Parties and Monitor agreed that a percentage rather than all SPs would be reviewed for proficiency. The number of transitional SPs (308) does not equal the 455 Colbert Class Members who transitioned. It is concerning that only 59% of these plans which guide the work of the transition team to assist the Class Member to acclimate to the community and connect to all needed resources were proficient.
- The State reports that a total of 1,122 initial SPs were submitted in FY24, compared to 699 SPs in FY23. This was 95% of the 1,187 SPs that were expected to be completed based on assessments. Of these 1,122 SPs, only 651 (58%) were received within forty-five days of the initiation of the assessment as required to be on time, which is comparable to the SPs completed on time in FY23. Additional SPs were received as follows: 386 (34%) within 46-100 days and 85 (8%) within 100 or more days. A total of 65 (6%) of the SPs due were not received during the reporting period. It is unclear if they are tracked or if they were ever received.
- The State also reports the timeliness and completion of submission of the transition service plans which are due within fourteen days of the planned transition. During FY24, 374 transition SPs were due, of which 193 (52%) were received within fourteen days of the transition. This is a slight decrease in number and percentage compared to FY23 when 235 (55%) were timely. In FY24, 48 (13%) SPs were submitted within thirty days of transition, and 133 (36%) submitted outside of thirty days. This year, unlike FY23, all SPs expected to be completed were submitted.
- There were 771 Class Members who were proceeding to transition who were due to have their SPs updated in 180 days. Of these CMs, 534 (69%) had SPs updated. This is a significant increase compared to FY23 when only 28% of the SPs due to be updated were completed. Of the 534 updated SPs, 231 (43%) were updated within 180 days of the initial SP, and 303 (57%) were completed in more than 180 days. The

lack of updates for 237 CMs is not explained so it appears these SPs were never updated.

- There were forty-seven requests for CAST review in FY24. UIC CON completed thirty-seven (79%) reviews and confirmed that thirty-three (89%) were unable to transition within the year. There were 186 Class Members in the Pipeline noted with a transition delay for behavioral health, cognitive status, physical health, or functional status, some of whom may have needed a CAST review but were not scheduled for one. This does not include the number delayed in the service planning phase of the Pipeline who may also be delayed for one of the reasons listed. This CAST review may result in a Class Member continuing to be considered ineligible for transition. The CAST review was perceived by Prime agencies as being very cumbersome in the past. The State made the process more efficient, and less paper driven in FY24.

- Service plans provide a window into housing preferences among Class Members recommended to transition; among the 1,202 plans with housing preferences indicated, permanent supportive housing or private residences were indicated as the preference in 676 (56%) with the remaining 526 (44%) divided among congregate housing. The majority of Class Members who do not prefer PSH, prefer the Supported Living Program. A much higher percentage of Class Members indicate a preference for non-PSH residential settings in FY24, compared to the 12% who indicated this preference in FY23. The State does not provide any analysis as to the reasons for this increase in preference for non-PSH residential settings.

- The State no longer reports the number of Class Members who are referred for employment services. The State indicates all Class Members who have a recommendation for employment support in their SPs are referred for employment support. The State does report the number of Class Members enrolled for employment support in either IPS or DRS, which totals 41: 17 (41%) enrolled in IPS and 24 (59%) enrolled in DRS. Of these 41 Class Members who were referred, 20 were hired: 10 through IPS and 10 through DRS. This is a decrease from the 63 who were enrolled in employment services with 34 obtaining employment in FY23. The State does not explain why the number of Class Members enrolled and ultimately hired is such a small percentage of the number of CMs who express an interest in employment and are referred for employment support. Income is essential for Class Members to sustain themselves in the community, especially after they are discharged from the CCMTP. While many Class Members have entitlements, many do not and need to earn wages in order to financially support themselves in the community.

- The State reported that IDHS funded 128 care managers, 100% of whom meet the requirements of a qualified professional.

Service Plan-Related Requirements and Compliance Ratings. *Table 9* lists the specific requirements in this domain. There are eight Consent Decree requirements: **one is in compliance, six are in partial compliance, and one is out of compliance.**

24

**Table 9: Consent Decree Service Planning Requirements and Ratings**

| Req # | Source/ Citation | Consent Decree Requirement Language | FY23 Compliance Rating | FY24 Compliance Rating |
|-------|------------------|-------------------------------------|------------------------|------------------------|
| 17 | Consent Decree Section VI(B)(1) | For those Class Members whose Service Plans include transitioning into a Community-Based setting, each Service Plan shall set forth with specificity the Community-Based Services, transition costs, home accessibility adaptation costs and/or housing assistance the Class Member needs in a Community-Based setting, including a projected timetable to complete the transition.<br><br>***Partial Compliance.*** This requirement, along with requirements 20 and 23, pertains to whether the service plans contained required content/components. The Defendants provided data that 68% percent of service plans met quality standards overall. The State did not provide data that assessed service plans against each requirement individually. | **Partial Compliance** | **Partial Compliance** |
| 18 | Consent Decree Section VI(B)(1) | Each Service Plan shall be updated at least every 180 days to reflect any changes in needs and preferences of the Class Member, including his or her desire to move to a Community-Based Setting after declining to do so, and shall incorporate, where appropriate, services to assist in acquisition of basic activities of daily living skills and illness self-management.<br><br>***Partial Compliance***: The State reports that of the 771 CMs whose SP was to be updated in 180 days, 534 (69%) were reviewed and updated. These data reflect the need of CMs proceeding to transition. The State does not report on the content of these updates regarding the acquisition of daily living skills and illness self-management. It does not appear these updated SPs are reviewed for proficiency. | **Out-of-Compliance** | **Partial Compliance** |

| 19 | Consent Decree Section VI(B)(3) | If there has been a determination that a Class Member will not be transitioning to PSH or Private Residence (except for those Class Members who have declined transitions), the Service Plan shall specify what services the Class Member needs that could not be provided in PSH or a Private Residence and shall describe the Community-Based Services the Class Member needs to live in another Community-Based Setting that is the most integrated setting appropriate to that Class Member's needs and preferences or shall specify what services the Class Member needs and preferences or shall specify what the Class Member needs that cannot be provided in any Community-Based setting.<br><br>***Partial Compliance.*** Of the 453 transition service plans reviewed, 308 (68%) met proficiency standards, demonstrating that these service plans collected Consent Decree-required information with adequate detail, including the content required under this requirement. When this number is broken out by initial SPs and transition SPs, the percentage found proficient is 73% for the Initial SPs and 59% for the Transition SPs. | **Partial Compliance** | **Partial Compliance** |

| 20 | *Colbert* Consent Decree Amendment | Service Plan means a Person-Centered plan with the goal of moving a Class Members to a Community-Based Setting, strategies to employ to achieve that goal and a description of all Community-Based Services, transition needs, home accessibility adaptation needs, and/or housing assistance necessary to support that goal; provided, however, that a Service Plan for a Class Member declining to be evaluated for transition shall simply state "declined to be evaluated" and shall be updated at least annually; and a Service Plan for a Class Member determined by a physician not affiliated with a Nursing Facility to have a condition such as severe Dementia or other severe cognitive impairments requiring such as high level of staffing to assist with activities of daily living or self-care management that they cannot effectively be served in PSH or a Private residence or who have an irreversible medical condition requiring such medical care that they cannot effectively be served in PSH or a Private residence shall simply state "severe Dementia or other severe cognitive impairments or irreversible medical condition" and need not be regularly updated as provided herein.<br><br>***Partial Compliance.*** This requirement, along with requirement 23, pertains to whether the service plans contained required content/components. The Defendants provided data that 68% percent of service plans met quality standards overall but did not provide data that assessed service plans against each requirement individually. | **Partial Compliance** | **Partial Compliance** |
| 21 | Consent Decree Section VI(D)(3) | Those Class Members not transitioning from Nursing Facilities into PSH or Private Residence shall have periodic re-evaluations with treatment objectives to prepare them for subsequent transition to the most integrated setting appropriate, including PSH or a Private Residence, except for Class Members who have chosen other living arrangements or have been determined by a physician not affiliated with a Nursing Facility to have a condition such as severe Dementia or other clinically significant progressive cognitive disorders and are unlikely to improve.<br><br>***Out of Compliance.*** One hundred and nine (109) Class Members moved to non-PSH settings. The State did not report how many who transitioned to a non-PSH residence had an SP with a planned secondary transition. | **Out of Compliance** | **Out of Compliance** |

| 22 | Consent Decree Section VI(B)(4) | The Service Plan must be developed by a Qualified Professional in conjunction with Class Member and/or his or her legal representative, if any.<br><br>**In Compliance**. 100% of staff assigned to complete SPs were qualified professionals. | **In Compliance** | **In Compliance** |
|---|---|---|---|---|
| 23 | Consent Decree Section VI(B)(5) | Each Service Plan shall focus on Class Member's personal vision, preferences, strengths and needs in home, community, and work environments.<br><br>**Partial Compliance.** This requirement, along with requirements 20, pertains to whether the service plans contained required content/components. The Defendants provided data that 68% percent of service plans met quality standards overall but did not provide data that assessed service plans against each requirement individually. | **Partial Compliance** | **Partial Compliance** |
| Colbert 2018 Updated Cost Neutral Plan Section E 15 & 16 | | These Service Plans will be completed within three months of the Class Member's Evaluation (positive outreach)<br><br>**Partial Compliance**: The State does not report the timeframe between outreach and the completion of the Service Plan. Rather the State reports the length of time between completing the assessment and completing the SP. This time period is expected to be forty-five days. The State reports that 651 (55%) of 1,187 initial SPs were completed within 45 days of the completed assessment. | **Out of Compliance** | **Partial Compliance** |

**Summary**

Service planning is critical to successful transitions for Class Members. Class Members need to be involved in meaningful ways in the planning process, so the Service Plan (SP) reflects their desires and needs. The SP needs to include measurable goals and strategies to achieve these goals while ensuring the plan is reasonable in its scope.

Class Members are assisted to transition by both the CCMTP and the Community Transition Initiative (CTI) program. The role of the Managed Care Organizations (MCOs) through the CTI program continues to expand. Over 31% of the transitions for *Colbert* Class Members in FY24 were made by the six CTI programs. The requirements and expectations vary for the CCMTP and CTI. The State does not report on the timeliness of assessments, service plans or transitions for the CTI program, only for the CCMTP. As the role of the CTI program under the state's contracts with MCOs continues, it is important to align the expectations for all providers and learn from the policies and procedures of both IDHS for the CCMTP and HFS for the CTI program which lead to the best outcomes for Class Members. This is particularly critical now that the State has

decided to centralize outreach and assessment and to develop a managed care model for service planning and care management for Class Members.

The State continues to underperform meeting the requirements of the Decree related to Service Planning. Resources must be brought to bear to improve the overall performance of the system.

My recommendations to improve service planning performance are:
- Assess the level of staffing resources needed to develop SPs within expected timeframes so the data from the assessments are current and can be used to create a meaningful service plan. I have made this recommendation in my previous report. It will be more critical for the State to undertake this analysis in FY25 through its study of the service and housing capacity of the system to better serve all Class Members. For at least the next two fiscal years, the Prime agencies in the CCMTP, and the MCOs in the CTI program, will continue to be responsible for service planning and transition activities. The chosen vendor for outreach and assessment is responsible to catch up on all outstanding outreach for existing Class Members, complete assessments for those who proceed to transition, and perform these functions in the timeframes the Decree requires. This implicitly means that there will be many more Class Members who will proceed to transition and require an SP to be completed. These agencies need to have sufficient staffing resources to complete SPs on time and assist these Class Members to transition within 180 days of the SP being completed.
- Ensure that all Class Members who are being delayed from transitioning have a clinical review by the State and are referred for a CAST review when indicated that is completed timely.
- Clarify the State' follow up on SPs reported as not completed within expected timeframes to verify that they were eventually completed.
- Address the recommendations made by JACSW made in FY23 to improve the actual employment outcomes for Class Members who express a desire to work and have an employment goal in their SP.
- Address the increasing preference of Class Members to move to non-PSH settings, while using these settings to prepare them for more independent living. Many more Class Members articulated this preference in FY24 compared to FY23. The State's plan to increase service and housing capacity, which is to be developed in FY25 must address the needs and preferences of these Class Members within the available residential options offered by the State through the Medicaid State Plan and HCBS waivers.


**Section V. Transitions**
The *Colbert* Consent Decree's central purpose is to transition Class Members who choose and are deemed clinically appropriate to move into the community, creating a pathway for them to rejoin and fully participate in society. This requirement is

often viewed as the most important, or at least the most visible, indicator of compliance. Success or failure to achieve the number of required transitions signals the Defendant's ability to effectively reach and identify Class Members' interests, prepare for, and effectuate transitions, and, at the systems-level, move toward rebalancing the mental health and disability services system away from Illinois' overuse of institution-based and restrictive care settings to community-based services, supports, and housing.

From March 2020 to present, the Defendants have primarily utilized a new approach titled the Comprehensive Class Member Transition Program (CCMTP). This involves eleven Prime agencies responsible for outreach, assessment service planning and transitions. Starting in FY20 the State implemented a new program with six Managed Care Organizations (MCOs), the Community Transition Initiative (CTI) to increase the number of providers accomplishing transitions and the number of Class Members who transition. This initiative has proven to be successful for *Colbert* Class Members in FY24 as the CTI program exceeded its target for transitions.

In addition to reaching the numeric transition requirements, the Defendants are required to:
- Develop a transition schedule and appropriately add Class Members who express an interest to transition. (Requirements 24 and 25).
- Offer all Class Members timely transition/community placement (Requirement 26).
- Utilize permanent supportive housing (PSH) for all Class Members, except for those who meet the exceptions outlined in the Decree (Requirement 28).
- Utilize buildings where fewer than 25 percent of all tenants have a mental illness (Requirement 29).
- Hold housing units available by paying rent for Class Members who are temporarily hospitalized (Requirement 30).
- Ensure Class Members receive added support and are not left without options when nursing facilities (NFs) close or if they are discharged during the transition process (Requirement 31), and
- Take measures to prevent, protect, and provide recourse in instances of retaliation by NF staff as Class Members consider or elect NF alternatives (Requirement 32).

Transition Data Highlights. This section summarizes the Defendants' FY24 transition data, provided in their semi-annual reports.
- 545 Class Members were transitioned in FY24 representing 99% of their requirement of 550 transitions, which represents the third year of significant improvement compared to prior years. Primes transitioned 374 Class Members under the CCMTP compared to 426 CMs in FY23. The target goal for the Prime agencies was 450 transitions and was not met by these providers. The CCMTP met 83% of its target goal. The Prime agencies have not met their transition goals for at least the past three

years. The Medicaid Managed Care Organizations (MCOs) transitioned 171 Class Members under the CTI compared to 123 in FY23. The CTI programs exceeded their target of 100 CMs to transition and ensured the State was able to meet 99% of its transition target of 550 Class Members.

- Of the 374 Class Members transitioned by Primes, 67 (18%) were transitioned within 120 days of their initial service plans, compared to 25% of the CMs who moved in FY23 and 30% in FY22 who were transitioned within 120 days. The State does not offer any explanation of the poorer performance of the Prime agencies. The State does not report the timeliness of the transitions which are completed by the CTI agencies.

- Class Members continued to experience protracted delays once approved for transition. There were 1,428 Class Members in the Pipeline as of 6/30/24, of whom 556 (39%) were delayed more than 120 days. This is an increase of 26% in the total number of Class Members in the Pipeline and an increase in the number (but not percentage) of Class Members unnecessarily delayed in FY23 which was 1,130 CMs in the Transition Pipeline of whom 473 (42%) were delayed for more than 120 days. Almost 600 (42%) were awaiting a Service Plan, 227 (16%) were seeking housing and another 606 (42%) were on transition delay. This category includes behavioral, functional, cognitive, and medical status, as well as income and legal concerns.

- The State reports on the time periods Class Members are delayed in the Pipeline in increments of 30 days, with the last category being over 120 days. However, the State recently disclosed that these time periods do not reflect the total length of time a Class Member is in the Pipeline, but rather the length of time the Class Member has experienced the most recent reason for his or her delay, i.e., housing search, physical health concern, income. The State is not reporting to the Court Monitor or Plaintiffs the entire length of time Class Members have been in the Pipeline. It is apparent that the State's methodology for reporting Pipeline data significantly underrepresents the length of time Class Members are waiting to transition. The State does not report the length of time from admission to transition, which would correctly reflect the length of time a Class Member is waiting to transition. The Compliance Indicators which will be used for FY25 reporting require more accurate data reporting.

- 339 Class Members were identified with low- or no incomes. 42 were referred to Supplemental Security Income and Social Security Disability Insurance Outreach, Access, and Recovery (SOAR) and of these 23 had approved applications. Another 12 reconsiderations were filed, with 4 approved.

- Most transitioned Class Members, 265 (71%) of the 374 transitioned by CCMTP were moved to permanent supportive housing (PSH). Among the 109 CMs who moved to non-PSH settings, 22 (20%) met exclusionary criteria and 82 (75%) elected to move to a non-PSH setting. This is an increase in the percentage of those CMs who select a non-PSH as their preference compared to FY23 when 59% of the CMs made this selection. Among the CMs who transitioned to PSH, 263 received Bridge subsidies and 9 received Statewide Referral Network or Section 811 units. The buildings and units occupied by CMs complied with relevant disability segregation rules.

- In FY23, twenty-eight Class Members had eighty rent payments covered by the State

while they were temporarily placed in a hospital or other treatment facility. The State provided this funding to all of the Class Members who requested it.

 Transition-Related Requirements and Compliance Ratings. *Table 10* lists the specific requirements in this domain and the ratings. Across the nine Consent Decree and FY24 IP requirements, **five are in compliance and four are out of compliance.**

**Table 10: Consent Decree Transition Requirements and Ratings**

| Req # | Source/ Citation | *Colbert* Consent Decree and Implementation Plan Requirements | FY23 Compliance Rating | FY24 Compliance Rating |
|---|---|---|---|---|
| 24c | Consent Decree Section VI(C)(6) | By April 22,2018, Defendants shall create a Transition Activity Schedule, including Class Members on the April 15, 2018, Master Class Member List, which includes Class Members who do not oppose moving to a Community-Based Setting.<br><br>***Out of Compliance.*** The transition activity schedule is no longer used. Instead, Defendants track all Class Members recommended to transition, placing them in categories based on where they are in the pre-transition pipeline. Currently, the State's method of a transition schedule is the pre-transition pipeline. However, it was discovered in FY23 that several thousand CMs have been outreached or may not have their outreach recorded so this list is not complete as it does not include everyone who does not oppose transition. The State was unable to address the outstanding outreach in FY24.The Pipeline only includes 1,428 Colbert CMs of a SNF census of over 20,000. | **Out of Compliance** | **Out of Compliance** |
| 25b | 2018 Updated Cost Neutral Plan Section C | At least every six months following the creation of the Schedule, the Defendants, through the outreach efforts described in Paragraph B and the Implementation Plan set forth in Paragraph H, shall identify and add to the schedule at least 1,000 Class Members who do not oppose moving to a community-based setting.<br><br>***Out of Compliance:*** The State did not add 1,000 Class Members to the transition schedule and is woefully behind outreaching Colbert Class Members. | **Out of Compliance** | **Out of Compliance** |

| 26c | Consent Decree Section VI(C)(6) | Defendants shall ensure that Class Members listed on the Schedule will move to appropriate Community-Based Settings according to the timeframes detailed in Paragraph R herein. Placements will be prioritized based on the urgency of need for CBS or placement in a community-based setting, the length of time that the Class Member has resided in the SNF, geographic considerations, and other appropriate factors., with selection prioritized by the Class Member's urgency of need for Community-Based Services or placement in a Community-Based Settings, the length of time that has passed since the Class Member was placed on the Community Transition Schedule, geographical considerations and other appropriate factors.<br><br>***Out of Compliance.*** Of the 374 Class Members transitioned by Primes, 67 (18%) were transitioned within 120 days of their initial service plans. This is a decrease in the number and percentage achieved in FY24 compared to in FY 23 when 25% of 426 CMs were transitioned within 120 days of the Service Plan completion. In FY22 30% of CMs were transitioned on time. The State continues to perform poorly in the area of timely transitions even though the State is meeting 99% of its expected number of transitions which was 550 in FY24.<br> The State does not report the timeliness of the transitions of CMs conducted by the CTI program. In FY24 the CTI program transitioned 171 (31%) of the transitions. This is a significant percentage for which the State provides no data regarding timeliness.<br>CMs continued to experience protracted delays once approved for transition. As of 6/30/24, 556 CMs had been in the transition pipeline more than 120 days. | **Out of Compliance** | **Out of Compliance** |

| 28 | Consent Decree Section VI(D)(3) | For Class Members with Mental Illness, PSH or Private Residence chosen by the Class Member shall be considered most integrated Community-Based Setting appropriate for Class Members except that for any Class Members with Mental Illness (i) who have been determined by a physician not affiliated with a Nursing Facility to have a condition such as severe Dementia or other severe cognitive impairments requiring such a high level of staffing to assist with activities of daily living or self- care management and that they cannot effectively be served in PSH or Private Residence, (ii) who have medical needs requiring such a high level of skilled nursing care that they cannot effectively be served in PSH or a Private Residence, or (iii) who present an imminent danger to themselves or others, the Qualified Professional will determine, through the Evaluation process, the most integrated setting appropriate. *In Compliance.* 265 (71%) of the 374 Class Members transitioned by Primes were moved to permanent supportive housing (PSH). Among the 109 CMs moved to non-PSH settings, 22 (20%) met exclusionary criteria and 82 (75%) elected to move to a non-PSH setting. No reason was given for the other five CMs who moved to a non-PSH setting. | **In Compliance** | **In Compliance** |
| 29 | Consent Decree Section VI(B)(2) | If there has been a determination that a Class Member will be transitioning to PSH, PSH options must include one or more appropriate buildings in which fewer than 25 percent of the building's units are occupied by persons known by the Defendants to have disabilities. *In Compliance.* The buildings and units complied by Class Members meet relevant disability segregation rules. | **In Compliance** | **In Compliance** |
| 30 | Consent Decree Section VI(D)(1) | And shall take appropriate measures to keep their housing available in the event they are placed in a hospital, Nursing Facility, or other treatment facility up to 60 days. *In Compliance.* The Defendants complied with the requirement to provide short-term rental assistance to Class Members who are at risk of losing their housing due to long-term care placement, incarceration, income issues, health concerns, or other reason. Twenty-eight CMs had rent payments covered by the State while they were temporarily placed in a hospital or other treatment facility. | **In Compliance** | **In Compliance** |

34

| 31 | Consent Decree Section VIII(E) | In the event that any Nursing Facility seeks to discharge any Class Member before a Community-Based Settings is available, including but not limited to, circumstances in which a Nursing Facility owner decides to close the Nursing Facility, Defendants shall take appropriate and necessary actions to ensure that such Class Members are not left without appropriate housing options based on their preferences, strengths, and needs.<br><br>**Out of Compliance**. The State reported that 332 Class Members were involuntarily discharged, compared to 247 in FY23. The State indicates any CM who is involuntarily discharged is provided notices regarding community-based services and housing. The State was unable to provide data relative to this requirement as to whether any of these CMs were provided necessary housing based on their preferences, strengths and needs. | **Out of Compliance** | **Out of Compliance** |
| --- | --- | --- | --- | --- |
| 32<br>O5 | Consent Decree Section VI(D)(2) | Defendants shall take all necessary and reasonable measures to protect Class Members from being pressured not to consider appropriate alternatives to Nursing Facilities or from being subjected to retaliation in any form by Nursing Facilities for seeking alternatives to Nursing Facilities.<br><br>*Strategy*: IDPH will track, investigate, and report data on CM retaliation by SNF or staff and enforce and track/report on recourse imposed by IDPH on facilities.<br><br>*Expected Outcome*:<br>• 100% of reports on or behalf of CMs alleging facility retaliation will have their claims investigated, provided these claims are reported to IDPH directly. All such investigations and outcomes will be reported in semi-annual compliance reports.<br><br>**In Compliance.** The State reports that six allegations of retaliation were reported, and all were investigated. one of the allegations were substantiated. | **In Compliance** | **In Compliance** |

| T1 | FY24 IP | Strategy: Transition required number of Class Members<br><br>Expected Outcome:<br>• 550 Class Members will transition by 6/30/24.<br><br>*In Compliance.* 545 CMs (99%) transitioned during FY24 | **In Compliance** | **In Compliance** |
|---|---|---|---|---|

**Related Reports**

The Court Monitor and her consultant issued a report: *Transition Pipeline Case Study* on September 21, 2023, which reported the findings and recommendations of a study that was undertaken in May 2023. The case study included a small sample of thirty-three Class Members who had been in the Transition Pipeline's Planning Phase for more than 120 days. The purpose of the study was to determine what causes significant delays for these Class Members. The Court Monitor's Office made several recommendations for improvement and subsequently submitted to the state four recommendations that were priorities to address in FY24 and FY25 to improve the infrastructure of the program serving Class Members and increase the timeliness of transitions. These include:

• Adequate staffing resources for transition activities: outreach, assessment, and service planning.
  **FY 24 Status:** The State has not conducted any analysis of the staffing resources needed for the transition activities listed in my recommendations. It has determined it will centralize outreach and assessment with a vendor. I believe these activities will be properly resourced in FY25. The State has also not ensured adequate staffing resources for service planning in FY24. The State has committed to continue the funding for the existing staffing Primes have devoted to outreach and assessment with the transition to a centralized system for these two transition functions. The State's goal is for the Primes to devote these staff positions to service planning and related transition activities to transition more Class Members and in a timelier fashion.

• The development of a comprehensive plan to increase service and housing capacity to meet the needs of Class Members who wish to transition so these transitions are not unduly delayed.
  **FY24 Status:** The State did not develop a comprehensive plan to increase service and housing capacity in FY24. The State did determine that it needed a comprehensive analysis of service and housing gaps to be performed by an external consulting group and contracted with IHDD of UIC to undertake this analysis in FY25. The State will develop its plan in response to this gap analysis and the recommendations.

- Effective and regular communication with Class Members who want to transition so they are aware of when transition activities will occur and what the projected timeframe is to transition.
  **FY 24 Status:** The State has not responded as to whether communication with Class Members to better inform them of when they can expect to transition. This requirement is included in the Compliance Indicators. The State will begin reporting on this activity in FY25.

- A review of all recommendations for Class Members to live in other than a PSH setting and a plan to develop sufficient housing resources for those Class Members who do need greater supervision or structure either temporarily or permanently.
  **FY24 Status:** One hundred nine (109) of the 445 Colbert Class Members who transitioned, moved to non-PSH settings. The majority of them (80%) who moved to these settings chose them, rather than moved to them because of a clinical or medical recommendation. The State has not undertaken an assessment of the need for these residential settings. It will be included in the gap analysis being performed in FY25.

The State issued its FY24 No Income/SOAR/Employment Year End Report and FY25 Objectives in November 2024. This report was not issued during FY24 but is included here since it addresses work accomplished in FY24. IDHS presided over a short term No Income Workgroup which commenced in January 2024. The group made policy recommendations and highlighted best practices. Additionally, DMH updated and implemented a new monthly No Income/SOAR/ Employment dashboard to improve data collection. The number of pre- and post- transition Class Members with no income increased from 182 to 339 Colbert CMs between June 2023 and June 2024. Sixty-one Colbert CMs without income received Bridge Subsidies. The report further states that 71% of Colbert CMs with no income accept and were referred to SOAR Services. The Work Group recommended objective for both SOAR and No Income Class Members for FY25. Employment data is also included in the new monthly dashboard. The Work Group reviewed employment data, designed data collection improvement strategies, updated best practices, and reviewed strategies to increase access and enrollment to employment services by CMs. The Work Group recommended objectives for Employment Services for FY25. The Work Group did not suggest measurable objectives or develop any related metrics.

**Summary**
The State substantially met its transition requirement for FY24 moving 545 of the 550 Class Members required to transition this year. Its Prime agencies underperformed but the CTI program transitioned 171 Class Members, ensuring the State met its transition requirement. The State did not include the CTI program in the JACSW timeliness study completed two years ago, nor does the State formally report on the length of time CTI programs take to accomplish transitions. The Prime's performance related to timely

transitions does not demonstrate significant improvement.  It appears the CTI program has transitioned Class Members more quickly from the performance outcomes and the data reviewed in the Court Monitor's Transition Pipeline Case Study referenced above, but the timeliness of these transitions is not reported. It will be important for the State to determine what the differences are, if any, and how to capitalize on activities and strategies that will lead to timely transitions in the future.

While the State met 99% of its transition goal for Colbert Class Members, over 1,400 CMs remained in the transition pipeline as of June 30, 2024, of whom 556 were waiting more than 120 days. Planning for only 550 annually is not acceptable as that number does not come close to transitioning the number of CMs who proceed to transition within 180 days of their SPs being completed as is required by the Decree. It is unacceptable for Class Members to wait so long to transition or not be outreached soon after admission and provided information about community services to make a reasonable decision about transition. The State's decision to centralize the functions of outreach and assessment is one I support. I believe it will lead to much improved performance for these activities.  However, for this to be meaningful for Class Members, the State must also ensure appropriate resources for service planning and the related transition activities, and sufficient service and housing capacity so that Class Members transition in a timelier fashion.

My recommendations to improve transition performance:
- Report the accurate number of Class Members who are waiting more than 120 days to transition after completing their SPs.
- Use assessment and SP data of the service and housing needs of the Class Members who wish to transition to enhance the data gathered as part of the service and housing gap analysis
- Conduct the planned analysis of the service and housing needs of the Class Members who wish to transition with a projection for future admissions (*an FY25 commitment)*
- Develop and implement a written plan to increase and expand housing and service capacity. Include in the plan housing and residential support for CMs who cannot or do not want to move initially to PSH, so they do not experience further delays. These settings providing greater supervision and staff support may be transitional while the CM gains confidence and learns greater skills to live independently (*an FY25 commitment).*
- Develop the plan for reasonable pace creating a multi-year plan to transition Class Members timely (*an FY25 commitment*).
- Determine and fund the staffing resources needed to perform the service planning functions associated with transition in a timely manner
- Implement the recommendations of the No Income/SOAR/Employment Work Group and set measurable objectives for FY25 and report on the status of these objectives

38

**Section VI. Community-Based Services and Housing Capacity Development**
The *Colbert* Consent Decree issued a clear imperative that the Defendants ensure the sufficient array and quantity of community-based services and housing opportunities needed to successfully transition Class Members from Cook County SNFs. From the onset, the Parties, the Court Monitor, and other stakeholders agreed that the current types and quantities of available services and housing in the community are insufficient to adequately support transition for the number of Class Members who want to return to the community, and to ensure transitions are timely.

By using Class Member data, a comprehensive analysis of service and housing gaps and a plan to address these gaps, other states' best practices, and a multimillion-dollar funding allocation for Consent Decree operations, Illinois can leverage the Consent Decree for real and lasting systems change that strengthens its community-based mental health, other disability, and housing systems.

Community-Based Services and Housing Capacity Development-Related Requirements. The Consent Decree requires that Defendants create and provide to Class Members an adequate system of housing and services which are addressed in Requirements 40, 41, 42, and 43.

Community-Based Services and Housing Capacity Development-Related Data Highlights. While not directly responsive to the specific requirements in this domain, several data findings herein suggest that community-based housing and services capacity is inadequate. As indicated in the previous section, only 18% of completed transitions were done so timely (within 120 days of the completed service plan**).** Further, 556 *Colbert* Class Members were stuck in the pipeline more than 120 days, which is a significant increase compared to the 473 Class Members who were in the pipeline for more than 120 days. As more Class Members indicate their interest in transitioning, it is incumbent upon the State to have the transition, service, and housing resources to accommodate the Class Members preferences for community living.

Community-Based Services and Housing Capacity Development-Related Requirements and Compliance Ratings. *Table 11* lists the specific requirements in this domain. There are four Consent Decree requirements relevant to this reporting period. Of those, **two in compliance, one is in partial compliance, and one is out of compliance.**

**Table 11: Consent Decree Service and Housing Capacity Requirements and Ratings**

| Req # | Source/ Citation | *Colbert* Consent Decree and Implementation Plan Requirements | FY23 Compliance Rating | FY24 Compliance Rating |
|---|---|---|---|---|
| 40b | Colbert 2018 Updated Cost Neutral Plan Section G | The Defendants' responsibility to continue development of an increasing Community Capacity necessary and appropriate to comply with the Consent Decree and this Plan shall continue under this Plan and shall incorporate and respond to findings by the Monitor and the consultant pursuant to paragraph I herein.<br><br>*Partial Compliance.* The State was able to meet almost 99% of its transition requirement of 550 transitions, achieving 545. However, there have been no substantive reports of increasing community capacity in FY24, and because of a lack of this capacity, many Class Members remain in the pipeline for far too long. The State has contracted with IHDD and Chartis to complete a gap analysis of service and housing in FY25 and have committed to develop a plan for service and housing expansion by the end of FY25. | **Partial Compliance** | **Partial Compliance** |
| 41 | Consent Decree Section V | Defendants shall develop and implement necessary and sufficient measures, services, supports, and other resources, such as having service providers available for and able to locate affordable housing, to arrange for transition into Community-Based Settings, and to assist Class Members with accessing Community-Based Services, consistent with the choices of Class Members, to ensure that the Defendants will meet their obligations under the Decree and the Implementation Plan. Nothing in this Decree shall reduce, impair, or infringe on any rights or entitlements of any Class Members in any State program or in any Medicaid program.<br><br>*In Compliance.* The Defendants report on the continued funding for bridge subsidies which secures tenant-based vouchers to cover any CM housing needs not otherwise funded. There were 263 new bridge subsidies issued. The State granted waivers to 147 of the 154 Class Members who requested a waiver to pay a rental amount over the Fair Market Rent (FMR). Thirty Class Members secured an SRN unit, and nine Class Members secured an 811 unit. | **In Compliance** | **In Compliance** |

| 42c | Colbert Updated 2018 Cost Neutral Plan Section C | The Defendants shall identify or develop appropriate Community-Based Settings and services so that Class Members placed on the Schedule will be able to move to appropriate Community-Based Settings in the time frames stated in this plan, or at a reasonable pace to be determined as set forth in paragraph F below.<br><br>**Out of Compliance.** The Defendants did not submit an updated capacity development report. Hundreds of Class Members remain in the transition pipeline due to inadequate outreach, assessment, service planning, transition support, and community-based services. Class Members who do transition do not generally transition in the timeframes agreed to by the Parties. | **Partial Compliance** | **Out of Compliance** |
| 43 | Consent Decree Section VI(D)(1) | Defendants shall ensure that Class Members who move to a Community-Based Setting have access to all appropriate Community-Based Services, Transition Costs, Home Accessibility Adaptation Costs and/or Housing Assistance specified in their Service Plan.<br><br>**In Compliance.** While many Class Members who wish to transition to the community remain in the Pipeline in some part due to a lack of sufficient community resources, the CMs who do transition move to the housing they prefer and have the services and supports offered as documented in their transition SPs. | **In Compliance** | **In Compliance** |

**Summary**
The State has committed in its FY25 Implementation Plan and its plan to achieve substantial compliance that it will develop a plan for the reasonable pace of transitions to address the desire for transition among existing Class Members, and projecting for new admissions; and will develop and implement a plan to increase community services and housing so that al Class Members who want to and are appropriate for transition can do so without waiting an inordinate amount of time while remaining institutionalized. Both initiatives are critical to successfully transitioning Class Members in a timely way and eventually meeting the requirements of the Consent Decree. To date, the State has not had the data about all Class Members that it needs to determine reasonable pace of comprehensively project the needs for service expansion and housing development.

My recommendations for improved service capacity performance are:

- Conduct the gap analysis of services and housing in FY25 and develop a multi-year plan to increase community-based services that allows more Class Members to transition each year. *(a FY25 commitment)*
- Link the results of the conflict-free assessments that begin in FY25 to continued

41

planning for service and housing expansion.
• Increase the service provider network to respond to the service and housing capacity plan.
• Determine if the State needs to develop more robust incentives to attract suitable providers who can develop and sustain the necessary qualified workforce.


**Section VII. Administrative Requirements**
It is critical that the Defendants support Consent Decree planning and operations with strong management and administrative processes. As such, the *Colbert* Consent Decree includes several administrative requirements, including obligations for timely reporting on performance relative to Consent Decree and Implementation Plan requirements, responsiveness to the Court Monitor and Plaintiffs' data and information requests, and unfettered access to Class Members and their records, as well as to various staff and stakeholders related to Consent Decree planning, operations, and implementation.

Administrative Requirements. The Defendants' administrative requirements during this compliance period include:

• Delivering semiannual reports containing the information and data agreed to by the Court Monitor and Parties (Requirement 46).
• Providing the Court Monitor unrestricted access to documents, information, and staff involved with the Consent Decree, without counsel present (Requirement 44).
• Ensuring the Court Monitor's unrestricted access to Class Members and their records (Requirement 50).
• Providing data and information requested by Plaintiffs' Counsel (Requirement 47).
• Compensating the Court Monitor and her staff consistent with their customary rates (Requirement 48).
• Addressing the issues of compliance with the Decree among the Parties, Monitor and Judge with a hearing at least annually (Requirement 49b).
• Covering all costs associated with the Decree (Requirement 51).

Administrative-Related Data Highlights.

• The Court Monitor, Consultant, IDHS and HFS had several meetings in FY24 to review the metrics associated with the Compliance Indicators to ensure a shared understanding and interpretation of the requirements for future reporting.
• The Court Monitor, Consultant and HFS had several meetings in FY24 regarding the proposed changes to outreach and assessment, and to discuss the planned systems change to utilize managed care entities to conduct service planning, oversee transition activities, and arrange for needed community-based services and appropriate housing for Class Members.
• The Court Monitor and Consultant continued to attend the JOC meetings

convened with the Prime agency providers to gain a deeper understanding of the system and to note their performance in critical areas.

- The State continued monthly consultative meetings with the Court Monitor to develop strategies for systemic improvement.
- The State contracted with consultants to conduct the service and housing gap analysis and to develop an approach to the redesign of the system for coordinating and implementing services for Class Members.

Administrative-Related Requirements and Compliance Ratings. *Table 12* lists the nine specific requirements and ratings in this domain. **All seven Consent Decree requirements are in compliance, as are the two requirements of the Court Monitor.**

**Table 12: Consent Decree Administrative Requirements and Ratings**

| Req # | Source/ Citation | *Colbert* Consent Decree Requirement Language | FY23 Compliance Rating | FY24 Compliance Rating |
|---|---|---|---|---|
| 44 | Consent Decree Section IX(C) | Defendants will not refuse any request by the Monitor for documents or other information that are reasonably related to the Monitor's review and evaluation of Defendant's compliance with the Decree, and Defendants will, upon reasonable notice, permit confidential interviews of Defendant's staff or consultants, except their attorneys.<br><br>*In Compliance*. The Defendants complied with this requirement. | **In Compliance** | **In Compliance** |
| 46 | Consent Decree Section IX(C) | The Monitor shall review and evaluate the Defendants' compliance with the terms of the Decree. Not less than every six months, starting no later than three months after finalization of the Implementation Plan, Defendants shall provide the Monitor and Plaintiffs with detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and progress toward achieving compliance, with Parties and Monitor agreeing in advance of the first report of the data and information that must be included in such report.<br><br>*In Compliance*. The Defendants produced semi-annual reports that contained the data and information necessary to assess compliance and performance on the Consent Decree and Implementation Plan requirements. The State worked with the Court Monitor to make these reports more understandable with greater analysis provided by the State. | **In Compliance** | **In Compliance** |

| 47 | Consent Decree Section IX(C) | The Defendants shall comply with the Class Counsel's requests for information that are reasonably related to Defendants' compliance with Decree, including without limitation requests for records and other relevant documents pertinent to the implementation of the Decree or to Class Members. Class Counsel also shall be permitted to review the information provided to the Monitor. All information provided to the Monitor and/or Class Counsel pursuant to the Decree shall be provided subject to the Protective Order and any applicable HIPAA requirements.<br><br>*In Compliance.* While the Defendants at times requested extensions to comply with data requests, and in some instances Class Counsel deemed the responses incomplete or deficient, there were no instances in which the Defendants refused to respond to a request from Class Counsel.<br><br>The State responded that it has responded to all data requests to the best of its abilities during the year, and some matters may have been issues it does not track or would require additional research to respond. The Decree does not require that the State provide responses within a specific timeframe, rather just that it provides responses to all reasonable requests for information. | **In Compliance** | **In Compliance** |
| 48 | Consent Decree Section IX(c) | The Monitor may hire staff as necessary to fulfill his or her duties under the Decree. Defendants shall compensate Monitor and his/her staff and consultants at their usual and customary rate; reimburse all reasonable expenses to the Monitor and the Monitor's staff; consistent with guidelines set forth "in "Governor's Travel Control Board Travel Guide for State Employees." After negotiation, comment and a good faith attempt to resolve all differences, Defendants may seek relief from the Court if Defendants believe that any of the Monitor's charges is inappropriate or unreasonable.<br><br>*In Compliance.* The Defendants were in compliance | **In Compliance** | **In Compliance** |

| 49b | Updated Cost Neutral Plan (2018) Section J | All provisions of the Consent Decree and the current Implementation Plan not specifically changed or modified by this Updated Cost Neutral Plan shall remain in full force and effective. The Parties and the Court Monitor shall meet with the Court at least annually to discuss and report on their progress.<br><br>*In Compliance.* There were regular Court status hearings, presided over by Judge Lefkow, that occurred in FY24; each included the Defendants' Counsel, Class Plaintiffs' Counsel, and the Court Monitor. The Court Monitor submitted the Annual Report for FY23 in March. Judge Jenkins was appointed to preside over the Colbert Decree in early FY25. | **In Compliance** | **In Compliance** |
| 50 | Consent Decree Section©(C) | The Monitor will have access to all Class Members and their records and files, as well as to those service providers, facilities, buildings, and premises that serve, or are otherwise pertinent to, Class Members, where such access is reasonably related to the Monitor's review and evaluation of Defendants'' compliance with the Decree.<br><br>*In Compliance.* The Defendants complied with this requirement. | **In Compliance** | **In Compliance** |
| 51 | Consent Decree Section XII(B) | The cost of all notices here under or otherwise ordered by the Court shall be borne by the Defendants.<br><br>*In Compliance.* The Defendants complied with this requirement. | **In Compliance** | **In Compliance** |

45

| CM3 | Consent Decree Section IX(D) | In the event the Monitor finds Defendants not in compliance with the Decree, the Monitor shall promptly meet and confer with the Parties in an effort to agree on steps necessary to achieve compliance. In the event that Class Counsel believe that Defendants are not complying with the terms of the Decree, Class Counsel shall notify the Monitor and Defendants o' Defendants' potential non-compliance. The Monitor then shall review Plaintiff's claims of actual or potential noncompliance and, as the Monitor deems appropriate in his or her professional judgment, meet and confer with Defendants and Plaintiffs in an effort to agree on steps necessary to achieve compliance with the Decree. If the Monitor and Parties agree, such steps shall be memorialized in writing and incorporated into, and become enforceable as part of, the Decree. In the event that the Monitor is unable to reach agreement with Defendants and Plaintiffs, the Monitor or either Party may seek appropriate relief from the Court. In the event that Plaintiffs believe that Defendants are not in compliance with the Decree and that the Monitor has not requested appropriate relief from the Court, Plaintiffs may seek relief from the Court. The Monitor shall not communicate with the Court without advance notice to the Parties.<br><br>***In Compliance.*** The Court Monitor participated in regular calls with the Olmstead Compliance Officer, monthly Parties meetings, and ad hoc calls to mediate and resolve disputes. | **In Compliance** | **In Compliance** |
| CM4 | Consent Decree Section IX(B) | The Monitor's duties include evaluating Defendants' compliance with the Decree, identifying actual and potential areas of noncompliance with the Decree, mediating disputes between the Parties, and bringing issues and recommendations for their resolution to the Court. The Monitor will file a written report at least annually with the Court and the Parties regarding compliance with the Decree. Such reports shall include the information necessary, in the Monitor's professional judgment, for the Court and Class Counsel to evaluate Defendants' compliance with the terms of the Decree. Reports of the Monitor shall be filed with the Court and served on all Parties. The Monitor may redact any portions of the Report necessary to make certain confidential matters and information is not disclosed.<br><br>***In Compliance.*** The Court Monitor FY23 Compliance Assessment Annual Report to the Court was filed March 13, 2024. The report was reviewed by and discussed with Parties prior to submission. | **In Compliance** | **In Compliance** |

**Section VIII. Implementation Planning**
The Defendants are required to develop an annual Implementation Plan in consultation with the Court Monitor and Class Plaintiff's Counsel, an integral deliverable that identifies a work plan to guide actions for the coming fiscal year and includes desired performance indicators and outcome measures, key tasks and action steps, stakeholder/responsible parties, and timeframes/due dates.

The *Colbert* Consent Decree contains a requirement that Defendants "shall create and implement an Implementation Plan" that outlines how they intend to operationalize concrete strategies to satisfy their Consent Decree obligations. The Implementation Plan is filed with the Court and the commitments contained therein become enforceable under the Decree. As such, on an annual basis, the Court Monitor conducts and reports on her compliance assessment and rating of each Implementation Plan item as well as Consent Decree and Updated Cost Neutral Plan requirements relevant during the assessment period.

 Implementation Plan-Related Requirements. The *Colbert* Consent Decree contains several requirements that dictate the requisite components of the Implementation Plan, obligate its development and timely filing, and sanction its enforceability under the Decree. The requirements cover different phases, ranging from Implementation Plan development to its filing with the Court; these efforts start during one fiscal year and conclude in the following fiscal year. The Court Monitor has assessed the following requirements for FY24:
- The Implementation Plan's delineation of specific tasks, timetables, goals, and plans to assure the Defendants' fulfillment of the Consent Decree (Requirement 64), as well as methods overall to ensure compliance with the Decree (Requirement 69).
- The FY24 Implementation Plan's inclusion of hiring, training, and supervision sufficient to fulfill the Decree's obligations and operate the Consent Decree overall (Requirement 65).
- The FY24 Implementation Plan's description of activities required to develop community-based services and housing in sufficient measure (Requirement 66).
- The FY24 Implementation Plan's description of a data-driven process that utilizes Class Member service plan data to inform the development of community-based services and housing (Requirement 67). *This year's Implementation Plan included a specific data requirement: The State will work with UIC College of Nursing, in coordination with others who have expertise as needed, to improve the reliability and validity of its data in all areas that have been identified by the Court Monitor as necessary to monitor substantial compliance. The State will identify the weaknesses in the reliability and validity of the data and produce a written plan addressing how the necessary corrections will be made to assure data reliability and validity. The State will complete the implementation of its data improvement plan by June 30, 2024 and report on its efforts.*

- The FY24 Implementation Plan's inclusion of methods for conducting outreach and engaging Class Members in nursing facilities (NFs) (Requirement 70), as well as making Class Members aware of their rights (Requirement 71).
- Key changes to regulations governing NFs that can facilitate stronger Consent Decree compliance (Requirement 68); and
- Whether the FY24 Implementation Plan was developed (Requirement 63), disagreements were resolved (Requirement 72), and the plan was filed with the Court (Requirement 73) during the FY23 compliance period.

Implementation Plan-Related Data Highlights. There are no data highlights for this domain.

Implementation Plan-Related Requirements and Compliance Ratings. *Table 13* lists the specific requirements in this domain. Across the ten Consent Decree and IP requirements, **nine are in compliance and one is in partial compliance.**

**Table 13: Consent Decree Implementation Plan Requirements and Ratings**

| Req # | Source/ Citation | Consent Decree Requirement Language | FY23 Compliance Rating | FY24 Compliance Rating |
|---|---|---|---|---|
| 63 72 73 | Consent Decree Section VIII(A) | Defendants, with input of Monitor and Plaintiffs, shall create and implement an Implementation Plan to accomplish the obligations and objectives set forth in the Decree.<br><br>*In Compliance.* This requirement pertains to whether the Defendants developed the FY24 Implementation Plan (due at the end of the FY23 compliance period) to identify commitments for FY24. The FY24 IP was submitted July 25, 2024. | **Partial Compliance** | **In Compliance** |
| 64 | Consent Decree Section VIII(A)(1) | Establish specific tasks, timetables, goals, programs, plans, strategies, and protocols to assure the Defendants fulfill the requirements of the Decree.<br><br>*In Compliance.* The FY24 Implementation Plan focused on activities that the parties and Monitor deemed necessary to ensure the development of the plan for reasonable pace and the overall plan for substantial compliance, and the required number of transitions for Class Members. | **In Compliance** | **In Compliance** |
| 65 | Consent Decree Section VIII(A)(2) | Describe hiring, training, and supervision of the personnel necessary to implement the Decree.<br><br>*In Compliance.* The Parties and Monitor agreed to not include any description of the personnel related activities necessary to implement the Decree in the IP for FY24, but the State maintained its commitment to employ the staff necessary to address the requirements of the Decree. | **In Compliance** | **In Compliance** |
| 66 | Consent Decree Section VIII(A)(3) | Describe the activities required to develop Community-Based Services, Transition Costs, Home Accessibility Adaptation Costs and/or Housing Assistance and Community-Based Settings, including inter-agency agreements, requests for proposals, mechanisms for housing assistance, and other actions necessary to implement the Decree.<br><br>*In Compliance.* The FY24 Implementation Plan outlined activities to expand capacity of community-based services and housing. The State continued to report on these activities in its Semiannual and Annual Compliance Reports. | **In Compliance** | **In Compliance** |

| 67 | Consent Decree Section VIII(A)(4) | Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services or supports anticipated or required in Service Plans developed pursuant to the Decree that are not currently available in the appropriate quantity, quality, or geographic location, and might be required to meet the obligations of the Decree.<br><br>*In Compliance.* The State, contracted IHDD of the UIC to conduct a gap analysis of community services and housing to inform housing and services capacity development. The Parties and Monitor agreed this was the next step to provide the State with the information it needed to develop a robust and meaningful plan to increase service and housing capacity. | **In Compliance** | **In Compliance** |
| 68 | Consent Decree Section VIII(A)(5) | Identify any necessary changes to regulations that govern Nursing Facilities in order to strengthen and clarify requirements for services to Nursing Facility residents and to provide for effective oversight and enforcement of all regulations and laws.<br><br>*In Compliance.* The Defendants continued to implement recent administrative rules under the Skilled Nursing & Intermediate Facilities Code (77 Ill. Admin. Code 300) to require facilities to submit an accurate monthly census of all Medicaid-eligible residents; and provide timely voluntary and involuntary discharge reports. | **In Compliance** | **In Compliance** |
| 69 | Consent Decree Section VIII(A)(6) | Describe the methods by which Defendants shall ensure compliance with their obligations of the Decree.<br><br>*In Compliance.* The FY24 Implementation Plan included activities and tasks associated with compliance with assessment of Class Members and implemented activities to conduct reviews of Class Members who might meet exclusionary criteria. | **In Compliance** | **In Compliance** |
| 70 | Consent Decree Section VII | The Implementation Plan shall describe methods for providing outreach to Class Members.<br><br>*In Compliance.* The FY24 Implementation Plan included reporting activities and tasks associated with compliance in the outreach domain. | **In Compliance** | **In Compliance** |

| 71 | Consent Decree Section VII | The Implementation Plan shall describe the method by which such information will be disseminated, the process by which Class Members may request services, and the manner in which Defendants will maintain records of these requests. The Implementation Plan shall describe methods for providing outreach to Class Members.<br><br>*In Compliance.* The FY24 Implementation Plan included reporting the activities and tasks associated with compliance to this requirement. | **In Compliance** | **In Compliance** |
| FY24 IP | FY24 IP | The State will work with UIC College of Nursing, in coordination with others who have expertise as needed, to improve the reliability and validity of its data in all areas that have been identified by the Court Monitor as necessary to monitor substantial compliance. The State will identify the weaknesses in the reliability and validity of the data and produce a written plan addressing how the necessary corrections will be made to assure data reliability and validity. The State will complete the implementation of its data improvement plan by June 30, 2024 and report on its efforts.<br><br>*Partial Compliance.* This activity was initiated in the third quarter of FY24. UIC and staff from IDHS met with the Court Monitor and Consultant to agree upon the metrics that would be used to determine compliance with the Compliance Indicators starting in FY25. The group began the review of the data dictionary and processes associated with current data collection. Completion of discussions concerning the data dictionary and processes were not completed. Therefore, the reliability and validity of the data for current reporting processes was not completed in FY24. The State submitted a Data Improvement Plan in July 2024. The Monitor and Consultant asked a series of questions that remain to be addressed.<br><br>This work is impacted by the development of the Compliance Indicators, and the State's plans for system redesign beginning with the transfer of responsibilities of outreach and assessment to Maximus. UIC College of Nursing will no longer be the repository of these data. The Monitor and Consultant will be working with HFS and Maximus in FY25 regarding the reliability | **N/A** | **Partial Compliance** |

| | | and validity of these data and will continue to work with IDHS regarding the reliability and validity of data for other Compliance Indicators. | | |
|---|---|---|---|---|

**Recommendations**

The IP for FY25 will need to reflect the Parties and Court Monitor agreement to utilize the Compliance Indicators (CIs) as the future measures for determining substantial compliance. These were shared with the Court and approved by Judge Lefkow at the January 2024 Status Hearing. The CIs will not change over the course of oversight of the Consent Decree. The metrics for determining the State is in Substantial Compliance have been set as has the review methodology. Some Metrics have been revised to reflect the actual collection and analysis of data performed by the State. The Court Monitor has documented all of these changes and shared them with the Parties. An updated version will be shared with the Court after the first year of reporting to ensure all changes in wording are captured appropriately. Future IPs will reflect specific activities the State commits to each year to further the success achieving the CIs.

Currently the State only reports transition numbers for the CTI program. To date, the State has not included any data from the CTI programs related to assessment, service planning, critical incidents, or quality of life for Class Members who have transitioned. The Court Monitor expects data on all requirements to be reported for all programs serving Class Members in future SACRs. This recommendation was also made in my FY23 Annual Report and so far the State has not provided the data for the CTI program but has agreed to begin with FY25 data.

**Section IX. Quality Assurance: Class Member Quality of Life, Safety, and Mortality**

*Colbert* Class Members are Medicaid-eligible individuals with disabilities, often with co-occurring substance use disorders, medical co-morbidities, and histories of poverty. Ensuring that they are provided with quality services and supports in safe environments, whether in community-based settings or in nursing facilities, is a fundamental responsibility of the Defendants. Use of quality assurance mechanisms and tools buttressed by a commitment to examine process and outcome data to inform decision-making and program implementation is key to successfully meeting this responsibility.

Several data sources in the Defendants' reports enable one to examine Class Member quality of life and safety. These include pre- and post-transition quality of life survey data completed by Class Members and analyzed by the University of Illinois in Chicago, College of Nursing (UIC CON); Skilled Nursing Home Reportable Performance Indicators data from the Illinois Department of Public Health (IDPH); post-transition critical incident data provided by DMH; and annual mortality data collected and analyzed by UIC CON.

*Critical Incident Data.* On a monthly basis, IDPH collects the number of specific types of critical incidents reported by NFs, including resident deaths that occur in NFs; incidents of abuse, neglect, or maltreatment; and other critical incident types. The following summarizes reportable Incidents during FY24 that were substantiated and rose to the level of a complaint investigation. A similar set of critical incident categories are collected by the DMH for the first eighteen months following a Class Member's transition to the community.

Comparing NF and post-transition critical incident data would ideally allow sound assessment of Class Members' outcomes and experiences in NFs versus in the community. However, several factors render it difficult to conduct a meaningful comparison between NF and post-transition (community-based) critical incident data, including:

- Post-transition critical incident data is only collected for eighteen months after transition date, leaving critical incidents that occur for Class Members transitioned longer than this period unreported and thus unknown.
- There appears to be a higher standard of substantiation for NF critical incidents versus community-based critical incidents for abuse/neglect/mistreatment and assault. The Defendants report that, while there are hundreds of complaints submitted within NFs each year, they have limited their reporting and analysis to those complaints that "rose to the level of complaint investigation."
- The critical incident categories across both cohorts have not been independently verified to ensure that definitions and reporting procedures align between NF and community categories.
- Some incidents, such as assaults, may be counted within multiple categories (e.g., sexual assault, abuse, assault, and criminal conduct), potentially giving a misleading picture regarding the true extent of critical incidents.
- The denominators for the subgroups are different. At the beginning of FY24, the census in NFs was approximately 20,000, while the number of people in the community (within 18 months of transition) was less than 1,000.

There are notably more reported instances of abuse/neglect/mistreatment and assault abuse/neglect/maltreatment in NFs versus community. Abuse/neglect/mistreatment incidents in the NFs increased slightly from 189 in FY23 to 266 in FY24. The reported assaults decreased dramatically from 133 in FY23 to 41 in FY24 in NFs. However, there were more deaths reported among Class Members post-transition (39) as compared to NFs (2). The State explains the reporting of critical incidents in SNFs, including deaths, as follows:

*Reportable Incident information is collected by IDPH for incidents that involve SNF residents. Not all information is available: for example, outcomes for individuals who are hospitalized may not be reported unless the individual returns to the SNF. The following tables represent Reportable Incidents by type during this reporting period that were substantiated and rose to*

*the level of a complaint investigation. There are hundreds of allegations that are reported to the Department, but not all are validated through review/analysis of the incident or rise to the level of a complaint investigation/survey.*

From this description it is not known if the State excludes natural deaths in SNFs when there is no investigation, and it seems the report excludes deaths of SNF residents that occur in a hospital. Therefore, it is of no value to compare the number of deaths in the community versus the SNFs.

In FY24, there were 1,131 reported incidents among 411 Class Members in the community which is comparable to the number reported in FY23. Eighty (80) percent of reported incidents in the community (909) reflected unexpected hospital visits or admissions, including emergency department visits, hospitalizations, and admissions to NFs or SMHRFs. This compares to 66% of reported incidents in the community in FY23 attributed to unexpected hospitalizations.

*Mortality Review Data.* Thirty-nine deaths occurred among Class Members in the community in FY24, compared to thirty-two deaths in FY23. The State reports only the deaths that occurred in the CCMTP but does not report the deaths of Class Members who were transitioned by the CTI program. The State reported age, gender, race, and length of time in the community. The State reports the number and percentages of deaths compared to the number and percentage of transitions each Prime made. In general, the percentages are comparable except for one Prime that transitioned 34% of the Class Members but incurred 44% of the deaths of *Colbert* Class Members. The percentage rate of deaths for active Class Members remained relatively stable at .07 in FY24 compared to .07 and .06 in the two previous fiscal years.

UIC CON conducts mortality reviews. These were performed for Class Members who died with the exception of one for whom there is a pending police investigation. *Colbert* Class Members decedents ranged in age from 29-80 with an average age of 60. The report includes the health conditions of the decedents and their functional status. The mortality review concludes that cardiovascular disease/failure (45%) and substance use (35%) were the most common contributors to the deaths of *Colbert* Class Members.

The State did report on the outcome of the review of care management performed by UIC CON for the *Colbert* decedents. The domains analyzed by the UIC CON reviewers includes medical, mental health and substance use care management. The quality of care management across all three domains was most often minimally managed or not managed. Primes manage mental health care the best of the three domains but still only did moderately well for 21% and less than 10% above average of all the decedents. The UIC CON mortality reviews include an identification of service delivery and care management gaps and recommendations for improvement. The prime areas for improvement are summarized as: care management of physical, mental and substance

use needs addressing documentation; development of Class Member skills; and adjustments to care management plans to reflect risks and changing conditions. The inclusion of the analysis of gaps in care management and service delivery in this report was extremely informative. The State should use this data to improve training, supervision, and oversight, and guide policy changes.

*Quality of Life Surveys.* The Defendants administer quality of life (QOL) surveys to Class Members at two points: at the time of transition or within two months of the move to determine the quality of life while residing in a facility; and 12-14 months after transition to the community to reflect their quality of life subsequent to their move.

The Defendants shared a three-part report prepared by UIC CON summarizing QOL survey findings for both *Williams* and *Colbert* Class Members, spanning July 1, 2021 – June 30, 2024. The total number of *Colbert* Class Members completing baseline and year one QOL surveys as part of this analysis in FY24 was 422 (60%) of the 706 Class Members due to be surveyed. This was the highest rate of respondents for the past three years and noted a significant increase of completed surveys compared to FY23. UIC CON presented its finding in reports submitted to the Court Monitor, including results of a simple bivariate statistical analysis which compares the survey responses of *Colbert* Class Members who moved into the community between January 1, 201, and June 30, 2024, and completed both baseline and year one surveys.

The Quality of Life (QOL) survey includes seven domains: Living Situation, Choice and Control of Living Arrangements, Access to Personal Care, Treated with Respect and Dignity by Caregivers, Community integration and Inclusion, Overall Life Satisfaction, and Lowered Mood and Health Status. Overall, Class Members' perception and ratings on several key QOL indicators were substantially higher for those transitioned into the community versus those living in nursing facilities. Class Members reported greater pleasure where they live, more choice and control over basic life choices, greater respect from staff, and greater satisfaction with their lives at year one compared to baseline. Several survey items showed an increase in happiness or satisfaction indicating an improvement in QOL of *Colbert* Class Members post-transition at statistically significant levels. Class Members reported a statistically significant increase from 15% to 88% liking where they live post-transition as compared to baseline. Class Members report having significantly more choice and control over daily decisions in their lives since moving to the community. Class Members report feeling more respected by their caregivers which increased from 71% at baseline to 96% one year after transition. Additionally, Class Members were significantly happier with their lives, which increased from 41% at baseline to 84% after year one.

The UIC CON survey reports do not note any areas of concern for Class Members post-transition. However, it is noted again as it was in previous years that *Colbert* Class Members report pain at both baseline and year one, with *Colbert* Class Members reporting the higher percentage of pain as compared to *Williams* Class Members. As recommended by the UIC-CON evaluators, these findings suggest that it is important for

Defendants to evaluate and respond to *Colbert* Class Members' need for pain management support and expand program level resources to include access to pain management and mental health care.

*Colbert* Class Members credit the staff of Prime agencies as the biggest factor supporting their transitions to the community.


**Section X. Recommendations**

Based on my review and assessment of Defendants' performance with Consent Decree requirements in FY22, I recommended the following priority actions listed in *Table 14* for FY23 and FY24. These recommendations align with current conversations between the Court Monitor and the Parties focused on establishing a plan for "reasonable pace," and operationalizing the prior Court Monitor's recommendations from the timeliness study filed in August 2022.

**Table 14: Status of Priority Recommendations for FY23 and FY24**

| 1) | Continue to implement and improve the PASRR processes and other efforts to divert needless admissions into long-term care | The Court Monitor commends the Defendants with Preadmission Screening and Resident Review (PASRR) redesign, which is being implemented by Maximus. When braided with the existing DON process implemented by the CCUs, these programs have the potential to ensure that Class Members who can successfully be served in the community (and elect to live there) will not experience needless NF admission. The Defendants should create simple performance indicators that capture the number and proportion of NF referrals who were meaningfully offered community-based services and housing. Further, Defendants must ensure these programs are implemented effectively and that quality assurance mechanisms are in place to ensure that the newly designed PASRR system continues to be implemented as it is constructed and that it coordinates effectively with the DON process to the benefit of *Colbert* CMs.<br><br>**FY24 Status:** The State provides quarterly reports on the PASRR screens but does not report actual diversions as this is not a specific requirement of *Colbert.* The census of the SNFs decreased in FY24. |
|---|---|---|
| 2) | Design a new outreach data reporting approach | The current outreach data renders it difficult to assess outreach penetration, appropriate frequency, and quality. The Court Monitor acknowledges that every Class Member contact cannot (and perhaps should not) be captured. A robust outreach program should include unstructured and informal engagements that do not lend themselves to onerous data collection requirements. However, the Court Monitor believes that it is time to design an approach that acknowledges the unquantifiable elements of an effective and organic outreach program while focused on capturing and providing data that reliably reports completed outreach and the time period in which the outreach occurs to relate to compliance expectations. It is essential that the Defendants can report reliably on admissions to the NFs to create the baseline of the number of individuals who should receive Outreach within 60-70 days.<br><br>**FY24 Status:** The state designed a pilot for Engagement and Support by Peers to be implemented in FY24. The evaluation methodology had been developed and shared with the Monitor in December 2023. This pilot was delayed significantly due to hiring and other related challenges. The State identified 9,000 *Colbert* Class Members who had no record of outreach in FY23. The State was unable to address these outstanding outreaches in FY24. Outreach to new Class Members remains unacceptably below the expected performance. The State identified a vendor to implement s centralized outreach |

| | | program that will be implemented in FY25. This vendor is also responsible to complete all outstanding outreaches. I believe this is a significant and positive change in the outreach process that should result in Class Members finally being outreached between 60-70 days of admission to an SNF. |
|---|---|---|
| 3) | Improve the capacity, contacts, and outcomes of the Peer Ambassador Program | People with lived experience with physical and behavioral health-related disabilities are among the best equipped to engage Class Members in the outreach process. While the Defendants are utilizing Peer Ambassadors to engage Class Members who express reluctance to transition, utilization numbers are extremely low. Defendants should ensure that this program has proper staffing and supervision resources and clear performance expectations.<br><br>**FY24 Status:** This recommendation was not addressed in FY23, nor in FY24 although the Pilot was anticipated to address this for Colbert members, but only in the four facilities included in the Pilot. |
| 4) | Address severe delays in all stages of the pre-transition process | When Class Members consent to outreach, assessment, service planning and transition processes, they should be able to move through these phases promptly. However, data provided herein – and in the August 2022 timeliness analysis – demonstrates that only 4% percent of Class Members received prompt initial outreach (within 60-70 days of admission), 41% received prompt initial assessments (within 14 days of positive outreach outcome), 29% received prompt initial service plans (within 45 days of assessment), and 41% were transitioned within 120 days of the initial service plan. While the organizing principle for the Comprehensive Program was to reduce handoffs among providers and improve process efficiency, it has now become standard that Class Members wait for months (and even years) to move through the rudimentary process steps, which likely erodes their confidence and trust in the program. The Defendants must develop a plan for reasonable pace for CMs to transition; determine how to best address the needs of individuals who have been in the pipeline; and propose for future years how resources will be used to balance the need to transition newly admitted CMs timely while addressing those who have waited months or years to transition.<br><br>**FY24 Status:** As noted in the related sections of this report there have not been significant improvements in performance in the key areas of pre-transition. The State is undertaking changes to the pipeline and improving the monitoring of the Primes. The State has addressed the needs of many Class Members in the pipeline who were waiting for their SP to be developed. The State has also revised the CAST process to make it less cumbersome so that Class Members delayed because of cognitive, functional, or significant behavioral or medical needs can be reviewed and assisted to transition when |

| | | possible. The State's decision to centralize both outreach and assessment is promising. The State will continue to fund the CCMTP providers at the same level as in FY24 so the Prime agencies can use all of their resources, once devoted to outreach and assessment t to service planning and related transition activities. The intention is to increase performance for these aspects of transition. |
|---|---|---|
| 5) | Ensure that those who have waited longest to transition receive priority in the transition pipeline | Class Members continue to spend inordinate amounts of time in the Pipeline waiting to return to the community. While it is positive to conduct outreach and assessments to add more Class Members to the transition pipeline, Class Members who were already recommended but wait in the pipeline should be prioritized for transition.<br><br>**FY24 Status**: The Parties and Court Monitor have agreed that each year at least 70% of the CMs transitioned will be individuals who have waited at least 120 days to transition. This is reflected in the Compliance Indicators. The State is more closely monitoring the Prime agencies through monthly meetings to assure targets are met for transition. The State is developing a plan for reasonable pace in FY25 and undertaking a comprehensive analysis of service and housing needs to develop a capacity plan in FY25. |
| 6) | Address critical incidents in NFs s and in the community, including reducing avoidable hospitalizations | Critical incident data within NFs remain a cause for alarm. The Defendants should conduct a more robust analysis of this data to determine trends, root causes, and potential strategies to prevent or address identified issues. This analysis should include a review of NF policies and operational procedures that might contribute to critical incidents and a regulatory framework that can address NFs that do not address issues. Further, the Defendants should develop dedicated interventions and programmatic strategies to prevent avoidable psychiatric and physical health-related hospitalizations, which constitute most community-based critical incidents. Such strategies could include (but are not limited to): enhancements of mobile crisis infrastructure, implementation and increased linkage to/utilization of peer respite and living room models, and enhanced access to ACT services when Class Members are escalating or experiencing crisis.<br><br>**FY24 Status:** The State has not provided any reports in either FY23 or FY24 regarding any progress towards addressing this recommendation. |
| 7) | Increase the role of the State's Medicaid MCOs in transitioning *Colbert* Class Members. | The vast majority of *Colbert* Class Members, whether residing in NFs or the community, are enrollees under a Medicaid MCO. The Court Monitor is encouraged by the increase in transitions accomplished by MCOs in FY23 and FY24. The Court Monitor advises HFS to dedicate concerted attention to the design of requirements, incentives, accountability, and performance measures so that the Medicaid MCO potential to achieve and support transitions consistent with Olmstead is fully realized in |

| | | both *Williams* and *Colbert* Consent Decrees. Relatedly, MCOs must be required to timely review and approve (when warranted) the services needed by Class Members enrolled in their plans for transition and community tenure.<br><br>**FY24 Status:** The CTI program as noted earlier far surpassed its requirements for transition of Colbert CMs in FY24 and allowed the State to meet its overall obligation to transition 550 CMs, transitioning 545 by June 2024. The State has hired a consultant to seek input from all stakeholders to begin a redesign of the service planning and service coordination activities for Class Members. |
|---|---|---|
| 8) | Develop innovative service delivery partnerships to expand transition support and services capacity | In addition to fully optimizing the MCO role in the Consent Decree processes, the State should continue to engage new organizations to perform transition support and community-based services and housing. Such organizations include (but are not limited to): specialty behavioral health organizations, primary/medical care organizations (including health systems that serve complex populations and federally qualified health centers), aging and disability services organizations, housing first organizations, and others. By deepening understanding of the needs of Consent Decree subpopulations (using four-quadrant and other data sources), the State can design dedicated care pathways for specific subpopulations and identify providers who can address their needs, ensuring that Class Members receive accurate care.<br><br>**FY24 Status:** The State has contracted with a vendor to complete a housing and service gap analysis that was initiated in FY24 and will be completed in FY25. The State will use this analysis to develop its comprehensive plan to increase capacity of both housing option and services, so it is able to design and fulfill its plan for the reasonable pace of transitions. The plan for reasonable pace must eventually result in the State's success in transitioning all Class Members who wish to transition within 180 days of completing their service plans. |

**Section XI. Conclusion**

The State was rated on fifty-nine requirements from the Consent Decree and the FY24 Implementation Plan, which include all unique, non-duplicative requirements. The State is in compliance with 33 (56%) of the requirements; in partial compliance with 9 (15%) of the requirements; and out of compliance with 17 (29%) of the requirements. This performance is similar to the State's achievements in FY23. The census as of June 30, 2023, was 20,278, which is a decrease of 3.3% over FY23. The State continued to surplus a percentage of its funding appropriation for *Colbert Class* Members but spent a larger percentage of the appropriation (94%) compared to previous years.

The State's major achievement was the transition of 545 *Colbert* Class Members. The Plaintiffs and Court Monitor advocated for a requirement of 550 transitions for FY24 recognizing the significant number of Class Members who were in the Pipeline in FY23. It is notable that the State and its network of providers helped so many Class Members meet their goal of returning to the community. The Court Monitor is well aware of the coordinated effort and commitment of so many staff that were required to achieve this success.

**The fact the State met its obligation of transitioning 550 *Colbert* Class Members, is not to diminish the significant size of the Pipeline for the more than 1,400 *Colbert* Class Members who have indicated their desire to return to the community, and the over 7,000 Class Members who have no record of being asked if they wish to return to the community. The length of time Class Members remain in SNFs after expressing their desire to transition is unacceptable and does not meet Consent Decree requirements. This must be addressed in the State's plan to increase service and housing capacity and its plan for reasonable pace.**

The State continued not to meet its performance targets for outreach, assessment, and service planning, **all requirements of the Decree which are critical to timely transitions.** Timeliness remains a major hurdle for the State. Only 4% of initial outreaches were completed within 70 days of admission; only 30% of assessments were initiated within fourteen days of outreach; only 55% of SPs were completed on time; and 1,428 Class Members remain in the transition pipeline of whom 556 have waited more than 120 days to transition. The pipeline has increased by 98 (7%) Class Members in this fiscal year

Outreach to existing Class Members was significantly better than it was to those who are newly admitted with 77% of the Class Members needing a follow up outreach receiving it. However, it must be remembered that several thousand Colbert Class Members still have no record of outreach ever being completed for them. It is concerning that only 16% of initial outreaches resulted in Class Members expressing interest in transition and only 36% of existing Class Members wanting to return to the community. This is important for the State to know as it develops its plan for reasonable pace. Class Members can change their minds to transition at any time, and the fact 36%

expressed a new interest to transition at the annual outreach is proof of that and reinforces the importance of regular contact about the option of transitioning. However, it is helpful data to project transition volume and activity. It is more important to use this information to determine how to more effectively outreach Class Members providing understandable and timely information about community resources; involving Class Members more quickly with peers with lived experience; and providing timely opportunities for Class Members to visit actual community programs to make a more informed decision about their futures. Once Class Members make this decision it is incumbent on the State to ensure there is active transition planning, clear communication with Class Members about their status for transition, and timely transitions to the greatest extent possible.

Service and housing capacity development must be a priority for the State if it is to transition Class Members at a reasonable pace. It is critical for there to be sufficient mental health, substance use, and employment supports for Class Members to not only transition but remain in the community and experience a quality of life with needed supports and services.

It is very easy for the Consent Decree implementation process to become focused on the most tangible requirement and measure its success solely based on achieving the required number of transitions. This is an egregious error in an initiative that is focused on achieving systemic change. That is because the majority of the effort is applied to completing transitions which distracts from correcting the significant flaws in the system that led to a class action lawsuit and an eventual Consent Decree. This is evidenced by the scope and magnitude of all the requirements and the lack of timely outreach, assessment, and service planning; housing capacity, community-based services capacity especially to address SMI, SUD; and the need for employment. The development of a comprehensive service delivery system can only be achieved through an effective partnership of private providers and public sector administration. The focus on transition numbers can result in a tunnel vision approach to achieving the numbers to exit without achieving the person-centered quality necessary for achieving the level of true system change at both the level of engagement with Class Members and in the community services needed to sustain them in the community and prevent reinstitutionalization. Prevention of institutionalization must be a key component of the systemic response.

This report is based on the data the State provided in its monthly dashboards, Semiannual compliance reports; ad-hoc reports and presentations at Parties meetings and to the Court Monitor separately. A caveat must be included that the data has been reviewed and analyzed as reported. However, there are numerous indications that the data is not consistently reliable or valid. This has been reported directly by the State on occasion; it is evidenced by the number of Class Members discovered to have never been outreached; and by the findings of the JACSW in its various studies conducted in FY22 and FY23. The State does not have the data to report by Class Member the status of outreach, assessment, and service planning. The review of the State's ability to meet the recently developed Compliance Indicators requires reliable and valid data that the

State can verify as being both, and the Court Monitor's Office can similarly verify through a review of the data collection, analysis and reporting processes that assure consistency, reliability, and validity. Developing these processes related to future reporting on the Compliance Indicators, will be a critical undertaking for the State during FY25.

Conclusions have also been made based on direct input to the Court Monitor and her Consultant from numerous program visits; conversations with Class Members; briefings with providers; attendance at Provider meetings; meetings with state agency staff; and conversations with the Plaintiffs. The Court Monitor greatly appreciates the time, insights, articulation of barriers and proposed solutions that have been provided by the many stakeholders engaged with the *Colbert* Consent Decree. Those involved exhibit a great commitment to the Class Members and an effort to overcome systemic barriers. During the last half of FY23 and first half of FY24 the Parties engaged in numerous meaningful discussions to clarify interpretations of the Decree requirements; to design new strategies to address issues that were diminishing performance, and to agree to Compliance Indicators and a review process that creates the path to an exit plan for the State to finally implement the requirements of the *Colbert* Consent Decree fully, honoring the wishes and life plans of Class Members. In the second half of FY24 the State began its design of related initiatives including the centralization of outreach and assessment; contracting with a vendor to complete a service and housing gap analysis; and contracting with a vendor to research and make recommendations for systemic change regarding service and transition planning.